**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

IRVING TANNING COMPANY,

PRIME TANNING CO., INC., and

PRIME TANNING CORP.

     Debtors.

Chapter 11
Case No. 10-11757

Jointly Administered

**MOTION FOR ORDER: (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION; (C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES FOR CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES;(D) APPROVING A BREAK-UP FEE, EXPENSE REIMBURSEMENTS AND OVERBID PROTECTIONS; AND (E) <u>APPROVING A FORM OF NOTICE OF SALE</u>**

**I.**   <u>**Introduction**</u>

Irving Tanning Company ("<u>Irving</u>"), Prime Tanning Co., Inc. ("<u>Prime Maine</u>") and Prime Tanning Corp. ("<u>Prime Missouri</u>") (collectively, the "<u>Debtors</u>"), the debtors and debtors in possession in these Chapter 11 cases, request that this Court enter an order pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>"), in the form attached hereto: (i) approving the bid procedures by which the Debtors may sell certain assets (ii) scheduling an auction; (iii) approving procedures under which the Debtor may assume and assign certain executory contracts and unexpired leases; (iv) approving the Break-Up Fee, Expense Reimbursement and overbid provisions (as set forth herein); and (v) approving the form of notice of sale which establishes a hearing date, and objection and overbid deadlines with respect to such sale, and assumption and assignment of contracts and leases. The Debtors have also filed their Motion of the Debtors for Authority to Sell Certain Assets of the Debtors to The

Jupiter Fund, LLC Free and Clear of Liens, Claims and Encumbrances and For Approval of the Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Motion"). Pursuant to the Sale Motion, the Debtors have requested that this Court enter an order authorizing the Debtors to consummate a sale of certain assets identified in the definition of "Purchased Assets" (the "Purchased Assets") under the Stalking Horse Agreement (defined herein) to The Fund of Jupiter, LLC or its designee (the "Stalking Horse") or to such other party who has submitted a higher and better offer.

The Debtors state in support of this request the following:

## II.  Background

1.     Irving is a worldwide leader in the manufacture and sale of leather primarily to manufacturers of footwear and consumer goods located in North America, Asia and Europe. Irving maintains its principal place of business in Hartland, Maine and employs approximately 178 people at the plant (the "Hartland Property") it owns and operates there.

2.     On November 16, 2010, (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code.  These cases are being jointly administered by order of this Court dated November 22, 2010.  A committee of unsecured creditors (the "Creditors Committee") has been appointed in these cases, and has retained counsel.

3.     The Debtors described the events leading to their voluntary petitions in some detail in the Affidavit of Paul Larochelle in Support of Various First Day Motions.  In summary, the filings were necessitated by historical liabilities accrued prior to and during the consolidation of certain of the Debtors' operations at the Hartland Property.  The combination of legacy liabilities and costs associated with ongoing environmental litigation made it increasingly

difficult for Irving to obtain further financing for its operations at reasonable costs, if at all. The persistent global credit crunch and the lengthy recession in the United States only added to the Debtors' difficulties by reducing sales volume and margins at a critical time. The Debtors filed their chapter 11 cases to preserve the going-concern value of their businesses.

4.      Based upon various circumstances, the Debtors have determined that a sale of the Purchased Assets is likely to maximize the return to the Debtors' creditors.

### III.    Summary of Sale

5.      On December 30, 2010, the Debtors received from the Stalking Horse a preliminary asset purchase agreement (the "Stalking Horse Agreement") regarding the purchase of substantially all of Irving's assets. On or about January 4, 2011, after extensive negotiations, the Debtors agreed to present the revised Stalking Horse Agreement to this Court to establish the sales procedures associated with any sale as well as approve certain bid protections to the Stalking Horse as the stalking horse bidder. The Stalking Horse Agreement contains the material terms of the Stalking Horse's proposed purchase of the Purchased Assets.

6.      The Stalking Horse Agreement can be summarized as follows:[1]

**Purchased Assets:** Substantially all of the assets related to Irving's and Prime Maine's operations in Hartland as defined more specifically in Section 2.1 of the Stalking Horse Agreement.

**Purchase Price:** The purchase price for the purchased assets is $6,676,249.25, or the aggregate of the Assumed Loans (as identified in Schedule 2.1(a)(iii) to the Stalking Horse Agreement) plus $2,000,000.00. The Stalking Horse shall pay the Purchase Price in the following order: (a) by assuming the Assumed Loans and (b) by crediting an amount of secured indebtedness of any Seller that is held by Purchaser as of the Closing Date, Purchaser shall be deemed to pay an amount equal to such secured indebtedness.

