**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>IRVING TANNING COMPANY,<br><br>PRIME TANNING CO., INC., and<br><br>PRIME TANNING CORP.<br><br>                Debtors. | Chapter 11<br>Case No. 10-11757<br><br>Jointly Administered |

**MOTION OF THE DEBTORS FOR AUTHORITY TO SELL CERTAIN ASSETS OF THE DEBTORS TO THE FUND OF JUPITER, LLC, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND FOR APPROVAL OF THE ASSUMPTION AND ASSIGNMENT OF CERTAIN LEASES AND EXECUTORY CONTRACTS**

      Irving Tanning Company ("Irving"), Prime Tanning Co., Inc. ("Prime Maine") and Prime Tanning Corp. ("Prime Missouri") (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 cases, by and through their attorneys and pursuant to 11 U.S.C. §§ 105, 363, and 365, Fed. R. Bankr. P. 6004, 6006, 9013 and 9014 and D. Me. LBR 6004-1 and 6006-1, hereby move this Court for an order authorizing the Debtors to sell certain assets of the Debtors to The Fund of Jupiter, LLC (the "Stalking Horse"), as more particularly described in that certain Asset Purchase Agreement, dated as of January 4, 2011 (the "Stalking Horse Agreement"), a copy of which is attached hereto as **Exhibit A**. By this motion (the "Sale Motion"), the Debtors also seek authority to assume and assign to the Stalking Horse, or to any successful bidder, certain executory contracts. A list of the executory contracts which may be assumed and assigned to the Stalking Horse or any successful bidder will be provided to

interested parties at or before the commencement of the hearing on the Debtors' Motion for Order: (A) Approving Bid Procedures for the Sale of the Debtors' Assets; (B) Scheduling an Auction; (C) Approving Assumption and Assignment Procedures for Certain Executory Contracts and Unexpired Leases; (D) Approving a Break-Up Fee, Expense Reimbursements and Overbid Protections; and (E) Approving a Form of Notice of Sale (the "<u>Bid Procedures Motion</u>").[1] The proposed sale shall be free and clear of all liens, claims and encumbrances with all such liens, claims and encumbrances to attach to the proceeds of the proposed sale, except as provided herein. Finally, the Debtors seek an order pursuant to Fed. R. Bankr. P. 6004(g) and 6006(d) authorizing them to consummate the proposed sale immediately after entry of this Court's order granting this Sale Motion. In further support hereof, the Debtors state the following:

## JURISDICTION, VENUE AND BASIS FOR RELIEF

1. This Court has jurisdiction to entertain this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The basis for the relief requested herein is 11 U.S.C. §§ 105, 363, and 365, Fed. R. Bankr. P. 6004, 6006, 9013 and 9014 and D. Me. LBR 6004-1 and 6006-1.

## FACTUAL AND PROCEDURAL BACKGROUND

2. Irving is a worldwide leader in the manufacture and sale of leather primarily to manufacturers of footwear and consumer goods located in North America, Asia and Europe. Irving maintains its principal place of business in Hartland, Maine and employs approximately 178 people at the plant (the "<u>Hartland Property</u>") it owns and operates there. On November 16, 2010 (the "<u>Petition Date</u>"), the Debtors separately filed voluntary petitions for relief under

---

[1] The Bid Procedures Motion has been filed simultaneously with this Motion. Although the Debtors seek an expedited hearing on the Bid Procedures Motion, no hearing date has been set as of the date of this Motion.

chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"). An order entered on November 22, 2010 directing joint administration of these bankruptcy cases.

3. The Debtors described the events leading to their voluntary petitions in some detail in the Affidavit of Paul Larochelle in Support of Various First Day Motions. In summary, the filings were necessitated by historical liabilities accrued prior to and during the consolidation of certain of the Debtors' operations at the Hartland Property. The combination of legacy liabilities and costs associated with ongoing environmental litigation made it increasingly difficult for Irving to obtain further financing for its operations at reasonable costs, if at all. The persistent global credit crunch and the lengthy recession in the United States only added to the Debtors' difficulties by reducing sales volume and margins at a critical time. The Debtors filed their chapter 11 cases to preserve the going-concern value of their businesses.

4. Irving's real and personal property is encumbered by liens securing prepetition obligations owed to: the Maine Rural Development Authority (the "MRDA"); the Finance Authority of Maine ("FAME"); Windsor Associates, LLC ("Windsor"); Tasman Industries, Inc. ("Tasman"), the Stalking Horse and Porter Capital ("Porter"). Those obligations are summarized as follows.

