## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of January 4, 2011, is by and among Irving Tanning Company, a Maine corporation ("Irving"), Prime Tanning Co. Inc., a Maine corporation ("Prime") and Prime Tanning Corp., a Missouri corporation ("Prime Corp", and, together with Irving and Prime, "Sellers" and each a "Seller"), debtors and debtors-in-possession operating under Chapter 11 of the Bankruptcy Code, and The Fund of Jupiter LLC, a Florida limited liability company ("Purchaser").

## RECITALS

A. Sellers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 16, 2010. Since that time, each Seller has remained in possession of its property and has continued to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Sellers' Chapter 11 cases are currently pending before the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court") and have been jointly administered as Case No. 10-1157(the "Bankruptcy Case").

B. Purchaser desires to purchase, and Sellers desire to sell, the Purchased Assets upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in reliance upon the representations and warranties contained herein, the parties hereto covenant and agree as follows:

## ARTICLE I CERTAIN DEFINITIONS

Section 1.1 Definitions. As used in this Agreement, the following terms have the following meanings:

"Agreement" means this Asset Purchase Agreement, including the Exhibits and the Schedules attached hereto.

"Allocation" has the meaning set forth in Section 2.5.

"Assumed Contracts" has the meaning set forth in Section 2.1(a)(vii).

"Assumed Liabilities" has the meaning set forth in Section 2.2(a).

"Assumed Loans" has the meaning set forth in Section 2.1(a)(viii)

"Auction" has the meaning set forth in Section 7.1.

"Bankruptcy Case" has the meaning set forth in Recital A.

"Bankruptcy Code" means Title 11 and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

"Bankruptcy Court" has the meaning set forth in Recital A.

"Break-Up Fee" has the meaning set forth in Section 12.1(c).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" means the first business day following the satisfaction or waiver (by the party entitled to waive the conditions) of all conditions to Closing set forth in Articles X and XI, unless otherwise agreed by the parties.

"Code" has the meaning set forth in Section 3.2(f).

"Commitment" has the meaning set forth in Section 6.2(a)(i).

"Contracts" has the meaning set forth in Section 4.5.

"Environmental Claim" has the meaning set forth in Section 4.9(a).

"Environmental Laws" has the meaning set forth in Section 4.9(a).

"Excluded Assets" has the meaning set forth in Section 2.1(b).

"Expenses" has the meaning set forth in Section 12.1(d).

"Final Order" means an order of the Bankruptcy Court (a) that has not been reversed, vacated or stayed, and the time to file an appeal or a motion to reconsider has expired or has not been extended, or (b) with respect to which any appeal has been finally decided and no further appeal or petition for certiorari can be taken or granted.

"FFE" means any furniture, fixtures and equipment located at any of the Properties.

"Hazardous Substances" has the meaning set forth in Section 4.9(c).

"Leases" means the interest of each Seller, as lessor, lessee or otherwise, in any leases, ground leases, subleases and other instruments and agreements relating to any real or personal property, together with all amendments, modifications and supplements thereto (if any), and all rights and interests of each Seller relating thereto.

"Liens" has the meaning set forth in Section 4.4.

"Minimum Overbid" has the meaning set forth in Section 7.1.

"Permits and Licenses" has the meaning set forth in Section 2.1(a)(ix).

"Permitted Exceptions" means, collectively: (a) all applicable zoning and building laws, restrictions, regulations and ordinances, provided that they are not violated by the

existing buildings and improvements in the Properties, do not prohibit or impair the use of the Properties for their existing uses and purposes, or materially and adversely affect the value of a Property; (b) encroachments, if any, on any street or highway; (c) the state of facts that would be shown on an accurate survey or from a personal inspection of the Properties, provided that such facts would not prevent or impair the use of the Properties for their existing uses and purposes or materially and adversely affect the value of a Property; (d) real estate taxes, and water and sewer charges, which are not due and payable prior to the Closing Date (subject to apportionments as provided for in Section 2.4); (e) easements and rights of public utilities, which do not prevent, prohibit or impair the use of the Properties for their existing uses and purposes or materially and adversely affect the value of a Property; (f) with respect to the Real Estate, all matters set forth on the Commitments prepared by the title insurer unless objected to by Purchaser pursuant to Section 6.2 below, other than those matters described in clauses (a) through (e) of this definition; and (g) with respect to Assumed Loans, the liens on Purchased Assets securing such loans to the extent approved by the Bankruptcy Court.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust, union, association, court, agency, government, tribunal, instrumentality, or other entity or authority.

"Properties" means the real properties described on Exhibit A.

"Purchase Price" has the meaning set forth in Section 2.3.

"Purchased Assets" has the meaning set forth in Section 2.1(a).

"Purchaser" has the meaning set forth in the preamble to this Agreement.

"Real Estate" has the meaning set forth in Section 2.1(a)(i).

"Sale Order" means an order of the Bankruptcy Court described in Section 11.3 approving the sale of the Purchased Assets to Purchaser or its designee, substantially in the form of Exhibit B.

"Sellers" has the meaning set forth in the preamble to this Agreement.

"Title Evidence" has the meaning set forth in Section 6.2(a).

## ARTICLE II
## THE TRANSACTION

Section 2.1 Purchase and Sale of Assets.

(a) *Purchased Assets.* Upon the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer, convey, and deliver to Purchaser pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, and Purchaser

shall purchase from Sellers, all assets and rights of Sellers that are used or held for use in, or that arise from or relate to, the conduct of each Seller's business, other than the Excluded Assets (collectively, the "Purchased Assets"), including the following assets, free and clear of all Liens (except Permitted Exceptions) to the fullest extent permissible under the Bankruptcy Code:

      (i)      the Properties and all other parcels of real property owned by each Seller, including the land, building improvements thereon, all plumbing, electrical, mechanical, heating and air conditioning equipment and systems that are permanently attached to the real property, and all easements, licenses, rights-of-way, permits, and other appurtenances thereto, and all purchase options, rights of first refusal and expansion rights relating thereto (including each Seller's rights in and to public streets or railways), whether held by any Seller directly or through a nominee or affiliate (collectively, the "Real Estate");

      (ii)      the Leases listed on Schedule 2.1(a)(i) and all interests of each Seller therein, including real estate fixtures, leasehold improvements, security and other deposits, common-area-maintenance refunds, adjustments, and other amounts payable to such Seller under or in respect of such leases, provided that Purchaser may elect, by giving notice thereof to Sellers at least five days before the Closing, that Sellers reject any of such Leases and such Leases shall be removed from Schedule 2.1(a)(i);

      (iii)      all tangible personal property, including the FFE and any other equipment, machinery, trucks, cars, other vehicles and rolling stock, furniture, furnishings, fixtures, trade fixtures, office materials and supplies, computers (laptop and desktop), monitors, servers, network equipment, routers, cables, and computer hardware;

      (iv)      all inventory, work in progress, by-products, supplies, spare parts, shipping materials, packaging materials, raw materials, and other consumables;

      (v)      all files, books of account, general, financial and tax records, personnel records, invoices, shipping records, supplier lists, correspondence, memoranda, plats, architectural plans, surveys, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil tests, engineering reports, expired purchase orders, operating records, operating safety manuals, and other printed, written, or electronic materials and documents, records and files and any rights thereto;

