**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

IRVING TANNING COMPANY,

PRIME TANNING CO., INC., and

PRIME TANNING CORP.

                Debtors.

Chapter 11
Case No. 10-11757

Jointly Administered

## ORDER APPROVING BID PROCEDURES

Irving Tanning Company ("Irving"), Prime Tanning Co., Inc. ("Prime Maine") and Prime Tanning Corp. ("Prime Missouri") (collectively, the "Debtors") filed their Motion for Order (A) Approving Bid Procedures For The Sale Of The Debtors' Assets (B) Scheduling An Auction; (C) Approving Assumption And Assignment Procedures For Certain Executory Contracts And Unexpired Leases; (D) Approving A Break-Up Fee, Expense Reimbursements And Overbid Protections; And (E) Approving A Form of Notice of Sale dated January 4, 2011 [D.E. 154] (the "Bid Procedures Motion").[1]  As filed, the Bid Procedures Motion concerned the Debtors' proposed sale of substantially all of Irving's and Prime Maine's assets located at, or used in connection with, the Debtors' business in Hartland, Maine (the "Purchased Assets") to The Fund of Jupiter, LLC ("Jupiter"), subject to higher and better offers.  An expedited hearing on the Bid Procedures Motion (the "Bid Procedures Hearing") was held on January 7, 2011. During the Bid Procedures Hearing, the Debtors announced that they had reached an agreement in principle with Tasman Industries, Inc. ("Tasman" or the "Stalking Horse") on the terms under which the Debtors would sell and Tasman would acquire certain of the Debtors' assets,

---

[1] Terms not otherwise defined herein shall have the meaning ascribed to them in the Bid Procedures Motion.

1

and Tasman would replace Jupiter as the stalking horse offeror. Jupiter consented to this agreement in principle on the record during the Bid Procedures Hearing, and confirmed that Jupiter does not have any claim or cause of action against the Debtors or their estates based on the substitution of Tasman for Jupiter as the stalking horse offeror. No other interested party objected to the relief sought by the Debtors, as set forth on the record of the Bid Procedures Hearing. It appearing that due notice of the Bid Procedures Motion has been given and that no other or further notice need be given; based upon the foregoing and the entire record of the Bid Procedures Hearing, and after due deliberation thereon, and good cause appearing therefor, it is hereby

ORDERED, that the Bid Procedures Motion is GRANTED and APPROVED on the terms set forth herein; and it is further

ORDERED, that the Bid Procedures attached hereto as **Exhibit A** (the "Bid Procedures") and the Assumption and Assignment Procedures attached hereto as **Exhibit B** (the "Assumption & Assignment Procedures") are approved, and the Debtors may conduct a sale process in accordance with the Bid Procedures and the Assumption & Assignment Procedures for the purpose of obtaining and determining the highest and best bid for the Purchased Assets or such other assets, executory contracts, or unexpired leases as the Debtors may determine to sell; and it is further

ORDERED, that the form and content of the Notice of (A) Sale of Certain Assets of the Debtors; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Procedure for Determining Cure Amounts attached hereto as **Exhibit C** (the "Sale Notice") is hereby approved; and it is further

ORDERED, that the Debtors are hereby authorized and directed to serve (a) the Sale Notice on all creditors and (b) the Sale Notice (with the Bid Procedures and Assumption &

Assignment Procedures attached) and the Sale Motion on (i) the Office of the United States Trustee; (ii) counsel to the Creditors Committee; (iii) the local, state and federal taxing authorities for each jurisdiction in which the Purchased Assets are located; (iv) counsel to the Stalking Horse; (v) prospective bidders (or their counsel) that are known to the Debtors and their advisors; (vi) counter-parties to the executory contracts and unexpired leases listed on the Contract & Cure Schedule (each, a "Counter-Party"); (vii) all parties known to the Debtors to have or to assert any lien, claim and encumbrance or other interest in any of the Purchased Assets; and (viii) all persons who have filed requests for notice in these chapter 11 cases; and it is further

ORDERED that such service is hereby deemed to be sufficient notice under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure of (i) the sale of the Purchased Assets, (ii) the assumption and assignment of the executory contracts and unexpired leases that may be assumed and assigned in connection with the sale of the Purchased Assets and (iii) the cure amounts alleged to be owed to the Counter-Parties as set forth on Contract & Cure Schedule (as defined in the Assumption & Assignment Procedures) (collectively, the "Proposed Cure Amounts"); and it is further

ORDERED, that any person seeking to submit a bid for the Purchased Assets, or any other assets, executory contracts and/or unexpired leases of the Debtors, shall comply with the Bid Procedures and shall submit such bid to counsel for the Debtors, Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME 04104-5029 (Fax: (207) 774-1127; email: rkeach@bernsteinshur.com) **so as to be received** no later than 5:00 p.m. (prevailing Eastern Time) on January 26, 2011 (the "Bid Deadline"); and it is further

**ORDERED**, that any bid must comply with the terms and conditions of the Bid Procedures, and it is further

**ORDERED**, that an auction (the "Auction") will be held at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, ME, beginning at 10:00 a.m. on January 28, 2011; and it is further

**ORDERED**, that only Qualified Bidders shall be entitled to submit further bids at the Auction in accordance with the provisions of the Bid Procedures and those other procedures which may be announced at the time of the Auction; and it is further

**ORDERED**, that a hearing on the sale of the Purchased Assets will be held on January 31, 2011 at 10:00 a.m. before the Honorable Louis H. Kornreich, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Maine, 202 Harlow Street, 3rd Floor, Bangor, ME 04401; and it is further

**ORDERED**, that objections, if any, to the relief requested in the Sale Motion or to final approval of the asset purchase agreement between the Debtors and Tasman (the "Stalking Horse Agreement") must be filed with the Clerk of the Bankruptcy Court on or before January 28, 2011 (the "Objection Deadline"). A copy of any objection must also be served by hand, facsimile, e-mail or overnight mail upon (i) Debtor's Counsel c/o Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME 04104-5029 (Fax: 207-774-1127; email: rkeach@bernsteinshur.com); and (ii) Stephen Morrell, Assistant U.S. Trustee, 537 Congress Street, Room 303, Portland, ME 04101 (Fax: 207-780-3564; email: Stephen.G.Morrell@usdoj.gov) (collectively, the "Interested Parties"), so **as to be received** on or before the Objection Deadline; and it is further ordered;

**ORDERED**, that any objection to a Proposed Cure Amount and any objection to the potential assumption and assignment of an executory contract or lease must be filed with the

Bankruptcy Court on or before January 28, 2011 (unless a later date is allowed by the Assumption & Assignment Procedures) and be served upon the Interested Parties so as to be received by that date in accordance with the Assumption & Assignment Procedures above; and it is further

**ORDERED**, that, if any Counter-Party fails to timely object to the Proposed Cure Amount, the Counter-Party will be forever barred from disputing the Proposed Cure Amount; and it is further

**ORDERED**, that any objection to the Proposed Cure Amounts shall not constitute an objection to the assumption, assignment and sale of any executory contract or unexpired lease, but only as a reservation of the Counter-Party's rights with respect to the correct cure amount; and it is further

**ORDERED**, that the Break-Up Fee and Expense Reimbursement are hereby approved and the Debtors are authorized to pay the Break-Up Fee and Expense Reimbursement to the Stalking Horse as an administrative expense in accordance with the provisions of the Stalking Horse Agreement; and it is further

**ORDERED**, that this Order shall become effective immediately upon its entry; and it is further

**ORDERED**, that this Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

Dated: _____

_____
Honorable Louis H. Kornreich
United States Bankruptcy Judge



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

IRVING TANNING COMPANY,

PRIME TANNING CO., INC., and

PRIME TANNING CORP.

