Table of Schedules and Exhibits

| Exhibit A | Form of Sale Order |
| --- | --- |
| Schedule 2.1(a)(i) | Assumed Leases |
| Schedule 2.1(a)(ii) | Assumed Contracts |
| Schedule 2.1(b) | Excluded Contracts |
| Schedule 2.3 | Supply Agreement, Purchase Price, Payment |
| Schedule 4.5 | Contracts |
| Schedule 4.6 | Leases |
| Schedule 4.9 | Environmental Disclosures |

EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MAINE

In re:

IRVING TANNING COMPANY,

PRIME TANNING CO., INC., and

PRIME TANNING CORP.

Debtors.

Chapter 11
Case No. 10-11757

Jointly Administered

## ORDER AUTHORIZING (A) SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND (B) ASSUMPTION AND ASSIGNMENT AND/OR SALE OF CERTAIN CONTRACTS

This matter came to be heard on the Motion of the Debtors for Authority to Sell Certain Assets of the Debtors to The Jupiter Fund, LLC Free and Clear of Liens, Claims and Encumbrances and For Approval of the Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Motion") and Notice of (A) Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances and (B) Assumption and Assignment and/or Sale of Executory Contracts and Unexpired Leases (the "Sale Notice"). Following the filing of the Sale Motion, Tasman Industries, Inc. was, with the approval of this Court, substituted for The Juniper Fund, LLC as the stalking horse bidder. At the hearing on this Sale Motion (the "Sale Hearing"), counsel for Tasman Industries, Inc. (the "Stalking Horse") and counsel for Irving Tanning Company, Prime Tanning Co., Inc. and Prime Tanning Corp. (collectively, the "Debtors") made offers of proof as to the fact that the Stalking Horse is a good faith purchaser for value. All objections to such offers of proof, and to the sale in general, if any, were either resolved or overruled during the hearing. The Court has reviewed the Sale Motion and heard and considered the statements of counsel in support of the relief requested in the Sale Motion during

a hearing held before me (the "Sale Hearing"). The Court being fully advised in the premises and having determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief herein granted,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of these cases and this motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.    Proper, timely, adequate and sufficient notice of (i) the Sale Motion, (ii) the Sale Hearing, (iii) the transactions described in the Asset Purchase Agreement attached (without its exhibits) as Exhibit 1 hereto, and as amended pursuant to the sealed bid process as detailed below (hereinafter the "Stalking Horse Agreement") and (iv) the assumption and assignment and/or sale of the contracts listed on Exhibit 2 hereto (the "Assigned Contracts") has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the bid procedures previously approved by this Court (the "Bidding Procedures").  Such notice was good and sufficient, and appropriate under the particular circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, the Sale or the assumption and assignment of the Assigned Contracts is or shall be required.

D. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the assets being sold pursuant to the Stalking Horse Agreement (the "Purchased Assets")[1] and conducted the sale process in compliance with the Bidding Procedures.

E. No consents or approvals other than those provided for in the Stalking Horse Agreement are required for the Debtors to consummate the transactions described in the Stalking Horse Agreement.

F. The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization.

G. A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities. All objections to the Sale, if any, have either been resolved or overruled.

H. The Stalking Horse Agreement was negotiated, proposed and entered into by the Debtors and the Stalking Horse without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor the Stalking Horse have engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided under section 363(n) of the Bankruptcy Code.

I. The Stalking Horse is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Stalking Horse will be acting in good faith within the meaning of section 363(m) in closing the

---

[1] The term "Purchased Assets" shall include and refer to the "Assigned Contracts."

transactions contemplated by the Stalking Horse Agreement at all times after the entry of this Order.

J. The consideration provided by the Stalking Horse for the Purchased Assets pursuant to the Stalking Horse Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

K. The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' businesses and assets.

L. The transfer of the Purchased Assets to the Stalking Horse will be a legal, valid, and effective transfer, and will vest the Stalking Horse with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all interests, liens, claims and encumbrances: (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or the Stalking Horse's interest in the Purchased Assets, or any similar rights; and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the business prior to the Closing Date (as defined in the Stalking Horse Agreement).

M. The Stalking Horse would not have entered into the Stalking Horse Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Purchased Assets to the Stalking Horse, including the assignment of the Assigned Contracts, were not free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever except those

expressly assumed by the Stalking Horse in the Stalking Horse Agreement (the "Expressly Assumed Obligations"), or if the Stalking Horse would, or in the future could, be liable for any of the interests.

N.    The Debtors may sell the Purchased Assets free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those nondebtor parties with interests in the Debtors' assets who did not object, whose objections were accommodated, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to sections 363(f)(2) and 365.  Those nondebtor parties with interests in the Purchased Assets who did object fall within one or more of the other subparagraphs under sections 363(f) and 365 and are adequately protected by having their interests, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an interest.

O.    Except for the Expressly Assumed Obligations, the transfer of the Purchased Assets to the Stalking Horse, including assignment to the Stalking Horse of the Assigned Contracts, will not subject the Stalking Horse to any liability whatsoever with respect to the operation of the business or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of equitable law, antitrust or successor or transferee liability.

P.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Stalking Horse in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is

in the best interests of the Debtors, their estates, and their creditors. The Assigned Contracts being assigned to the Stalking Horse are an integral part of the business being purchased by the Stalking Horse and, accordingly, such assumption and assignment of Assigned Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

Q. The Debtors (i) have cured, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(I)(A) of the Bankruptcy Code, and (ii) have provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B).

