

| Caption and Case No. | Nature of Proceeding | Court and Location | Status or Disposition |
|---|---|---|---|
| William Kemper, et al. v. Prime Tanning Corp., et al., Case No. 10AP-CC00067 | Personal Injury | Circuit Court of Clinton County, Missouri | Pending |
| Carol Helms v. Rockwool Industries, Inc., et al., Case No. 5:09-cv-06081-GAF | Personal Injury | U.S. District Court, Western District of Missouri | Dismissed |
| Maycee Gardner v. Prime Tanning Corp., et al., Case No. 09RY-CV01273 | Personal Injury | Circuit Court of Ray County, Missouri | Pending |
| Cyndee Gardner, Roger Wayne Osborn, et al. v. Rockwool Industries, Inc., et al., Case No. 5:09-CV-06082-GAF | Personal Injury | U.S. District Court, Western District of Missouri, St. Joseph Division | Pending |
| Beverly Long, et al. v. Prime Tanning Corp., et al., Case No. 09CN-CV00422 | Personal Injury | Circuit Court of Clinton County, Missouri | Pending |
| Blane Fife v. Eteroutremer S.A., et al., Case No. 09CN-CV00458 | Personal Injury | Circuit Court of Clinton County, Missouri | Pending |
| Verline Reid v. Eteroutremer S.A., et al., Case No. 09CN-CV00459 | Wrongful Death | Circuit Court of Clinton County, Missouri | Pending |
| Paula Bicket v. Eteroutremer S.A., et al., Case No. 09CN-CV00457 | Personal Injury | Circuit Court of Clinton County, Missouri | Pending |
| Michael O'Loughlin v. Prime Tanning Corp., et al., Case No. 08CN-CV00705 | Wrongful Death | Circuit Court of Clinton County, Missouri | Pending |
| Jannette Meyer v. Eteroutremer S.A., et al., Case No. 09CN-CV00541 | Personal Injury | Circuit Court of Clinton County, Missouri | Pending |
| Jill Smith, et al. v. Prime Tanning Corp., et al., Case No. 09BU-CV04413 | Personal Injury | Circuit Court of Buchanan County, Missouri | Pending |
| Mary E. Williamson v. Prime Tanning Corp., et al., Case No. 09DK-CC00217 | Personal Injury | Circuit Court of Dekalb County, Missouri | Pending |
| S. Beery, et al. v. Prime Tanning Corp., et al., Case No. 09BU-CV06421 | Personal Injury | Circuit Court of Buchanan County, Missouri | Pending |

| | | | |
|---|---|---|---|
| Bill Couldry v. Prime Tanning Corp., et al., Case No. 10AW-CC00496 | Property Damage | Circuit Court of Andrew County, Missouri | Pending |
| Robert Kilgore, Jr. v. Prime Tanning Corp., et al., Case No. 10DK-CC00008 | Personal Injury | Circuit Court of Dekalb County, Missouri | Pending |
| Sandra Miller v. Prime Tanning Corp., et al., Case No. 10DK-CC00033 | Personal Injury | Circuit Court of Dekalb County, Missouri | Pending |
| Ruth Nicholson, et al. v. Prime Tanning Corp., et al., Case No. 5:09-cv-06083-GAF | Personal Injury/Product Liability | U.S. District Court, Western District of Missouri (St. Joseph) | Dismissed |
| Tammy Battershell, et al. v. Prime Tanning Corp., et al., Case No. 10BU-CV01131 | Personal Injury | Circuit Court of Buchanan County, Missouri | Pending |
| Erin Adamek, et al. v. Prime Tanning Corp., et al., Case No. 10BU-CV02065 | Personal Injury | Circuit Court of Buchanan County, Missouri | Pending |
| Hope Solberg, et al. v. Eteroutremer S.A., et al., Case No. 5:09-6128-CV-SJ-GAF | Personal Injury | U.S. District Court, Western District of Missouri | Dismissed |
| Bruce Moss, et al. v. Prime Tanning Corp., et al., Case No. 10CN-CV00548 | Personal Injury | Circuit Court of Clinton County, Missouri | Pending |
| Shawn Manheim, et al. v. Prime Tanning Corp., et al., Case No. 10CN-CV00900 | Personal Injury – Product Liability | Circuit Court of Clinton County, Missouri | Pending |
| James Frasher, et al. v. Prime Tanning Corp., et al., Case No. 10DK-CC00144 | Personal Injury | Circuit Court of Dekalb County, Missouri | Pending |
| Melissa Gabriel v. Prime Tanning Corp., et al., Case No. 10BU-CV05540 | Personal Injury | Circuit Court of Buchanan County, Missouri | Pending |
| David Gabbard, et al. v. Prime Tanning Corp., et al., Case No. 10CY-CV11863 | Property Damage | Circuit Court of Clay County, Missouri | Pending |





### DEPARTMENT ORDER

## IN THE MATTER OF

| | | |
|---|---|---|
| IRVING TANNING COMPANY | ) | MAINE HAZARDOUS WASTE |
| ANNEX FACILITY, PLEASANT STREET | ) | SEPTAGE & SOLID WASTE |
| HARTLAND, SOMERSET COUNTY, | ) | MANAGEMENT ACT |
| MAINE 04943 | ) | |
| | ) | COMPLIANCE ORDER |

This Compliance Order is issued to IRVING TANNING COMPANY ("IRVING") and any and all successors, purchasers or assigns, however styled, by the MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION ("DEP" or the "Department"). IRVING TANNING COMPANY is a Maine Business Corporation (Charter # 19981396) in good standing to conduct business. Irving's headquarters are in Hartland, Maine.

## LEGAL AUTHORITIES

1. The *Maine Hazardous Waste, Septage and Solid Waste Management Act* ("Waste Act"), 38 M.R.S.A. § 1304(12), provides DEP's commissioner with the ability to order that immediate actions be taken to bring a violation involving hazardous waste or waste oil into compliance when it is determined to be endangering or causing damage to public health or the environment:

   "Whenever, after investigation, the commissioner determines that there is or has been an unauthorized discharge of hazardous waste, constituents of hazardous waste, or waste oil into the environment where there is a reasonable basis to believe that the discharge is endangering or causing damage to public health or the environment or that any person has violated or is in violation of any requirement of this subchapter, including rules adopted thereunder, relating to hazardous waste or waste oil activities, he may issue an order requiring compliance immediately or within a specified time period or requiring corrective action or other response measures as necessary to protect the public health and safety or the environment.

   The commissioner may require assurance of financial ability for completing corrective action and may require, where necessary, that corrective action be taken beyond a facility or site to remove the danger to the public health or the environment unless the person to whom the order is directed demonstrates to the commissioner that, despite that person's best efforts, he was unable to obtain the necessary permission to undertake such actions."

   38 M.R.S.A. § 1304(12).

| IRVING TANNING COMPANY | 2 | MAINE HAZARDOUS WASTE |
|---|---|---|
| ANNEX FACILITY, PLEASANT STREET | ) | SEPTAGE & SOLID WASTE |
| HARTLAND, SOMERSET COUNTY, | ) | MANAGEMENT ACT |
| MAINE, 04943 | ) | |
| | ) | COMPLIANCE ORDER |

2.      Maine's Hazardous Waste Management Rules (hereinafter the "Rules"), 06-096 CMR
        Chapters 850 to 857.

The Department has reviewed site investigation reports, supportive data, agency review
comments, and other related materials on file and FINDS THE FOLLOWING FACTS:

1.      PROJECT SUMMARY

        The Irving Tanning Corporation conducts leather manufacturing operations at several
        locations in the Town of Hartland. The Irving facility that is the subject of this order is
        the Irving Tanning Annex Facility (hereinafter the "Annex") located on Pleasant Street in
        Hartland. This Pleasant Street facility operated historically as a vegetable cannery until
        Irving purchased it in about 1962 or 1963. Shortly thereafter, Irving began operating this
        facility as an Annex to their main facility located about a mile away on Main Street in
        Hartland. Irving moved most of the leather finishing operations (application of primarily
        solvent-based lacquers) over to the Annex while retaining most of the wet processes
        (dehairing, tanning, etc) at the Main Street plant.

        In 1980 Irving notified the Department and obtained an Interim Hazardous Waste License
        (#I-045) for landspreading of hair waste generated in the dehairing operations at their
        Main Street facility. The landspreading of this waste was done on the fields that surround
        and are part of the Annex facility over a period of about one year in 1980 and 1981. A
        subsequent compliance inspection of the Annex conducted in 1987 identified, in addition
        to the licensed activity, an area of the facility that Irving was operating as a greater than
        90 day hazardous waste storage facility. This storage facility was added to Irving's
        existing Interim License and, in an August 24, 1989 Administrative Consent Agreement
        and Enforcement Order, Irving agreed to undertake an investigation and interim
        hazardous waste license closure. Irving submitted an interim license closure plan to the
        Department in 1990 followed by a series of modifications. On December 14 1994 the
        Board of Environmental Protection issued an order to Irving accepting the closure plan
        and directing them to complete the closure and certification for aforementioned interimly
        licensed activities.

| IRVING TANNING COMPANY | 3 | MAINE HAZARDOUS WASTE |
| ANNEX FACILITY, PLEASANT STREET | ) | SEPTAGE & SOLID WASTE |
| HARTLAND, SOMERSET COUNTY, | ) | MANAGEMENT ACT |
| MAINE, 04943 | ) | |
| | ) | COMPLIANCE ORDER |

The land spreading area has been investigated and no hazardous waste residues of concern have been identified. A certification of closure has been completed for the land spreading portion of the interim license. Additionally, much of the investigation and remediation of the hazardous waste storage area has been completed with the exception of one fairly defined area. This remaining area, contaminated groundwater and requirements to certify closure of the interim license are the subject of this order.

2. SITE DESCRIPTION

The Irving facility is located in the town of Hartland, Somerset County, Maine. **Figure 1** provides a map of the facility's location. The site is identified as Tax Map 7, Lot 35 and Tax Map 19, Lots 28 and 33 (the "Site"). The site consists of a series of manufacturing and storage buildings, most of which are interconnected (estimated to be in excess of several hundred thousand square feet total), a series of asphalt and gravel driveways and parking lots, as well as undeveloped fields and wooded land. The structures and paved and gravel areas occupy approximately fifteen (15) acres of an approximately 60 acre property. The site layout is shown in **Figure 2**. The facility property is further described in Warranty Deeds dated July 31, 1961 and March 4, 1963 as recorded in the Somerset County Registry of Deeds at Book 655, Pages 345 to 349 and Book 674 Pages 253 and 254.

The facility is located in a rural area on the southwest side of Pleasant Street. The site is bounded by residential areas on the South and East, by woods to the West and North. The Northwest corner of the Annex property is currently leased to the Town of Hartland and is occupied by the Hartland Sludge Landfill. The nearest residences are located approximately 1,000 feet to the South, and are served by public water from the Hartland Water District.