---

[1] The description set forth herein is a summary of the terms and conditions of the Stalking Horse Agreement. For a complete description of the terms of the Stalking Horse Agreement, the Debtors refer all parties to Exhibit A to the Sale Motion.

**Closing Costs:**  Sellers shall prepare and pay for the bills of sale, assignments and deeds (and any recording and transfer costs applicable thereto).  The Stalking Horse or its designee shall pay for title insurance premiums and other instruments for the transfer of Real Estate.  Other costs associated with the Closing and transactions contemplated under the Stalking Horse Agreement shall be allocated as provided elsewhere in the Stalking Horse Agreement.

**Cure Costs:**  Sellers bear the sole responsibility for all costs if curing defaults under the leases listed on Section 2.1(a)(i) to the Stalking Horse Agreement, the Assumed Contracts and the Assumed Loans pursuant to Section 365 of the Bankruptcy Code.

**Break-Up Fee and Overbid Protections:**  The Stalking Horse Agreement requires that the Bankruptcy Court shall have entered an order, in a form reasonably satisfactory to the Stalking Horse approving bid protections (the "Bidding Protections"), including, without limitation, a break-up fee of $100,000 (the "Break-Up Fee") plus expenses up to a maximum of $100,000 (the "Expenses").  The Break-Up fee shall be payable from (and at the time of) a closing of a competing transaction or transactions from a successful competing bid offered and accepted at the Auction and if Purchaser terminates the Stalking Horse Agreement pursuant to Section 12.1(a)(v), (vi) or (vii).  The Expenses shall be paid upon the earlier to occur of (i) a closing of a competing bid offered and accepted at the Auction or (ii) the date of the first distribution to creditors of Sellers (other than payment of administrative expenses), in payment of the creditors' pre-petition claims.  Sellers may solicit and obtain bids during the Auction for the Purchased Assets; provided, however, that no offer for any of the Purchased Assets shall be accepted by Sellers unless the proposed purchase price equals or exceeds an amount which is $250,000 greater than the Purchase Price (the "Minimum Overbid").

7.      To attract higher and better offers for the sale of its business, the Debtors seek the approval of certain bid procedures to maximize the value of the Purchased Assets.  Pursuant to this Motion, the Debtors seek Court approval of the bid procedures with respect to the Auction (as defined herein) for the sale of the Purchased Assets and the assignment of certain contracts (the "Assigned Contracts"),[2] including approval of the Break-Up Fee and Expense Reimbursement (each defined below and payable to the Stalking Horse upon the occurrence of certain events), overbid protections, and the form of notice of sale to be disseminated to the various parties.  As noted, the Debtors have separately filed the Sale Motion which seeks approval of the sale of the Purchased Assets to the Stalking Horse, as well as the assumption and

---

[2] The term "Purchased Assets" shall include and collectively refer to the "Assigned Contracts."

assignment of the Assigned Contracts by the Stalking Horse in accordance with the terms of the Stalking Horse Agreement, subject to higher and better bids.

## IV. Break-Up Fee and Overbid Protection

8. The Stalking Horse Agreement provides for the payment of the Break-Up Fee and Expense Reimbursement to the Stalking Horse, as well as overbid protections. Such provisions provide the Stalking Horse with protection and compensation in consideration of its agreement to enter into the Stalking Horse Agreement notwithstanding the uncertainties presented by a sale of this nature. The Stalking Horse requires the approval of the Break-Up Fee and Expense Reimbursement on an advance basis in order to proceed with its offer as set forth in the Stalking Horse Agreement, and thus the Debtors request that the Court approve such provisions.

## A. Request for Approval of the Break-Up Fee Provisions.

9. The Stalking Horse Agreement provides that upon the occurrence of certain events, the Debtors will be obligated to pay the Stalking Horse (i) a "break-up fee" equal to $100,000 (the "Break-Up Fee"), plus (ii) the amount of fees and expenses actually and reasonably incurred by the Stalking Horse in connection with the acquisition of the Purchased Assets, with such amount not to exceed $100,000 (the "Expense Reimbursement").