5. Pursuant to a promissory note dated November 3, 2005 (the "2005 Note"), in the original principal amount of $500,000, Irving is obligated to the MRDA, in the approximate amount of $401,933.07. The 2005 Note is secured by the Hartland Property, in relation to which MRDA holds a first position mortgage (the "MRDA Mortgage").

6. Additionally, FAME holds a second-priority mortgage on the Hartland Property and subordinated security interests in Irving's personal property. These liens secure Irving's obligations to FAME in the approximate amount of $828,620.

7. In late 2008 and early 2009, the Debtors entered into a composition with certain trade vendors (the "Composition"). In connection with the Composition, Irving granted to Windsor, as a collateral agent for the participating vendors (the "Composition Creditors"), a security interest in all or substantially all of Irving's personal property, including its inventory, which such security interest is subordinate to Porter and the Stalking Horse. As detailed below, Windsor's security interest, if any, in certain of Irving's personal property is junior to the liens of Tasman, the Stalking Horse, Porter and FAME. The current balance of the promissory notes issued to the Composition Creditors is approximately $7.5 million.

8. Additionally, in or around November 2009, Irving and some of its affiliates entered into a security agreement with Tasman whereby Tasman obtained a purchase money security interest in certain in order to secure the obligations of Irving (among others). Tasman filed a UCC-1 financing statement with the office of the Maine Secretary of State on November 19, 2009 and provided a notice of its purchase money security interest in the foregoing inventory collateral to the other parties that had filed financing statements against Irving.

9. In January 2010, Irving entered into a factoring agreement with Porter whereby that creditor agreed to factor certain receivables generated by Irving. To secure its obligations to Porter, Irving granted Porter a first priority security interest in Irving's accounts and a second priority security interest in Irving's other personal property, including inventory. Irving owes Porter approximately $1,959,500 under the factoring agreement.

10. Around the same time, Irving borrowed $2.5 million (the "First Jupiter Note") from the Stalking Horse and executed a promissory note in favor of that lender. Irving's obligations to the Stalking Horse are secured by first priority security interests in all of Irving's personal property other than accounts, including inventory, and a second priority security interest

4

in Irving's accounts. In June 2010, Irving borrowed an additional $500,000.00 from the Stalking Horse and executed and delivered a second promissory note in favor of the Stalking Horse (the "Second Jupiter Note"). As a result of certain modifications, the principal balance owed to the Stalking Horse under the Second Jupiter Note was increased to $1.68 million. As of November 3, 2010, according to the Stalking Horse's demand letter to the Irving, the amount owed to the Stalking Horse on account of the First Jupiter Note and the Second Jupiter Note was, in the aggregate, $4,358,577.83. Both the First Jupiter Note and the Second Jupiter Note are secured by the same collateral.

11. Irving's obligations under the First Jupiter Note are guaranteed by Prime Maine. In connection with its guaranty, Prime Maine granted the Stalking Horse a first priority mortgage in its real property.

12. On November 18, 2010, two days after the Petition Date, this Court entered a final order (the "DIP Order") authorizing Irving to enter into post-petition financing with MRDA. In accordance with the DIP Order, MRDA re-advanced $100,000 (the "$100K Note") to Irving on the 2005 Note, on the same terms and conditions as the 2005 Note. The $100K Note is secured by the MRDA Mortgage.

13. Also in accordance with the DIP Order, MRDA loaned Irving an additional $450,000 (the "$450K Note") under a new Commercial Promissory Note (the "2010 Note"), which note is secured by a first priority security interest in certain specified inventory.

14. The Debtors own, *inter alia*; the Hartland Property, inventory, machinery and equipment, a negligible amount of cash, and various other assets related to the operation of the Hartland plant.

15. Despite substantial efforts, the Debtors have not been able to refinance their obligations at a reasonable cost and, therefore, Irving's assets must be sold promptly if the going-concern value is to be preserved for the benefit of the estate. Absent a sale, the Debtors anticipate that operations would be suspended or terminated, and their cases would be converted to cases under chapter 7 of the Code.