      (vi)      all prepaid expenses, deferred charges, advance payments, security deposits, and prepaid items;

      (vii)      the Contracts listed on Schedule 2.1(a)(ii), including all prepaid deposits thereunder (the "Assumed Contracts"); provided that Purchaser may elect, by giving notice thereof to Sellers at least five days before the Closing, (a) to add a

Contract to the list of Assumed Contracts, and (b) that Sellers reject any such Contract and such Contract shall be removed from Schedule 2.1(a)(ii);

(viii)   the loans and related documents listed on Schedule 2.1(a)(iii), (the "Assumed Loans"); provided that Purchaser may elect, by giving notice thereof to Sellers at least two (2) days before the Auction, that Sellers reject any such Loan and such Loan and the related documents shall be removed from Schedule 2.1(a)(iii);

(ix)   municipal, state, federal, and foreign franchises, permits, licenses, agreements, waivers, and authorizations, including those relating to environmental matters (collectively, the "Permits and Licenses"), and all deposits and prepaid expenses held by any Person in connection therewith;

(x)   all causes of action (whether or not asserted as of the Closing Date) relating to the Purchased Assets, or against Purchaser or any affiliate of Purchaser;

(xi)   all rights to tax refunds, tax credits, or other tax benefits, including without limitation those pursuant to Maine's Business Equipment Tax Rebate and Pine Tree Zone programs;

(xii)   all sales and promotional literature, customer lists, and other sales materials;

(xiii)   all intellectual property, trade marks and trade names, domain names, web site content, databases, telephone numbers, and e-mail addresses;

(xiv)   all insurance policies and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims therefore (except as pertain to any causes of action excluded from the Purchased Assets);

(xv)   all warranties, indemnities, or guaranties (and all security therefor) from any third party with respect to any Purchased Asset;

(xvi)   all accounts and notes receivable; and

(xvii)   all goodwill associated with each Seller's business or the Purchased Assets.

(b)   *Excluded Assets.*  Notwithstanding anything in Section 2.1 (a) to the contrary, no Seller shall sell, convey, assign, transfer, or deliver to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any Seller's right, title, and interests in and to the following assets of Sellers (the "Excluded Assets"):

(i)    all cash and cash equivalents, marketable securities, and negotiable instruments on hand, in lock boxes, in financial institutions, or elsewhere;

(ii)    each Seller's company seal, minute books, charter documents, stock or equity record books, and such other books and records pertaining to the organization, existence, or capitalization of such Seller as an entity;

(iii)    all rights of Sellers under this Agreement;

(iv)    any Lease that is not listed on Schedule 2.1(a)(i);

(v)    any Contract that is not an Assumed Contract listed on Schedule 2.1(a)(ii), including but not limited to the specific Contracts listed for rejection on Schedule 2.1(b);

(vi)    all assets held in relation to any employee benefit or welfare plan or any contract, policy, or arrangement relating to any such plan, and all rights to refunds or to other excess funds held by or on behalf the State of Maine with respect to workers' compensation including, without limitation, any right to receive any surplus under the so-called Vista Trust Fund;

(vii)    any contract creating indebtedness of any Seller for borrowed money or for purchase-money indebtedness for the acquisition by any Seller of any business, or guarantying or securing any such indebtedness of others other than the Assumed Loans;

(viii)    the assets, including the real estate in Berwick, Maine, the assets relating solely to the Prime Missouri business and the inventory assets that are encumbered by the MRDA inventory loan lien, listed on Exhibit B attached hereto;

and

(ix)    any assets otherwise excluded pursuant to the provisions of Section 2.1(a) above.

Section 2.2    Assumption and Exclusion of Liabilities.

(a)    Upon the terms and subject to the conditions of this Agreement, at the Closing, Purchaser shall assume only the following liabilities and obligations of Sellers (the "Assumed Liabilities"):

(i)    all liabilities and obligations of each Seller under the Leases listed on Schedule 2.1(a)(i) and the Assumed Contracts for which all necessary consents and/or Bankruptcy Court approvals to transfer have been obtained, in each case only to the extent arising and relating to the period from and after the Closing Date;

(ii)　　all liabilities and obligations of each Seller under the Assumed Loans and the related loan and security documents, for which all necessary consents and/or Bankruptcy Court approvals to transfer have been obtained, in each case only to the extent arising and relating to the period from and after the Closing Date;

(iii)　　all liabilities and obligations of each Seller in respect of the Permits and Licenses to the extent arising and related to events that occur from and after the Closing Date, other than with respect to hazardous materials or environmental conditions that existed on or before the Closing Date (which liabilities shall remain with Sellers); and

(iv)　　all real and personal property taxes and assessments on the Purchased Assets that relate to the period from and after the Closing Date.

(b)　　Notwithstanding anything to the contrary in this Agreement, Purchaser shall not assume, or be deemed to have assumed or guaranteed, or otherwise be responsible for, any liability, obligation, or claim of any nature of any Seller, whether matured or unmatured, liquidated or unliquidated, fixed or contingent, known or unknown, or whether arising out of acts or occurrences before, on, or after the date hereof, other than the Assumed Liabilities.

Section 2.3　<u>Purchase Price</u>.  The purchase price for the Purchased Assets is an amount equal to the aggregate of the Assumed Loans plus $2,000,000 (the "<u>Purchase Price</u>").  Purchaser shall pay the Purchase Price in the following order: (a) by assuming the Assumed Loans,  and (b) by crediting an amount of secured indebtedness of any Seller that is held by Purchaser as of the Closing Date, Purchaser shall be deemed to pay an amount equal to such secured indebtedness.

Section 2.4　<u>Prorations</u>.  As of the Closing Date, utility charges, rents and other charges under the Leases listed on <u>Schedule 2.1(a)(i)</u>, real and personal property taxes, and other similar obligations to third parties shall be prorated between Sellers and Purchaser.  Except as may be otherwise provided in any Lease, real property taxes shall be prorated based upon the year with respect to which such taxes are assessed, determined in accordance with local law and custom. Sellers shall be responsible for all real property assessments and similar charges, and any accrued interest thereon, including any special assessments.

Section 2.5　<u>Allocation of the Purchase Price</u>.

(a)　　The Purchase Price and the Assumed Liabilities shall be allocated among the Purchased Assets as of the Closing Date in accordance with the relative fair market value of the Purchased Assets at that time, to the extent relevant, and in a manner consistent with Section 1060 of the Code and the regulations promulgated thereunder, which allocation will be set out in a statement to be agreed upon by Purchaser and Sellers on or before the Closing Date (the "<u>Allocation</u>").  If Purchaser and Sellers are unable to agree upon the Allocation by the Closing Date, the disputed items shall be resolved by an independent accounting firm jointly selected by Purchaser and Sellers.

(b)     The transactions contemplated herein shall be reported for tax purposes in a manner consistent with the Allocation.  Neither Purchaser nor Sellers will take any position inconsistent therewith.  Purchaser and Sellers will cooperate with the other parties in preparing IRS Form 8594 and will furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.

## ARTICLE III
## THE CLOSING

Section 3.1  Time and Place of Closing.  The consummation of the sale and transfer of the Purchased Assets provided for in this Agreement (the "Closing") shall occur on the Closing Date, at the office of Purchaser's counsel in Portland, Maine, subject to satisfaction of all the conditions to Closing set forth in Articles X and XI and elsewhere in this Agreement.