Debtors.

Chapter 11
Case No. 10-11757

Jointly Administered

## BID PROCEDURES

Set forth below is the general process to be employed by the Debtors as sellers (collectively, the "Seller") with respect to the proposed Sale of all or substantially all of the assets of Irving Tanning Company and Prime Tanning Co., Inc., located in and/or used in connection with the operations located in Hartland, Maine, as contained in the Debtors' Motion for entry of an order: (A) approving bid procedures for the sale of certain of the Debtors' assets, (B) scheduling an auction, (C) approving assumption and assignment procedures, (D) approving a break-up fee, expense reimbursement and overbid protections; (E) approving form of notice, and (F) granting related relief [D.E. 154] (the "Bid Procedures Motion"). As used herein, the term "Stalking Horse Agreement" refers to that certain Asset Purchase Agreement between the Sellers and Tasman Industries, Inc. dated as of January 7, 2011, as the same may be amended, supplemented, or modified from time to time, and the term "Stalking Horse" refers to Tasman Industries, Inc. or its permitted successors and assigns (if any).

    a.    **Assets to Be Sold**. The Debtors are offering for sale all or substantially all of the assets of Irving Tanning Company and Prime Tanning Co., Inc. located in and/or used in connection with the operations located in Hartland, Maine. A list

1

of assets of the Debtors that are included in the definition of "Purchased Assets" under the Stalking Horse Agreement (the "Purchased Assets") and a list of the Debtors' assets that are not proposed to be purchased by the Stalking Horse are available as part of the due diligence material being made available to Potential Bidders (defined below). Bidders may also submit a bid for less than all the Purchased Assets or a bid that includes assets of the Debtors that are not included in the Purchased Assets, including, without limitation, the real property that the Debtors do not propose to sell to the Stalking Horse (the "Other Assets" and, together with the Purchased Assets, the "Assets").

b.   **The Bidding Process.** The Debtors, in conjunction with their advisors and using reasonable discretion taking into account their fiduciary duties and after consultation with the Official Committee of Unsecured Creditors appointed in the Debtors' jointly administered bankruptcy cases (the "Creditors Committee") shall: (i) determine whether any person is a Potential Bidder (hereinafter defined); (ii) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Debtors' businesses; (iii) receive offers from Qualified Bidders (hereinafter defined); and (iv) negotiate any offer made to purchase the Assets, together or separately (collectively, the "Bidding Process"). Except as set forth below with respect to the Pension Benefit Guaranty Corporation, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

c.   **Participation Requirements.** Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtors, in their reasonable

discretion taking into account their fiduciary duties and after consultation with the Creditors' Committee, in order to participate in the Bidding Process each person (a "Qualified Bidder") must submit a bid that adheres to the following requirements (a "Qualified Bid"):

i. All Qualified Bids must be submitted to counsel for the Debtors: Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME, 04104-5029 (Fax: (207) 774-1127; email: rkeach@bernsteinshur.com) not later than 5:00 p.m. (prevailing Eastern Time) on January 26, 2011 (the "Bid Deadline"). The Debtors shall immediately distribute any bid so submitted by facsimile transmission, electronic mail, or personal delivery to counsel for the Creditors Committee. Promptly upon Debtors' determination that a Bid is a Qualified Bid, the Debtors shall provide copies of such Qualified Bid to all other Qualified Bidders. Upon determination that any Bid is not a Qualified Bid, the Debtors shall notify such bidder of such determination forthwith, but in any event not later than 1:00 p.m. (prevailing Eastern Time) on January 27, 2011, and shall provide such bidder with the basis for such determination.

ii. All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors' Committee, deem financially able to consummate the purchase of the Assets, which letter states:

3

(A)      that such Qualified Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed asset purchase agreement (an electronic version in Word format and blacklined against the Stalking Horse Agreement received on or before the Bid Deadline, with a hard copy to follow), together with its exhibits and schedules, including terms relating to price and the time of closing (the "Proposed Agreement");

(B)      that such Qualified Bidder is prepared to consummate the transaction, following entry of an order of this Court approving the Sale to the Successful Bidder (the "Sale Order");

(C)      that in the event such Qualified Bidder becomes the Successful Bidder (both the highest or otherwise best bid and second-highest bid), such Qualified Bidder's offer is irrevocable until the earlier to occur of February 28, 2011 or two (2) business days after the closing of the Sale of the Assets;

(D)      the actual value of such Qualified Bidder's bid to the Debtors' estates;

(E)      which of the Debtors' leases and executory contracts are to be assumed in connection with the consummation of the Qualified Bidder's bid;

(F)      that the Qualified Bidder agrees to pay the full amount of the Tasman Payable (as such term is used and defined in the Stalking Horse Agreement and estimated to be not more than $2 million at closing) in cash at closing; and

(G)      whether such bid proposes to assume all or any portion of the liabilities of Prime Tanning Corp. in connection with the Prime Tanning Retirement Income Plan for Hourly Employees (the "Pension Plan").  No bid is required to assume all or any portion of such liabilities, but if any bid does propose to assume such liabilities, the bid shall so indicate.

iii.      All Qualified Bids, including any bid by any of the creditors holding prepetition secured claims (the "Prepetition Senior Secured Lenders"), or any entity (each a "Newco") formed by any of the Prepetition Senior Secured Lenders for purposes of bidding on the Debtors' assets, shall be accompanied by a

deposit into escrow with the Debtors of an amount equal to $350,000 (the "<u>Good Faith Deposit</u>"), provided, however, that the Stalking Horse shall not be required to make a Good Faith Deposit because it is credit bidding the Tasman Payable as part of the purchase price set forth in the Stalking Horse Agreement.

iv.    All Qualified Bids shall be accompanied by satisfactory evidence, in the reasonable opinion of the Debtors and their advisors, taking into account their fiduciary duties and after consultation with the Creditors' Committee, of committed financing or other ability to perform all transactions contemplated by the Proposed Agreement. With respect to the Prepetition Senior Secured Lenders or any Newco formed for the purpose of submitting a bid on behalf of the Prepetition Senior Secured Lenders, committed financing in the principal amount of $2 million shall constitute satisfactory evidence of ability to perform.

v.    Qualified Bids should not contain any financing conditions or contingencies (other than those set forth in the Stalking Horse Agreement).

vi.    All Qualified Bids must provide for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder, which,

with respect to the Prepetition Senior Secured Lenders or any Newco formed for the purpose of submitting a bid on behalf of one or more of the Prepetition Senior Secured Lenders, shall be satisfied by a commitment for financing in the principal amount of $2 million.