S. The Stalking Horse has provided adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

### General Provisions

1. The Sale Motion is granted, as further described herein.

2. All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, accommodated or settled, and all reservations of rights included therein, are hereby overruled on the merits.

### Approval of the Purchase Agreement

3.     The Stalking Horse Agreement and all of the terms and conditions thereof, are hereby approved.

4.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale in accordance with the terms and conditions of the Stalking Horse Agreement immediately upon entry of this Order.

5.     The Debtors are authorized to execute and deliver, and empowered to perform under, consummate and implement the Stalking Horse Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Agreement, and to take all further actions as may be requested by the Stalking Horse for the purpose of assigning, transferring, granting, conveying and conferring to the Stalking Horse or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Stalking Horse Agreement.

<u>Transfer of Purchased Assets to Stalking Horse</u>

6.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the assets shall be transferred to the Stalking Horse, and upon consummation of the Stalking Horse Agreement (the "<u>Closing</u>") shall be, free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever, other than the Expressly Assumed Obligations, with all such interests of any kind or nature whatsoever to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets.

7.     Except as expressly permitted or otherwise specifically provided by the Stalking Horse Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade and other creditors, holding interests of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the business prior to the Closing, or the transfer of the Purchased Assets to the Stalking Horse, hereby are forever barred, estopped, and permanently enjoined from asserting against the Stalking Horse, their successors or assigns, their property, or the assets, such persons' or entities' interests.

8.     The transfer of the assets to the Stalking Horse pursuant to the Stalking Horse Agreement constitute a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Stalking Horse with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever.

Assumption and Assignment to Stalking Horse
of Assigned Contracts

9.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to the Stalking Horse, and the Stalking Horse's assumption on the terms set forth in the Stalking Horse Agreement, of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) with respect thereto are hereby deemed satisfied.

10.    The Debtors are hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Stalking Horse, effective upon the Closing of the Sale, the Assigned Contracts free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever, and (b) execute and deliver to the Stalking

Horse such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Stalking Horse.

11.     The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k), the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Stalking Horse.

12.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured upon payment by the Debtors at the Closing of the Sale or as soon thereafter as practicable of the Cure Amounts, if any, set forth on Exhibit 2 hereto (the "Cure Amounts") with respect to each of the Assigned Contracts.

13.     Except for the obligation of the Debtors to pay the Cure Amounts, each nondebtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Stalking Horse, or the property of any of them, any default existing as of the date of the Sale Hearing, whether declared or undeclared or known or unknown; or, against the Stalking Horse, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtors.

14.     The failure of the Debtors or the Stalking Horse to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or

conditions, or of the Stalking Horse's rights to enforce every term and condition of the Assigned Contracts.

## Additional Provisions

15.     On the Closing Date of the Sale, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its interests in the assets, if any, as such interests may have been recorded or may otherwise exist.

16.     This Order (a) shall be effective as a determination that, on the Closing Date, all interests of any kind or nature whatsoever existing with respect to the Debtors or the assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the assets.

17.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Agreement. The transfers under the Stalking Horse Agreement are made pursuant to section 1146(c) of the Bankruptcy Code, and, accordingly, shall not be taxed under, and shall be exempt from, any law imposing a stamp, sale, transfer, recording or other similar tax imposed by any governmental entity,

including without limitation the States of Florida and Michigan and any county or municipality in Florida or Michigan.

18. If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing interests with respect to the Debtors or the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtors or the assets or otherwise, then the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; provided, however, that regardless of whether such persons or entities or the Debtors execute and file any releases, the Stalking Horse is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests in the Purchased Assets of any kind or nature whatsoever.

19. All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the assets to the Stalking Horse on the Closing Date.

20. Except for the Expressly Assumed Obligations, the Stalking Horse shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Stalking Horse Agreement, the Stalking Horse shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Stalking Horse shall have no successor or vicarious liabilities of any kind or character

whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the business prior to the Closing date.

21.     Under no circumstances shall the Stalking Horse be deemed a successor of or to the Debtors for any interest against or in the Debtors or the assets of any kind or nature whatsoever. Except for the Expressly Assumed Obligations, the sale, transfer, assignment and delivery of the Purchased Assets shall not be subject to any interests, and interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtors. Except for persons holding Expressly Assumed Obligations, all persons holding interests against or in the Debtors or the assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such interests of any kind or nature whatsoever against the Stalking Horse, its property, its successors and assigns, or the assets with respect to any interest of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the assets.

22.     Any amounts that become payable by the Debtors pursuant to the Stalking Horse Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Stalking Horse Agreement (a) shall constitute administrative expenses of the Debtors' estates and (b) may be paid by the Debtors in the time and manner as provided in the Stalking Horse Agreement, without further order of this Court.

23.     This Court retains jurisdiction to enforce and implement the terms and provisions of the Stalking Horse Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to the Stalking Horse; (b) resolve any disputes arising under or related to the Stalking Horse Agreement, except as otherwise provided therein; (c) interpret, implement, and enforce the provisions of this Order; and (d) protect the Stalking Horse against any interests in the Debtors or the assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

24.     Nothing contained in any plan of liquidation confirmed in these cases or any order of this court confirming such plan shall conflict with or derogate from the provisions of the Stalking Horse Agreement or the terms of this Order.