3. REGULATORY HISTORY

On July 29, 1980 Irving notified the United Stated Environmental Protection Agency (hereinafter the "EPA") that the Annex facility was operating as a generator of hazardous waste. Based on this notification, EPA assigned to the Annex facility the identification number MED001065580 for the purpose of tracking hazardous waste activities. Irving then notified the Department requesting an Interim Hazardous Waste Facility License for the landspreading of hair waste on the fields at the Annex. In response to that request, the Board issued Interim License #I-045 to Irving on September 24, 1980 permitting the proposed landspreading.

| IRVING TANNING COMPANY | 4 | MAINE HAZARDOUS WASTE |
| ANNEX FACILITY, PLEASANT STREET | ) | SEPTAGE & SOLID WASTE |
| HARTLAND, SOMERSET COUNTY, | ) | MANAGEMENT ACT |
| MAINE, 04943 | ) | |
| | ) | COMPLIANCE ORDER |

On August 24, 1989 the Board signed an Administrative Consent Agreement and Enforcement Order with Irving in order to correct violations of Maine's Hazardous Waste Management Rules as determined during a compliance inspection conducted on December 30, 1987 by Department staff. This inspection identified, in addition to the licensed activity, an area of the facility that Irving was operating as a greater than 90 day hazardous waste storage facility. This storage facility was added to Irving's existing Interim License and, in the Administrative Consent Agreement and Enforcement Order, Irving agreed to undertake the investigation and closure of the interim license activities conducted at the Annex. Toward that goal, Irving submitted an interim license closure plan to the Department in 1990 followed by a series of modifications. On December 14 1994, the Board of Environmental Protection issued an order to Irving accepting the closure plan and directing them to complete the closure and certification for aforementioned interimly licensed activities in accordance with the plan.

Also as required by the aforementioned Administrative Consent Agreement and Enforcement Order, Irving submitted an after-the-fact application for a license-by-rule for a solvent distillation unit on May 10, 1988. The distillation unit is used for the beneficial reuse of hazardous waste thinners and leather finishes generated at the Annex facility. The Department issued license-by-rule #O-37-95-A-N for beneficial reuse to Irving on November 27, 1999. This license has had subsequent renewals as an Abbreviated License and the current renewal license #O-000037-HL-C-R is due to expire on October 19, 2005.

In the aforementioned distillation unit Irving distilled waste thinners and solvent-based leather finishes on a regular basis. The recovered solvents were reused at the Annex as thinners and cleaning solvents. The maximum allowed amount of waste thinners and leather finishes processed in a month is 2000 gallons.

IRVING TANNING COMPANY       5      MAINE HAZARDOUS WASTE
ANNEX FACILITY, PLEASANT STREET     )      SEPTAGE & SOLID WASTE
HARTLAND, SOMERSET COUNTY,      )      MANAGEMENT ACT
MAINE, 04943      )
     )      COMPLIANCE ORDER

Irving has reported that the following chemicals and hazardous wastes were managed at the Annex site from 1980 through 2005.

| Waste | Waste Code | Hazard |
|---|---|---|
| N-butyl acetate | D001 | Ignitable |
| Glycol ether | D001 | Ignitable |
| Mineral spirits | D001 | Ignitable |
| Unspecified halogenated solvents mixed with other listed wastes. | F003 | Ignitable, Toxic |
| >150 different proprietary low-solids lacquers including: | | |
|     Nitrocellulose | D001 | Ignitable |
|     Cellulose acetate butyrates | D001 | Ignitable |
|     Polyurethanes | D001 | Ignitable |

There was no chemical analysis information available on the hair waste that was landspread in the fields at the Annex in 1980 and 1981. A single chemical analysis was found for a sample of a similar waste (i.e. pretreatment screenings hair waste) taken nearly a year after the landspreading operations ceased. Although the sample was tested for a limited number of analytes, it was found to have a total chromium content of 3600 mg/kg on a dry weight basis. This is about four times what might be allowable in soils in a residential exposure.

The landspreading activities took place in several fields adjacent to the Annex buildings extending from the landfill located at the Northwest corner of the site around the buildings to the Southeast corner of the site. It was determined that the landspreading (also referred to in some documents as "sheet composting") of hair waste occurred on about 11 acres of field. This area was investigated and the closure of the landspreading part of the Interim License was completed to the Department's satisfaction in 1995. Soil investigations in this area showed evidence of chromium residuals slightly elevated above background but well below levels that would suggest need of additional remediation. No other contaminants of concern were identified in this portion of the investigation.

Irving has also performed a substantial investigation of the Interim Licensed hazardous waste storage area where many drums of waste leather finishes, spent solvents and solvent still bottoms had been stored. This storage area consisted of two adjacent storage rooms about 40 X 40 feet each, located along one side of the main Annex building. In addition to hazardous waste storage, these rooms contained unused finishes, a finish mixing area and an, at that time, unlicensed distillation unit for waste finishes and solvents. Upon investigation, it was discovered that the concrete floors in these rooms both sloped to central floor trenches and each trench had outlet drains (capped with concrete at the time of discovery) which interconnected in a sump at the side of one of the rooms, then flowed to a manhole outside the building then along a 150 foot pipe to ultimately discharge directly into an overgrown ditch alongside the plant driveway. The pipes, sump and ditch were found to contain large quantities of partially dried and partially cured leather finishes of various colors. While this material was primarily a solid, it was found to contain a large percentage of various solvents as well as significant levels of lead and chromium.

Remediation of this identified discharge was initiated. The floors, trenches and sump were cleaned and the manhole, pipelines, and visibly contaminated soils were removed. Evidence of residual VOC contamination was found in some of the deeper soils in the bottom of the trench below where sections of the large drain pipe had leaked. Confirmation sampling was done in the ditch where remediation had been done on areas up to about 200 yards from the discharge point. No additional contamination was found in surficial soils along the ditch. Following the source removal of the visibly contaminated soils, a subsurface soil and groundwater investigation was conducted to determine what residuals remained in the soil and groundwater and what was the nature and extent of the anticipated plume. This investigation included the installation of 20 monitoring wells and the sampling of the soils and groundwater at each location. Several sampling locations had significantly elevated levels of VOCs in the soil and groundwater.

Monitoring well MW-15, which was located on what was expected to be the fringe of the VOC plume, actually had the highest VOC levels (3 to 5 times higher than the next highest well The source of the high VOCs in MW-15 needs to be better identified and remediated to the extent possible.

The Department also will require monitoring to ensure that contaminated groundwater does not leave the Irving property and/or impact human health and the environment. The ultimate result of this investigation is for Irving, along with an independent Professional Engineer, to be able certify closure of the Interim License in accordance with the

requirements of Chapter 855, Section 9 (A) 15 of the Rules and the requirements of the Board Order #O-000142-HC-A-N issued December 14, 1994.

4. SITE CHARACTERIZATION

The site characterization presented in this order relate only to the portion of the Annex facility that may have been impacted by releases from the hazardous waste storage area.

Geology:

Site geology in the area being investigated has been determined only through the observations made while advancing a series of Geoprobe borings into the surface soils. Depth to bedrock or characterization of bedrock at this site has not been done as part of this investigation. To date, none of the borings (some were upward of 30 feet deep) have knowingly contacted bedrock. The surface soils on site consist mainly of various layers of gray-green silty clay and tan till ranging from fine to coarse sand. Deeper soils where examined, tend to consist of rather tight glacial till.

Groundwater: Groundwater was detected across the site in almost all borings. The depths to groundwater vary from 6 feet bgs (below ground surface) to 16 feet bgs across the series of microwells installed in the area under investigation. The topography of the area under investigation includes filled land around the buildings and driveways (as much as 4 to 5 feet in some places), old agricultural fields at more or less native contours and areas where surficial soils have been mined to depths of 4 to 6 feet or more below native contours. Average depth to groundwater appears to be about 11 feet bgs. A total of twenty (20) micro wells are currently installed in the area under investigation on this site. The locations of the wells are depicted in **Figure 3**.

Results of VOC analyses from several rounds of sampling of various monitoring wells show contaminants of concern to include several benzene compounds, xylenes, toluene and a number of ketones. There have also been some low levels of several chlorinated solvents found in several samples. A summary of the volatile organic compounds found in the most recent analysis and corresponding drinking water guidelines are presented in **Table 1**.

The Maine Department of Human Services, Bureau of Health, periodically publishes Maximum Exposure Guidelines for drinking water in Maine. The Maximum Exposure Guidelines (MEGs) are health based guidelines intended to help risk managers, home owners, and others make decisions regarding the suitability for human consumption of

drinking water contaminated by chemicals. The MEG for a carcinogenic compound in drinking water is the concentration of that compound that is expected to result in a maximum lifetime cancer risk of one additional cancer case per 100,000 individuals (DHS, 1992). The MEG for a non-carcinogenic compound in drinking water is the concentration below which no adverse health effects are expected to occur over a lifetime of exposure. In addition to the MEGs, Maine uses the USEPA Office of Water, Drinking Water Regulations including the Maximum Contaminant Levels (MCLs). The MCL represents the maximum permissible level of a contaminant in water that is delivered to any user of a public water supply system (USEPA, 1996). In Maine, the groundwater protection standard is the lower of the MEG or MCL for a given contaminant.

Not all contaminants have established MEGs or MCLs but in their absence alternative guidance numbers may be available. The lower of the MEG, MCL or other appropriate criteria reported in **Table 1** is used.

5.     CORRECTIVE MEASURES

Additional measures must be taken to insure that groundwater contamination on the Annex site is eliminated or minimized to the extent possible.

Plume determination: The investigations conducted to date at the Annex facility have identified several components of a contaminated groundwater plume. (See **Figure 3** and **Table 1**) A small plume is identified in the vicinity of MW-1/1A. The expected source of that plume segment was a small "sink drain" that exited the hazardous waste storage room at that location. The drain was found to have discharged waste leather finishes or solvents directly into the soil in the vicinity of MW-1/1A. As part of the Annex remediation, that drain line was removed and capped and all visually contaminated soils were removed for disposal.

A second component of the plume is believed to have originated up gradient of and in the vicinity of MW-5A. This is the location of the outfall of the large drain pipe associated with the hazardous waste storage room floor trench drain system which received large volumes of waste leather finishes and solvents. As part of the Annex remediation, the drains were plugged and all known piping and structures associated with this drain were excavated, removed and decontaminated or disposed of. All visual contamination was removed where the pipe joints had leaked in sections of the excavation immediately upgradient of the outfall. All waste finish material and visual contamination was removed from the ditch at and below the outfall for disposal as hazardous waste. About

500 tons of soil was removed from the ditch for disposal as special waste. MW-5A is located immediately adjacent to the former outfall location.