10. The Stalking Horse has incurred and will incur significant time, expense and costs in negotiating the terms of the Stalking Horse Agreement, as well as in conducting due diligence. The Stalking Horse Agreement will serve as a basis by which other offers, if any, will be measured. In light of these considerations, the Debtors believe that the Break-Up Fee, Expense Reimbursement and the overbid protections are reasonable and should be approved by this Court.

11. Break-up fees serve a number of useful functions: (1) they attract bidders; (2) they help to insure that a bidder does not withdraw its bid; and (3) they help to establish a bid

standard for other bidders. <u>In re Great Northern Paper, Inc.</u>, 299 B.R. 1 (D. Me. 2003). *See also,* <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 661-62 (S.D.N.Y. 1992); <u>In re Hupp Industries</u>, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1991) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's … due diligence"); <u>In re 995 Fifth Ave. Assocs., L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("break up fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bid by providing some form of compensation for the risks it is undertaking").

12.     Courts consider three questions in assessing the appropriateness of break-up fees: (1) whether the relationship between the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the break-up fee is reasonably relative to the proposed purchase price. *See* <u>Integrated Resources</u>, 147 B.R. at 657.

13.     Applying this test to the Break-Up Fee, it should first be noted that the Break-Up Fee is the product of arm's length negotiations between unrelated parties. Second, the Break-Up Fee and accompanying provisions encourage meaningful bidding by: (i) attracting and retaining the Stalking Horse's bid, where no other party was willing to make a firm offer to acquire all or a portion of the Purchased Assets; and (ii) establishing a benchmark against which the Debtors can evaluate overbids. Third, the Debtors believe the Break-Up Fee is fair and reasonable relative to the amount to be paid to the Debtors if the Sale Motion is approved. Based on the Debtors' preliminary analysis of the Stalking Horse's offer, and depending on the amount of the Stalking Horse's reasonable expenses associated with its purchase of the Purchased Assets, the combined Break-Up Fee and Expense Reimbursement is less than one percent of the value of the Stalking

Horse's offer.  Viewed in this light, the Break-Up Fee is extremely reasonable relative to the proposed purchase price.

**B.**     **The Appropriateness of the Overbid Provision.**

14.     The Stalking Horse Agreement contemplates that any competing offer for the Purchased Assets must provide that an initial minimum overbid must be no less than $250,000 more than the Stalking Horse's offer.  Subsequent bidding increments must be no less than $50,000 more than the previous bid.  The initial minimum overbid is inclusive of the maximum Break-Up Fee and Expense Reimbursement of $200,000 payable to the Stalking Horse.  Given the size of this transaction, subsequent bidding increments of $50,000 will not discourage competing bids at an auction.

## V.     Proposed Bid Procedures

**A.**     **Pre-Auction Bidding**

15.     To ensure that the estate receives the highest and best offer for the Purchased Assets, the Debtors will solicit competing bids for the Purchased Assets pursuant to the proposed bid procedures attached hereto as **Exhibit A** (the "Bidding Procedures").  Court Approval of the Bidding Procedures is appropriate.  In re Food Barn Stores, Inc., 107 f. 3d 558, 564-68 (8th Cir. 1997); In re Jon J. Peterson, Inc., 411 B. R. 131, 135 (Bankr. W.D.N.Y. 2009).  Bidding procedures will be approved if they do not provide an undue advantage to the stalking horse bid, provide the same access to information to all potential bidders, provide the option to contain the same contingencies as any stalking horse bid, and promote overall fairness.  Jon J. Peterson, Inc., 411 B.R. at 137.  Of course, the primary goal of any sale process is to maximize the proceeds received by the estate, and clear bid procedures promote that goal.  Food Barn Stores, 107 F. 3d at 564-65.  *See also*, Lehigh Coal and Navigation Co., 2010 WL 2025211 (Bankr. M.D.

Pa.)(example of bid procedures); <u>In re Fortunoff Fine Jewelry & Silverware, LLC</u> 2008 WL 618986 (Bankr. S.D.N.Y,)(same).