**RELIEF REQUESTED**

16. Pursuant to this Motion, the Debtors request entry of an order authorizing them to sell the Purchased Assets (as defined below) to the Stalking Horse (or such other entity, if any, that submits a higher and better offer for the Purchased Assets, hereinafter the "<u>Successful Bidder</u>") free and clear of all liens, claims and encumbrances. Additionally, the Debtors also seek authority to assume and assign certain executory contracts (the "<u>Assigned Contracts</u>")[2] to the Stalking Horse or the Successful Bidder. In connection with the sale and assignment, the Debtors request that this Court enter a Sale Order substantially in the form attached to the Stalking Horse Agreement, which would (i) authorize and approve the proposed sale pursuant to the terms of the Stalking Horse Agreement; and (ii) approve the assumption and assignment of the Assigned Contracts (or such other executory contracts and/or unexpired leases as the Stalking Horse or Successful Bidder may identify).

**SUMMARY OF SALE**

17. The Stalking Horse Agreement contains the materials terms of the Stalking Horse's proposed purchase. The Stalking Horse Agreement can be summarized as follows:

> **Purchased Assets:** Substantially all of the assets related to Irving's and Prime Maine's operations in Hartland as defined more specifically in Section 2.1 of the Stalking Horse Agreement.

---

[2] The term "Purchased Assets" shall include and refer to the "Assigned Contracts."

6

**Purchase Price:** The purchase price for the purchased assets is $6,676,249.25, or the aggregate of the Assumed Loans (as identified in Schedule 2.1(a)(iii) to the Stalking Horse Agreement) plus $2,000,000.00. The Stalking Horse shall pay the Purchase Price in the following order: (a) by assuming the Assumed Loans and (b) by crediting an amount of secured indebtedness of any Seller that is held by Purchaser as of the Closing Date, Purchaser shall be deemed to pay an amount equal to such secured indebtedness.

**Closing Costs:** Sellers shall prepare and pay for the bills of sale, assignments and deeds (and any recording and transfer costs applicable thereto). The Stalking Horse or its designee shall pay for title insurance premiums and other instruments for the transfer of Real Estate. Other costs associated with the Closing and transactions contemplated under the Stalking Horse Agreement shall be allocated as provided elsewhere in the Stalking Horse Agreement.

**Cure Costs:** Sellers bear the sole responsibility for all costs of curing defaults under the Leases listed on Schedule 2.1(a)(i) to the Stalking Horse Agreement, the Assumed Contracts and the Assumed Loans pursuant to Section 365 of the Bankruptcy Code.

**Break-Up Fee and Overbid Protections:** The Stalking Horse Agreement requires that the Bankruptcy Court shall have entered an order, in a form reasonably satisfactory to the Stalking Horse approving bid protections (the "Bidding Protections"), including, without limitation, a break-up fee of $100,000 (the "Break-Up Fee") plus expenses up to a maximum of $100,000 (the "Expenses"). The Break-Up fee shall be payable from (and at the time of) a closing of a competing transaction or transactions from a successful competing bid offered and accepted at the Auction and if Purchaser terminates the Stalking Horse Agreement pursuant to Section 12.1(a)(v), (vi) or (vii). The Expenses shall be paid upon the earlier to occur of (i) a closing of a competing bid offered and accepted at the Auction or (ii) the date of the first distribution to creditors of Sellers (other than payment of administrative expenses), in payment of the creditors' pre-petition claims. Sellers may solicit and obtain bids during the Auction for the Purchased Assets; provided, however, that no offer for any of the Purchased Assets shall be accepted by Sellers unless the proposed purchase price equals or exceeds an amount which is $250,000 greater than the Purchase Price (the "Minimum Overbid").

## ARGUMENT

*A.     Request for Authority to Sell Substantially All of Irving's Assets*

18.     Section 363(b) of the Bankruptcy Code provides authority for a trustee and, through the application of section 1107(a) of the Bankruptcy Code, a debtor in possession, "after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The authority to sell assets conferred upon a

debtor by section 363(b) of the Bankruptcy Code "include[s] a sale of substantially all the assets of an estate." In re Coastal Cable T.V., Inc., 24 B.R. 609 (1st Cir. B.A.P. 1982); In re CadKey, Inc., 317 B.R. 19 (D. Mass. 2004); In re Envisionet Computer Services, Inc., 275 B.R. 664 (D.Me. 2002). *See also,* Otto Preminaer Films. Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment. Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991); In re Haven Eldercare, LLC, 2008 WL 2690729 (Bankr. D. Conn.) (collecting cases).