Section 3.2  Deliveries by Sellers.  At the Closing, Sellers shall deliver to Purchaser or its designee, in form and substance reasonably acceptable to Purchaser, the following:

(a)     a certified copy of the Sale Order;

(b)     with respect to the Real Estate, quitclaim deed(s), assignments of rents and security deposits, appropriate affidavits, applicable local and state transfer tax forms, assignments of any intangible property used in connection with the operation of the Real Estate, original counterparts or certified copies of all the Leases, original bills and fuel readings required for apportionments, duplicates of all written guarantees and warranties in force that any Seller has received from contractors, suppliers and materialmen, together with an assignment of such guaranties and warranties;

(c)     with respect to each of the Leases listed on Schedule 2.1(a)(i), a customary assignment and assumption agreement without warranties except as set forth in this Agreement;

(d)     with respect to the Assumed Contracts, Assumed Loans, tangible personal property (including the FFE), inventory, and intangibles, a customary bill of sale and assignment and assumption agreement without warranties except as set forth in this Agreement and any applicable local or state transfer tax forms;

(e)     the rejection or cancellation under Section 365 of the Bankruptcy Code of any Contracts between any Seller and any affiliates of any Seller or third parties affecting the Purchased Assets or the Real Estate, if requested by Purchaser;

(f)     a non-foreign affidavit, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), stating that no Seller is a "foreign person" as defined in section 1445 of the Code;

(g)     all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by any Seller at or prior to the Closing Date pursuant to this Agreement or otherwise required, or reasonably requested by Purchaser or any title insurer to deliver the Purchased Assets free and clear of any Liens, except the Permitted Exceptions.

Section 3.3  Deliveries by Purchaser.  At the Closing, Purchaser or Purchaser's designee shall deliver to Sellers the following:

(a)     the cash portion of the Purchase Price, calculated pursuant to Section 2.3;

(b)     counterparts of the instruments referred to in Section 3.2 that are to be executed by Purchaser or its designee; and

(c)     all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Purchaser or its designee at or prior to the Closing Date pursuant to this Agreement, each in form and substance reasonably satisfactory to Purchaser and Sellers.

Section 3.4  Possession.  On the Closing Date, possession of the Purchased Assets shall be delivered to Purchaser or its designee.

Section 3.5  Closing Costs.  Sellers shall prepare and pay for the bills of sale, assignments and deeds (and any recording and transfer costs applicable thereto).  Purchaser or its designee shall pay for title insurance premiums and other instruments for the transfer of the Real Estate.  Other costs associated with the Closing and transactions contemplated under the Agreement shall be allocated as provided elsewhere in the Agreement.

Section 3.6  Cure Costs.  Sellers shall have sole responsibility for all costs of curing defaults under the Leases listed on Schedule 2.1(a)(i), the Assumed Contracts and the Assumed Loans pursuant to Section 365 of the Bankruptcy Code in accordance with the procedures in Article VIII hereof.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Purchaser as follows:

Section 4.1  Due Organization, Etc.  Each Seller is a corporation duly organized and validly existing under the laws of the jurisdiction of its organization and, subject to any required approval of the Bankruptcy Court, has the corporate power and authority and all necessary governmental approvals to enter into the transactions contemplated in this Agreement.  Each Seller is duly qualified as a foreign company to do business in each jurisdiction where such Seller does business.

Section 4.2 <u>Authorization, No Conflicts, Etc.</u> Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by each Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser and upon receipt of any required approval of the Bankruptcy Court) constitutes a valid and binding agreement of each Seller, enforceable against such Seller in accordance with its terms. Subject to any required approval of the Bankruptcy Court, neither the execution and delivery of this Agreement and all documents contemplated hereunder to be executed by each Seller, nor the performance of the obligations of each Seller hereunder or thereunder will result in the violation of any law or any provision of the organizational documents of such Seller or will conflict with any order or decree of any court or governmental instrumentality of any nature by which such Seller is bound.

Section 4.3 <u>Consents and Approvals</u>. No consent, approval or authorization of, or declaration, filing, or registration with, any federal or state governmental or regulatory authority is required to be made or obtained by any Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer Sellers' interest in any Purchased Assets, the title to which is governed by filing in the public records; and (c) the filing of such documents as may be necessary to reflect the release of any Liens as a matter of public record.

Section 4.4 <u>Real Estate</u>. Subject to entry of the Sale Order by the Bankruptcy Court, each Seller has, with respect to the Properties, good and marketable insurable fee simple title to such Properties, insurable as such at regular rates by a title insurer, free and clear of all liens, claims (including any mechanics liens), security interests and encumbrances (collectively "<u>Liens</u>"), other than the Permitted Exceptions (but excluding encumbrances that will be released at the Closing by payment or order of the Bankruptcy Court). No Seller has any knowledge of any existing or pending condemnation proceedings or deeds in lieu of condemnation affecting any of the Properties nor does any Seller have knowledge that any such condemnation proceedings have been threatened.

Section 4.5 <u>Contracts</u>. All contracts, agreements, licenses, permits, certificates, and other arrangements, oral or written (collectively called the "<u>Contracts</u>"), that pertain to or affect the Purchased Assets, any part thereof or any Seller's business operations are listed on the Sellers' Schedule G in the Bankruptcy Case. Except as disclosed by the Sellers on <u>Schedule 4.5</u>, (a) all of the Contracts are in good standing and in full force and effect in accordance with their respective terms and have not been modified, amended, renewed or extended, except as disclosed in writing by the Sellers to the Purchaser, (b) there has been no claim of default under any of the Contracts by any party thereto, and (c) to each Seller's knowledge, no event has occurred or failed to occur that, with the giving of notice or the passage of time, or both, would constitute a default under any of the Contracts by any party thereto except as disclosed in writing by the Sellers to the Purchaser.

Section 4.6 <u>Leases</u>. Sellers have a valid leasehold interest under all Leases. Except as disclosed by the Seller to the Purchaser on <u>Schedule 4.6</u>, Sellers have not received any notice that any Seller is in default under, or otherwise in breach of, the terms of any of the Leases and, to Sellers' knowledge, neither any Seller nor any other party is in default or otherwise in breach

thereof except as set forth on <u>Schedule 4.6</u>.  No party to any of the Leases has exercised any right to terminate such Lease.  Sellers have provided to Purchaser true, correct and complete copy of each of the Leases.  Each of the Leases is in full force and effect and constitutes the entire agreement between the parties thereto, and there are no other agreements, whether oral or written, between such parties.  No party to any of the Leases has repudiated any provision thereof and there is no dispute, oral agreement, or forbearance program in effect with respect to any of the Leases. Sellers have not received written or, to each Seller's knowledge, oral notice from any insurance company that such insurance company will require any alteration to any leased property for continuance of a policy insuring such property or the maintenance of any rate with respect thereto (other than any notice of alteration that has been completed), to the extent that such alteration is the responsibility of any of the Sellers.  In addition, except as disclosed by the Sellers to the Purchaser on <u>Schedule 4.6</u>: (a) no Sellers have contested, and no Seller is currently contesting, any operating cost, tax or assessment or other charge payable under any of the Leases; (b) there is no purchase option, right of first refusal, first option or other right held by any of the Sellers (or any tenant where any Seller holds a landlord interest) with respect to, or any real estate or building affected by, any of the Leases that is not contained within the Leases; and (c) no Seller has exercised any option or right to (i) renew or extend any of the Leases beyond the current term now in effect, (ii) terminate any of the Leases, or (iii) purchase the real or personal property subject to any of the Leases.