vii. The Debtors shall provide a copy of any Qualified Bid wherein the bidder proposes to assume any or all of the liabilities relating to the Pension Plan to counsel for the Pension Benefit Guaranty Corporation (the "PBGC") promptly after receipt of such Qualified Bid(s), but only if the PBGC has previously entered into a confidentiality agreement covering such bids on terms reasonably acceptable to the Debtors and PBGC.

d. **Due Diligence.** The Debtors shall afford each Potential Bidder (hereinafter defined) due diligence access to the Assets. Due diligence access may include management presentations as may be scheduled by the Debtors, access to data rooms, onsite inspections and such other matters which a Potential Bidder may request and as to which the Debtors may agree in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, provided that all such information shall be made available to each Potential Bidder on an equal basis. Neither the Debtors nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to the Assets to any person except to Potential Bidders, Qualified Bidders, and the Creditors Committee. Potential Bidders are advised to exercise their own discretion before relying

on any information regarding the Assets provided by anyone other than the Debtors or their representatives. To be a "Potential Bidder," each bidder must have delivered the following:

    i.    an executed confidentiality agreement in a form satisfactory to the Debtors in their reasonable discretion taking into account their fiduciary duties, provided that no Potential Bidder will be required to execute a confidentiality agreement more onerous in any material respect to the confidentiality agreements executed by other Potential Bidders; and

    ii.    current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, demonstrating such Potential Bidder's ability to close the proposed transaction, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

Each of (a) the Prepetition Secured Lenders and (b) any Newco formed for the purpose of submitting a bid on behalf of one or more of the Prepetition Senior Secured Lenders (and, with regard to any such Newco, evidence of a commitment for financing in the principal amount of $2 million) shall be deemed a Potential Bidder for all purposes.

e.   **"As Is, Where Is."** The sale of the Purchased Assets or the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder. Except as otherwise provided in the Proposed Agreement, all of the Debtors' right, title and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, charges, security interests, restrictions and other encumbrances of any kind or nature thereon and there against (collectively, the "Transferred Liens"), with such Transferred Liens to attach to the proceeds of the sale. Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection with the Assets, the Bidding Process or the Auction, except as expressly stated in these Bid Procedures or, as to the Successful Bidder, in the applicable Proposed

Agreement.

f. **Stalking Horse**. The Stalking Horse has submitted a Qualified Bid pursuant to the Stalking Horse Agreement, which Qualified Bid shall serve as a stalking horse bid (the "Stalking Horse Bid").  For purposes of these Bid Procedures, the Debtors currently value the Stalking Horse's Qualified Bid at $6,500,000.

g. **Credit Bid.** The Prepetition Senior Secured Lenders, and any Newco created by any of the Prepetition Senior Secured Lenders for such purpose shall have the right to credit bid at the Auction and any credit bid submitted shall be a Qualified Bid to the extent it meets the other terms and conditions hereof. The Stalking Horse has the right to credit bid the amount of the Tasman Payable.

h. **Auction.**  If the Debtors receive more than one Qualified Bid prior to the Bid Deadline, the Debtors shall conduct an auction (the "Auction") at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, ME,  on January 28, 2011, beginning at 10:00 a.m. (prevailing Eastern Time) or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids, provided, however, that the Auction shall be completed and the Successful Bid (as defined herein) announced no later than January 31, 2011 at 8:00 a.m. (prevailing Eastern Time). Only representatives of the Stalking Horse, the Debtors, the United States Trustee, the Creditors Committee, and any Qualified Bidders who have timely submitted Qualified Bids shall be entitled to attend the Auction. The Debtors, in their reasonable discretion taking into account their fiduciary

duties and after consultation with the Creditors Committee, may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bid Procedures. Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, determine is relevant, the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, may conduct the Auction in the manner they determine will achieve the maximum value for the Assets. At the Auction, the minimum initial bid against the Stalking Horse bid must exceed the value of the Stalking Horse bid by $250,000. (Therefore, to be a Qualified Bid, such initial bid must have a value to the estate of not less than $6,750,000). Subsequent bids shall be made in minimum increments of $50,000 (unless such amount is increased or decreased as set forth below). At the commencement of the Auction and at the conclusion of each round of bidding at the Auction, the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, shall announce the then highest or otherwise best offer or combination of offers for the Assets and the basis for such determination,

including identifying any non-economic terms that form the basis for such determination. Prior to concluding the Auction, the Debtors shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (ii) using their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, identify and announce to all attending the Auction, the highest or otherwise best offer or combination of offers for the Assets (the "Successful Bid") and any second-highest offer (the "Back-up Bid") and the basis for such determination. Subject to the foregoing, in determining the Successful Bid and the Back-Up Bid, the Debtor shall consider, among other factors, the benefit to their respective estates arising out of any bid's proposed assumption of all or any portion of the Pension Plan liabilities. The Debtors and the Successful Bidder shall be required to execute the asset purchase agreement for the Successful Bid at the conclusion of the Auction or immediately thereafter. The Debtors shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing. The bidder as to the Back-up Bid shall also execute an asset purchase agreement, contingent on the failure to close of the Successful Bid.

i. **Acceptance of Qualified Bids.** The Debtors shall sell the Purchased Assets to the Stalking Horse or the Assets to the Successful Bidder, as the case may be, submitting the highest or otherwise best Qualified Bid at the Auction, after approval of such Qualified Bid by the Bankruptcy Court at the Sale Hearing. The Debtors' presentation to the Bankruptcy Court for approval of a

particular Qualified Bid does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors shall have accepted a Qualified Bid only when that Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

j.  **The Sale Hearing.** After the conclusion of the Auction, the Bankruptcy Court shall conduct a hearing (the "Sale Hearing") to approve the Sale. At the Sale Hearing, the Debtors will seek entry of an order (the "Sale Order"), among other things, authorizing and approving the Sale to the Successful Bidder(s), as determined by the Debtors in accordance with the Bid Procedures, pursuant to the terms and conditions set forth in the Proposed Agreement(s) submitted by the Successful Bidder(s) (as such agreement may be modified prior to, during or after the Auction with the agreement of the Debtors). The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court. Following the entry of the Sale Order approving the Sale, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid(s) and the Debtors shall be authorized to effectuate such sale without further order of the Bankruptcy Court.

k.  **Return of Good Faith Deposit.** The Good Faith Deposits of the Qualified Bidders submitting the Successful Bid and the Back-up Bid shall be retained by the Debtors and such Successful Bid and Back-up Bid will remain open and irrevocable, notwithstanding Bankruptcy Court approval of a sale

pursuant to the terms of a Successful Bid by a Qualified Bidder, until the earlier to occur of February 28, 2011 or two (2) business days after the closing of the Sale of the Purchased Assets and/or Other Assets. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, which shall be retained by the Debtors as liquidated damages to the extent the Debtors are entitled to such damages under the Proposed Agreement.

l. **<u>Modifications.</u>** The Debtors may: (i) determine, in their reasonable business judgment taking into account their fiduciary duties and after consultation with the Creditors Committee, which Qualified Bid, if any, is the highest or otherwise best offer; (ii) consult with the representatives of the Creditors Committee, or any other significant constituent in connection with the bidding process and Bid Procedures; and (iii) reject at any time before announcing the Successful Bid at the Auction, any bid that, in the Debtors' reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, is: (x) inadequate or insufficient; or (y) not in conformity with the Bankruptcy Code or the Bid Procedures.

m. **<u>Reservation of Rights.</u>** In addition to their rights set forth in sections (h) and (l) above, the Debtors may modify these Bid Procedures or impose, at or prior to the Auction, additional terms and conditions on the proposed Sale of the Assets if, in their reasonable judgment, taking into account their fiduciary duties and after consultation with the Creditors Committee, such

modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process. Without limitation, at any point during the Auction, the Debtors shall have the absolute right to convert the bidding process from an open auction to a "sealed bid auction," in which case all Qualified Bidders shall have one opportunity to make a final, sealed bid.  If the Debtors exercise this option, then the Debtors shall collect all sealed bids, analyze them, and determine the highest and best bid and any Back-up Bid, in consultation with the Creditors Committee.