25.     The transfer of the assets pursuant to the Sale shall not subject the Stalking Horse to any liability with respect to the operation of the business prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

26.     The transactions contemplated by the Stalking Horse Agreement are undertaken by the Stalking Horse in good faith, as that term is used in section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Stalking Horse, unless such authorization is duly stayed pending such appeal.  The Stalking Horse is a purchaser in good

faith of the Purchased Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

27.     The terms and provisions of the Stalking Horse Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Stalking Horse, and its respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third-parties including, but not limited to, all persons asserting interests in the assets to be sold to the Stalking Horse pursuant to the Stalking Horse Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

28.     The failure specifically to include any particular provision of the Stalking Horse Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Agreement be authorized and approved in its entirety.

29.     The Stalking Horse Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

30.     As provided by Bankruptcy Rule 7062, and notwithstanding Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be automatically stayed, but shall be effective and enforceable immediately upon signature of this Order. Time is of the essence in closing the Sale and the Debtors and the Stalking Horse intend to close as soon as possible. Therefore, any party

objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk their appeal being foreclosed as moot.

31. Any appeal seeking to enjoin or stay consummation of the Sale ("Appeal") shall be subject to the appellant depositing or posting a bond in an amount equal to the then aggregate purchase price, and applicable damages, pending the outcome of the Appeal.

32. Notwithstanding anything in the Sale Motion or this Order to the contrary, including, this Order shall be without prejudice to the rights of the Debtors to challenge the claims, liens, mortgages and/or security interests asserted against the Debtors' property by their secured creditors.

Dated: _____

Honorable Louis K. Kornreich
United States Bankruptcy Judge

**SCHEDULE 2.1(a)(i)**
**ASSUMED LEASES**


**TO COME**

**SCHEDULE 2.1(a)(ii)**
**ASSUMED CONTRACTS**


**TO COME**

## SCHEDULE 2.1(b)
## EXCLUDED CONTRACTS


## TO COME

Schedule 2.3
SUPPLY AGREEMENT, PURCHASE PRICE, PAYMENT OF PURCHASE PRICE

Supply Agreement; Accounts Payable. Beginning on the date of this Agreement and continuing through February 2, 2011, Purchaser shall supply first quality hides, usable for Seller's purposes, in the quantities set forth on, and on the dates set forth on, the delivery schedule attached to this Schedule 2.3 (the "Delivery Schedule"). Purchaser acknowledges that a failure to adhere to the Delivery Schedule shall be, inter alia, a material breach of this Agreement. Amounts otherwise due for such hides delivered to Seller in accordance with the Delivery Schedule (the "Post-Agreement Payable") shall not be due and payable until the Closing Date, and in any event shall not be paid by Seller, but rather such amount shall be credit-bid, as set forth below, or, if Purchaser is not the Successful Bidder at the Auction (as defined in this Agreement), shall be paid in full by the Successful Bidder at the Auction as a condition of such Successful Bidder's purchase of the Purchased Assets  In addition, Seller shall not be required to pay the existing accounts payable due to Purchaser in the aggregate amount of $1,036,057 (the "Pre-Agreement Payable") in accordance with their terms, but rather such amount shall be credit-bid, as set forth below, or, if Purchaser is not the Successful Bidder at the Auction (as defined in this Agreement), shall be paid in full by the Successful Bidder at the Auction as a condition of such Successful Bidder's purchase of the Purchased Assets. The sum of the Pre-Agreement Payable and the Post-Agreement Payable shall be referred to as the "Tasman Payable." In any event, until the closing, the Tasman Payable shall continue to be secured by all existing collateral and shall continue to have the same treatment as set forth in the existing orders of the Bankruptcy Court. Upon closing, if Purchaser is the Successful Bidder, and upon closing and payment of the amount of the Tasman Payable, if Purchaser is not the Successful Bidder, Tasman shall be deemed to release its liens on all such collateral and shall return to the Seller any cash collateral in Purchaser's possession.

Purchase Price; Payment of Purchase Price. The Purchase Price shall be as follows, and Purchaser shall pay the Purchase Price, as follows:

1.  Purchaser shall credit bid the amount of the Tasman Payable (and, accordingly, if the Successful Bidder, shall release the Seller from any liability for the Tasman Payable);
2.  Purchaser shall, by agreement with Fund of Jupiter, LLC ("Jupiter"), tender to Jupiter (a) $300,000 in cash; and (b) a promissory note in the amount of $3,000,000,which note shall be secured by a first security interest in the machinery and equipment purchased by Purchaser from Seller.  The note shall provide that, annually, Jupiter shall be paid the greater of (i) interest on the $3 million balance at the rate of 2.25% per annum or (ii) 50% of the EBITDA generated from the Purchaser's operation of the business represented by the Purchased Assets, such amount to be paid each year until the principal is fully paid or, otherwise, for a maximum period of five (5) years. Payments of interest at such rate will be paid monthly, and, to the extent 50% of annual EBITDA exceeds the interest paid for the year, an additional payment equal to the difference between interest paid and 50% of annual EBITDA shall be made to Jupiter on or before January 31 of the succeeding year. If the principal balance is not paid at the end of the five-year period, the remaining balance at that time shall be released and discharged and Jupiter shall likewise release

and discharge its security interest securing the promissory note. The payment of the $300,000 and execution and delivery of the aforesaid note shall result in a reduction of Jupiter's claims against the Seller in the amount of $2 million.