A third component of the plume appears to originate or at least manifests itself in the vicinity of MW-15. Since the first analysis about five years ago the contaminant levels in the groundwater at MW-15 have increased from a low of 15 ppm to greater than 40 ppm total VOCs. This level is about eight times higher than the highest contaminant level ever observed in any of the other groundwater sampling locations. Recent investigations have found no soil or groundwater contamination in a series of microwells as close as about 60 feet upgradient of MW-15. Additional microwells downgradient of MW-15 define the Northeast and Southwest edges of the plume as well as the Southeast boundary of the plume in shallow soils. Pursuant to this order, the Department may require additional monitoring to define the plume in the deeper soils on the Southeast boundary.

Source Determination: Due to the high levels of contaminants found in the groundwater at MW-15, additional effort must be made to identify and remove the contaminant source to the extent possible. Since the location of this source appears to be confined to a very specific area immediately upgradient of MW-15 it is the Department's belief that a series of investigatory trenches dug at regular intervals across that area would provide the best opportunity to locate any potential source material.

6. PLUME MONITORING

A groundwater investigation has demonstrated that a plume of VOC contamination exists in the groundwater beneath the Annex facility and portions of that plume have constituents at levels which exceed the established groundwater MEGs, MCLs or other appropriate criteria. It will be necessary to establish a series of monitoring points and a monitoring schedule that will confirm through periodic monitoring that the plume of contamination is not migrating off the Annex property. The return to compliance for groundwater at the Annex facility is expected to be achieved through source removal and natural attenuation.

7. MONITORING SHUT DOWN CRITERIA

Standards must be set to determine when site groundwater has been restored to a level that is protective of human and environmental health.

Site Groundwater: In Maine all groundwater is classified as GW-A pursuant to 38 M.R.S.A. Section 470. GW-A groundwater must be of such quality that it may be used as a public water supply. These waters must be free of any matter that imparts color, turbidity, taste, or odor which would impair the usage of these waters, other than that occurring from natural phenomena. The Maine Department of Human Services, Bureau of Health, periodically publishes Maximum Exposure Guidelines (MEGs) for drinking water in Maine (DHS, 2000). The EPA periodically publishes the MCLs. The MEGs and MCLs are health based guidelines intended to help risk managers, homeowners, and others make decisions regarding the suitability for human consumption of drinking water contaminated by chemicals.

The groundwater monitoring program set forth in this order is intended to monitor the plume of contaminated groundwater above the lower of the MEGs, MCLs or other appropriate criteria where a MEG or MCL does not exist and to insure that contaminated groundwater does not move off the Irving site. The points of compliance for this standard are the monitoring wells established for the site as identified on **Figure 3** as MW-2, MW-5A/5, MW-6, MW-7, MW-15, MW-17, MW-18, MW-20 plus two other well locations to be identified (may be multilevel wells). The monitoring program must operate until the drinking water standards (including, but not limited to, all applicable MEGs and MCLs) have been attained and maintained and can be expected by the DEP to be maintained in the future.

BASED on the above Findings of Fact, and subject to the conditions listed below, the Department makes the following CONCLUSIONS:

1.  Actual and unauthorized discharges of hazardous wastes and their constituents into the environment have occurred at the Irving facility in Hartland, Maine.

2.  A continued threat from the above referenced discharge of hazardous wastes and constituents into the environment exists at the site and could result in the migration of these substances.

3.  These discharges are endangering or causing damage to the environment, within the meaning of 38 M.R.S.A. Subsection 1304 (12).

4.  Irving owns and is responsible for the site in Hartland, Maine, and therefore is the person causing or contributing to the discharge within the meaning of 38 M.R.S.A. § 1304(12).

| IRVING TANNING COMPANY | 11 | MAINE HAZARDOUS WASTE |
| ANNEX FACILITY, PLEASANT STREET | ) | SEPTAGE & SOLID WASTE |
| HARTLAND, SOMERSET COUNTY, | ) | MANAGEMENT ACT |
| MAINE, 04943 | ) | |
| | ) | COMPLIANCE ORDER |

5.      The response ordered in this Order is necessary to remove the danger to the environment.


## IT IS HEREBY ORDERED THAT:


1.      Source Determination: Irving shall provide a plan for the Department's review and
approval to investigate possible plume sources in the area immediately upgradient of
MW-15. This investigation shall include the placement of investigatory trenches in the
form of a series of arcs at increasing distances upgradient of MW-15. The first trench
shall be upgradient of MW-15 and form an arc of at least 10 feet in length, the second
trench shall be at 20 feet upgradient and form an arc of at least 20 feet in length and the
third trench shall be at 30 feet upgradient and form an arc of at least 30 feet in length.
Depth of the trenches shall be a minimum of 10 feet. Continuous observations must be
made throughout the trenching process to include visual observations and screening with
appropriate field instruments such as the photo ionization detector. A minimum of
twelve (12) samples representative of the three trenches will be selected for laboratory
analysis. This investigation must be directed by and observations made by a Maine
Certified Geologist. Irving shall notify the Department at least five (5) business days
prior to any field activities in order to provide the Department opportunity to observe
such activities.

Subject to DEP review and approval of a monitoring plan for the effects of an oxidant in
the first trench, which approval will not be unreasonably delayed or denied, Irving may
use ORC-A in the first trench.

Within 45 days of completion of the trenching activities, a report must be submitted to the
Department providing recommendations for additional remediation in this area or a
justification for no additional remedial action. This report shall be certified by an
appropriate professional in accordance with Maine's geologist certification and engineer
registration laws. The Department reserves the option to authorize field decisions
regarding additional remediation when it is deemed appropriate.

2.      Groundwater Monitoring: Irving, in agreement with the Department, shall select
locations for eight (8) of the existing groundwater monitoring wells and two (2) new
groundwater monitoring wells for the purpose of monitoring the identified plume of VOC
contamination at the Annex facility and to confirm that groundwater is not leaving the
Irving property with VOC contamination levels in excess of that allowable for

groundwater. Certain of the existing wells may be utilized for monitoring and the Department may require Irving to install two additional well locations. Irving shall conduct sampling and analysis of the designated monitoring wells on site three times per year (excluding the Winter season). All samples shall be analyzed in a laboratory for VOCs (EPA method 8260 plus diisobutyl ketone). If sample data suggests that the plume is increasing or moving off site, the data with interpretation must be provided to the Department within 15 days of Irving's receipt of that data.

When implementing the monitoring program described above, Irving shall take water level measurements of the twenty (20) existing wells plus any new wells for a minimum of nine (9) consecutive months. Thereafter, Irving shall at a minimum take water level measurements of the wells in the ongoing monitoring program.

3. Annual Report: Irving shall provide the Department with an Annual Monitoring Report to be submitted by February 28 of each year. The report shall include but may not be limited to an evaluation of the previous year's groundwater monitoring data. The report may include proposals for modifications of the monitoring program, if warranted, to assure the program is continuing to provide useful information. The report shall be certified by an appropriate professional in accordance with Maine's geologist certification and engineer registration laws. An electronic data deliverable (EDD), either in the form of a computer disk or e-mail submittal, that contains laboratory and field data in a format approved by the DEP for uploading into the DEP environmental and groundwater database (EGAD) must be submitted to the DEP in conjunction with the written report. The groundwater monitoring report shall include the following information:

A. Complete historical groundwater analytical results database and/or tables for all detected contaminants (including approximate and below reporting limit detections). The list should include blind and open duplicates, analytical methods, and reporting limits;

B. Field sampling notes, custody, and laboratory data sheets for the most recent sampling rounds not previously reported to DEP;

C. Complete historical water level database with well construction data including screen top and bottom, top of riser, and ground surface elevations. Water level measurements for each round should be given in feet (or meters) below top of riser and as elevation relative to the datum used for all other site measurements;

D.   A quality control report for latest sampling rounds not previously reported to DEP;

E.   Piezometric/phreatic surface map(s) for the most recent sampling rounds not previously reported to DEP;

F.   Map(s) showing detected contaminants for at least the latest rounds not previously reported to DEP;

G.   Graphs of concentration vs. time for wells showing contaminant detections in four or more sampling rounds;

4.   Irving shall certify closure of Interim License #I-045 in accordance with the Closure Order identified earlier in this Order following completion of the source removal investigation and any related remedial actions.

5.   Termination of Order:  Irving shall operate the groundwater monitoring program until groundwater concentrations in the monitoring wells are reduced to or below the groundwater protection standards identified in **Table 1**.  These concentrations must be maintained for three consecutive years.  When the DEP provides written acknowledgement that the groundwater monitoring program may be terminated, following receipt and approval of a written report from Irving which demonstrates that such concentrations have been attained and maintained and can be expected to be maintained in the future, Irving may discontinue the monitoring program, and this Order shall terminate.

6.   Representative Sample:  Samples and measurements taken for the purpose of monitoring under this Order shall be representative of the monitored activity.  Irving shall retain records of all monitoring information including boring logs, field notes, groundwater monitoring well data, and any other data generated in support of this Order.  Records of monitoring information shall include:

A.   the date, exact place, and time of sampling or measurements;

B.   the individual(s) who performed the sampling or measurements;

C.   the date(s) the analyses were performed;

D.   the individual(s) who performed the analyses;

    E.    the analytical techniques or methods used; and

    F.    the results of such analyses.

7.    Copy of Order: A copy of this Order shall be retained at the Site as long as it is owned by Irving. Irving shall take the steps necessary to ensure that persons under contract to Irving conducting activities required by this Order are familiar with and adhere to conditions of this Order. When Irving has actual knowledge of a transfer of ownership of the Annex, it shall promptly provide a copy of this Order, or any subsequent Order that replaces this Order, to the new owner of the Annex.

8.    Information Requests: Irving shall furnish to the Department, within a reasonable time, any information which the Department may request to determine whether cause exists for modifying or suspending this Order or to determine compliance with the terms of this Order.

9.    Entry: Irving shall allow the Department or an authorized representative, upon presentation of credentials to:

    A.    Enter at reasonable times upon the premises where remedial activity is located or constructed, or where records are kept under the terms of this Order;

    B.    Have access to and copy, at reasonable times, any records (eg. monitoring reports, workplans, written communications pertaining to corrective action at the Annex) that must be kept under the conditions of this Order;

    C.    Inspect, at reasonable times, any facilities, equipment, practices, or operations regulated or required under this Order; and

    D.    Sample or monitor, at reasonable times, for the purposes of assuring compliance with this Order any substance or parameters at the Annex.

10.    Transfer of Property: Irving shall not transfer, remove, or allow the removal of all or any portion of the groundwater monitoring system, including structures and equipment, without the prior written approval of the DEP. The Annex that is the subject of this Order may be sold by Irving to a third party in the future. In that event, Irving will notify the DEP as far in advance as is practicably possible of the date of transfer of the Annex. Irving will prohibit the third party transferee, by separate contract between the two

| IRVING TANNING COMPANY | 15 | MAINE HAZARDOUS WASTE |
|---|---|---|
| ANNEX FACILITY, PLEASANT STREET | ) | SEPTAGE & SOLID WASTE |
| HARTLAND, SOMERSET COUNTY, | ) | MANAGEMENT ACT |
| MAINE, 04943 | ) | |
| | ) | COMPLIANCE ORDER |

parties, from interfering with Irving's obligations under this Order. The third party transferee will be provided a copy of this Order by Irving in advance of the transaction, but the third party transferee is not required by the terms of this Order to become a party to this Order. Transfer of the property will not relieve Irving of its obligations under this Order. However, by mutual agreement between DEP and Irving, which shall be through modification of this Order, Irving's obligations under this Order may be terminated and another party may undertake to fulfill the obligations herein.