16.     In summary, the Bidding Procedures provide for the following process in connection with the sale of the Purchased Assets:

a.      **<u>Assets to Be Sold</u>**. The Debtors are offering for sale all or substantially all of the assets of Irving Tanning Company and Prime Tanning Co., Inc. located in and/or used in connection with the operations located in Hartland, Maine. A list of assets of the Debtors that are included in the definition of "Purchased Assets" under the Stalking Horse Agreement (the "<u>Purchased Assets</u>") and a list of the Debtors' assets that are not proposed to be purchased by the Stalking Horse are available as part of the due diligence materials being made available to Potential Bidders (defined below). Bidders may also submit a bid for less than all the Purchased Assets or a bid that includes assets of the Debtors that are not included in the Purchased Assets, including, without limitation, the real property that the Debtors do not propose to sell to the Stalking Horse (the "<u>Other Assets</u>" and, together with the Purchased Assets, the "<u>Assets</u>").

b.      **<u>The Bidding Process</u>.** The Debtors, in conjunction with their advisors and using reasonable discretion taking into account their fiduciary duties and after consultation with the Official Committee of Unsecured Creditors (the "<u>Creditors Committee</u>") appointed in the Debtors' jointly administered bankruptcy cases, shall: (i) determine whether any person is a Potential Bidder (hereinafter defined); (ii) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Debtors' businesses; (iii)

receive offers from Qualified Bidders (hereinafter defined), and (iv) negotiate any offer made to purchase the Assets, together or separately (collectively, the "Bidding Process"). Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

c.    **Participation Requirements.** Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, in order to participate in the Bidding Process each person (a "Qualified Bidder") must submit a bid that adheres to the following requirements (a "Qualified Bid"):

   i.    All Qualified Bids must be submitted to counsel for the Debtors: Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME, 04104-5029 (Fax: (207) 774-1127; email: rkeach@bernsteinshur.com) not later than 5:00 p.m. (prevailing Eastern Time) on January 26, 2011 (the "Bid Deadline"). The Debtors shall immediately distribute any bid so submitted by facsimile transmission, electronic mail, or personal delivery to counsel for the Creditors Committee. Promptly upon Debtors' determination that a Bid is a Qualified Bid, the Debtors shall provide copies of such Qualified Bid to all other Qualified Bidders. Upon determination that any Bid is not a Qualified Bid, the Debtors shall notify such bidder of such determination forthwith,

but in any event not later than 1:00 p.m. (prevailing Eastern Time) on January 27, 2011, and shall provide such bidder with the basis for such determination.

ii. All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, deem financially able to consummate the purchase of the Assets, which letter states:

(A)  that such Qualified Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed asset purchase agreement (an electronic version in Word format and blacklined against the Stalking Horse Agreement received on or before the Bid Deadline, with a hard copy to follow), together with its exhibits and schedules, including terms relating to price and the time of closing (the "Proposed Agreement");

(B)  that such Qualified Bidder is prepared to consummate the transaction, following entry of an order of this Court approving the Sale to the Successful Bidder (the "Sale Order");

(C)  that in the event such Qualified Bidder becomes the Successful Bidder (both the highest or otherwise best bid and second-highest bid), such Qualified Bidder's offer is irrevocable until the earlier to occur of February 28, 2011 or two (2) business days after the closing of the Sale of the Assets;

(D)  the actual value of such Qualified Bidder's bid to the Debtors' estates; and

(E)  which of the Debtors' leases and executory contracts are to be assumed in connection with the consummation of the Qualified Bidder's bid.

iii. All Qualified Bids, including any bid by any of the creditors holding prepetition secured claims the ("Prepetition Senior

10

Secured Lenders"), or any entity (each a "Newco") formed by any of the Prepetition Senior Secured Lenders for purposes of bidding on the Debtors' assets, shall be accompanied by a deposit into escrow with the Debtors of an amount equal to $350,000 (the "Good Faith Deposit"), provided, however, that the Stalking Horse shall not be required to make a Good Faith Deposit because it is credit bidding its existing secured loan as part of the purchase price set forth in the Stalking Horse Agreement.

iv. All Qualified Bids shall be accompanied by satisfactory evidence, in the reasonable opinion of the Debtors and their advisors, taking into account their fiduciary duties and after consultation with the Creditors Committee, of committed financing or other ability to perform all transactions contemplated by the Proposed Agreement. With respect to the Prepetition Senior Secured Lenders or any Newco formed for the purpose of submitting a bid on behalf of the Prepetition Senior Secured Lenders, committed financing in the principal amount of $2 million shall constitute satisfactory evidence of ability to perform.

v. Qualified Bids should not contain any financing conditions or contingencies (other than those set forth in the Stalking Horse Agreement).