19. A bankruptcy court's power to authorize a sale under section 363(b) is to be exercised at the court's discretion. *See* In re WPRY-TV, Inc., 983 F.2d 336, 340 (1st Cir. 1993). Courts have frequently authorized the sale of all, or substantially all, of a debtor's assets pursuant to section 363(b) and in the absence of a reorganization plan where there is a "sound business purpose." *See* Lionel Corp. v. Committee of Equity Security Holders (In re Lionel), 722 F.2d 1063, 1071 (2d Cir. 1983)(rejecting the requirement that only an emergency situation permits the use of section 363(b) and setting forth the "sound business purpose" test in the context of a sale of substantially all of a debtor's assets under section 363(b)). *See also,* Stephen Indus., Inc. v. McClung, 789 F.2d. 386, 390 (6th Cir. 1986); Abbotts Dairies of Pennsylvania, 788 F.2d. 143, 147-49 (3d Cir. 1986); The Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines), 780 F.2d 1223, 1226 (5th Cir. 1986); CadKey, 31 B.R. at 23.

20. Assuming that the standard for approval of a sale of substantially all of a debtor's assets applies to the proposed sale of the Purchased Assets, the "sound business purpose" test is easily met. Despite their diligent efforts, the Debtors have not been able to obtain financing necessary to maintain the Debtors' business operations. A sale of the Purchased Assets as a going concern will maximize the value of the estate for the benefit of all stakeholders. The delay

attendant in confirming a plan and selling under a plan will likely result in a material loss of value.

21. Courts have also required that the sale price be fair and reasonable and that the sale be the result of good faith negotiations with the Stalking Horse.[3] *See, e.g.*, In re Abbotts Dairies of Pa., 788 F.2d 143, 147-50 (3d Cir. 1986). The Debtors extensively marketed the Purchased Assets to several potential purchasers, both before and after the Stalking Horse Agreement was negotiated with the Stalking Horse. Despite those marketing efforts, the Debtor was not able to secure an offer for its business that provided more consideration to the estate than the Stalking Horse Agreement.

22. The Stalking Horse Agreement is the product of good faith and arm's length negotiations between the Debtors and the Stalking Horse. The price and the form and structure of the offer proposed by the Stalking Horse will continue to be tested in the marketplace. The bidding procedures, requested to be approved by this Court in accordance with the Bid Procedures Motion, are fair to all parties and are designed to permit the Debtors to obtain the best possible price. Thus, the Debtors believe that the winning bid or bids that emerge from this process will be the highest and best bid(s) obtainable for the Purchased Assets.

23. The Debtors respectfully submit that the proposed sale of the Purchased Assets to the Stalking Horse is entirely consistent with the guidelines set forth in applicable case law. The Debtors believe that a prompt sale is in their best interests and in the best interests of their creditors and estates, and will maximize the amount that the Debtors, their creditors and their estates may realize for the value of the Purchased Assets.

    B.    *Sale Free and Clear of Liens, Claims and Interests*

---

[3] Section 363(m) of the Bankruptcy Code provides: The reversal or modification on appeal of an authorization under subsection (b) and (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stated pending appeal.

24. The Debtors request authorization to sell the Purchased Assets free and clear of liens, claims and encumbrances and other interests subject to the provisions contained herein. Section 363(f) of the Bankruptcy Code authorizes a debtor in possession to sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also,* In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988)(section 363(f) is written in the disjunctive; a court may approve a sale "free and clear" provided at least one of the subsections is met).

25. The Debtors expect that they will satisfy the second and fifth of these requirements. If any of the secured creditors asserting a security interest against the Purchased Assets are not willing to consent to the sale of the Purchased Assets, the Court is nonetheless empowered to authorize the sale free and clear of any such creditor as long as that creditor receives the value of its collateral. *See* In re Beker Indus. Corp., 63 B.R. 474 (Bankr. S.D.N.Y. 1986); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57; In re Collins, 180 B.R. 447 (Bankr. E.D.Va. 1995). Those secured creditors could be compelled to accept a money satisfaction of their respective interests pursuant to section 363(f)(5) of the Bankruptcy Code. *See, e.g.,* In re James, 203 B.R. 449, 453 (Bankr. W.D.Mo. 1997); In re Grand Slam U.S.C., Inc., 178 B.R. 460,

463-64 (E.D. Mich. 1995); WPRY-TV, Inc., 143 B.R. at 321 (Bankr. D.P.R. 1991). Courts considering this issue have held that the "cramdown" provision under the Bankruptcy Code constitutes a "legal or equitable proceeding" and permits a sale under section 363(f)(5). *See e.g.,* Grand Slam, 178 B.R. at 464; Scherer v. Fed. Nat. Mortgage Ass'n (In re Terrace Chalet Stalking Horse Agreementrtments, Ltd.), 159 B.R. 821, 829 (N.D. Ill. 1993); In re Healthco Int'l, Inc., 174 B.R. 174, 176-77 (Bankr. D. Mass. 1994).