        Section 4.7  <u>Insurance</u>.  Except for amounts accruing prior to the start of the Bankruptcy Case, all premiums for insurance have been or shall be paid in full when due unless payable in installments, in which case the installments have been or shall be paid in full when due.  No Seller has performed, permitted or suffered any act or omission that would cause the insurance coverage provided in its insurance policies to be reduced or cancelled, and (except as may be reflected in pleadings filed in the Bankruptcy Case) no Seller has received (nor has knowledge of) any notice or request from any insurance company requiring the performance of any work or alteration in respect of any Properly or any part thereof or canceling or threatening to cancel any of policies.  No Seller has made any claims under its casualty insurance policy maintained with respect to the Properties and no Seller has knowledge of any casualty that has occurred with respect to any portion of each Property for which it could have made such a claim.

        Section 4.8  <u>True and Complete Documentation</u>.  To each Seller's knowledge, all of the documentation and information furnished to Purchaser by Sellers is true, complete and correct in all material respects.  To each Seller's knowledge, no representation or warranty given by any Seller hereunder omits to state a material fact necessary to make the statements made herein not misleading.

        Section 4.9  <u>Environmental Matters</u>.  To the best of Sellers' knowledge and except as may have been disclosed to the Purchaser in writing by the Sellers:

                (a)        Sellers are and have always been in material compliance with all applicable federal, state, local and foreign statutes, regulations, laws and ordinances relating to pollution, compensation for damage or injury caused by pollution or protection of human health or the environment (collectively, "<u>Environmental Laws</u>"), and there are no circumstances presently affecting any of the Sellers that could reasonably be expected to

prevent or interfere with such compliance by the Sellers in the future, including any failure to make a timely application or submission for renewal of a permit or other license. All licenses and permits necessary pursuant to any Environmental Law for the lawful operation of the business of the Sellers on the Real Estate, leased or otherwise operated or occupied by any of the Sellers, are in their respective possession and are in full force and effect. All such licenses and permits currently held by the Sellers are identified on Schedule 4.9. There is no Environmental Claim pending or, to any Seller's knowledge, threatened against any of the Sellers or against any person whose liability for such Environmental Claim the Sellers have retained or assumed either contractually or by operation of law, and there are no past or present actions, activities, circumstances, conditions, events or incidents, that could reasonably be expected to form the basis of an Environmental Claim against any Seller or against any Person whose liability for such Environmental Claim any of the Sellers have or may have retained or assumed either contractually or by operation of law. As used in this Agreement, "Environmental Claim" means any notice alleging potential liability (including potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (i) the presence, or release into the environment, of any material or form of energy at any location, whether or not owned by any of the Sellers, or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

(b)     Without in any way limiting the generality of the foregoing, (i) all on-site and off-site locations where the Sellers have stored, disposed or arranged for the disposal of Hazardous Substances are identified on Schedule 4.9; (ii) all underground storage tanks, and the capacity and contents of such tanks, currently or formerly located on any of the Real Estate are identified on Schedule 4.9; (iii) all wells or other borings (regardless of whether such wells or borings are in use) located on the Real Estate are identified on Schedule 4.9; (iv) there is no asbestos contained in or forming part of any building, building component, structure or office space on any of the Real Estate; (vi) no polychlorinated biphenyls (PCBs) are used or stored at any of the Real Estate; and (vii) all equipment used by the Sellers on the Real Estate using substances that will be phased out under Title VI of the Clean Air Act Amendments of 1990 are listed on Schedule 4.9.

(c)     There are not present in, on or under any of the Real Estate any Hazardous Substances in such form or quantities as to create any material liability or obligation of either Seller under any Environmental Law or any other liability for the Purchaser. As used in this Agreement, "Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in or regulated by or identified in any Environmental Law. No Seller has, in connection with the Real Estate, installed, used, generated, treated, disposed of, or arranged for the disposal of any Hazardous Substances in any manner so as to create any liability or obligation under any Environmental Law or any other liability for Sellers or Purchaser.

(d)     Each Seller has delivered to Purchaser true and correct copies of all reports, licenses, permits, authorizations, disclosures and other documents of which it is aware

relating in any way to the status of the Real Estate or otherwise relating to the business of any of the Sellers with respect to any Environmental Law.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

Section 5.1 <u>Due Incorporation, Etc</u>.  Purchaser is a limited liability company duly organized and validly existing under the laws of the jurisdiction of its organization and has the company power and authority and all necessary governmental approvals to enter into the transactions covered by this Agreement.  Purchaser is duly qualified as a foreign limited liability company to do business in each jurisdiction where Purchaser does business.

Section 5.2 <u>Authorization, No Conflicts, Etc</u>.  Purchaser has the company power and authority to enter into this Agreement and to carry out its obligations hereunder.  The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated herein have been duly authorized by all requisite company action.  This Agreement has been duly and validly executed and delivered by Purchaser, and, subject to the entry and effectiveness of the Sale Order, this Agreement constitutes the valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditor's rights generally from time to time in effect and to general equitable principles.  Neither the execution and delivery of this Agreement and all other documents contemplated herein to be executed by Purchaser, nor the performance of the obligations of Purchaser hereunder or thereunder, will result in the violation of any law or any provision of the organizational documents of Purchaser or will conflict with any order or decree of any court or governmental instrumentality of any nature by which Purchaser is bound.

Section 5.3 <u>Consents and Approvals</u>.  No consent, approval or authorization of, or declaration, filing, or registration with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except (a) for consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) for consents and approvals necessary to transfer the Permits and Licenses; and (c) for consents, approvals, authorizations, declarations, filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a material adverse effect on the transactions contemplated in this Agreement.

Section 5.4 <u>Litigation</u>.  There is no action, suit, inquiry, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission pending, or, to the knowledge of Purchaser, threatened against Purchaser that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  To Purchaser's knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement.

Section 5.5  WHERE-IS/AS-IS.  Except as otherwise expressly stated in this Agreement, Purchaser and any designee agree to accept the Purchased Assets in a "WHERE-IS, AS-IS" condition as of the Closing Date.  Without limitation of the foregoing, Purchaser acknowledges, represents and warrants to each Seller that Purchaser has not been induced to execute this Agreement by any act, statement or representation of such Seller or its agents, employees or other representatives not expressly set forth in this Agreement.

Section 5.6  Financing.  At the Closing, Purchaser will have sufficient immediately available funds to pay the Purchase Price and all other amounts payable pursuant to tills Agreement, the other agreements contemplated herein, and the transactions contemplated herein and thereby. Upon the consummation of the transactions contemplated herein, Purchaser will not be insolvent, be left with unreasonably small capital, or have incurred debts beyond its ability to pay such debts as they mature.

## ARTICLE VI
## COVENANTS PRIOR TO CLOSING

Section 6.1  Affirmative and Negative Covenants Pending Closing.  Except as expressly set forth below, during the period from the date hereof to the Closing Date:

(a)    *Sellers' Covenants.*

(i)    *Affirmative Covenants Pending Closing.*  Each Seller covenants and agrees that it shall, unless otherwise agreed to in writing by Purchaser:

(A)    Maintenance.  Maintain the Purchased Assets in the same condition as they are today, subject only to ordinary wear and tear, and keep and perform all of its obligations under the Leases and Assumed Contracts.