**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE**

| | |
|---|---|
| In re: | Chapter 11 |
| IRVING TANNING COMPANY, | Case No. 10-11757 |
| PRIME TANNING CO., INC., and | Jointly Administered |
| PRIME TANNING CORP. | |
| Debtors. | |

## ASSUMPTION AND ASSIGNMENT PROCEDURES

Set forth below are the assumption and assignment procedures (the "Assumption & Assignment Procedures") to be employed with respect to the proposed Sale contemplated by the Debtors as contained in the Debtors' Motion for entry of an order: (A) approving bid procedures for the sale of certain of the Debtors' assets, (B) scheduling an auction, (C) approving assumption and assignment procedures, (D) approving break-up fee, expense reimbursement and overbid protections; (E) approving form of notice, and (F) granting related relief (the "Motion")

a. Within five (5) days prior to the Bid Deadline[1], the Debtors shall file a schedule of cure obligations (the "Contract & Cure Schedule") listing all leases and executory contracts that the Stalking Horse intends to assume (the "Assigned Contracts") and the amount, if any, that the Debtors contend is the amount needed to cure any defaults with respect to such Assigned Contracts (the "Cure Amounts").

b. Upon filing, a copy of the Contract & Cure Schedule and these Assumption & Assignment Procedures will be served on each of the counterparties to the

---

[1] All capitalized terms not defined herein shall have the same meaning as set forth in the Bid Procedures.

Assigned Contracts listed on the Contract & Cure Schedule.

c.     The Debtors shall amend the Contract & Cure Schedule promptly after the completion of the Auction to update the information contained therein with respect to the Successful Bid, and Back-up Bid including but not limited to adding additional leases and executory contracts (which shall then be deemed Assigned Contracts) and corresponding cure amounts (which shall be deemed Cure Amounts) and shall serve an amended Contract & Cure Schedule on each of the counterparties to the Assigned Contracts listed thereon on each of the counterparties to the Assigned Contracts listed thereon.

d.     The bidder approved by the Bankruptcy Court as submitting the highest or otherwise best bid for purchase of the Debtors' assets (the "Successful Bidder"), at any time prior to closing on the sale of the Assets, may identify executory contracts and leases to be (a) added to the Contract & Cure Schedule (which contracts shall then be deemed Assigned Contracts) and the corresponding cure amounts (which shall be deemed Cure Amounts) and (b) deleted from the list of Assigned Contracts (which shall then cease to be Assigned Contracts). The Debtors shall give notice (the "Supplemental Notice") to counterparties to executory contracts and leases added to or deleted from the Contract and Cure Schedule.

e.     Any objections ("Assignment Objections") to the assumption and assignment of any Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth in the Contract & Cure Schedule must be filed with the Bankruptcy Court and served upon the Notice Parties on or before 4 p.m. prevailing Eastern Time on

the later of the date (the "Assignment Objection Deadline") that is (a) one business day before the Sale Hearing and (b) ten days after the date of service of the applicable Supplemental Notice with regard to any Assigned Contract listed on such Supplemental Notice. Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred: (i) objecting to the Cure Amount set forth on the Contract & Cure Schedule with respect to its Assigned Contract; (ii) seeking additional amounts arising under its Assigned Contract prior to the Closing from the Debtors or the Successful Bidder; and (iii) objecting to the assumption and assignment of its Assigned Contract to the Successful Bidder.

f.    Any Assignment Objections required to be filed prior to the date of the Sale Hearing and not consensually resolved prior to the Sale Hearing shall be heard at the Sale Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Assigned Contracts will be heard at the Sale Hearing, provided, however that all Assignment Objections for which the Assignment Objection Deadline is after the date of the Sale Hearing and which objection is not filed prior to the Sale Hearing, shall be heard on a date to be determined jointly by the Debtors and the Successful Bidder, subject to the availability of the Bankruptcy Court.

g.    Except as may otherwise be agreed to by all parties to an Assigned Contract, on or before the Closing, the cure of any  defaults under Assigned Contracts necessary to permit   assumption and assignment thereof shall be by (i) payment of the   undisputed Cure Amount, and/or (ii) establishment of a

reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the Proposed Agreement between the Successful Bidder or Back-up Bidder and the Seller.

## Contract & Cure Schedule

| Counterparty | Description of Contract/Lease | Cure Amount |
|---|---|---|
| NMHG Financial Services, Inc. P.O. Box 643749 Pittsburgh, PA 15264 | Forklift Lease | $7,646.82 |
| Pitney Bowes Credit Corp. P.O. Box 909 Shelton, CT 06484-0949 | Mailing System Lease | $0.00 |
| Ryder Transportation Services P.O. Box 96723 Chicago, IL 60693 | Truck Lease | $1,724.78 |
| Wells Fargo Financial Leasing, Inc. P.O. Box 6434 Carol Stream, IL 60197 | Photocopier Lease | $416.63 |
| Dang Tu Ky Leather Co., Ltd. H24A-24B-25-26-27, Road 3 Le Minh Xuan Industrial Zone Binh Chanh Dist, Hochiminh City VIETNAM | Production Agreement | $0.00 |
| Key Equipment Finance 600 Travis, Suite 1300 Houston, TX 77002 | Xerox Photocopier Lease | $136.52 |
| Hartland Pollution Control c/o Peggy Morgan Town of Hartland P.O. Box 280 Hartland, ME 04943 | Sewage Treatment Contract | $96,734.80 |
| Unifirst 430 Riverside Industrial Pkwy Portland, ME 04103-1436 | Uniform Contract | $1,416.50 |
| Cintas Corporation 15 Eisenhower Drive Westbrook, ME 04092 | Uniform Contract | $3,152.88 |
| Moore & Giles, LLC 3018 Carroll Avenue P.O. Box 11766 Lynchburg, VA 24506 | Commission Agreement | $35,568.37 |
| Ross Bear Suite #103-234 16420 S.E. McGillivray Blvd Vancouver, WA 98683 | Commission Agreement | $1,192.73 |

| | | |
|---|---|---:|
| Craig Scotland<br>P.O. Box 248<br>Cape Neddick, ME 03902 | Commission Agreement | $1,469.55 |
| 4B Leather Company<br>646 High Street<br>Westwood, MA 02090 | Commission Agreement | $16,568.86 |
| R.F. Hood<br>96 Pitfield Agincourt<br>Ontario, Canada<br>M1S1Y6 | Commission Agreement | $135.75 |
| Wolverine World Wide Inc.<br>9341 Courtland Drive, N.E.<br>Rockford, MI 49351 | Bailment and Service Agreement | $0.00 |



EXHIBIT
C

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE**

In re:

IRVING TANNING COMPANY,

PRIME TANNING CO., INC., and

PRIME TANNING CORP.