3. Purchaser shall assume and agree to pay the amount of the Seller's obligations to Porter Capital as of the Closing Date; and

4. Purchaser shall enter into a triple net lease of the Hartland, Maine real estate.

Bid Procedure. The Seller shall require any Potential Bidder at the Auction to include in its bid, in order to become a Qualified Bidder, a provision that such Qualified Bidder will, at Closing, pay the Tasman Payable in full in cash at the Closing.

| ~~Date~~ to be Delivered to Hartland | Hide Count | Approx. Value | Type of Hides | Source Plants |
|---|---|---|---|---|
| **Week of** 01/10/11 | 899 | $90,124.75 | HBS | Mexican Border |
| ~~01/11/11~~ | 2,274 | $196,132.50 | HBH | Mexican Border |
| ~~01/12/11~~ | 606 | $65,599.50 | Lakeside | Hartford |
| | ~~3,779~~ | ~~$351,856.75~~ | | |
| | | | | |
| ~~01/14/11~~ | 606 | $65,599.50 | Lakeside | Hartford |
| **Week of** 01/17/11 | 1,210 | $98,010.00 | HBC | Hartford |
| ~~01/18/11~~ | 619 | $50,139.00 | HBC | Mexican Border |
| ~~01/19/11~~ | 899 | $90,124.75 | HBS | Mexican Border |
| | ~~2,334~~ | ~~$303,873.25~~ | | |
| | | | | |
| ~~01/21/11~~ | 619 | $50,139.00 | HBC | Mexican Border |
| **Week of** 01/24/11 | 1,210 | $98,010.00 | HBC | Hartford |
| 01/25/11 | 899 | $90,124.75 | HBS | Mexican Border |
| | 2,728 | $238,273.75 | | |
| | | | | |
| ~~02/02/11~~ | 1,250 | $102,000.00 | HBC | Mexican Border |
| 02/02/11 | 625 | $67,500.00 | Lakeside | Hartford |
| 02/03/11 | 625 | $71,875.00 | Jumbo | Hartford |
| 02/04/11 | 950 | $92,500.00 | HBS | Mexican Border |
| | 3,450 | $333,875.00 | | |
| | | | | |
| 02/04/11 | 1,250 | $102,000.00 | HBC | Mexican Border |
| 02/04/11 | 625 | $67,500.00 | Lakeside | Hartford |
| 02/05/11 | 2,274 | $196,132.50 | HBH | Mexican Border |
| 02/06/11 | 950 | $92,500.00 | HBS | Mexican Border |
| | 5,099 | $458,132.50 | | |
| | | | | |
| 02/06/11 | 1,250 | $102,000.00 | HBC | Mexican Border |
| 02/14/11 | 1,210 | $98,010.00 | HBC | Hartford |
| 02/15/11 | 625 | $71,875.00 | Jumbo | Hartford |
| 02/15/11 | 899 | $90,124.75 | HBS | Mexican Border |
| 02/16/11 | 899 | $90,124.75 | HBS | Mexican Border |
| | 4,883 | $452,134.50 | | |

\* Deliveries in each week may be substituted for deliveries in another week.

## Contract & Cure Schedule

| Counterparty | Description of Contract/Lease | Cure Amount |
|---|---|---|
| NMHG Financial Services, Inc.<br>P.O. Box 643749<br>Pittsburgh, PA 15264 | Forklift Lease | $7,646.82 |
| Pitney Bowes Credit Corp.<br>P.O. Box 909<br>Shelton, CT 06484-0949 | Mailing System Lease | $0.00 |
| Ryder Transportation Services<br>P.O. Box 96723<br>Chicago, IL 60693 | Truck Lease | $1,724.78 |
| Wells Fargo Financial Leasing, Inc.<br>P.O. Box 6434<br>Carol Stream, IL 60197 | Photocopier Lease | $416.63 |
| Dang Tu Ky Leather Co., Ltd.<br>H24A-24B-25-26-27, Road 3<br>Le Minh Xuan Industrial Zone<br>Binh Chanh Dist, Hochiminh City<br>VIETNAM | Production Agreement | $0.00 |
| Key Equipment Finance<br>600 Travis, Suite 1300<br>Houston, TX 77002 | Xerox Photocopier Lease | $136.52 |
| Hartland Pollution Control<br>c/o Peggy Morgan<br>Town of Hartland<br>P.O. Box 280<br>Hartland, ME 04943 | Sewage Treatment Contract | $96,734.80 |
| Unifirst<br>430 Riverside Industrial Pkwy<br>Portland, ME 04103-1436 | Uniform Contract | $1,416.50 |
| Cinta Corporation<br>15 Eisenhower Drive<br>Westbrook, ME 04092 | Uniform Contract | $3,152.88 |
| Moore & Giles, LLC<br>3018 Carroll Avenue<br>P.O. Box 11766<br>Lynchburg, VA 24506 | Commission Agreement | $35,568.37 |
| Ross Bear<br>Suite #103-234<br>16420 S.E. McGillivray Blvd<br>Vancouver, WA 98683 | Commission Agreement | $1,192.73 |

| | | |
|---|---|---|
| Craig Scotland<br>P.O. Box 248<br>Cape Neddick, ME 03902 | Commission Agreement | $1,469.55 |
| 4B Leather Company<br>646 High Street<br>Westwood, MA 02090 | Commission Agreement | $16,568.86 |
| R.F. Hood<br>96 Pitfield Agincourt<br>Ontario, Canada<br>M1S1Y6 | Commission Agreement | $135.75 |
| Wolverine World Wide Inc.<br>9341 Courtland Drive, N.E.<br>Rockford, MI 49351 | Bailment and Service Agreement | $0.00 |