11. Environmental Covenant: Irving shall file, with review and approval of the DEP, an Environmental Covenant pursuant to Maine's Uniform Environmental Covenants Act to protect any ongoing monitoring program and to limit potential exposure to VOCs remaining on site. Irving shall review the status of compliance with the environmental covenant every five (5) years. Irving shall report inspection results to the Department in accordance with an inspection plan developed by Irving and approved by the Department.

12. Other Laws: All actions taken pursuant to this Order shall be undertaken in accordance with the requirements of all applicable local, state, and federal laws and regulations.

13. Qualified Consultants and Engineers: All work performed by and for Irving for the remedial activities to date has been under the direction and supervision of a qualified professional engineer or geologist, and all work performed by or for Irving pursuant to this Order shall be under the direction and supervision of a qualified professional engineer or geologist with expertise in hazardous waste site cleanup. Within fifteen (15) working days of the effective date of retention of any new engineer or geologist and of any new contractors and subcontractors to be used in carrying out the terms of this Order, Irving shall provide written notice to the DEP of the identity and qualifications of such persons.

14. Assumption of Risk: Irving shall assume all financial and other risks associated with its obligations under this Order. In assuming these risks, Irving does not waive its right to assert that other persons are responsible for any liabilities or environmental problems associated with the site, to seek indemnity or contribution from such other persons, or to assert any claim or to impose any other defense that may be available to it under law.

15. Permits: Irving shall use best efforts to assure that all permits necessary for completion of the activities required by this Order are issued in a timely fashion. Failure or delay of the State of Maine or the federal or local government to issue any necessary permit in a timely fashion, following receipt of a complete and approvable application, shall relieve Irving of its obligations to initiate or complete any actions otherwise required by this

Order which cannot reasonably be initiated or completed without that permit, until such permits are obtained. Irving shall promptly notify DEP of its inability to obtain such permit or permits.

16. Data: In addition to providing the reports otherwise required by this Order, Irving shall promptly make available to the Department results of any sampling, tests, or other data generated pursuant to this Order if requested.

17. Record Retention: Irving shall preserve during the pendancy of this Order and for a minimum of ten (10) years after its generation, all records and documents in its possession or in the possession of its divisions, employees, agents, accountants, contractors or attorneys which relate to the activities undertaken pursuant to this Order, despite any document retention policy to the contrary. Nothing in this Order shall constitute any waiver of privilege that may otherwise attach to any such records or documents. Irving shall notify the Department not less than thirty (30) days prior to the destruction of any documents referred to in this paragraph. Upon request by DEP, Irving shall provide DEP with the records.

18. Other Claims: Nothing herein releases or is intended to release any claims, causes of action or demands in law or equity of the State of Maine or DEP, against any person, firm, partnership, entity or corporation which is not a signatory to this Order for any liability that may arise or may have arisen out of or relating in any way to the generation, storage, treatment, handling, transportation, or disposal of any materials, wastes or hazardous substances at, to, or from the Site. This Order shall not limit any legal or equitable claims of the State of Maine against Irving, its agents, contractors, or assigns, including but not limited to, claims related to releases of hazardous wastes or other pollutants, provided further, however, that except as expressly set forth in this Order, nothing herein shall constitute a waiver of defenses or other rights available to Irving pursuant to its confirmed Plan of Reorganization Dated July 10, 2002 entered in Chapter 11 Case No. 01-10586 or pursuant to its confirmed First Amended Plan of Reorganization (July 6, 2005) entered in Chapter 11 Case No. 05-10423.

19. Creation of Danger: In the event that the Department determines that activities which are taking place at the Annex are in noncompliance with this Order and which create an actual danger to the environment or to the health or welfare of the people at the Annex or in the surrounding area, or in the event that such danger arises from any other circumstances encountered during the implementation of this Order, DEP may order Irving to stop further implementation of this Order for such period of time as needed to abate the danger. The Department may issue such an order regardless of whether the

IRING TANNING COMPANY      17    MAINE HAZARDOUS WASTE
ANNEX FACILITY, PLEASANT STREET     )    SEPTAGE & SOLID WASTE
HARTLAND, SOMERSET COUNTY,       )    MANAGEMENT ACT
MAINE, 04943                     )
                                       )    COMPLIANCE ORDER

endangering activity or circumstances are in compliance with this Order or are caused by circumstances not expected or contemplated in this Order. Irving may petition a court of competent jurisdiction for review of such a stop work order. Irving agrees to comply with the provisions of any such stop work order. During the period of time that the Department orders Irving to stop implementation of this Order, Irving's obligations pursuant to this Order shall be suspended and, in the event that such a delay was not caused by the negligent or noncompliant acts or omissions of Irving whose activities have suspended, the time schedule for implementation shall be extended by a reasonable time period.

20.    Dispute Resolution: If Irving objects to any DEP decision made pursuant to this Order, it shall notify the DEP in writing of its objections within ten (10) working days of receipt of the decision. The parties will endeavor to settle the dispute by negotiating in good faith. If agreement cannot be reached on disputed issues within fourteen (14) days from the date of receipt by the DEP of notification of objection, Irving may invoke formal dispute resolution by providing to the Commissioner a written statement of position including any factual data, analysis or opinion in support of its position. Within thirty (30) days of receiving any additional information, the Commissioner shall issue a final written decision resolving the dispute. The period of negotiation may be extended by mutual agreement between Irving and DEP. The dispute resolution procedures of this paragraph shall be the exclusive mechanism to resolve disputes arising under this Order unless otherwise agreed in writing by Irving and DEP, and the Commissioner's decision shall be deemed final agency action.

21.    Designation of Coordinators:

For the DEP:   Edward Vigneault or successor in position
                 RCRA Corrective Action Project Manager
                 Maine Department of Environmental Protection
                 17 State House Station
                 Augusta, ME 04333-0017

For Irving:

            Irving Tanning Inc.
            P.O. Box 400
            Hartland, ME 04943-0400

IRVING TANNING COMPANY                    18      MAINE HAZARDOUS WASTE
ANNEX FACILITY, PLEASANT STREET           )       SEPTAGE & SOLID WASTE
HARTLAND, SOMERSET COUNTY,                )       MANAGEMENT ACT
MAINE, 04943                              )
                                          )       COMPLIANCE ORDER

A different coordinator may be designated by either of the parties provided that notice of
such designation is made to the other party within five (5) working days of the
designation.

22.    Notice:  All notices required pursuant to this Order shall be deemed to have been made
       upon receipt of a certified letter or receipted express delivery to the Coordinators
       designated above.

DONE AND DATED AT AUGUSTA, MAINE THIS _16th_____ DAY

OF _September__, 2005.

BY: _____ for

Dawn R. Gallagher, Commissioner
Department of Environmental Protection

XEVDOIrving Hartland final.doc



Figure 3

GENERAL NOTES

(1) THE ELEVATIONS SHOWN HEREON ARE BASED ON A LOCAL BENCHMARK FOUND AT THE NORTHWESTERLY CORNER OF A CONCRETE TANK SHOWN HEREON.

(2) THE ELEVATION APPROXIMATES THE NATIONAL GEODETIC VERTICAL DATUM OF 1929.

(3) A OBSERVATION WAS MADE AT THE SITE USING AN ASHTECH Z-XTREME DUAL FREQUENCY GPS RECEIVER AND IT WAS DETERMINED THAT ALL ELEVATIONS WOULD HAVE TO BE ADJUSTED BY +1.84 FEET TO BE REFERENCED TO THE NGVD 1929.

(4) COORDINATES ARE REFERENCED TO THE MAINE STATE COORDINATE SYSTEM (WEST ZONE), SAID COORDINATE SYSTEM IS BASED ON THE NORTH AMERICAN DATUM OF 1983 (NAD 83).

(5) COORDINATES FOR THIS SURVEY WERE DERIVED FROM GPS DATA THAT WAS SUBMITTED TO THE NATIONAL GEODETIC SURVEY (NGS) FOR PROCESSING BY THE "OPUS" PROGRAM.

(6) BASE MAP DERIVED FROM PLISGA AND DAY SURVEY DATED DEC. 23, 2004, PROJECT NUMBER 04345T.

LEGEND:

⊕  EXISTING MONITORING WELLS

⊕  MONITORING WELLS
    INSTALLED NOV. 2004

✦  HYDRANT

●  MANHOLE

——  INFERRED GROUNDWATER
     CONTOUR

244.82  GROUNDWATER ELEVATION
        (FEB. 23, 2005)

BAR SCALE
1" = 50'
50'    0    50'    100'

CHECK GRAPHIC SCALE BEFORE USING

IRVING TANNING
HARTLAND, MAINE

SITE MAP AND
GROUNDWATER CONTOUR MAP

WOODARD & CURRAN
Engineering · Science · Operations

PORTLAND, MAINE                    1-800-426-4262

DESIGNED BY: JE          CHECKED BY: KK
DRAWN BY: PFF            21192601-U1-CAD-03.dwg

JOB NO: 21192.01
DATE: MARCH 2005
SCALE: AS NOTED
FIGURE

Figure 3



Figure 1

Site Locator Map



FIGURE 2

IRVING TANNING
HARTLAND, MAINE

ANNEX FACILITY
SOIL SAMPLING LOCATIONS

ACHERON INC.
Engineering, Environmental & Geologic Consultants
Newport, Maine • Winthrop, Maine

| JOB NO. | DWG NO. |
|---|---|
| 2920 | A-1,312 |

SITE PLAN
1" = 300'

### SOIL SAMPLE CONCENTRATION

| AREA A | mg/kg | AREA B | mg/kg | AREA C | mg/kg | AREA D | mg/kg | AREA E | mg/kg |
|---|---|---|---|---|---|---|---|---|---|
| A-1 | 25 | B-1 | 18 | C-1 | 20 | D-1 | | E-1 | 23 |
| A-2 | 17 | B-2 | 22 | C-2 | 15 | D-2 | | E-2 | 23 |
| A-3 | 42 | B-3R | 20 | C-3 | 22 | | | E-3 | 21 |
| A-4 | 12 | B-4 | 21 | C-4 | 29 | AREA D | mg/kg | | |
| | | B-5 | 25 | C-5 | 26 | D-1 | 26 | | |
| | | B-6 | 28 | C-6 | 20 | D-2 | 48 | | |
| | | | | C-7 | 16 | | | | |
| | | | | C-8 | 23 | | | | |

### LEGEND

— EDGE OF WATER
— PAVED ROAD
— — GRAVEL ROAD
TREE LINE
— — — APPROXIMATE PROPERTY LINE
☐ BUILDINGS
░ DISTURBED AREA
HAIR SPREADING AREA
⊕ SOIL SAMPLING LOCATIONS

### NOTES

1. BOUNDARIES ESTIMATED BASED
ON INTERVIEWS.

2. AREAS A, B, C, & D REFER TO
DESIGNATIONS DESCRIBED IN THE
DEP DOCUMENT #0-001142-4C-A-N
(DECEMBER 1994). AREA E REFERS
TO THE DESIGNATION DESCRIBED IN
ACHERON CORRESPONDENCE TO
MEDEP (FEB. 10, 1995).