vi. All Qualified Bids must provide for adequate working capital

11

financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder, which, with respect to the Prepetition Senior Secured Lenders or any Newco formed for the purpose of submitting a bid on behalf of one or more of the Prepetition Senior Secured Lenders, shall be satisfied by a commitment for financing in the principal amount of $2 million.

d.    **<u>Due Diligence.</u>** The Debtors shall afford each Potential Bidder (hereinafter defined) due diligence access to the Assets. Due diligence access may include management presentations as may be scheduled by the Debtors, access to data rooms, on site inspections and such other matters which a Potential Bidder may request and as to which the Debtors may agree in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, provided that all such information shall be made available to each Potential Bidder on an equal basis. Neither the Debtors nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to the Assets to any person except to Potential Bidders, Qualified Bidders, and the Creditors Committee. Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtors or their representatives. To be a "Potential Bidder," each bidder must have

delivered the following:

i. an executed confidentiality agreement in a form satisfactory to the Debtors in their reasonable discretion taking onto account their fiduciary duties, provided that no Potential Bidder will be required to execute a confidentiality agreement more onerous in any material respect to the confidentiality agreements executed by other Potential Bidders; and

ii. current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, demonstrating such Potential Bidder's ability to close the proposed transaction, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

Each of (a) the Prepetition Secured Lenders and (b) any Newco

formed for the purpose of submitting a bid on behalf of one or more of the Prepetition Senior Secured Lenders (and, with regard to any such Newco, evidence of a commitment for financing in the principal amount of $2 million) shall be deemed a Potential Bidder for all purposes.

e.   **"As Is, Where Is."** The sale of the Purchased Assets or the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder. Except as otherwise provided in the Proposed Agreement, all of the Debtors' right, title and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, charges, security interests, restrictions and other encumbrances of any kind or nature thereon and there against (collectively, the "Transferred Liens"), with such Transferred Liens to attach to the proceeds of the sale. Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection with the Assets, the Bidding Process or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, in the applicable Proposed Agreement.

f. **Stalking Horse**. The Stalking Horse has submitted a Qualified Bid pursuant to the Stalking Horse Agreement, which Qualified Bid shall serve as a stalking horse bid (the "Stalking Horse Bid").

g. **Credit Bid:** The Prepetition Senior Secured Lenders, and any Newco created by any of the Prepetition Senior Secured Lenders for such purpose shall have the right to credit bid at the Auction and any credit bid submitted shall be a Qualified Bid to the extent it meets the other terms and conditions hereof.

17. If the Debtors do not receive any Qualified Bids, the Debtors will report the same to this Court and proceed to seek approval of the Stalking Horse Agreement.

**B.    The Auction**

h. **Auction.** If the Debtors receive more than one Qualified Bid prior to the Bid Deadline, the Debtors shall conduct an auction (the "Auction") at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, ME, on January 28, 2011, beginning at 10:00 a.m. (prevailing Eastern Time) or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids, provided, however, that the Auction shall be completed and the Successful Bid (as defined herein) announced no later than January 31, 2011 at 8:00 a.m. (prevailing Eastern Time). Only representatives of the Stalking Horse, the Debtors, the United States Trustee, the Creditors Committee, and any Qualified Bidders who have timely submitted Qualified Bids shall be entitled to attend the Auction. The Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, may announce at the Auction

additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bidding Procedures. Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, determine is relevant, the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, may conduct the Auction in the manner they determine will achieve the maximum value for the Assets. At the Auction, the minimum initial bid against the Stalking Horse bid must exceed the value of the Stalking Horse bid by $250,000. Subsequent bids shall be made in minimum increments of $50,000.

At the commencement of the Auction and at the conclusion of each round of bidding at the Auction, the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, shall announce the then highest or otherwise best offer or combination of offers for the Assets and the basis for such determination, including identifying any non-economic terms that form the basis for such determination. Prior to concluding the Auction, the Debtors shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and

certainty of consummating the Sale; and (ii) using their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, identify and announce to all attending the Auction, the highest or otherwise best offer or combination of offers for the Assets (the "Successful Bid") and any second-highest offer (the "Back-up Bid") and the basis for such determination. The Debtors and the Successful Bidder shall be required to execute the asset purchase agreement for the Successful Bid at the conclusion of the Auction or immediately thereafter. The Debtors shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.  The bidder as to the Back-up Bid shall also execute an asset purchase agreement, contingent on the failure to close of the Successful Bid.