26. All liens against the Purchased Assets will attach to the cash proceeds received from the sale of those assets in the same force, effect and priority as such liens have existed prior to the Petition Date, subject to the rights and defense, if any, of the Debtors or any party in interest.

   C. *Potential Assumption and Assignment of Executory Contracts*

27. The Stalking Horse Agreement, as well as the Bid Procedures Motion, contemplates that certain unexpired leases and executory contracts will be assumed and assigned to the Stalking Horse or Successful Bidder.[4] The Debtors, pursuant to this Sale Motion, seek to assume and assign those executory contracts designated by the Stalking Horse or Successful Bidder to be assumed.

28. To accomplish this goal in the most fair and expeditious manner, as provided in the Bid Procedures Motion, the Debtors shall provide the non-debtor parties to such agreements notice and a reasonable opportunity to state cure amounts, if any, that they believe are owing.

29. The Debtors request that this Court establish a deadline for parties to the Assigned Contracts to file alleged cure amounts, or to object to the Debtors' proposed assumption and assignment of such agreements, that is (a) one business day before the Sale Hearing and (b) ten

---

[4] Nothing contained herein shall be construed as an agreement by the Debtors to assume all or any of the Assigned Contracts or as an acknowledgment that any of such leases or contracts are executory in nature or subject to assignment.

days after service of the applicable Supplemental Sale Notice (as that term is defined in the Assumption and Assignment Procedures).

30. A debtor in possession is authorized to assume an executory contract provided that, at the time of assumption: (1) the debtor cures, or provides adequate assurance that the debtor will promptly cure, any default; (2) compensates, or provides adequate assurance that the debtor will promptly compensate, the counterparty for any actual pecuniary loss resulting from any default; and (3) provides adequate assurance of future performance under the executory contract. *See* 11 U.S.C.§§ 365(a), 365(b)(1). A default based upon the filing of the bankruptcy case or the insolvency or financial condition of the debtor need not be cured. *See* 11 U.S.C. § 365(b)(2).

31. In the case of an assumption and assignment, the purchaser or assignee provides the adequate assurance of future performance. *See* 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *See* In re Great Northwest Recreation Center, Inc., 74 B.R. 846 (Bankr. D. Mont. 1987). To the extent a party raises an issue with respect to this requirement, the Debtors request that this Court address the matter at the hearing on the sale of the Purchased Assets.

32. Finally, pursuant to section 365(k), the Debtors request that they be relieved from any further liability with respect to the Assigned Contracts after assumption and assignment to the Stalking Horse or the Successful Bidder. *See* 11 U.S.C § 365(k).

## NOTICE

33. In accordance with the Bid Procedures Motion, copies of this Motion will be served upon: (a) the Sale Notice on all creditors and (b) the Sale Notice and the Sale Motion on

(i) the Office of the United States Trustee; (ii) the twenty largest non-insider unsecured creditors of each of the Debtors; (iii) the local, state and federal taxing authorities for each jurisdiction in which the Purchased Assets are located; (iv) counsel to the Stalking Horse; (v) prospective bidders (or their counsel) that are known to the Debtors and their advisors; (vi) counter-parties to the executory contracts and unexpired leases proposed to be assumed and assigned; (vii) all parties known to the Debtors to have or to assert any lien, claim and encumbrance or other interest in any of the Purchased assets; and (viii) all persons who have filed requests for notice in these chapter 11 cases. Given the nature of the relief requested herein, the Debtors submit that no further notice of this motion is necessary.

## **CONCLUSION**

34. Based upon all of the foregoing, the Debtors request that this Court enter the proposed sale order authorizing the Debtors to sell the Purchased Assets to the Stalking Horse, subject to higher and better offers in accordance with the provisions of the bidding procedures previously approved by order of this. In addition, the Debtors request that this Court enter an order waiving the provisions of Bankruptcy Rule 6004(g) and that any stay contemplated in Bankruptcy Rule 6004(g) not be imposed upon the sale transaction contemplated by this Motion.

Dated: January 4, 2011

IRVING TANNING COMPANY
PRIME TANNING CO., INC.
PRIME TANNING CORP.

By their attorneys:

*/s/ Robert J. Keach*
Robert J. Keach, Esq.
Michael A. Fagone, Esq.
Máire B. Corcoran, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
(207) 774-1200