(B)    Court Orders.  Obtain an order or orders of the Bankruptcy Court approving the Break-Up Fee and the Auction procedures described herein on or before January 10, 2011.  Sellers then shall use their best efforts to obtain the Sale Order from the Bankruptcy Court on or before February 2, 2011.

(C)    Entry and Testing.  Upon reasonable notice from Purchaser, give Purchaser and its employees, agents and authorized representatives access to the Real Estate for the purpose of conducting such tests and inspections as Purchaser reasonably elects; provided, however, that Purchaser shall hold Sellers harmless and indemnify Sellers against any costs, expenses or liability that may arise out of Purchaser's conducting such tests and inspections, except Purchaser shall have no liability for any Hazardous Substances located on the Real Estate.

(ii)    *Negative Covenants Pending Closing.*  Except as expressly permitted herein, Sellers shall not, without the prior written consent of Purchaser:

(A)  <u>Leases, Assumed Contracts and Assumed Loans</u>.  Renew, amend or voluntarily terminate any Lease, Assumed Contract or Assumed Loan;

(B)  <u>Encumbrances</u>.  Encumber, sublease or otherwise grant any Liens or other rights with respect to the Purchased Assets; or

(C)  <u>Contracts</u>.  Enter into any contracts or agreements affecting the Purchased Assets or that will be binding on Purchaser (or its designee), in any case, from and after the execution of this Agreement.

(b)  *Purchaser's Covenants.*  Purchaser covenants and agrees that it shall, unless otherwise agreed with Sellers, with respect to the Leases and Assumed Contracts (including any relating to any assumed loan), use good faith efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance of the applicable Leases and Assumed Contracts by Purchaser or its designee.  Purchaser agrees that it will promptly take, or cause its designee to take, all actions reasonably required by Sellers to assist in obtaining the Bankruptcy Court's entity of the Sale Order, such as furnishing affidavits, nonconfidential financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to testify before the Bankruptcy Court, with respect to demonstrating adequate assurance of future performance by Purchaser under the Leases and Assumed Contracts.

Section 6.2  Title.

(a)  Within five days after the date hereof, Sellers shall provide Purchaser with copies of any existing policies of title insurance and surveys applicable to the Real Estate not previously provided to Purchaser.  Thereafter, Purchaser may elect to obtain the following:

(i)  a commitment to insure title to the Real Estate (the "<u>Commitment</u>");

(ii)  current surveys of the Real Estate; and

(iii)  reports of searches of the Uniform Commercial Code records of the secretary of state, county recorder and any other applicable filing location in the jurisdiction in which the Real Estate is located under the Uniform Commercial Code as adopted therein (clauses (i), (ii) and (iii), the "<u>Title Evidence</u>").

(b)  Any objections to the Title Evidence not made prior to entry of the Sale Order shall be deemed to be waived by Purchaser and shall be deemed to be Permitted Exceptions.

(c)     Sellers shall not be obligated to cure any objections made by Purchaser pursuant to this Section 6.2, except Sellers shall satisfy any mortgages or other Liens securing payment of a debt incurred by Sellers that may be a Lien against the Real Estate as of the Closing Date or otherwise cause through entry of the Sale Order the discharge of any such Lien on the Real Estate.  Notwithstanding the foregoing, if Sellers have not cured the title objections raised by Purchaser pursuant to this Section 6.2 on or before the Closing Date, Purchaser shall have the option to do either of the following:

(i)      terminate this Agreement; or

(ii)     waive one or more of its objections and proceed to Closing.

Section 6.3  <u>Consents and Further Actions</u>.  Subject to the terms and conditions herein provided, Sellers and Purchaser covenant and agree to use their good faith efforts to take, or cause to be taken, all actions, or do, or cause to be done, all things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated in this Agreement, including all closing conditions to be satisfied.  This Section 6.3 shall survive the closing of the transactions contemplated in this Agreement.

Section 6.4  <u>Maintenance</u>.  Between the date of this Agreement and the Closing Date, Sellers shall, subject to the provisions of this Agreement, maintain the Purchased Assets as is required for normal maintenance and upkeep.

Section 6.5  <u>Permits and Licenses</u>.  Commencing on the date of this Agreement, the parties, cooperating in good faith, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with governmental agencies or authorities, as may be necessary (a) to effect the transfer of the Permits and Licenses to Purchaser on or prior to the Closing Date, to the extent such transfer is permissible under applicable law, and (b) to enable Purchaser to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations as may be necessary for the lawful operation of the Purchased Assets by Purchaser from and after the Closing Date.

Section 6.6  <u>Tax Cooperation and Exchange of Information</u>.  Each party hereto will provide the other parties with such cooperation and information as may be reasonably requested in filing any tax return, amended tax return, or claim for refund, determining any liabilities for taxes or a right to refund of taxes, or participating in or conducting any audit or other proceeding in respect of taxes relating to the Purchased Assets or Sellers' business.  Such cooperation and information shall include providing copies of relevant tax returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities.

Section 6.7  <u>Vehicle Registration</u>.  Effective upon Closing, Sellers and Purchaser shall arrange for the transfer of the registration of all registered trucks, cars, other vehicles and rolling stock included in the Purchased Assets into Purchaser's name.

## ARTICLE VII
## BID PROCESS

Section 7.1 <u>Auction; Bidding Procedures</u>. Purchaser acknowledges that Sellers intend to conduct an auction sale of the Purchased Assets prior to the hearing on a motion seeking approval of the transactions contemplated in this Agreement (the "<u>Auction</u>"). Seller may solicit and obtain bids during the Auction for the Purchased Assets; <u>provided</u>, <u>however</u>, that no offer for any of the Purchased Assets shall be accepted by Sellers unless the proposed purchase price equals or exceeds an amount which is $250,000 greater than the Purchase Price (the "<u>Minimum Overbid</u>"). The bidding procedures, including the Minimum Overbid and the Break-Up Fee, must be approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to Purchaser by no later than  January 10, 2011.

Section 7.2 <u>Sale at Auction; Break-Up Fee</u>. If a qualified bid for the Purchased Assets exceeds the Purchase Price by the Minimum Overbid or more, then Sellers may accept such competing bid, <u>provided</u> that Sellers shall pay Purchaser an amount equal to the Break-Up Fee on the closing date of the competing transaction with a third party.

## ARTICLE VIII
## ASSIGNMENT OF LEASES AND ASSUMED CONTRACTS

Section 8.1 <u>Post-Closing Expenses</u>. Except as otherwise provided in this Agreement, all obligations with respect to Leases listed on <u>Schedule 2.1(a)(i)</u>, the Assumed Contracts and the Assumed Loans assigned to Purchaser or its designee shall be the sole responsibility of Purchaser or its designee from and after the Closing Date. Notwithstanding anything to the contrary in the foregoing sentence or in any other provision of this Agreement, Purchaser or its designee shall not be liable for any costs, taxes, obligations or liabilities relating to the Leases listed on <u>Schedule 2.1(a)(i)</u>, the Assumed Contracts or the Assumed Loans that are attributable in any way to, or were incurred during, the period prior to the Closing Date.