              Debtors.

Chapter 11
Case No. 10-11757

Jointly Administered

**NOTICE OF (A) SALE OF CERTAIN ASSETS OF THE DEBTORS;
(B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (C) PROCEDURE
FOR DETERMINING CURE AMOUNTS**

To Creditors and Parties in Interest:

       Notice is hereby given, pursuant to 11 U.S.C. §§ 363 and 365, Fed. R. Bankr. P. 2002, 4001, 6004, 6006 and D. Me. LBR 6004-1(a)(2), that Irving Tanning Company ("Irving"), Prime Tanning Co., Inc. ("Prime Maine") and Prime Tanning Corp. ("Prime Missouri") (collectively, the "Debtors"), intend to sell certain assets of the Debtors (the "Purchased Assets") and potentially assume and assign certain executory contracts and unexpired leases related thereto (the "Assigned Contracts").[1]

       The Debtors have entered into an asset purchase agreement (the "Stalking Horse Agreement") with Tasman Industries, Inc. (the "Stalking Horse"), by which the Stalking Horse intends to purchase the Purchased Assets and take an assignment of any contracts that are designated as Assigned Contracts. Pursuant to the Motion of the Debtors for Authority to Sell Certain Assets of the Debtors to The Fund of Jupiter, LLC Free and Clear of Liens, Claims and Encumbrances and for Approval of the Assumption and Assignment of Certain Leases and Executory Contracts [D.E. 156] (the "Sale Motion"), the Debtors seek final approval of the Stalking Horse Agreement with Stalking Horse or a higher and better bidder, if any.

       Under the Stalking Horse Agreement, the Debtors currently expect to receive aggregate consideration of approximately $6,500,000 for the Purchased Assets from the Stalking Horse. The Stalking Horse Agreement is subject to higher and better offers. The Debtors are soliciting higher and better offers by means of an Auction (as defined in **Exhibit A**) which shall be governed by the terms and conditions of the Bid Procedures attached hereto as **Exhibit A** (the "Bid Procedures"). The Bid Procedures have been approved by the Bankruptcy Court (as

---

[1] The term "Purchased Assets" shall include and refer to the "Assigned Contracts."

defined below).  The Purchased Assets are more fully described in the Stalking Horse Agreement.

The Purchased Assets will be sold and transferred free and clear of all liens, claims and encumbrances.  Any perfected, enforceable and valid liens shall attach to the proceeds of the sale according to priorities established under applicable law or the orders of the Bankruptcy Court.

The Sale Motion and the Stalking Horse Agreement are on file with the United States Bankruptcy Court for the District of Maine, 202 Harlow Street, 3rd Floor, Bangor, ME 04401 (the "Bankruptcy Court"), and are available for review during regular business hours.  Copies of the Sale Motion and the Stalking Horse Agreement are also available (free of charge) upon written request from Angela Stewart, Bankruptcy Paralegal, Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME 04104-5029 (Tel: 207-228-7374; email: astewart@bernsteinshur.com).

OBJECTIONS, if any, to the relief requested in the Sale Motion or to final approval of the Stalking Horse Agreement must be filed with the Clerk of the Bankruptcy Court on or before January 28, 2011 (the "Objection Deadline").  A copy of any objection must also be served by hand, facsimile, e-mail or overnight mail upon (i) Debtor's Counsel c/o Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME (Fax: 207-774-1127; email: rkeach@bernsteinshur.com); (ii) the Stalking Horse c/o Jacob Manheimer, Esq., Pierce Atwood LLP, One Monument Square, Portland, ME 04101 (Fax: 207-791-1350; e:mail: jmanheimer@pierceatwood.com); and (iii) Stephen Morrell, Assistant U.S. Trustee, 537 Congress Street, Suite 303, Portland, ME 04101 (Fax: 207-780-3568; email: Stephen.G.Morrell@usdoj.gov) (collectively, the "Interested Parties"), so **as to be received** on or before the Objection Deadline.

Through this notice, HIGHER AND BETTER OFFERS to purchase the Purchased Assets, and/or for such other assets, executory contracts, or unexpired leases as a purchaser desires to acquire, are hereby solicited.  To be considered a qualified counteroffer, a counteroffer shall comply with the Bid Procedures, including the service of such counteroffer by hand, facsimile, email or overnight mail upon Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME (Fax: 207-774-1127; email: rkeach@bernsteinshur.com); so as to be received on or before 5:00 p.m. on January 26, 2011.  If a qualified bid is timely received, the Debtors will hold an open auction at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, ME commencing at 10:00 a.m. on January 28, 2011 (the "Auction").

A FINAL HEARING on the Sale Motion is scheduled to take place at the Bankruptcy Court before the Honorable Louis H. Kornreich, United States Bankruptcy Judge on January 31, 2011 at 10:00 a.m.

Notice is further given to each counter-party (a "Counter-Party") listed on Attachment 1 to the Assumption and Assignment Procedures attached hereto as **Exhibit B** (the **"Assumption and Assignment Procedures"**) of the cure amounts listed on such Attachment 1 (the "Cure Amounts"), if any, that the Debtors believe are owing on each of the Assigned Contracts which

may be designated by any potential buyer as an executory contract or unexpired lease to be assumed and assigned.

OBJECTIONS, if any, of any Counter-Party to the stated Cure Amounts must be filed with the Clerk of the Bankruptcy Court on or before the Objection Deadline in accordance with the Assumption and Assignment Procedures. A copy of any objection must also be served upon Interested Parties so as to be received on or before the Objection Deadline in accordance with the Assumption and Assignment Procedures. An objection should contain the Cure Amount such Counter-Party believes is due. The failure of a Counter-Party to submit an objection will forever bar such Counter-Party from asserting any other Cure Amount or from otherwise disputing such amount(s) with respect to the contract(s) in question. The filing of an objection to the Cure Amounts shall not constitute an objection to the assumption, assignment and sale of the executory contract but shall reserve the rights of such objecting party to a determination of a different Cure Amount.

Any party who has filed an objection or a Qualified Bid is expected to be present at the Auction, failing which the objection may be overruled or the Qualified Bid may be stricken.

At the Auction, the Bankruptcy Court may, upon the request of the Debtors or on the Bankruptcy Court's own motion, (1) consider any requests to strike a higher offer; (2) determine further terms and conditions of the sale; and (3) determine the requirements for further competitive bidding.

Dated:  January 10, 2011

IRVING TANNING COMPANY
PRIME TANNING CO., INC.
PRIME TANNING CORP.

By their attorneys:

*/s/ Robert J. Keach*
Robert J. Keach, Esq.
Michael A. Fagone, Esq.
Máire B. Corcoran, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
(207) 774-1200



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

IRVING TANNING COMPANY,

PRIME TANNING CO., INC., and

PRIME TANNING CORP.