Attached hereto as **Exhibit A** is a summary of the "spill record" of both Irving and Prime (a/k/a Prime Berwick), which documents each release of hazardous and non-hazardous materials by Irving from 1998 to the present and by Prime from 1983 through 2007.

Sellers, and specifically Prime and Prime Corp.(a/k/a Prime Missouri), have been named as defendants in certain litigation pursuant to which Prime and/or Prime Corp. are allegedly liable for injuries or damages resulting from the release of certain chemicals. Attached hereto as **Exhibit B** is a list summarizing all such litigation about which the Sellers were aware and/or had knowledge as of November 16, 2010.

A Compliance Order was issued to Irving on September 16, 2005 by the Maine Department of Environmental Protection (the "MDEP") pursuant to the Maine Hazardous Waste, Septage and Solid Waste Management Act, 38 M.R.S.A. § 1304(12), pursuant to which Irving was directed to remediate certain groundwater contamination at the Irving Annex Facility. A true and correct copy of the Compliance Order is attached hereto as **Exhibit C**. Groundwater sampling results from 2008, taken from the Irving Annex Facility, are attached hereto as **Exhibit D**.

A true and correct copy of the Prime Tanning, Berwick—No Action Assurance Letter dated October 27, 2010 (the "NAA Letter") is attached hereto as **Exhibit E**. The NAA Letter references Prime's application to participate in the Voluntary Response Action Program with respect to the Prime site located in Berwick, Maine. Additionally, the MDEP issued a further NAA Letter to Prime dated December 3, 2010 based on the results of a Phase I, Phase II, asbestos and PCB study of the Berwick facility. A true and correct copy of the NAA Letter is attached hereto as **Exhibit F**.

The diagram attached hereto as **Exhibit G** identifies the solvent recovery still/hazardous waste storage area used by the Sellers. Due to operational and process changes, this still has not been used since 2001. The last shipment of hazardous waste was in 2001.

The list attached hereto as **Exhibit H** identifies all underground storage tanks ("USTs"). The list provides the tank type, tank material, size, piping material, date installed and current status. As noted on the list, Prime has only one UST.

All licenses and permits currently held by the Sellers and which are necessary pursuant to any Environmental Law are listed as follows:

| | | |
|---|---|---|
| a. | UST Registration (Annex) | 11450 |
| b. | Title V Air Emissions Permit | A-252-70-A-I |
| c. | Cooling Water Discharge License | MPDES #ME0000108 |
| d. | Town of Hartland Industrial Discharge Permit | #001 |
| e. | MDEP Stormwater Multi-Sector Permit | MER05B443 |
| f. | MDEP Stormwater No Exposure Certification (Annex) | MERNEB474 |

The Sellers are not aware of any equipment used by the Sellers on the Real Estate using substances that will be phased out under Title VI of the Clean Air Act Amendments of 1990.

As of August 31, 2009,[1] Prime and/or Prime Corp. had been notified by the Federal Environmental Protection Agency ("EPA") or other parties that it is considered to be a potentially responsible party at the following EPA Superfund sites:

a.    Union Chemical Site, South Hope, ME

Prime used the Union Chemical site in the early 1980's to recycle and dispose of various chemical wastes. Prime is ranked No. 12 on the EPA volumetric ranking list for the site with approximately 1% of the total waste sent to the site. A cleanup plan is being implemented with an expected total cost of between $10 and $15 million. Prime is a member of the Potentially Responsible Party Group ("PRP") which has agreed to conduct the cleanup pursuant to a Consent Decree entered by the U.S. District Court in Maine in 1991. Prime's contribution to the cleanup is expected to be approximately $150,000 to $200,000. The active cleanup is complete and the PRP Group has begun implementing the long-term groundwater monitoring plan in 2008. Liberty Mutual has agreed to cover this claim to the extent of the liability limits of the relevant policy of insurance, which it represents covers $1,500,000 in property damage. Liberty has made all payments to date which have been requested of it toward interim payments.

b.    Resolve Site, North Dartmouth, MA

Prime used the Resolve facility to recycle and dispose of chemical wastes in the mid to late 1970's. In 1989, Prime, along with several hundred other generators, entered into a Consent Decree with EPA to reimburse EPA for past costs and conduct a final cleanup of the site. The cleanup is ongoing and is expected to continue for many years. Prime is ranked No.7 on the EPA volumetric ranking list with approximately 2.5% of the total waste sent to the site. Prime's share of the cleanup cost is estimated at approximately $1 million. Liberty Mutual has agreed to cover this claim and has made all payments to date which have been requested of it toward the interim payments. Liberty has acknowledged coverage in the amounts of $250,000 underlying coverage and $5,000,000 umbrella liability coverage.