3. SAMPLING LOCATIONS BASED ON
RANDOMLY GENERATED COORDINATES
ON AN ARBITRARY GRID OVERLAY.

FILE: A-1312
1" = 300', BAH, 6/15/95

ROUTES #3 & 151

SEBASTICOOK RIVER

WOODS

IRVING TANNING
ANNEX

LICENSED LANDFILL
BOUNDARY

LEACHATE POND

PUMP HOUSE

PHASE I
PHASE II

OLD
LANDFILL

SITE 1

Table 1. November 2004 Groundwater Results

| Parameter | Units | Detection Limit | Standards MEG | Standards MCL | Standards PRG | MW-15 | MW-16B | MW-17 | MW-18 | MW-19 | MW-20 | MW-21 | MW-22 | MW-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sample Date | | | | | | 11/22/99, 3/30/00, 6/24/04 | 11/30/2004 | 11/30/2004 | 11/30/2004 | 11/30/2004 | 11/30/2004 | 11/30/2004 | 11/30/2004 | 11/30/2004 |
| VOCs | | | | | | | | | | | | | | |
| Acetone | ug/L | 25 | 700 | -- | -- | ND | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 |
| sec-butylbenzene | ug/L | 5 | -- | -- | 240 | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| 1,1-Dichloroethane | ug/L | 5 | 70 | -- | -- | ND | <5 | 8 | <5 | <5 | <5 | <5 | <5 | <5 |
| Cis-1,2-Dichloroethene | ug/L | 5 | 70 | 70 | -- | ND | <5 | 38 | 13 | <5 | <5 | <5 | <5 | <5 |
| Diethylether | ug/L | 5 | -- | -- | -- | | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| Ethylbenzene | ug/L | 5 | 70 | 700 | -- | 2,780 - 4,110 | <5 | 23 | 140 | <5 | <5 | <5 | <5 | <5 |
| Isopropylbenzene | ug/L | 5 | -- | -- | 660 | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| Methyl ethyl ketone (MEK) | ug/L | 25 | 1,440 | -- | -- | ND | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 |
| Methyl isobutyl ketone (MIBK) | ug/L | 25 | -- | -- | 160 | ND - 4,090 | <25 | 580 | <25 | <25 | <25 | <25 | <25 | <25 |
| Naphthalene | ug/L | 5 | 14 | -- | -- | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| n-Propylbenzene | ug/L | 5 | -- | -- | 240 | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| Tetrachloroethene | ug/L | 5 | 7 | 5 | -- | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| Toluene | ug/L | 5 | 1,400 | 1,000 | -- | 6,610 - 19,300 | <5 | 220 | <5 | <5 | <5 | <5 | <5 | <5 |
| 1,1,1-Trichloroethane | ug/L | 5 | 200 | 200 | -- | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| Trichloroethene | ug/L | 5 | 32 | 5 | -- | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| 1,2,4-Trimethylbenzene | ug/L | 5 | -- | 70 | 12 | ND | <5 | 11 | <5 | <5 | <5 | <5 | <5 | <5 |
| 1,3,5-Trimethylbenzene | ug/L | 5 | -- | -- | 12 | ND | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| o-Xylene | ug/L | 5 | 14,000 | 10,000 | -- | 506 - 954 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| m,p-Xylene | ug/L | 10 | 14,000 | 10,000 | -- | 4,010 - 5,760 | <10 | 23 | 12 | <10 | <10 | <10 | <10 | <10 |
| Diisobutyl ketone (DIBK) | ug/L | NA | -- | -- | -- | 1,420 - 7,010 | ND | 110 | 10 | ND | ND | ND | ND | ND |
| Total VOCs | | | | | | 15,546 - 41,224 | 0 | 1013.0 | 175.0 | 0 | 0 | 0 | 0 | 0 |

Notes:

ND = Not Detected

NA = Not Applicable

Bold values indicate exceedances of regulatory criteria

< = Values detected below the Project Quantitation Limit (PQL)

Table #1.

Table 2 - Detected Groundwater Contaminants
Prime Tanning/Anmex
Hartland, Maine

| Parameter | Units ug/l | Detection Limit | MEG | MCL | PRG | MW-1 8/08/2008 | MW-2 8/08/2008 | MW-5A 8/11/2008 | MW-5 8/7/2008 | MW-6 8/9/2008 | MW-7 8/7/2008 | MW-8 8/7/2008 | MW-9 Duplicate 8/7/2008 | MW-15 8/9/2008 | MW-17 8/9/2008 | MW-18 8/9/2008 | MW-19 8/9/2008 | MW-20 8/9/2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **VOCs** | | | | | | | | | | | | | | | | | | |
| 1,2,3-TRIMETHYLBENZENE | | 1 | NA | NA | --- | <1 | 2 | 7 | <1 | 17 | <1 | <1 | <1 | 14 | 4 | <1 | <1 | <1 |
| 1,2,4-TRIMETHYLBENZENE | | 1 | NA | NA | --- | <5 | 3 | 8 | <1 | 34 | <1 | <1 | <5 | 71 | 2 | <1 | <1 | <1 |
| 1,2-DICHLOROETHYLENE | | 2 | 70 | 70 | --- | <2 | <2 | 6 | <2 | 8 | 8 | <2 | <2 | <2 | 6 | <2 | <2 | <2 |
| 1,3,5-TRIMETHYLBENZENE | | 1 | NA | NA | --- | <1 | <1 | 11 | <1 | 16 | <1 | <1 | <5 | 18 | <1 | <5 | <1 | <1 |
| 4-METHYL-2-PENTANONE | | 5 | 6 | 5 | 2050 | <5 | <5 | <5 | <5 | 2 | <5 | <5 | <5 | 120 | <5 | <5 | <5 | <5 |
| BENZENE | | 1 | 600 | | | <1 | <1 | <1 | <1 | <1 | <1 | 1 | <1 | 3 | <1 | <1 | <1 | <1 |
| CARBON DISULFIDE | | 1 | 3 | | | <2 | <2 | <2 | <1 | <1 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | 3 |
| CHLOROMETHANE | | 2 | 70 | 70 | --- | <1 | <1 | 3 | <1 | <1 | 8 | <1 | <1 | 2 | 6 | <1 | <1 | <1 |
| CIS-1,2-DICHLOROETHENE | | 1 | | | | <1 | <1 | 1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| CIS-1,3-DICHLOROPROPENE | | 1 | | | | <1 | <1 | <10 | <1 | 5 | <1 | <1 | <5 | 4 | <1 | <1 | <1 | <1 |
| CIS-1,4-DICHLORO-2-BUTENE | | 1 | | | 10000 | <5 | <5 | 3400 | <5 | 47 | <5 | <5 | <5 | 1200 | 15 | <5 | <5 | <5 |
| CYCLOHEXANE | | 1 | NA | NA | NA | <5 | <5 | <2 | <2 | ND | <2 | <2 | <2 | 4 | <1 | <5 | <5 | <1 |
| DI-ISOBUTYL Acetone | | 5 | 1400 | | | <2 | <1 | <1 | <1 | ND | <1 | <1 | <1 | 39 | <1 | <1 | <1 | <1 |
| DICHLORODIFLUOROMETHANE | | 2 | NA | NA | NA | <1 | <1 | 460 | <1 | 210 | <1 | <1 | <1 | 2600 | 8 | <1 | <1 | 2 |
| DIETHYL ETHER | | 1 | 70 | 700 | 1300 | <1 | <1 | 7 | <1 | 12 | <1 | <1 | <1 | 42 | <1 | <1 | <1 | <1 |
| ETHYLBENZENE | | 1 | NA | NA | NA | <2 | 2 | 240 | <2 | 190 | <2 | <2 | <2 | 2400 | 12 | <2 | <2 | <2 |
| ISOPROPYLBENZENE | | 1 | 1400 | | 5200 | <1 | <1 | 10 | <1 | 10 | <1 | <1 | <1 | 9 | 5 | <1 | <1 | <1 |
| M-,P-XYLENES | | 2 | 14 | | | <1 | <1 | 5 | <1 | 8 | <1 | <1 | <1 | 5 | 5 | <1 | <1 | <1 |
| METHYLCYCLOHEXANE | | 1 | | 740 | 240 | <1 | <1 | 7 | <1 | 4 | <1 | <1 | <1 | 16 | 5 | <1 | <1 | <1 |
| NAPHTHALENE | | 1 | | | 240 | <1 | <1 | 7 | <1 | 17 | <1 | <1 | <1 | 16 | 2 | <1 | <1 | <1 |
| N-BUTYLBENZENE | | 1 | 1400 | | 1400 | <1 | <1 | 2 | <1 | 17 | <1 | <1 | <1 | 420 | <1 | <1 | <1 | <1 |
| N-PROPYLBENZENE | | 1 | | | 240 | <1 | <1 | <5 | <1 | 18 | <1 | <1 | <1 | 49 | <5 | <5 | <5 | <1 |
| O-XYLENE | | 1 | NA | NA | 240 | <5 | <5 | <5 | <1 | 6 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| SEC-BUTYLBENZENE | | 1 | 7 | 5 | | <1 | 1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| TERT-BUTYL ALCOHOL | | 5 | 1400 | 1000 | | 30 | 1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| TERT-BUTYLBENZENE | | 1 | NA | NA | | <1 | <1 | 3 | <1 | 1 | <1 | <1 | <1 | 1200 | 52 | <1 | <1 | <1 |
| TETRACHLOROETHENE | | 1 | 32 | 5 | | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| TOLUENE | | 1 | 0.2 | 2 | | 2 | <1 | 2 | <1 | 5 | <1 | <1 | <1 | <1 | 1 | 1 | <1 | <1 |
| TRANS-1,2-DICHLOROETHENE | | 1 | 1400 | | | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | 4 | 4 | <2 | <2 | <2 |
| TRANS-1,4-DICHLORO-2-BUTENE | | 1 | 70 | | | <3 | <3 | 240 | <3 | 200 | <3 | <3 | <3 | 2800 | 16 | <3 | <3 | <3 |
| TRICHLOROETHENE | | 1 | | | | <1 | <1 | <1 | <1 | 6 | <1 | <1 | <1 | 16 | ND | <1 | <1 | <1 |
| VINYL CHLORIDE | | 2 | | | | | | | | | | | | | | | | |
| XYLENES (TOTAL) | | 3 | | | | | | | | | | | | | | | | |
| P-ISOPROPYLTOLUENE | | 1 | | | | | | | | | | | | | | | | |
| **TOTAL VOCS** | | | | | | 32 | 7 | 4097 | ND | 530 | 16 | 1 | ND | 8182 | 113 | 1 | ND | 5 |

Notes:
1) Bold indicates compound detected above method detection limits.
2) Yellow indicates compound exceeds available standards.