i.   **Acceptance of Qualified Bids.** The Debtors shall sell the Purchased Assets to the Stalking Horse or the Assets to the Successful Bidder, as the case may be, submitting the highest or otherwise best Qualified Bid at the Auction, after approval of such Qualified Bid by the Bankruptcy Court at the Sale Hearing. The Debtors' presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors shall have accepted a Qualified Bid only when that Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

j.   **The Sale Hearing.**  After the conclusion of the Auction, the Bankruptcy Court shall conduct a hearing (the "Sale Hearing") to approve the Sale. At the Sale Hearing, the Debtors will seek entry of an order (the "Sale Order"), among other things, authorizing and approving the Sale to the Successful Bidder(s), as

determined by the Debtors in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Proposed Agreement(s) submitted by the Successful Bidder(s) (as such agreement may be modified prior to, during or after the Auction with the agreement of the Debtors). The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court. Following the entry of the Sale Order approving the Sale, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid(s) and the Debtors shall be authorized to effectuate such sale without further order of the Bankruptcy Court.

k. **<u>Return of Good Faith Deposit.</u>** The Good Faith Deposits of the Qualified Bidders submitting the Successful Bid and the Back-up Bid shall be retained by the Debtors and such Successful Bid and Back-up Bid will remain open and irrevocable, notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder, until the earlier to occur of February 28, 2011 or two (2) business days after the closing of the Sale of the Purchased Assets and/or Other Assets. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, which shall be retained by the Debtors as liquidated damages to the extent the Debtors are entitled to such damages under the Proposed Agreement.

l.      **Modifications.** The Debtors may: (i) determine, in their reasonable business judgment taking into account their fiduciary duties and after consultation with the Creditors Committee, which Qualified Bid, if any, is the highest or otherwise best offer; (ii) consult with the representatives of the Creditors Committee, or any other significant constituent in connection with the bidding process and Bid Procedures; and (iii) reject at any time before announcing the Successful Bid at the Auction, any bid that, in the Debtors' reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, is: (x) inadequate or insufficient; or (y) not in conformity with the Bankruptcy Code or the Bidding Procedures.

18.      **Reservation of Rights:** In addition to their rights set forth in sections (h) and (l) above, the Debtors may modify these Bidding Procedures or impose, at or prior to the Auction, additional terms and conditions on the proposed Sale of the Assets if, in their reasonable judgment, taking into account their fiduciary duties and after consultation with the Creditors Committee, such modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process. Without limitation, at any point during the Auction, the Debtors shall have the absolute right to convert the bidding process from an open auction to a "sealed bid auction," in which case all Qualified Bidders shall have one opportunity to make a final, sealed bid.   If the Debtors exercise this option, then the Debtors shall collect all sealed bids, analyze them, and determine the highest and best bid and any Back-up Bid, in consultation with the Creditors Committee.

19. As a sale of the Purchased Assets is in the best interests of the Debtors' estates and the Bidding Procedures are intended to foster bidding to maximize a return on the Purchased Assets, the Bidding Procedures should be approved by this Court.

**VI.    Proposed Procedures Relating to Executory Contracts and Unexpired Leases**

20. In connection with the Stalking Horse Agreement, the Stalking Horse has requested the Debtors to assume and assign the Assigned Contracts. Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to approval of the Bankruptcy Court, and provided that certain defaults under such contracts or leases are cured and adequate assurance of future performance is provided. To avoid the time and expense of addressing cure issues on a piecemeal basis, the Debtors request approval of procedures for objections to assumption and assignment, and to establish the cure amounts, if any, that are owed under their unexpired leases and executory contracts, as further set on **Exhibit B** attached hereto (the "Assumption and Assignment Procedures").

21. To determine the amount that must be paid to each counter-party to an executory contract or unexpired lease (each, a "Counter-Party"), the Debtors need to accurately determine the extent of their cure obligations, if any. The Debtors are currently preparing an exhibit (the "Contract & Cure Schedule") which shall provide a listing of the executory contracts and unexpired leases proposed to be assume and assigned, as well as the cure amounts, if any, that the Debtors believe are owed under each such contract or lease. The Contract & Cure Schedule will be submitted to the Court prior to the date that the Sale Notice (as defined below) is served on all required parties, and will be appended to the Bidding Procedures attached hereto as **Exhibit A** (the "Cure Procedures")(which Bidding Procedures will be attached to the Sale Notice

as an exhibit).[3]   The Debtors request that the Court require any Counter-Party to file and serve by a date established by the Court any objection to the cure amount asserted by the Debtors on the Contract and Cure Schedule in accordance with Assumption and Assignment Procedures. Any such objection should contain the cure amount such Counter-Party believes is owing.  The failure of a Counter-Party to submit such objection will forever bar such Counter-Party from asserting any other cure amount or otherwise disputing such amounts with respect to the contracts and leases set forth on the Contract & Cure Schedule.