Section 8.2 <u>Conditions to Assignment</u>. It shall be a condition to assignment of any Lease or Assumed Contract that Sellers shall have at their sole cost (a) cured any monetary default arising under the Lease or Assumed Contract and outstanding as of the Closing Date and required to be paid under Section 365 of the Bankruptcy Code; and (b) cured any and all other defaults with respect to the Lease or Assumed Contract, as provided in Section 365 of the Bankruptcy Code so that such Lease or Assumed Contract may be assigned to Purchaser or its designee in accordance with the provisions of Section 365 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that Sellers shall not be obligated to cure any such default that is in dispute as of the Closing Date if an escrow or other commercially reasonable arrangement with respect thereto that is reasonably acceptable to Purchaser shall have been established pursuant to an order of the Bankruptcy Court. If Sellers are unable to cure any default that is required to be cured as a condition to the assumption and assignment of the Lease or Assumed Contract, Purchaser may elect to cure and obtain a credit for such amount, <u>provided</u> that the amount of such costs of cure shall be reasonably documented by Purchaser, and <u>provided further</u> that Purchaser shall provide Sellers with at least three business days' notice of its intent to cure, or, at Purchaser's option, the affected Lease or Assumed Contract

shall be excluded from the Purchased Assets and the Purchase Price shall be reduced by an amount mutually agreed upon by Purchaser and Sellers.

## ARTICLE IX
## EMPLOYEE MATTERS

Section 9.1  <u>Employees</u>.

(a)  With respect to those employees of Sellers, Sellers shall terminate the employment of all such employees on or before the Closing Date.  Subject to Purchaser's standard hiring practices and policies, Purchaser may advertise, recruit and offer employment to such employees as it determines in its sole discretion.  This Section 9.1(a) does not constitute any commitment or understanding (expressed or implied) of any obligation on Purchaser's part to (i) offer employment or to hire any such employees or (ii) hire any such employees for a fixed term or duration or upon any terms or conditions other than those that Purchaser establishes pursuant to individual offers of employment.

(b)  Purchaser will have no responsibility for, and Sellers will be solely responsible for, any wages, compensation, bonuses, deferred compensation, overtime, profit sharing benefits, workers' compensation, 401(k) matching, sick pay, vacation, personal days and severance pay benefits accrued through and including the time any employee's employment with Purchaser commences.  No such responsibility or obligation will constitute an Assumed Liability.

Section 9.2  <u>Employee Benefit Claims</u>.  Sellers will retain all liabilities under any employee benefit or welfare plans.  Purchaser is not assuming, and will not have any responsibility for the continuation of, or any liabilities under or in connection with, any employee benefit or welfare plan maintained by Sellers.  Claims, if any, of employees of Sellers and their eligible beneficiaries and dependents for medical, dental, prescription drug, life insurance, disability and other welfare benefits that are incurred prior to the Closing Date shall be the responsibility of Sellers.

Section 9.3  <u>COBRA Obligations</u>.  Notwithstanding anything to the contrary in this Agreement, Sellers shall retain all liabilities, and Purchaser shall have no liability, with respect to the provision of notices, election periods, and benefits pursuant to Section 4908B of the Code or Part 6 of Subtitle B of Title 1 of the Employee Retirement income Security Act, as amended, to any employees or former employees of Sellers or other individuals associated with any such employees or former employees with respect to qualifying events occurring on or before the Closing Date or in connection with the purchase and sale of the Purchased Assets.

## ARTICLE X
## CONDITIONS TO SELLERS' OBLIGATIONS

Sellers' obligations to consummate the transactions contemplated in this Agreement are subject to the satisfaction at or prior to the Closing Date of each of the following conditions:

Section 10.1 <u>Representations and Warranties; Covenants</u>.

       (a)    All representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that speak as of an earlier date, which will be true and correct as of such date), and Sellers shall have received a certificate dated as of the Closing Date and signed by an authorized representative of Purchaser to that effect.

       (b)    Purchaser shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date in all material respects, and Sellers shall have received a certificate dated as of the Closing Date and signed by an authorized representative of Purchaser to that effect.

Section 10.2 <u>No Injunction</u>. No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

Section 10.3 <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order.

Section 10.4 <u>Purchaser's Deliveries</u>. Purchaser shall have duly executed and delivered to Sellers each document, instrument and agreement required to be delivered under Section 3.3 above.

**ARTICLE XI**
**<u>CONDITIONS TO PURCHASER'S OBLIGATION</u>**

Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject to the satisfaction, in the discretion of Purchaser, at or prior to the Closing Date of each of the following conditions:

Section 11.1 <u>Representations and Warranties: Covenants</u>.

       (a)    All representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that speak as of an earlier date, which will be true and correct as of such date).

       (b)    Each Seller shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date in all material respects.

Section 11.2 <u>Sellers' Deliveries</u>. Each Seller shall have duly executed and delivered to Purchaser each document, instrument and agreement required to be delivered under Section 3.2 above.

Section 11.3  <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a Final Order and shall contain, among other things, the following:

      (a)      confirmation that the Leases listed on <u>Schedule 2.1(a)(i)</u>, the Assumed Contracts and the Assumed Loans (in each case, including all amendments thereto) are in full force and that the assumption and assignment thereof shall be free and clear of any Liens (other than Permitted Exceptions) or claims of defaults and Sellers shall be responsible for curing any and all defaults that may exist at the time of the assignment from Sellers' share of the Purchase Price;

      (b)      a finding that Purchaser or its designee is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code;

      (c)      a finding that in accordance with the provisions of Section 363, the Purchased Assets shall be transferred free and clear of all Liens, claims, mortgages and encumbrances (with same to attach to the Purchase Price), except Permitted Exceptions;

      (d)      an order that any extension or renewal option in any Lease listed on <u>Schedule 2.1(a)(i)</u>, Assumed Contract or Assumed Loan that purports to be "personal" only to Sellers or to be exercisable only by Sellers is an unenforceable restriction on assignment and, in fact, may be freely exercised by Purchaser or its designee to its full extent;

      (e)      a release of Purchaser and any designee from successor liability and liability for any of Sellers' environmental obligations;

      (f)      an order that the pre-petition and post-petition secured claims held by Purchaser in the Bankruptcy Case in the aggregate amount of [$4,358,577.83] as of September 3, 2010, together with advances, interest, fees and costs accruing after September 3, 2010, are allowed in their entirety and (i) paid to the extent used as credit to the Purchase Price upon the Closing with the Purchaser, and (ii) with the remainder continuing as secured obligations, secured by the Excluded Assets; and

      (g)      otherwise approving the transactions contemplated hereunder.

Section 11.4  <u>Auction</u>.  An auction, as described in Article VII, shall be held no later than January 31, 2011(or such later date as the parties may mutually agree upon), and Purchaser's (or its designee's) offer shall have been accepted by Sellers as the highest or best offer for the Purchased Assets.

Section 11.5  <u>No Injunction</u>.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

Section 11.6  <u>Permits and Licenses and Governmental Restrictions</u>.  All of the Permits and Licenses, including the environmental permits, necessary to operate the Purchased Assets, and any other licenses, permits, approvals, consents, certificates, registrations, and authorization as may be necessary for the lawful operation of the Purchased Assets by Purchaser from and after the Closing

Date, shall have been obtained by Purchaser, and Purchaser shall have determined that there are no governmental restrictions that would prohibit or unreasonably restrict the use of the Real Estate for Purchaser's intended purpose.