Debtors.

Chapter 11
Case No. 10-11757

Jointly Administered

## BID PROCEDURES

Set forth below is the general process to be employed by the Debtors as sellers (collectively, the "Seller") with respect to the proposed Sale of all or substantially all of the assets of Irving Tanning Company and Prime Tanning Co., Inc., located in and/or used in connection with the operations located in Hartland, Maine, as contained in the Debtors' Motion for entry of an order: (A) approving bid procedures for the sale of certain of the Debtors' assets, (B) scheduling an auction, (C) approving assumption and assignment procedures, (D) approving a break-up fee, expense reimbursement and overbid protections; (E) approving form of notice, and (F) granting related relief [D.E. 154] (the "Bid Procedures Motion").   As used herein, the term "Stalking Horse Agreement" refers to that certain Asset Purchase Agreement between the Sellers and Tasman Industries, Inc. dated as of January 7, 2011, as the same may be amended, supplemented, or modified from time to time, and the term "Stalking Horse" refers to Tasman Industries, Inc. or its permitted successors and assigns (if any).

a.   **Assets to Be Sold**. The Debtors are offering for sale all or substantially all of the assets of Irving Tanning Company and Prime Tanning Co., Inc. located in and/or used in connection with the operations located in Hartland, Maine. A list

1

of assets of the Debtors that are included in the definition of "Purchased Assets" under the Stalking Horse Agreement (the "Purchased Assets") and a list of the Debtors' assets that are not proposed to be purchased by the Stalking Horse are available as part of the due diligence material being made available to Potential Bidders (defined below). Bidders may also submit a bid for less than all the Purchased Assets or a bid that includes assets of the Debtors that are not included in the Purchased Assets, including, without limitation, the real property that the Debtors do not propose to sell to the Stalking Horse (the "Other Assets" and, together with the Purchased Assets, the "Assets").

b.    **The Bidding Process.** The Debtors, in conjunction with their advisors and using reasonable discretion taking into account their fiduciary duties and after consultation with the Official Committee of Unsecured Creditors appointed in the Debtors' jointly administered bankruptcy cases (the "Creditors Committee") shall: (i) determine whether any person is a Potential Bidder (hereinafter defined); (ii) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Debtors' businesses; (iii) receive offers from Qualified Bidders (hereinafter defined); and (iv) negotiate any offer made to purchase the Assets, together or separately (collectively, the "Bidding Process"). Except as set forth below with respect to the Pension Benefit Guaranty Corporation, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

c.    **Participation Requirements.** Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtors, in their reasonable

discretion taking into account their fiduciary duties and after consultation with the Creditors' Committee, in order to participate in the Bidding Process each person (a "Qualified Bidder") must submit a bid that adheres to the following requirements (a "Qualified Bid"):

    i.    All Qualified Bids must be submitted to counsel for the Debtors: Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME, 04104-5029 (Fax: (207) 774-1127; email: rkeach@bernsteinshur.com) not later than 5:00 p.m. (prevailing Eastern Time) on January 26, 2011 (the "Bid Deadline"). The Debtors shall immediately distribute any bid so submitted by facsimile transmission, electronic mail, or personal delivery to counsel for the Creditors Committee. Promptly upon Debtors' determination that a Bid is a Qualified Bid, the Debtors shall provide copies of such Qualified Bid to all other Qualified Bidders. Upon determination that any Bid is not a Qualified Bid, the Debtors shall notify such bidder of such determination forthwith, but in any event not later than 1:00 p.m. (prevailing Eastern Time) on January 27, 2011, and shall provide such bidder with the basis for such determination.

    ii.    All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors' Committee, deem financially able to consummate the purchase of the Assets, which letter states:

(A) that such Qualified Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed asset purchase agreement (an electronic version in Word format and blacklined against the Stalking Horse Agreement received on or before the Bid Deadline, with a hard copy to follow), together with its exhibits and schedules, including terms relating to price and the time of closing (the "Proposed Agreement");

(B) that such Qualified Bidder is prepared to consummate the transaction, following entry of an order of this Court approving the Sale to the Successful Bidder (the "Sale Order");

(C) that in the event such Qualified Bidder becomes the Successful Bidder (both the highest or otherwise best bid and second-highest bid), such Qualified Bidder's offer is irrevocable until the earlier to occur of February 28, 2011 or two (2) business days after the closing of the Sale of the Assets;

(D) the actual value of such Qualified Bidder's bid to the Debtors' estates;

(E) which of the Debtors' leases and executory contracts are to be assumed in connection with the consummation of the Qualified Bidder's bid;

(F) that the Qualified Bidder agrees to pay the full amount of the Tasman Payable (as such term is used and defined in the Stalking Horse Agreement and estimated to be not more than $2 million at closing) in cash at closing; and

(G) whether such bid proposes to assume all or any portion of the liabilities of Prime Tanning Corp. in connection with the Prime Tanning Retirement Income Plan for Hourly Employees (the "Pension Plan").  No bid is required to assume all or any portion of such liabilities, but if any bid does propose to assume such liabilities, the bid shall so indicate.

iii. All Qualified Bids, including any bid by any of the creditors holding prepetition secured claims (the "Prepetition Senior Secured Lenders"), or any entity (each a "Newco") formed by any of the Prepetition Senior Secured Lenders for purposes of bidding on the Debtors' assets, shall be accompanied by a

4

deposit into escrow with the Debtors of an amount equal to $350,000 (the "<u>Good Faith Deposit</u>"), provided, however, that the Stalking Horse shall not be required to make a Good Faith Deposit because it is credit bidding the Tasman Payable as part of the purchase price set forth in the Stalking Horse Agreement.

iv.    All Qualified Bids shall be accompanied by satisfactory evidence, in the reasonable opinion of the Debtors and their advisors, taking into account their fiduciary duties and after consultation with the Creditors' Committee, of committed financing or other ability to perform all transactions contemplated by the Proposed Agreement. With respect to the Prepetition Senior Secured Lenders or any Newco formed for the purpose of submitting a bid on behalf of the Prepetition Senior Secured Lenders, committed financing in the principal amount of $2 million shall constitute satisfactory evidence of ability to perform.

v.    Qualified Bids should not contain any financing conditions or contingencies (other than those set forth in the Stalking Horse Agreement).

vi.    All Qualified Bids must provide for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder, which,

with respect to the Prepetition Senior Secured Lenders or any Newco formed for the purpose of submitting a bid on behalf of one or more of the Prepetition Senior Secured Lenders, shall be satisfied by a commitment for financing in the principal amount of $2 million.

vii. The Debtors shall provide a copy of any Qualified Bid wherein the bidder proposes to assume any or all of the liabilities relating to the Pension Plan to counsel for the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") promptly after receipt of such Qualified Bid(s), but only if the PBGC has previously entered into a confidentiality agreement covering such bids on terms reasonably acceptable to the Debtors and PBGC.