c.    Wheeling Disposal Site, Amazonia, MO

Prime Corp. used the site in the 1970's and early 1980's to dispose of certain waste sludges. Prime Corp. is listed as the No. I potentially responsible party by volume with approximately 55% of the total waste volume sent to the site by the PRP Group. There are a total of approximately 30 PRPs identified at the site. Prime Corp. contributed approximately $1,500,000 to the conducting of a Remedial Investigation Feasibility Study and implementing a cleanup plan at the site. The cleanup plan involves the placing of soil cover over the site and the sampling of groundwater monitoring wells for 30 years. The cap was completed several years ago and groundwater has been monitored since then with no appreciable change in groundwater conditions. Liberty Mutual has agreed to cover this claim in its entirety. Liberty has made all

---

[1] The information regarding Prime's and/or Prime Corp.'s status as a potentially responsible party is current as of August 31, 2009 and is set forth herein as the information was reported to the Sellers' auditors.

payments to date, including attorneys' fees, and has agreed to make all future payments relating to the monitoring.

     d.       Solvent Recovery Service Facility, Southington, CT

Prime has been listed by EPA as a potentially responsible party at this site. Prime's information indicates that it is one of approximately 300 viable PRP's and that its alleged contribution to the site is approximately 0.6%. The PRP Group, of which Prime is a member, has been conducting a $20 million interim cleanup measure with EPA. In 2008, EPA announced a final cleanup for the site. The PRP Group has reached agreement with EPA to perform this final remedy and to pay for a portion of EPA's past costs and other charges. The expected total cost of the settlement is approximately $60 -70 million. Prime's share of the cleanup is estimated at approximately $400,000. Prime initially elected not to participate in the settlement because of the requirement to fund or financially secure the full settlement share up front. Prime is presently in discussions with the PRP Group and EPA to join the settlement by paying its expected settlement share over an extended period of time.

     e.       Peter Cooper Landfill, Gowlanda, New York

In June, 1999, Prime received a notice letter from EPA stating that EPA considers Prime a potentially responsible party at the Peter Cooper Landfill in Gowlanda, NY. Approximately 12 other viable parties received similar notice letters. EPA alleges that in the 1950's and 1960's Prime sent scrap hide materials to the Peter Cooper Company which used the hides as raw materials in its adhesive manufacturing business. In March, 2000, EPA issued an Administrative Order against Prime and the other PRPs ordering the PRPs to perform a study of the site at a cost of approximately $500,000. Prime and the other PRPs complied with the Order and conducted the study which was completed in early 2005.

Recently, EPA announced a plan to cleanup the site at a projected cost of $2.6 million to $4 million. The PRPs have reached agreement with EPA to perform the remedy and a Consent Decree memorializing the settlement was approved by the Federal District Court. Prime's share of this cost is expected to be in the $100,000 range. Prime has already deposited $100,000 with the PRP Group.

     f.       Markham's Site, Dayton, NY

In July 2000, Prime received, along with 11 other parties, a notice of potential liability and request to perform a site study concerning the Markham's Site in Dayton, NY. According to EPA, Peter Cooper Corporation disposed of some of the wastes from its Gowlanda facility to the Markham's Site. EPA is alleging that Prime and the other PRPs at the Peter Cooper Site are liable under a "transshipment" theory. Prime, along with the other PRPs, have written to EPA denying liability. In September, 2000, EPA issued an Administrative Order to Prime and the other PRPs ordering the PRPs to perform a study of the Site at a cost of approximately $500,000. Prime and the other PRPs complied with the Order and completed the study in 2006. EPA has issued a cleanup plan calling for a remedy costing approximately $1.5 million. The PRPs have reached agreement with EPA to clean up the Site and the Consent Decree memorializing the settlement was approved the Federal District Court. Prime's expected share of the cleanup costs is approximately $50,000, a sum which has already been deposited with the PRP Group.

g.     <u>Old Southington Landfill, CT</u>

This matter had been previously reported to the former auditors of Prime. Earlier in 2008 the EPA acknowledged that Prime had no involvement at this site and that the EPA would no longer be including Prime as a potentially responsible party.



EXHIBIT

A

IRVING TANNING COMPANY
SPILL HISTORY – 1998 TO THE PRESENT

1.  January 16, 2000: Approximately 50 gallons Hydroil KW was spilled indoors on
    the concrete floor of the spilt room. Forty-eight gallons were recovered. The
    remaining two gallons were cleaned up with speedy dry and placed in a drum for
    disposal. There was no release to the environment or contact with storm water.

2.  August 28, 2000: A mixture of M-Pyrol was spilled indoors at the Annex as it
    was being transported in a bucket. Approximately 75 pounds (10 gallons) was
    spilled. It was cleaned with pig mat and speedy dry and put into a drum for
    disposal. There was no release to the environment or contact with storm water.

3.  February 12, 2001: Less than 10 gallons of #6 fuel oil was leaked into the heat
    exchanger tubes and mixed with the condensate in the condensate return line.
    This leak was due to cracks that had developed in the heat exchanger tubes. The
    water/oil mix was contained in the system (in the sump) and was recovered for
    use. There was no release to the environment or contact with storm water. This
    was reported to the Maine DEP.