Table 3 - Groundwater Analytical Results (2008)
Prime Tanning Annex
Hartland, Maine

| Parameter | Units | Detection Limit | Standards MEG | MCL | PRG | MW-1 8/06/2008 | MW-2 8/08/2008 | MW-5A 8/7/2008 | MW-5 8/7/2008 | MW-6 8/8/2008 | MW-7 8/7/2008 | MW-8 8/7/2008 | MW-4 Duplicate 8/7/2008 | MW-15 8/6/2008 | MW-17 8/5/2008 | MW-18 8/6/2008 | MW-19 8/6/2006 | MW-20 8/8/2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VOCs |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 1,1,1,2-TETRACHLOROETHANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,1,1-TRICHLOROETHANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,1,2,2-TETRACHLOROETHANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,1,2-TRICHLOROETHANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,1-DICHLOROETHANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,1-DICHLOROETHENE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,1-DICHLOROPROPENE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,2,3-TRICHLOROBENZENE | ug/l | 5 | NA | NA | NA | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,2,3-TRICHLOROPROPANE | ug/l | 1 | NA | 70 | 70 | <1 | 2 | 2 | <1 | 17 | <1 | <1 | 14 | <1 | 1 | <1 | <1 | <1 |
| 1,2,4-TRIMETHYL BENZENE | ug/l | 1 | 70 | 70 |  | <1 | 3 | 8 | <1 | 34 | <1 | <1 | 3 | <1 | 2 | <1 | <1 | <1 |
| 1,2,4-TRICHLOROBENZENE | ug/l | 1 | 0.25 | 0.2 |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,2-DIBROMO-3-CHLOROPROPANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,2-DIBROMOETHANE | ug/l | 1 | 63 | 600 |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,2-DICHLOROBENZENE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <2 | <1 | 8 | <1 | 6 | 6 | <1 | <2 | <2 |
| 1,2-DICHLOROETHANE | ug/l | 1 | 4 | 5 |  | <1 | <1 | 6 | <2 | <2 | <2 | <2 | <1 | <2 | <2 | <1 | <1 | <1 |
| 1,2-DICHLOROETHYLENE | ug/l | 2 | 70 | 70 |  | <1 | <1 | 11 | <1 | 16 | <1 | <1 | 14 | <1 | <1 | <1 | <1 | <1 |
| 1,2-DICHLOROPROPANE | ug/l | 1 | 5 | 5 |  | <1 | <1 | <1 | <1 | <1 | <1 | 18 | <1 | 18 | <1 | <1 | <1 | <1 |
| 1,3,5-TRICHLOROBENZENE | ug/l | 1 | 40 | 40 |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,3,5-TRIMETHYLBENZENE | ug/l | 1 | 60 | 600 |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,3-DICHLOROBENZENE | ug/l | 1 | 4 |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,3-DICHLOROPROPANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,4-DICHLOROBENZENE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <100 | <1 |
| 1,4-DIOXANE (P-DIOXANE) | ug/l | 100 |  |  |  | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 | <100 |
| 1-CHLOROHEXANE | ug/l | 5 |  |  |  | <5 | <5 | <5 | <5 | <25 | <5 | <5 | <5 | <5 | <5 | <5 | <25 | <5 |
| 2,2-DICHLOROPROPANE | ug/l | 5 |  |  |  | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| 1-BUTANONE | ug/l | 5 |  |  |  | <1f | <1f | <1f | <1f | <1f | <1f | <1f | <1f | <1f | <1f | <1f | <1f | <1f |
| 2-CHLOROETHYL VINYL ETHER | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 2-CHLOROTOLUENE | ug/l | 5 |  |  |  | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | 120 | <5 | <5 | <5 | <5 |
| 2-HEXANONE | ug/l | 5 |  |  |  | <5 | <5 | <5 | <5 | <25 | <5 | <5 | <5 | <5 | <5 | <5 | <25 | <5 |
| 4-CHLOROTOLUENE | ug/l | 5 |  |  |  | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| 4-METHYL-2-PENTANONE | ug/l | 5 |  |  |  | <5 | <5 | <5 | <5 | <25 | <5 | <5 | <5 | <5 | <5 | <5 | <25 | <5 |
| ACETONE | ug/l | 5 | 2000 |  |  | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 |
| ACETONITRILE | ug/l | 25 | 6300 |  |  | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 | <25 |
| ACROLEIN | ug/l | 10 |  |  |  | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 |
| ACRYLONITRILE | ug/l | 1 | 7 | 2 |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| ALLYL CHLORIDE | ug/l | 6 | 5 |  |  | <1 | 2 | <1 | <1 | <1 | <1 | <1 | <1 | 3 | <1 | <1 | <1 | <1 |
| BENZENE | ug/l | 1 | 6 | 5 |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| BROMOBENZENE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| BROMOCHLOROMETHANE | ug/l | 10 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| BROMODICHLOROMETHANE | ug/l | 6 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| BROMOFORM | ug/l | 44 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| BROMOMETHANE | ug/l | 10 |  |  |  | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 |
| CARBON DISULFIDE | ug/l | 600 |  |  |  | <1 | <1 | <1 | <1 | <1 | 1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| CARBON TETRACHLORIDE | ug/l | 3 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| CHLOROBENZENE | ug/l | 2 | 70 | 80 |  | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 |
| CHLOROETHANE | ug/l | 1 |  |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| CHLOROFORM | ug/l | 1 | 70 |  |  | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 |
| CHLOROMETHANE | ug/l | 2 | 3 |  |  | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | 3 |
| CHLOROPRENE | ug/l | 2 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

Table 3 - Groundwater Analytical Results (2008)
Prime Tanning Annex
Hartland, Maine

| Parameter | Units | Detection Limit | Standards | | | MW-1 | MW-2 | MW-5A | MW-5 | MW-6 | MW-7 | MW-8 | MW-9 Duplicate | MW-9 | MW-15 | MW-17 | MW-18 | MW-19 | MW-20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MEG | MCL | PRG | 8/08/2008 | 8/08/2008 | 8/7/2008 | 8/7/2008 | 8/9/2008 | 8/7/2008 | 8/7/2008 | 8/7/2008 | 8/8/2008 | 8/8/2008 | 8/8/2008 | 8/8/2008 | 8/8/2008 | 8/8/2008 |
| CIS-1,2-DICHLOROETHENE | ug/l | 1 | 70 | 70 | --- | <1 | <1 | 3 | <1 | 5 | <1 | <1 | <1 | 2 | 8 | <1 | <1 | <1 | <1 |
| CIS-1,3-DICHLOROPROPENE | ug/l | 1 | --- | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| CIS-1,4-DICHLORO-2-BUTENE | ug/l | 1 | --- | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| CYCLOHEXANE | ug/l | 1 | --- | --- | 10000 | <5 | <5 | 1 | <1 | 5 | <5 | <1 | <5 | <1 | 15 | <5 | <5 | <5 | <5 |
| DI Isopropyl Ketone | ug/l | 5 | NA | NA | NA | <5 | <5 | 3600 | <1 | 47 | <5 | <5 | <5 | 1200 | 15 | <5 | <5 | <5 | <5 |
| DIBROMOCHLOROMETHANE | ug/l | 4 | 4 | --- | NA | <1 | <1 | <1 | <1 | ND | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| DIBROMOMETHANE | ug/l | 1 | --- | --- | NA | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | 4 | <2 | <2 | <2 | <2 | <2 |
| DICHLORODIFLUOROMETHANE | ug/l | 2 | 1400 | --- | NA | <1 | <1 | <1 | <1 | ND | <1 | <1 | <1 | 39 | <1 | <1 | <1 | <1 | <1 |
| DIETHYL ETHER | ug/l | 1 | NA | NA | NA | <1 | <1 | <1 | <1 | ND | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| DIISOPROPYL ETHER | ug/l | 1 | --- | --- | 650 | <1 | <1 | <1 | <1 | ND | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| ETHYL METHACRYLATE | ug/l | 1 | --- | --- | 1300 | <1 | <1 | <1 | <1 | 210 | <1 | <1 | <1 | 2600 | 8 | <1 | <1 | <1 | 2 |
| ETHYLBENZENE | ug/l | 1 | 70 | 700 | --- | <1 | <1 | 400 | <1 | 210 | <1 | <1 | <1 | 2600 | 8 | <1 | <1 | <1 | 2 |
| ETHYL TERTIARY-BUTYL ETHER | ug/l | 1 | --- | --- | 59000 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| FREON 113 | ug/l | 1 | --- | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| HEXACHLOROBUTADIENE | ug/l | 1 | 4 | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| IODOMETHANE (METHYL IODIDE) | ug/l | 20 | --- | --- | --- | <20 | <20 | <20 | <20 | <20 | <20 | <20 | <20 | <20 | <20 | <20 | <20 | <20 | <20 |
| ISOBUTYL ALCOHOL | ug/l | 1 | --- | --- | --- | <1 | <1 | 7 | <1 | 12 | <1 | <1 | <1 | <1 | 12 | <1 | <1 | <1 | <1 |
| ISOPROPYLBENZENE | ug/l | 2 | --- | --- | --- | <2 | 2 | 240 | <1 | 160 | <2 | <2 | <2 | 2400 | 12 | <2 | <2 | <2 | <1 |
| M+P-XYLENES | ug/l | 2 | 1400 | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| METHYL ACETATE | ug/l | 1 | --- | --- | --- | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 |
| METHYL METHACRYLATE | ug/l | 10 | --- | --- | --- | <1 | <1 | <1 | 10 | <1 | <1 | <1 | 9 | <1 | <1 | <1 | <1 | <1 | <1 |
| METHYLACRYLONITRILE | ug/l | 1 | --- | --- | --- | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| METHYL-TERT-BUTYL ETHER | ug/l | 5 | --- | --- | 8200 | <5 | <5 | 5 | <5 | 6 | <5 | <5 | <5 | 5 | 5 | <5 | <5 | <5 | <5 |
| METHYLCYCLOHEXANE | ug/l | 1 | --- | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| METHYLENE CHLORIDE | ug/l | 5 | --- | --- | --- | <1 | <1 | 7 | <1 | 17 | <1 | <1 | <1 | 16 | 5 | <1 | <1 | <1 | <1 |
| NAPHTHALENE | ug/l | 1 | 14 | --- | 240 | <2 | <2 | 2 | <2 | 17 | <2 | <2 | <2 | 420 | 2 | <2 | <2 | <2 | <1 |
| N-BUTYLBENZENE | ug/l | 1 | --- | --- | 240 | <10 | <10 | <10 | <10 | 16 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 |
| N-PROPYLBENZENE | ug/l | 1 | --- | --- | --- | <10 | <10 | <10 | <10 | 16 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 | <10 |
| O-XYLENE | ug/l | 1 | 1400 | --- | 240 | <5 | <5 | <5 | <5 | 8 | <5 | <5 | <5 | 49 | <5 | <5 | <5 | <5 | <5 |
| PENTACHLOROETHANE | ug/l | 10 | --- | --- | --- | <5 | <5 | <5 | <5 | 2 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| PROPIONITRILE | ug/l | 10 | --- | --- | 240 | <5 | <5 | <5 | <5 | 1 | <5 | <5 | <5 | <1 | <5 | <5 | <5 | <5 | <5 |
| SEC-BUTYLBENZENE | ug/l | 1 | --- | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | 1200 | 52 | <1 | <1 | <1 | <1 |
| STYRENE | ug/l | 1 | NA | NA | NA | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| TERT-BUTYL ALCOHOL | ug/l | 6 | --- | --- | 240 | <5 | <5 | <5 | <5 | 8 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| TERT-BUTYLBENZENE | ug/l | 1 | 7 | --- | --- | <2 | <2 | <2 | <2 | 2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 |
| TERTIARY-AMYL METHYL ETHER | ug/l | 5 | --- | --- | --- | <5 | <5 | <5 | <5 | 1 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| TETRACHLOROETHENE | ug/l | 5 | 1400 | 1000 | --- | <1 | <1 | <1 | <1 | 1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| TOLUENE | ug/l | 1 | 1400 | 1000 | --- | <1 | <1 | 3 | <1 | 1 | <1 | <1 | <1 | 1200 | 52 | <1 | <1 | <1 | 1 |
| TRANS-1,2-DICHLOROETHENE | ug/l | 1 | NA | NA | --- | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 |
| TRANS-1,3-DICHLOROPROPENE | ug/l | 1 | 7 | --- | --- | <1 | <2 | <2 | <2 | <2 | <1 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 |
| TRANS-1,4-DICHLORO-2-BUTENE | ug/l | 5 | NA | NA | NA | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 | <5 |
| TRICHLOROETHENE | ug/l | 1 | 32 | 5 | --- | 2 | <2 | <2 | <2 | 1 | <2 | <2 | <2 | 52 | <2 | <2 | <2 | <2 | <2 |
| TRICHLOROFLUOROMETHANE | ug/l | 1 | 2100 | --- | --- | <1 | <2 | <2 | <2 | ND | <1 | <2 | <2 | <2 | <2 | <2 | <2 | <2 | <2 |
| VINYL ACETATE | ug/l | 5 | NA | NA | NA | <1 | <2 | <2 | <2 | <3 | <1 | <3 | <3 | 4 | <3 | <3 | <3 | <3 | <3 |
| VINYL CHLORIDE | ug/l | 2 | 0.2 | 2 | --- | <1 | <2 | 52 | <2 | 3 | <1 | <2 | <2 | 2800 | 15 | <2 | <3 | <3 | <3 |
| XYLENES (TOTAL) | ug/l | 3 | 1400 | --- | --- | <1 | <1 | 240 | <1 | 200 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 |
| 1,1,1,2-TETRACHLOROETHANE | ug/l | 1 | 13 | --- | 410 | <1 | <1 | <1 | <1 | 6 | <1 | <1 | <1 | <1 | 1 | <1 | <1 | <1 | <1 |
| P-ISOPROPYLTOLUENE | ug/l | 1 | 70 | --- | --- | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | <1 | 13 | <1 | <1 | <1 | <1 |
| TOTAL VOCS | ug/l | | | | | 32 | 7 | 4697 | ND | 630 | 16 | 1 | ND | 6,182 | 1113 | 1 | 1 | 1 | 5 |