22.     The Debtors request that this Court hear any objection with respect to any cure amounts at the Sale Hearing or adjourn any hearing on such objection on the condition that the difference between the amount asserted by the Counter-Party and the Debtors, or such lower amount as the Court shall fix, shall be held in escrow from the sale proceeds, pending further order of the Court or mutual agreement of the parties.  The Debtors submits that such an objection should not be deemed an objection to the assumption, assignment and sale of any Assigned Contract, but only as a reservation of the Counter-Party's rights to request a subsequent determination as to the correct cure amount.

23.     Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See* <u>In re Carlisle Homes, Inc</u>., 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  As necessary, the proposed assignee must demonstrate to the Court that it can provide adequate assurance of future performance in connection with any executory contract or unexpired lease to be assigned, or will have obtained any necessary consents of the counter-parties to such contract or lease.  The Debtors request that,

---

[3] The Debtors believe that the Contract & Cure Schedule will be a complete list of their executory contracts and unexpired leases, but reserve the right to amend that list prior to the hearing on the Sale Motion.

in connection with the Sale Hearing, the Court determine that the Stalking Horse, or the maker of the winning bid, has provided adequate assurance of future performance to each Counter-Party.

## VII.   Proposed Form and Manner of Notice

24.   A proposed form of notice with respect to the sale of the Purchased Assets and the objection, overbid and hearing dates is attached hereto as **Exhibit C** (the "Sale Notice").  The Debtors respectfully request this Court to approve such Sale Notice.

25.   In accordance with Rules 2002, 6004, and 6006 of the Bankruptcy Rules, the Debtors intend, upon approval of this Motion, to:

(a)   serve copies of the Sale Motion and Sale Notice upon:

    (i)   the United States Trustee;

    (ii)   the twenty largest non-insider unsecured creditors of each of the Debtors;

    (iii)   local, state and federal taxing authorities for each jurisdiction in which the Purchased Assets are located;

    (iv)   counsel to the Stalking Horse;

    (v)   prospective bidders (or their counsel) that are known to the Debtors and their advisors;

    (vi)   the Counter-Parties to the executory contracts and unexpired leases on the Contract & Cure Schedule;

    (vii)   all parties known to the Debtors to have or assert any liens, claims and encumbrances or other interests against the Purchased Assets; and

    (viii)   all parties having filed requests for notices in the Debtors' cases.

and

(b)   serve a copy of the Sale Notice by first class mail, upon all creditors.

26.     The Debtors submit that such notice constitutes good and sufficient notice of the competitive bid procedures, the Sale Motion and all proceedings to be held thereon and that no other further notice need be given.

## CONCLUSION

27.     Approval of the Break-Up Fee, Expense Reimbursement and the Bidding Procedures described herein are conditions precedent to the consummation of the sale of the Purchased Assets to the Stalking Horse.  Based upon the timing considerations and the requirements of the Stalking Horse, the Debtors request that the terms of such provisions be approved by this Court.

WHEREFORE, the Debtors respectfully request this Court to enter an order:

A)      Approving the Bidding Procedures described herein, including, without limitation, the initial overbid amount and the subsequent bidding intervals;

B)      Approving the assumption and assignment procedures as provided for herein;

C)      Approving the Break-Up Fee and Expense Reimbursement and authorizing the Debtors to pay the Break-Up Fee and Expense Reimbursement in accordance with the terms of this Sale Motion;

D)      Establishing a date and time for the final hearing on Debtors' Sale Motion and setting the deadline for objections or overbids;

E)      Approving the form and content of the Sale Notice attached hereto as **Exhibit C**; and

F)      Granting such other and further relief as seen just and equitable.

Dated:  January 4, 2011

IRVING TANNING COMPANY
PRIME TANNING CO., INC.
PRIME TANNING CORP.

By their attorneys:

*/s/  Robert J. Keach*
Robert J. Keach, Esq.
Michael A. Fagone, Esq.
Máire B. Corcoran, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
(207) 774-1200