Section 11.7 <u>Tax Benefits</u>. Purchaser shall be qualified and entitled to receive the same tax benefits received by Sellers under the Maine Business Equipment Tax Rebate and as a business conducting operations in a Pine Tree Zone.

Section 11.8 <u>Transfer Taxes</u>. Purchaser shall have no liability with respect to any state or local transfer taxes relating to the transfer of the Purchased Assets pursuant to this Agreement.

Section 11.9 <u>Objections to Purchaser's Claims</u>. No third parties shall have objected to Purchaser's claims in the Bankruptcy Case relating to the secured indebtedness held by Purchaser, and such claims shall have been allowed by the Bankruptcy Court.

Section 11.10 <u>Title</u>. The title company selected by Purchaser shall be irrevocably committed to issue to Purchaser one or more policies of title insurance pursuant to the Commitment with respect to the Real Estate, subject only to the Permitted Exceptions and otherwise in a form approved by Purchaser pursuant to Section 6.2.

Section 11.11 <u>Environmental and Physical Condition</u>. Purchaser shall be satisfied in its sole discretion with the physical and environmental condition of the Real Estate.

Section 11.12 <u>Supply Agreements</u>. Purchaser shall have entered into agreements that are reasonably satisfactory to Purchaser with third-party suppliers of hides and chemicals.

Section 11.13 <u>Water Supply; Waste Treatment</u>. Purchaser shall be reasonably satisfied with the supply of water to the Real Estate and with any agreements relating to the treatment and disposal of wastewater including the rates and other charges relating thereto.

Section 11.14 <u>Financing</u>. Purchaser shall have obtained a working capital facility in the principal amount of at least $2,000,000, supported by a FAME guaranty, on terms and conditions reasonably satisfactory to Purchaser.

## ARTICLE XII
## <u>MISCELLANEOUS</u>

Section 12.1 <u>Termination; Other Remedies: Break-Up Fee; Expense Reimbursement</u>.

(a) This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing:

(i) by the mutual consent of Purchaser and Sellers;

(ii) (A) by Purchaser, if any Seller is in material breach of this Agreement and such breach continues for five days following written notice from

Purchaser to Sellers; or (B) by Sellers, if Purchaser is in material breach of this Agreement and such breach continues for five days following written notice from Sellers to Purchaser;

(iii)     by Purchaser, if the Closing Date has not occurred on or before February 15, 2011;

(iv)     by Purchaser, if the order relating to the Break-Up Fee and the Auction procedures has not been entered by the Bankruptcy Court on or before January 10, 2011;

(v)     by Purchaser, if the Sale Order has not been entered by the Bankruptcy Court on or before  February 2, 2011(in which case the Purchaser shall be entitled to the Break-Up Fee);

(vi)     by Purchaser, if the Sale Order, as entered, does not conform to Exhibit C hereto and contains provisions not acceptable to Purchaser in its sole discretion, in which case Purchaser shall have three business days after the entry of the Sale Order to notify Sellers in writing that Purchaser elects, in its sole discretion, to terminate this Agreement (in which case the Purchaser shall be entitled to the Break-Up Fee); or

(vii)     by Purchaser, if the Sale Order does not become a Final Order as a result of appeals or motions which have been filed challenging the Sale Order, in which case Purchaser shall have 14 days from the date of entry of the Sale Order to notify Sellers in writing that Purchaser elects, in its sole discretion, to terminate this Agreement (in which case the Purchaser shall be entitled to the Break-Up Fee).

(b)     Upon the termination of this Agreement pursuant to Section 12.1(a), Sellers, on one hand, and Purchaser, on the other, shall have no further liability to the other hereunder, except for intentional breach and as otherwise specifically provided in this Agreement.  This Section 12.1(b) shall survive the termination of this Agreement.

(c)     Break-Up Fee.  Sellers shall use their best efforts to cause prompt entry of an order of the Bankruptcy Court in the Bankruptcy Case, satisfactory in form and substance to the Purchaser, approving (i) in the event of an accepted overbid, the payment of a break-up fee to Purchaser in the amount of $100,000 (the "Break-Up Fee") and (ii) the Minimum Overbid, which order shall be entered prior to any auction with respect to any of the Purchased Assets and in any event on or before  January 10, 2011.  The Break-Up Fee shall be paid to Purchaser from (and at the time of) a closing of a competing transaction or transactions from a successful competing bid offered and accepted at the Auction and if Purchaser terminates this Agreement pursuant to Section 12.1(a)(v), (vi) or (vii).

(d)     Expense Reimbursement.  If this Agreement is terminated pursuant to its terms other than by Sellers and Purchaser pursuant to Section 12.1 (a)(i) or by Sellers pursuant to Section 12.1(a)(ii)(B), then Sellers shall reimburse Purchaser for its actual out-

of-pocket expenses not to exceed $100,000 in the aggregate. The out-of-pocket expenses shall include costs and fees (including attorneys', accountants', consultants', and other third-party fees and expenses incurred by Purchaser in connection with the transactions contemplated herein through the date on which the Agreement is terminated) incurred in connection with the negotiation, preparation, execution, delivery and attempted performance of this Agreement and the attempt to consummate the transactions contemplated herein (the "Expenses"). The Expenses shall be paid upon the earlier to occur of (i) a closing of a competing transaction or transactions from a successful competing bid offered and accepted at the Auction or (ii) the date of the first distribution to creditors of Sellers (other than payment of administrative expenses), in payment of the creditors' pre-petition claims. The Expenses shall be reimbursed as an administrative expense (and payable *pari passu* with administrative expenses other than those paid in the ordinary course of business) to the extent allowed by the Bankruptcy Court after notice and a hearing in an amount that shall be Purchaser's actual out-of-pocket expenses.

Section 12.2 <u>Successors and Assigns</u>. This Agreement is made solely and specifically by and for the benefit of the parties hereto, and their respective successors and assigns, including Purchaser's designee, if any. Purchaser shall be entitled to assign its rights hereunder to an affiliate or an entity related to Purchaser, which assignment shall not relieve Purchaser of its obligations hereunder.

Section 12.3 <u>Default and Remedies</u>.

     (a)     In the event of a material breach of, or material default under, this Agreement by Sellers, Purchaser shall be entitled (i) to specific performance of this Agreement or (ii) to terminate this Agreement as provided herein and thereupon obtain reimbursement from the Sellers for the Expenses, or (iii) pursue an action at law for damages.

     (b)     In the event of a material breach of, or material default under, this Agreement by Purchaser prior to the Closing, and provided that no Seller is in material default hereunder, Sellers shall be entitled (i) to terminate this Agreement, (ii) to seek specific performance or (iii) pursue an action at law for damages.