d. **<u>Due Diligence.</u>** The Debtors shall afford each Potential Bidder (hereinafter defined) due diligence access to the Assets. Due diligence access may include management presentations as may be scheduled by the Debtors, access to data rooms, onsite inspections and such other matters which a Potential Bidder may request and as to which the Debtors may agree in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, provided that all such information shall be made available to each Potential Bidder on an equal basis. Neither the Debtors nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to the Assets to any person except to Potential Bidders, Qualified Bidders, and the Creditors Committee. Potential Bidders are advised to exercise their own discretion before relying

on any information regarding the Assets provided by anyone other than the Debtors or their representatives. To be a "Potential Bidder," each bidder must have delivered the following:

i.    an executed confidentiality agreement in a form satisfactory to the Debtors in their reasonable discretion taking into account their fiduciary duties, provided that no Potential Bidder will be required to execute a confidentiality agreement more onerous in any material respect to the confidentiality agreements executed by other Potential Bidders; and

ii.    current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, demonstrating such Potential Bidder's ability to close the proposed transaction, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

Each of (a) the Prepetition Secured Lenders and (b) any Newco formed for the purpose of submitting a bid on behalf of one or more of the Prepetition Senior Secured Lenders (and, with regard to any such Newco, evidence of a commitment for financing in the principal amount of $2 million) shall be deemed a Potential Bidder for all purposes.

e.     **"As Is, Where Is."** The sale of the Purchased Assets or the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder. Except as otherwise provided in the Proposed Agreement, all of the Debtors' right, title and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, charges, security interests, restrictions and other encumbrances of any kind or nature thereon and there against (collectively, the "<u>Transferred Liens</u>"), with such Transferred Liens to attach to the proceeds of the sale. Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection with the Assets, the Bidding Process or the Auction, except as expressly stated in these Bid Procedures or, as to the Successful Bidder, in the applicable Proposed

Agreement.

f.  **Stalking Horse**. The Stalking Horse has submitted a Qualified Bid pursuant to the Stalking Horse Agreement, which Qualified Bid shall serve as a stalking horse bid (the "Stalking Horse Bid").  For purposes of these Bid Procedures, the Debtors currently value the Stalking Horse's Qualified Bid at $6,500,000.

g.  **Credit Bid.** The Prepetition Senior Secured Lenders, and any Newco created by any of the Prepetition Senior Secured Lenders for such purpose shall have the right to credit bid at the Auction and any credit bid submitted shall be a Qualified Bid to the extent it meets the other terms and conditions hereof. The Stalking Horse has the right to credit bid the amount of the Tasman Payable.

h.  **Auction.**  If the Debtors receive more than one Qualified Bid prior to the Bid Deadline, the Debtors shall conduct an auction (the "Auction") at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, ME,  on January 28, 2011, beginning at 10:00 a.m. (prevailing Eastern Time) or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids, provided, however, that the Auction shall be completed and the Successful Bid (as defined herein) announced no later than January 31, 2011 at 8:00 a.m. (prevailing Eastern Time). Only representatives of the Stalking Horse, the Debtors, the United States Trustee, the Creditors Committee, and any Qualified Bidders who have timely submitted Qualified Bids shall be entitled to attend the Auction. The Debtors, in their reasonable discretion taking into account their fiduciary

duties and after consultation with the Creditors Committee, may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bid Procedures. Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, determine is relevant, the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, may conduct the Auction in the manner they determine will achieve the maximum value for the Assets. At the Auction, the minimum initial bid against the Stalking Horse bid must exceed the value of the Stalking Horse bid by $250,000. (Therefore, to be a Qualified Bid, such initial bid must have a value to the estate of not less than $6,750,000). Subsequent bids shall be made in minimum increments of $50,000 (unless such amount is increased or decreased as set forth below). At the commencement of the Auction and at the conclusion of each round of bidding at the Auction, the Debtors, in their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, shall announce the then highest or otherwise best offer or combination of offers for the Assets and the basis for such determination,

including identifying any non-economic terms that form the basis for such determination. Prior to concluding the Auction, the Debtors shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (ii) using their reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, identify and announce to all attending the Auction, the highest or otherwise best offer or combination of offers for the Assets (the "Successful Bid") and any second-highest offer (the "Back-up Bid") and the basis for such determination. Subject to the foregoing, in determining the Successful Bid and the Back-Up Bid, the Debtor shall consider, among other factors, the benefit to their respective estates arising out of any bid's proposed assumption of all or any portion of the Pension Plan liabilities. The Debtors and the Successful Bidder shall be required to execute the asset purchase agreement for the Successful Bid at the conclusion of the Auction or immediately thereafter. The Debtors shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing. The bidder as to the Back-up Bid shall also execute an asset purchase agreement, contingent on the failure to close of the Successful Bid.

i. **Acceptance of Qualified Bids.** The Debtors shall sell the Purchased Assets to the Stalking Horse or the Assets to the Successful Bidder, as the case may be, submitting the highest or otherwise best Qualified Bid at the Auction, after approval of such Qualified Bid by the Bankruptcy Court at the Sale Hearing. The Debtors' presentation to the Bankruptcy Court for approval of a

particular Qualified Bid does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors shall have accepted a Qualified Bid only when that Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

j.   **The Sale Hearing.**   After the conclusion of the Auction, the Bankruptcy Court shall conduct a hearing (the "<u>Sale Hearing</u>") to approve the Sale. At the Sale Hearing, the Debtors will seek entry of an order (the "<u>Sale Order</u>"), among other things, authorizing and approving the Sale to the Successful Bidder(s), as determined by the Debtors in accordance with the Bid Procedures, pursuant to the terms and conditions set forth in the Proposed Agreement(s) submitted by the Successful Bidder(s) (as such agreement may be modified prior to, during or after the Auction with the agreement of the Debtors). The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court. Following the entry of the Sale Order approving the Sale, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid(s) and the Debtors shall be authorized to effectuate such sale without further order of the Bankruptcy Court.

k.   **Return of Good Faith Deposit.** The Good Faith Deposits of the Qualified Bidders submitting the Successful Bid and the Back-up Bid shall be retained by the Debtors and such Successful Bid and Back-up Bid will remain open and irrevocable, notwithstanding Bankruptcy Court approval of a sale

pursuant to the terms of a Successful Bid by a Qualified Bidder, until the earlier to occur of February 28, 2011 or two (2) business days after the closing of the Sale of the Purchased Assets and/or Other Assets. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, which shall be retained by the Debtors as liquidated damages to the extent the Debtors are entitled to such damages under the Proposed Agreement.

l.  **<u>Modifications</u>.** The Debtors may: (i) determine, in their reasonable business judgment taking into account their fiduciary duties and after consultation with the Creditors Committee, which Qualified Bid, if any, is the highest or otherwise best offer; (ii) consult with the representatives of the Creditors Committee, or any other significant constituent in connection with the bidding process and Bid Procedures; and (iii) reject at any time before announcing the Successful Bid at the Auction, any bid that, in the Debtors' reasonable discretion taking into account their fiduciary duties and after consultation with the Creditors Committee, is: (x) inadequate or insufficient; or (y) not in conformity with the Bankruptcy Code or the Bid Procedures.

m.  **<u>Reservation of Rights</u>.** In addition to their rights set forth in sections (h) and (l) above, the Debtors may modify these Bid Procedures or impose, at or prior to the Auction, additional terms and conditions on the proposed Sale of the Assets if, in their reasonable judgment, taking into account their fiduciary duties and after consultation with the Creditors Committee, such

modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process. Without limitation, at any point during the Auction, the Debtors shall have the absolute right to convert the bidding process from an open auction to a "sealed bid auction," in which case all Qualified Bidders shall have one opportunity to make a final, sealed bid.  If the Debtors exercise this option, then the Debtors shall collect all sealed bids, analyze them, and determine the highest and best bid and any Back-up Bid, in consultation with the Creditors Committee.



## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re: | Chapter 11 |
| IRVING TANNING COMPANY, | Case No. 10-11757 |
| PRIME TANNING CO., INC., and | Jointly Administered |
| PRIME TANNING CORP. | |
| Debtors. | |

## ASSUMPTION AND ASSIGNMENT PROCEDURES

Set forth below are the assumption and assignment procedures (the "Assumption & Assignment Procedures") to be employed with respect to the proposed Sale contemplated by the Debtors as contained in the Debtors' Motion for entry of an order: (A) approving bid procedures for the sale of certain of the Debtors' assets, (B) scheduling an auction, (C) approving assumption and assignment procedures, (D) approving break-up fee, expense reimbursement and overbid protections; (E) approving form of notice, and (F) granting related relief (the "Motion")

    a.    Within five (5) days prior to the Bid Deadline[1], the Debtors shall file a schedule of cure obligations (the "Contract & Cure Schedule") listing all leases and executory contracts that the Stalking Horse intends to assume (the "Assigned Contracts") and the amount, if any, that the Debtors contend is the amount needed to cure any defaults with respect to such Assigned Contracts (the "Cure Amounts").

    b.    Upon filing, a copy of the Contract & Cure Schedule and these Assumption & Assignment Procedures will be served on each of the counterparties to the

---

[1] All capitalized terms not defined herein shall have the same meaning as set forth in the Bid Procedures.

Assigned Contracts listed on the Contract & Cure Schedule.

c.     The Debtors shall amend the Contract & Cure Schedule promptly after the completion of the Auction to update the information contained therein with respect to the Successful Bid, and Back-up Bid including but not limited to adding additional leases and executory contracts (which shall then be deemed Assigned Contracts) and corresponding cure amounts (which shall be deemed Cure Amounts) and shall serve an amended Contract & Cure Schedule on each of the counterparties to the Assigned Contracts listed thereon on each of the counterparties to the Assigned Contracts listed thereon.

d.     The bidder approved by the Bankruptcy Court as submitting the highest or otherwise best bid for purchase of the Debtors' assets (the "<u>Successful Bidder</u>"), at any time prior to closing on the sale of the Assets, may identify executory contracts and leases to be (a) added to the Contract & Cure Schedule (which contracts shall then be deemed Assigned Contracts) and the corresponding cure amounts (which shall be deemed Cure Amounts) and (b) deleted from the list of Assigned Contracts (which shall then cease to be Assigned Contracts). The Debtors shall give notice (the "<u>Supplemental Notice</u>") to counterparties to executory contracts and leases added to or deleted from the Contract and Cure Schedule.

e.     Any objections ("<u>Assignment Objections</u>") to the assumption and assignment of any Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth in the Contract & Cure Schedule must be filed with the Bankruptcy Court and served upon the Notice Parties on or before 4 p.m. prevailing Eastern Time on

the later of the date (the "<u>Assignment Objection Deadline</u>") that is (a) one business day before the Sale Hearing and (b) ten days after the date of service of the applicable Supplemental Notice with regard to any Assigned Contract listed on such Supplemental Notice. Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred: (i) objecting to the Cure Amount set forth on the Contract & Cure Schedule with respect to its Assigned Contract; (ii) seeking additional amounts arising under its Assigned Contract prior to the Closing from the Debtors or the Successful Bidder; and (iii) objecting to the assumption and assignment of its Assigned Contract to the Successful Bidder.

f.　　Any Assignment Objections required to be filed prior to the date of the Sale Hearing and not consensually resolved prior to the Sale Hearing shall be heard at the Sale Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Assigned Contracts will be heard at the Sale Hearing, provided, however that all Assignment Objections for which the Assignment Objection Deadline is after the date of the Sale Hearing and which objection is not filed prior to the Sale Hearing, shall be heard on a date to be determined jointly by the Debtors and the Successful Bidder, subject to the availability of the Bankruptcy Court.

g.　　Except as may otherwise be agreed to by all parties to an Assigned Contract, on or before the Closing, the cure of any defaults under Assigned Contracts necessary to permit assumption and assignment thereof shall be by (i) payment of the undisputed Cure Amount, and/or (ii) establishment of a

reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the Proposed Agreement between the Successful Bidder or Back-up Bidder and the Seller.

## Contract & Cure Schedule

| Counterparty | Description of Contract/Lease | Cure Amount |
|---|---|---|
| NMHG Financial Services, Inc.<br>P.O. Box 643749<br>Pittsburgh, PA 15264 | Forklift Lease | $7,646.82 |
| Pitney Bowes Credit Corp.<br>P.O. Box 909<br>Shelton, CT 06484-0949 | Mailing System Lease | $0.00 |
| Ryder Transportation Services<br>P.O. Box 96723<br>Chicago, IL 60693 | Truck Lease | $1,724.78 |
| Wells Fargo Financial Leasing, Inc.<br>P.O. Box 6434<br>Carol Stream, IL 60197 | Photocopier Lease | $416.63 |
| Dang Tu Ky Leather Co., Ltd.<br>H24A-24B-25-26-27, Road 3<br>Le Minh Xuan Industrial Zone<br>Binh Chanh Dist, Hochiminh City<br>VIETNAM | Production Agreement | $0.00 |
| Key Equipment Finance<br>600 Travis, Suite 1300<br>Houston, TX 77002 | Xerox Photocopier Lease | $136.52 |
| Hartland Pollution Control<br>c/o Peggy Morgan<br>Town of Hartland<br>P.O. Box 280<br>Hartland, ME 04943 | Sewage Treatment Contract | $96,734.80 |
| Unifirst<br>430 Riverside Industrial Pkwy<br>Portland, ME 04103-1436 | Uniform Contract | $1,416.50 |
| Cintas Corporation<br>15 Eisenhower Drive<br>Westbrook, ME 04092 | Uniform Contract | $3,152.88 |
| Moore & Giles, LLC<br>3018 Carroll Avenue<br>P.O. Box 11766<br>Lynchburg, VA 24506 | Commission Agreement | $35,568.37 |
| Ross Bear<br>Suite #103-234<br>16420 S.E. McGillivray Blvd<br>Vancouver, WA 98683 | Commission Agreement | $1,192.73 |

| | | |
|---|---|---|
| Craig Scotland<br>P.O. Box 248<br>Cape Neddick, ME 03902 | Commission Agreement | $1,469.55 |
| 4B Leather Company<br>646 High Street<br>Westwood, MA 02090 | Commission Agreement | $16,568.86 |
| R.F. Hood<br>96 Pitfield Agincourt<br>Ontario, Canada<br>M1S1Y6 | Commission Agreement | $135.75 |
| Wolverine World Wide Inc.<br>9341 Courtland Drive, N.E.<br>Rockford, MI 49351 | Bailment and Service Agreement | $0.00 |