4.  April 19, 2001: Approximately 4 kilograms (~6.8 gallons) of ammonia
    bicarbonate was spilled as the person carrying it (in a closed pail) tripped and
    dropped the pail near a floor drain. The area was immediately evacuated and the
    areas washed. The Safety Director was contacted. The material was sent via
    sewer through the pretreatment system prior to being discharged to the Hartland
    POTW for biological degradation. There was no direct release to the
    environment or contact with storm water.

5.  September 26, 2001: Approximately 110 gallons of Chemtan R106 was spilled in
    the Sample Department while in transport on a jack. The material was shoveled
    into barrels (no speedi-dry required due to the nature of the material). About 30
    gallons of the material (which had solidified) was recovered at Pretreatment. A
    review of the MSDS indicated that this product did not contain oil or any
    hazardous materials. For future transport of materials, the containers will be
    secured to the jack.

6.  June 17, 2002: Approximately 950 gallons of Lionol SC was spilled when the
    tote holding it failed. About 900 gallons went to the sewer while the remaining
    50 gallons was recovered through the use of speedi-dry. It was shoveled into a
    container and disposed of in the trash. A review of the MSDS indicated that the
    product did not contain any oil or any hazardous materials.

7.  September 17, 2002: Approximately 28 gallons of formic acid was spilled in two
    different events. First, approximately 8 gallons was spilled in Hüni room on the
    mezzanine when a tank overflowed while testing a new pumping system. It was
    flushed down to the sewer. The second event occurred in the Samples

Department due to a leaking gasket in a formic acid storage tote. The valve was shut and the gasket replaced. The material was recovered from the containment area.

8. September 25, 2002: Approximately 3 gallons of Busan 30WB was spilled when the container it was in was accidentally kicked over in the Huni Room. It was cleaned up through the use of pig mats with the residual washed down the sewer. A review of the MSDS indicated that the product did not contain oil but did contain 2.5% ethylene glycol. Total amount lost was 0.64 pounds. The reporting requirement is 1,000 pounds.

9. July 11, 2003: An estimated 2 gallons of hydraulic oil was released when the hydraulic power steering hose on the yard jack ruptured. Pig mat was used to clean up the oil and it was estimated that more than half of the oil was recovered. The spill was reported to Darryl Luce of the Maine DEP.

10. June 21, 2006: An estimated 5 gal. of waste oil was released during a transfer of the oil from one container to another when a hose coupling came loose. The oiled was released to a grassy area by the #6 oil tank. The soil was completely dug, containerized along with absorbent materials used, and disposed of at the Crossroads facility in Norridgewock.

11. October 6, 2006: A small amount of #6 oil escaped from the secondary containment of the underground piping associated with the 20,000 gal. #6 oil tank at the annex. The piping had corroded and the secondary containment was perforated allowing a small amount of oil to reach the soil. Most of the oil flowed back to the sump as designed which set the alarm off. This lead to the discovery and subsequent clean-up of the leak. 9 Barrels of soil were removed and disposed of at the Crossroads facility in Norridgewock. All piping and alarm wiring has been relocated above ground.

12. April 17, 2008: Approximately 60 gallons of Magnopal PNG was released from a tote when the nozzle on the tote was accidently broken off. The product was contained with absorbent pads while it was pumped off the floor into a barrel with a total of 55 gallons recovered in this manner. The remaining material was cleaned for proper disposal. A review of the MSDS shows that the product is an acrylic polymer and does not contain any hazardous materials nor reportable chemicals.

13. November 4, 2008: Approximately ½ cup of #6 fuel oil was released onto the ground at the Main Plant AST filling location. Speedi-dry was applied to the spill and the material cleaned up for proper disposal.

14. January 14, 2009: Approximately 2,000 gallons of wastewater overflowed inside the Pretreatment Building due to a hide blocking one of the two bar racks. The

wastewater flowed out of the building and along side the building. It was estimated that 75% of the wastewater flowed back into the sewer.

15. October 2, 2009: Approximately 100 gallons of a fuel blend (70% #6 fuel oil and 30% liquid bio-fuel) was released to the floor inside the boiler room. A gasket on the strainer had failed. This material was 100% contained inside the plant sewer system and recovered.

16. October 12, 2009: Several hundred gallons of liquid bio-fuel was released to the plant sewer system. The heat exchanger at the Annex boiler room had failed, allowing the bio-fuel to get into the sewer. The material was 100% contained inside the plant sewer system and recovered.

17. October 27, 2009: Approximately 5 gallons of liquid bio-fuel was released in the Annex boiler room. A member of the maintenance crew had removed a temperature probe not realizing that the system was still pressurized. Sorbent material was used to clean up the material for proper disposal.

18. March 10, 2010: Approximately 20 gallons of Scotchgard PM-4700 was released in the R&D area of the Main Plant. Some of the released material was recovered for use in production while the remainder was cleaned up with sorbent material. According to the MSDS, this product does not contain hazardous materials and is not a regulated RCRA waste.

**Spill record of Prime Tanning Co, Inc., Berwick 1983 through 2007**
**Hazardous and Non-hazardous Materials**

5/3/1983 – Corrosion/Piping 125 gallons hazardous chemical. 100 gallons put back into system, 25 gallons speedy dry sent to Union Chemical. No further action.

5/22/1984 – Accident 300 gallons mixed liquids. Sorbents used. No further response action.

4/9/1985 – Accident, physical breakage 200 gallons non-hazardous material. Reused. No further response action.