Notes: J = results are rejected based on QA/QC





JOHN ELIAS BALDACCI
GOVERNOR

DAVID P. LITTELL
COMMISSIONER

October 27, 2010

Paul Larochelle, President
Prime Tanning-Hartland
9 Main Street
Hartland, Maine 04943

Mark Kehaya, Managing Member Executive Director
The Fund of Jupiter LLC
1061 E. Indiantown Road, Suite104
Jupiter, Florida 33477

DRAFT

Keith Trefethen, Manager
Town of Berwick
PO Box 696
Berwick, Maine 03901

Re:    Prime Tanning, Berwick-No Action Assurance Letter

Dear Mr. Larochelle, Kehaya, and Trefethen:

The Maine Department of Environmental Protection (hereinafter the Department) has received your application for the Prime Tanning Company Site, located at 20, 29, 34 & 35 Sullivan Street in Berwick to participate in the Voluntary Response Action Program (VRAP). We have reviewed the Ransom Environmental Phase 1 environmental site assessment report (ESA) dated August 2, 2010 and the St Germain Collins Environmental Consulting Group Phase II ESA report dated October 15, 2010 for this site, along with supporting documentation. Based on this information, you have requested that the applicants to the VRAP receive the protections from Department enforcement actions provided by the VRAP Law

The site has been an industrial/manufacturing property since 1877 and was most recently operated as a leather tanning and processing complex. Historically the site facility was operated as a wool pulling works facility, a sash and door manufactory, a reed manufactory, a carriage manufactory, an oil company, a laundry facility, a shoe factory, and a lumber company. As a result of site investigations and assessments at the property in 2010, six areas of concern (AOCs) and seven recognized environmental conditions (RECs) were identified---see attached Figure 2. These areas of concern and RECs are discussed in detail in the St Germain Phase II ESA report.

Remedial activities have occurred at the site including the removal and disposal of 400 tons of leather waste from the site Area 3(?) in 2009. In addition, the site went through RCRA closure in 2009 as well

yes

AUGUSTA
17 STATE HOUSE STATION
AUGUSTA, MAINE 04333-0017
(207) 287-7688 FAX: (207) 287-7826
RAY BLDG., HOSPITAL ST.
web site: www.maine.gov/dep

BANGOR
106 HOGAN ROAD
BANGOR, MAINE 04401
(207) 941-4570  FAX: (207) 941-4584

PORTLAND
312 CANCO ROAD
PORTLAND, MAINE 04103
(207) 822-6300  FAX: (207) 822-6303

PRESQUE ISLE
1235 CENTRAL DRIVE, SKYWAY PARK
PRESQUE ISLE, MAINE 04769-2094
(207) 764-0477 FAX: (207) 760-3143

printed on recycled paper

DRAFT

Based on the information presented in the ESA reports, the Department concurs with St
Germain's recommendations for additional actions to be taken onsite as part of the
redevelopment of the site. These recommendations along with additional input from VRAP are
discussed below:

1.   If soil excavation is planned for AOCs 1, 2, 3, 4, or 6, the Department must be
     notified beforehand, and a soil management plan (SMP) to include/address worker
     health and safety issues, and the disposal, recycling/reuse and/or appropriate cover of
     contaminated soil or waste materials such as buried leather scrap, must be developed.
     An appropriate cover system must consist of a cover layer and at least 12" of clean
     fill or a DEP-approved impervious layer over the area of concern. The SMP must be
     approved by the Department, prior to commencing the excavation work in these
     areas.

2.   If the Main Tannery Building foundation (AOC 1, 2 & 3) and or Blue Sort Building
     foundation/slab (AOC 6) is to be removed, the exposed soils must be inspected by a
     qualified environmental professional for evidence of release (e.g. staining, odor, etc.),
     especially near the floor drains and other conduits that penetrate the foundation. This
     provision must be included in the SMP, and if impacts are suspected when
     foundation/slab demolition activities occur, MEDEP must be notified and the soil
     management plan provisions must be implemented. Additional sampling,
     characterization, and remediation activities (removal/disposal, cover, deed
     restrictions, etc) may be necessary.

3.   Groundwater extraction shall be prohibited without the written permission of the
     VRAP. It is understood that public water will be supplied to the property if future
     redevelopment requires water.

4.   If a new building(s) is planned to be constructed in AOC 1, 2, 3, (and 6?), then a
     vapor management system to prevent the potential migration of petroleum and VOC
     vapors into the structure, must be developed and approved by the Department. Plans
     for such system must be developed and stamped by a Maine Certified Professional
     Engineer. If existing buildings are to remain in place, indoor air quality sampling
     must be conducted and results must comply with current appropriate regulatory
     guidelines/standards for the proposed reuse of the building. If indoor air samples do
     not meet appropriate regulatory guidelines, a remedial plan must be submitted to the
     VRAP for review and approval and remedial measures must be implemented prior to
     commencing use of such building for the intended purpose. ;*if the*

5.   Additional investigation is necessary to determine ~~the extent~~ of PCE contamination ~~in~~ *is impacting*
     ~~soil gas on the site, and to determine if there are off site impacts to receptors.~~ *off site receptors*

6.   Additional investigation and remediation may be necessary for the property to be
     used for residential use.

7.   A Declaration of Environmental Covenants consistent with the final Certificate of
     Completion or No Further Action letter that is acceptable to the Department, must be
     prepared and recorded at the York County Registry of Deeds. A copy of the recorded
     final DEP letter and DEC document must be supplied to the Department.

DRAFT

DRAFT

Provided that the recommendations and/or remedial actions are completed as outlined in the above and to the satisfaction of the Department, the applicants (Prime Tanning/Mr. Larochelle, The Fund of Jupiter LLC/Mr. Kehaya, and the Town of Berwick/Mr Trefethen) and their successors and/or assigns will be granted the liability protection provided by 38 M.R.S.A. §343-E(1) for the property located at 20, 29, 34 & 35 Sullivan Street in Berwick, identified as Lots 95, 130, 133, & 146 on Berwick Tax Map U-4, and described in Book 6707 Page 302 (Lot 95), Book 2157 Page 637 (Lot 130), Book 2611 Page 246 (Lot 133), Book 2045 Page 638 (Lot 133), and Book 1522 Page 235 (Lot 146) of the York County Registry of Deeds. The Department will take no action against (Prime Tanning/Mr. Larochelle, The Fund of Jupiter LLC/Mr. Kehaya, and the Town of Berwick/Mr Trefethen) and those persons identified in 38 M.R.S.A. § 343-E(6).

Once the proposed and DEP-approved recommended remedial measures for the property are satisfactorily completed, a report demonstrating the successful implementation of the tasks should be forwarded to the VRAP for review. Upon determining successful conclusion of the remedial tasks, the Department will issue to Prime Tanning/Mr. Larochelle, The Fund of Jupiter LLC/Mr. Kehaya, and the Town of Berwick/Mr Trefethen, a Commissioner's Certificate of Completion or No Further Action letter.

If you have any questions, please call me at 207-287-4853.