     (c)     Except as otherwise provided in this Section 12.3, no remedy herein or otherwise conferred upon the parties shall be considered exclusive of any other remedy, but the same shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

Section 12.4 <u>Notices</u>. All notices, requests, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally against written receipt or mailed (postage prepaid by certified or registered U.S. mail, return receipt requested) or by overnight courier to the parties at the following addresses or facsimile numbers:

If to Sellers, addressed to:

Paul Larochelle, President
Irving Tanning Company
9 Main Street
Hartland, ME 04943-0400
Fax # (207)-938-2977

With copies (which shall not constitute notice hereunder) to:

_____

Robert J. Keach, Esq.
Bernstein Shur
100 Middle Street
Portland, ME 04104-5029
(207)-774-1127

If to Purchaser, addressed to:

1061 E. Indiantown Road, Suite 104
Jupiter, Florida  33477

With copies (which shall not constitute notice hereunder) to:

Verrill Dana, LLP
One Portland Square, 9th Floor
Portland, Maine 04101
Attention:  Roger A. Clement

All such notices, requests, and other communications will (a) if delivered personally to the address as provided in this Section 12.4, be deemed given upon delivery; (b) if delivered by mail in the manner described above to the address as provided in this Section 12.4, be deemed given three business days after mailing; or (c) if delivered by overnight courier service to the address as provided in this Section 12.4, be deemed given one business day after deposit with the courier (in each case regardless of whether such notice, request, or other communication is received by any other Person to whom a copy of such notice, request, or other communication is to be delivered pursuant to this Section).  Any party from time to time may change its address or other information for the purpose of notices to that party by giving notice specifying the change to the other parties.

Section 12.5  Expenses.  Except as otherwise expressly provided herein, each party shall bear its own costs with respect to the drafting of the agreements involved in these transactions and the closing of such transactions.  The provisions of this Section 12.5 shall survive the Closing or earlier termination of this Agreement.

Section 12.6  <u>Brokerage Commissions and Fees</u>.  Purchaser warrants and represents that no brokerage commissions or fees are due any broker as a result of Purchaser's actions in connection with the transactions contemplated in this Agreement; and Purchaser agrees that should any claim be made for commissions or fees by any broker against Sellers, Purchaser will indemnify and hold Sellers harmless from and against any and all such claims in connection therewith.  Sellers warrant and represent that no brokerage commissions or fees are due to any brokers (a) under any of the Leases or (b) as a result of any Seller's actions in connection with the transactions contemplated in this Agreement; and each Seller agrees that, should any claim be made for commissions or fees by any broker against Purchaser, Sellers shall indemnify and hold Purchaser harmless from and against any and all such claims in connection therewith. Notwithstanding anything contained herein to the contrary, the provisions of this Section 12.6 shall survive the Closing or any earlier termination of this Agreement.

Section 12.7  <u>Casualty and Condemnation</u>.  If any of the Purchased Assets are destroyed or materially damaged, or if condemnation proceedings are commenced against any Real Estate, all proceeds of insurance or condemnation awards payable to any Seller by reason of such damage or condemnation shall be paid or assigned to Purchaser, or, at Purchaser's option, proceeds of insurance or condemnation awards shall be retained by Sellers and such affected Property shall be excluded from the sale and the Purchase Price reduced accordingly.  In the event of non-material damage to any Purchased Asset that is otherwise uninsured, which damage Sellers are unwilling to repair prior to the Closing, Purchaser shall be entitled to a reduction in the Purchase Price to the extent of the cost of repairing such damage.  Purchaser acknowledges that the risk of loss with respect to the Purchased Assets shall pass to Purchaser as of the Closing Date.

Section 12.8  <u>Entire Agreement</u>.  This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and this Agreement, including the schedules and exhibits hereto, and other documents to be delivered in connection herewith, contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

Section 12.9  <u>Waiver</u>.

(a)  Any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term or condition being waived, and shall be executed by an authorized officer of such party.  A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach on a future occasion.  A waiver hereunder shall be effective without an order of the Bankruptcy Court, or notice to the Bankruptcy Court or any third party, in relation to such waiver.

(b)  Without limiting any of Purchaser's other rights and remedies under this Agreement, if any of the conditions set forth in Article XI shall not be satisfied and are not waived by Purchaser, so long as Purchaser is not in default hereunder, Purchaser may, in its discretion, (i) if such condition affects all of the Purchased Assets, terminate this Agreement and neither party shall have any further liability to the other, except for the payment of the Break-Up Fee to Purchaser, or (ii) if such condition affects less than all of

the Purchased Assets, exclude the affected asset from this Agreement and the Purchase Price shall be reduced by an amount mutually acceptable to Purchaser and Sellers.

Section 12.10  <u>Amendment</u>.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of each of the parties hereto.

Section 12.11  <u>Counterparts: Facsimile Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile.

Section 12.12  <u>Headings, Gender, Etc.</u>  The headings used in this Agreement have been inserted for convenience and do not constitute matter to be construed or interpreted in connection with this Agreement.  Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender; (b) words using the singular or plural number shall also include the plural or singular number, respectively; (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement; (d) the words "include" and "including" shall be construed as incorporating "but not limited to" or "without limitation"; and (e) each reference to "Seller" shall also include its subsidiaries and predecessors and each representation, warranty, covenant and other agreement made herein with respect to any Seller shall be deemed made with respect to all such subsidiaries and predecessors.  The language used in this Agreement shall be deemed to the language chosen by the parties hereto to express their mutual intent and no rule of strict construction shall be applied against any Person.

Section 12.13  <u>Continuing Jurisdiction</u>.  The parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

Section 12.14  <u>Choice of Law</u>.  This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Maine without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation or limited liability company that is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction of incorporation or organization of such entity shall govern.

Section 12.15  <u>No Partnership or Joint Venture</u>.  Nothing contained in the preceding paragraph or elsewhere in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of seller and purchaser between the parties hereto.

Section 12.16  <u>No Third-Party Beneficiaries</u>.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person, firm or corporation, other than the parties hereto and their respective permitted successors and assigns and Purchaser's designee(s), any rights or remedies under or by reason of this Agreement.

Section 12.17  <u>Exhibits</u>.  To the extent that any Exhibit or Schedule to this Agreement is not attached or identified as "[TO COME]", Sellers and Purchaser agree to negotiate in good faith

with the other regarding the terms and/or content of any such Exhibit or Schedule to complete such Exhibit or Schedule prior to the Closing, and will amend this Agreement to include such Exhibit or Schedule when the same has been finalized.

**[Signature page follows.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly authorized, executed and delivered.

Irving Tanning Company

By: _____
    Name: _____
    Title: _____

Prime Tanning Co. Inc.

By: _____
    Name: _____
    Title: _____

Prime Tanning Corp.

By: _____
    Name: _____
    Title: _____

The Fund of Jupiter LLC

By: _____
    Name: _____
    Title: _____

Table of Schedules and Exhibits

Exhibit A                    Properties
Exhibit B                    Form of Sale Order

Schedule 2.1(a)(i)           Assumed Leases
Schedule 2.1(a)(ii)          Assumed Contracts
Schedule 2.1(a)(iii)         Assumed Loans
Schedule 2.1(b)              Excluded Contracts
Schedule 4.5                 Contracts
Schedule 4.6                 Leases
Schedule 4.9                 Environmental Disclosures

Schedule 2.1(a)(iii)
Assumed Loans


Purchaser will assume the following loans as a part of the Purchase Price:

| Loan | Estimated  Amount |
|------|-------------------|
| FAME | $828,620.58 |
| MRDA (real estate loan only) | $400,000.00 |
| Porter | $2,497,281.92 |
| TASMAN | $950,346.75 |