9/23/1985 – Human error 60 gallons waste oil. Sorbents used, sent to Sawyers Environmental
Landfill. No further response action.

6/10/1986 – Human error 25 gallons mixed liquids. Excavation. No further response action.

8/20/1987 – Tank removal - 50 gallons gasoline. Excavated, aerated and reused in parking lot. No further response action.

8/19/1991 – Storm damage - 200 gallons mixed liquid media. Treatment in place. No further response action.

6/25/1999 – Human error - 20 gallons non-hazardous chemical. Prime Tanning arranged disposal. No further response action

5/5/2003 – Oil incident, mechanical failure - 20 gallons hydraulic oil from trash compactor hose. Impacts to pavement, contained through the use of sorbents. Sorbents used, managed in the facility waste plan. No further response action.

1/21/2004 – drum of leather finishing product (Urethane/Acrylic Water Top) punctured by fork lift. Some released to building, some product spilled outside. 15-20 gallons in total. Speedy dry used to remediate. No further action required.

4/19/2004 – Drum containment dike spilled while being moved. Approximately 10 gallons spilled, 90% water and 10% hydraulic oil. Speedy dry used to remediate, placed in drum for disposal. No further action required.

5/18/2004 – One quart of hydraulic oil spilled while transporting 1 gallon jug. Speedy dry used to remediate, placed in 55 gallon drum for disposal. No further action required.

7/5/2004 – 5-gal pail of roofing adhesive fell off roof during repairs. Impacts to interior concrete floor 5-gallon adhesive. Material allowed to cure, and was removed. No further action required.

7/6/2004 – Finish dye container knocked over spilling ½ gallon. Speedy dry used to remediate, placed in 55 gallon drum for disposal. No further action required.

7/13/2004 – 200 gallons of Bisoft 680 due to mechanical failure. This is a non-hazardous fish oil product. Free liquid reclaimed for use. Speedy dry used for remainder, placed in a drum for disposal. No further action required.

10/28/2004 – 2 ½ gallons of Eukesolar Orange spilled interior of plant Leather dye Mopped up and placed in drum for off-site hazardous waste disposal. No further action required.

11/5/2004 – 10 gallons of hydraulic oil due to mechanical failure went to the loading dock sump. Speedy dry used to remediate oil. Oil/water mix pumped/vacuumed into 55 gallon drums for disposal.
3/25/2005 – Failed seal on reservoir of equipment - 2 gallons hydraulic oil. Speedy dry and pads used to remediate, placed in 55 gallon drum for disposal. No further action required.

5/23/2005 – 2 ½ gallons of hydraulic oil due to gear box tipping over. Absorbants used to remediate, placed in 55 gallon drum for disposal. No further action required.

6/10/2005 – 1 ½ gallons of hydraulic oil spilled while performing maintenance on Rizzi #6 machine. Used speedy dry and absorbents to remediate, placed in 55 gallon drum for disposal. No further action required.

6/26/2005 – 90 gallons tanning chemicals due to overwhelming flood event. Material not recoverable. No further action required.

7/19/2005 – 1 quart of hydraulic oil due to equipment move. Speedy dry used to remediate, placed in 5 gallon pail for disposal. No further action required.

8/10/2005 – 25 gallons of Lubritan TG Arcylic Retan (non-hazardous material) due to drum falling off pallet during unloading. Speedy dry used to remediate, placed in drum for disposal. No further action required.

8/11/2005 – Drum spill inside building - 25 gallons of Leukotan NS3 Acrylic syntan. Speedy dry used to remediate, placed in a drum for disposal. No further action required.

12/12/2005 – 3 gallons of heat transfer oil spilled due to mechanical failure inside facility. Speedy dry used to remediate for proper disposal. No further action required.

2/9/2006 – Equipment failure inside facility spilled 1 gallon heat transfer oil. Speedy dry used to remediate, placed in drum for disposal. No further action required.

3/17/2006 – Equipment failure inside facility spilled 10 gallons of hydraulic oil. Approximately one gallon ran into a drain which leads to WWTP. Speedy dry used to remediate, placed in 55 gallon drum for disposal. No further action required.

6/5/2006 – 2 gallons of heat transfer oil spilled when unit overflowed while filling. Speedy dry used to remediate, placed in barrel for disposal. No further action required.

12/11/2006 – 50 gallons of wastewater. Maintenance personnel used water hoses to wash wastewater to loading dock sump which was pumped to the wet well. No further action required.

5/7/2007 – Leak of hydraulic oil from trash compactor. Used speedy dry and absorbent pads to remediate, placed into drums for disposal. Placed double boom in canal as a precaution. No oil observed, so booms removed. No further action required.

6/14/2007 – Fitting value on scissor lift broke, spilling 2 quarts on hydraulic oil on pavement. Speedy dry was used to remediate, placed in barrel for disposal. No further action required.

11/28/2007 – Approximately 50 gallons of Relugan RV, a non-hazardous product, was spilled to a drain due to a tote valve left open. Notified WWTP. Contained in wet well and, after consulting WWTP superintendent, slowly fed the material in the pretreatment system. No further action required.

6/3/2008 – 3 gallons of DC 253-9 Silicone leaked through a drum cover when drum fell off pallet during unloading. Absorbent was used to remediate and properly disposed of as hazardous waste. No further action required.