Sincerely,

Gordon Fuller, Oil and Hazardous Materials Specialist
Division of Remediation
Bureau of Remediation and Waste Management

cc:     Nick Hodgkins, Jean Firth--MEDEP





LEGEND

-- -- --  SITE BOUNDARIES (APPROXIMATE)

SB-113/ ⊕  SOIL BORING/TEMPORARY
GW-113      MONITORING WELL LOCATION

⊕ SB-117   SOIL BORING LOCATION

▦ TP-102   TEST PIT LOCATION

⊠ SV-104   SOIL VAPOR SAMPLE

✚ SS-105   SHALLOW SOIL SAMPLE

AREAS OF CONCERN

①   AOC (AREA OF CONCERN)

REFERENCE:
1. AERIAL PHOTOGRAPH DATED BETWEEN MARCH 2003
AND JUNE 2005 OBTAINED FROM MAINE GSL.

SCALE IN FEET

0    75    150    300

SITE INVESTIGATION
DRAFT PHASE I ENVIRONMENTAL SITE ASSESSMENT
PRIME TANNING COMPANY
SULLIVAN STREET
BERWICK, MAINE

MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION
BROWNFIELDS PROGRAM
17 STATE HOUSE STATION
AUGUSTA, ME 04330

St.Germain · Collins

FIGURE 2



STATE OF MAINE
DEPARTMENT OF ENVIRONMENTAL PROTECTION


EXHIBIT
F

JOHN ELIAS BALDACCI
GOVERNOR

DAVID P. LITTELL
COMMISSIONER

December 3, 2010

Paul Larochelle, President
Prime Tanning-Hartland
9 Main Street
Hartland, Maine 04943

RE:

Mark Kehaya, Managing Member Executive Director
The Fund of Jupiter LLC
1061 E. Indiantown Road, Suite104
Jupiter, Florida 33477

Keith Trefethen, Manager
Town of Berwick
PO Box 696
Berwick, Maine 03901

Re:    Prime Tanning, Berwick-No Action Assurance Letter

Dear Mr. Larochelle, Kehaya, and Trefethen:

The Maine Department of Environmental Protection (hereinafter the Department) has received your application for the Prime Tanning Company Site, located at 20, 29, 34 & 35 Sullivan Street in Berwick to participate in the Voluntary Response Action Program (VRAP). We have reviewed the Ransom Environmental Phase 1 environmental site assessment report (ESA) dated August 2, 2010 and the St Germain Collins Environmental Consulting Group Phase II ESA report dated October 15, 2010 for this site, along with supporting documentation. Based on this information, you have requested that the applicants to the VRAP receive the protections from Department enforcement actions provided by the VRAP Law

The site has been an industrial/manufacturing property since 1877 and was most recently operated as a leather tanning and processing complex. Historically the site facility was operated as a wool pulling works facility, a sash and door manufactory, a reed manufactory, a carriage manufactory, an oil company, a laundry facility, a shoe factory, and a lumber company. As a result of site investigations and assessments at the property in 2010, six areas of concern (AOCs) and seven recognized environmental conditions (RECs) were identified---see attached Figure 2. These areas of concern and RECs are discussed in detail in the St Germain Phase II ESA report.

Remedial activities have occurred at the site including the removal and disposal of 400 tons of leather waste from the site—Area 3 in 2009. In addition, the site went through RCRA closure in 2009 as well

AUGUSTA
17 STATE HOUSE STATION
AUGUSTA, MAINE 04333-0017
(207) 287-7688 FAX: (207) 287-7826
RAY BLDG., HOSPITAL ST.
web site: www.maine.gov dep

BANGOR
106 HOGAN ROAD
BANGOR, MAINE 04401
(207) 941-4570 FAX: (207) 941-4584

PORTLAND
312 CANCO ROAD
PORTLAND, MAINE 04103
(207) 822-6300 FAX: (207) 822-6303

PRESQUE ISLE
1235 CENTRAL DRIVE, SKYWAY PARK
PRESQUE ISLE, MAINE 04769-2094
(207) 764-0477 FAX: (207) 760-3143

printed on recycled paper

Based on the information presented in the ESA reports, the Department concurs with St Germain's recommendations for additional actions to be taken onsite as part of the redevelopment of the site. These recommendations along with additional input from VRAP are discussed below:

1. A soil management plan (SMP) to include/address worker health and safety issues, and the disposal, recycling/reuse and/or appropriate cover of contaminated soil or waste materials such as buried leather scrap, must be developed and then approved by MEDEP prior to excavation and/or building foundation/slab demolition work in Areas 1, 2, 3 & 6. (An appropriate cover system must consist of a cover/marker layer and at least 12" of clean fill or a DEP-approved impervious layer over the area of concern).

2. For soil excavation and/or building foundation slab demolition/removal activities planned for AOCs 1, 2, 3, or 6, the Department must be notified beforehand. Exposed soils must be inspected by a qualified environmental professional for evidence of release (e.g. staining, odor, etc.), especially near the floor drains and other conduits that penetrate the foundation. If contamination is suspected or confirmed, MEDEP should be notified, and additional sampling, characterization, and remediation activities (removal/disposal, cover, deed restrictions, etc) may be necessary. Plans for such activities should also be approved by MEDEP beforehand.

3. Groundwater extraction shall be prohibited without the written permission of the VRAP. It is understood that public water will be supplied to the property if future redevelopment requires water.

4. If a new building(s) is planned to be constructed in AOC 1, 2, 3), then a vapor management system to prevent the potential migration of petroleum and VOC vapors into the structure, must be developed and approved by the Department. Plans for such system must be developed and stamped by a Maine Certified Professional Engineer. If existing buildings are to remain in place, indoor air quality sampling must be conducted and results must comply with current appropriate regulatory guidelines/standards for the proposed reuse of the building. If indoor air samples do not meet appropriate regulatory guidelines, a remedial plan must be submitted to the VRAP for review and approval and remedial measures must be implemented prior to commencing use of such building for the intended purpose.

5. Additional investigation is necessary to determine if the PCE contamination detected onsite is migrating offsite and impacting receptors.

6. Additional investigation and remediation may be necessary for the property to be used for residential use.

7.  If building demolition/renovation activities are to be conducted onsite, building construction materials must be handled and disposed of appropriately (ie asbestos containing materials, etc.).

8.  A Declaration of Environmental Covenants consistent with the final Certificate of Completion or No Further Action letter that is acceptable to the Department, must be prepared and recorded at the York County Registry of Deeds. A copy of the recorded final DEP letter and DEC document must be supplied to the Department.

Provided that the recommendations and/or remedial actions are completed as outlined in the above and to the satisfaction of the Department, the applicants (Prime Tanning/Mr. Larochelle, The Fund of Jupiter LLC/Mr. Kehaya, and the Town of Berwick/Mr Trefethen) and their successors and/or assigns will be granted the liability protection provided by 38 M.R.S.A. §343-E(1) for the property located at 20, 29, 34 & 35 Sullivan Street in Berwick, identified as Lots 95, 130, 133, & 146 on Berwick Tax Map U-4, and described in Book 6707 Page 302 (Lot 95), Book 2157 Page 637 (Lot 130), Book 2611 Page 246 (Lot 133), Book 2045 Page 638 (Lot 133), and Book 1522 Page 235 (Lot 146) of the York County Registry of Deeds. The Department will take no action against (Prime Tanning/Mr. Larochelle, The Fund of Jupiter LLC/Mr. Kehaya, and the Town of Berwick/Mr Trefethen) and those persons identified in 38 M.R.S.A. § 343-E(6).

Once the proposed and DEP-approved recommended remedial measures for the property are satisfactorily completed, a report demonstrating the successful implementation of the tasks should be forwarded to the VRAP for review. Upon determining successful conclusion of the remedial tasks, the Department will issue to Prime Tanning/Mr. Larochelle, The Fund of Jupiter LLC/Mr. Kehaya, and the Town of Berwick/Mr Trefethen, a Commissioner's Certificate of Completion or No Further Action letter.

If you have any questions, please call me at 207-287-4853.

Sincerely,

Gordon Fuller,
Oil and Hazardous Materials Specialist
Division of Remediation
Bureau of Remediation and Waste Management

cc:    Nick Hodgkins, Jean Firth--MEDEP



Annex Upper Floor
Bldg Footprint
4-20-09

106,024 Sq Ft

Solvent recovery still/hazardous waste
storage area.
The still has not been used since 2001.
Last hazardous waste shipment
occurred in 2001.

LOADING
DOCK
2 BAYS
10' X 24'



EXHIBIT
H

## INDIVIDUAL TANK DATA
## FOR
## SITE NUMBER:
## 11455

| Tank-Chamber Number | Tank Type | Tank Size | Tank Monitoring | Product Stored | Piping Type | Pipe Monitoring | Date Installed | Tank Status | Tank Status Date |
|---|---|---|---|---|---|---|---|---|---|
| 1-1 | Steel - bare or asphalt coated. | 10000 | Unknown | Chemical | Galvanized steel | | 7/1/75 | Removed | 07/01/92 |
| 2-1 | Steel with cathodic protection. | 3000 | Unknown | Chemical | Steel with cathodic protection. | | 10/1/76 | Removed | 07/01/92 |
| 3-1 | Steel with cathodic protection. | 3000 | Unknown | Chemical | Steel with cathodic protection. | | 10/1/76 | Removed | 07/01/92 |
| 4-1 | Steel with cathodic protection. | 3000 | Unknown | Chemical | Steel with cathodic protection. | | 10/1/76 | Removed | 07/01/92 |
| 5-1 | Steel with cathodic protection. | 3000 | Unknown | Chemical | Steel with cathodic protection. | | 7/1/75 | Removed | 07/01/92 |
| 6-1 | Steel with cathodic protection. | 3000 | Unknown | Chemical | Steel with cathodic protection. | | 7/1/75 | Removed | 07/01/92 |
| 7-1 | Steel with cathodic protection. | 3000 | Unknown | Chemical | Steel with cathodic protection. | | 7/1/75 | Removed | 07/01/92 |



# INDIVIDUAL TANK DATA
## FOR
## SITE NUMBER:
## 11450

| Tank-Chamber Number | Tank Type | Tank Size | Tank Monitoring | Product Stored | Piping Type | Pipe Monitoring | Date Installed | Tank Status | Tank Status Date |
|---|---|---|---|---|---|---|---|---|---|
| 1-1 | Steel - bare or asphalt coated. | 15000 | Unknown | #6 Fuel Oil | Galvanized steel | | 1/1/55 | Removed | 07/01/93 |
| 2-1 | Steel - bare or asphalt coated. | 250 | Unknown | Regular Gasoline | Copper | | 10/1/69 | Removed | 07/01/92 |
| 3-1 | Steel - bare or asphalt coated. | 250 | Unknown | Regular Gasoline | Copper | | 10/1/69 | Abandone d In Place | 09/01/90 |
| 4-1 | Double-walle d cathodically protected steel | 20000 | Sec. Con. W/Confin. Elec. Monitor | #6 Fuel Oil | Steel with secondary containment. | Unknown | 8/28/92 | Active | 08/28/92 |
| 5-1 | Steel - bare or asphalt coated. | 6800 | Unknown | #6 Fuel Oil | Galvanized steel | | 10/1/69 | Removed | 01/01/93 |