**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>IRVING TANNING COMPANY<br><br>Debtor. | Chapter 11<br>Case No. 10-11757 |

**AFFIDAVIT OF PAUL LAROCHELLE IN SUPPORT**
**OF VARIOUS FIRST DAY MOTIONS**

I, Paul Larochelle, being duly sworn, depose and say:

1. I am the President of Irving Tanning Company ("Irving").

2. On November 16, 2010 (the "Petition Date"), Irving, Prime Tanning Co., Inc., and Prime Tanning Corp. (collectively, the "Debtors") each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court"). As will be discussed in further detail below, the Debtors have filed a motion seeking joint administration of their chapter 11 cases.

3. This Affidavit is submitted in support of the following motions and applications filed on the Petition Date (collectively, the "First Day Motions"):

> a. Motion for an Order Directing Joint Administration of Debtors' Chapter 11 Cases (the "Joint Administration Motion");
>
> b. Application for Order, Pursuant to Sections 327 and 328 of the Bankruptcy Code, Authorizing the Employment of Bernstein, Shur, Sawyer & Nelson, P.A., as Attorneys for the Debtors (the "Application to Employ");
>
> c. Motion for Authority to Pay Pre-Petition Employee Wages, Salaries and Related Items; to Make Payments for Which Payroll Deductions are Made; and to Make Insurance Payments (the "Payroll Motion");

d. Motion for Approval of Cash Management System and for Authorization of Use of Prepetition Bank Accounts and Business Forms (the "Cash Management System Motion");

e. Motion for an Order, Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure, Extending the Time to File Schedules and Statement of Financial Affairs (the "Schedules/SOFA Motion");

f. Motion for Authority to Assume Executory Contract with Tasman Industries, Inc. (the "Tasman Assumption Motion");

g. Motion to Approve Stipulation and Agreement Regarding Use of Cash Collateral and Adequate Protection (the "Cash Collateral Motion");

h. Motion for Order (I) Approving Incurrence of Post-Petition Debt to Porter Capital Corporation in the Ordinary Course of Business; (II) Authorizing Grant of Security Interests in Connection Therewith and (III) Granting Related Relief (the "Porter Borrowing Motion");

i. Motion for Entry of an Order Authorizing Debtor to Pay Prepetition Claims of Certain Critical Vendors and Approving Procedures Related Thereto (the "Critical Vendors Motion");

j. Motion for an Order (A) Authorizing the Debtor to Obtain Post-Petition Financing, (B) Granting Post-Petition Senior Security Interest to the Maine Rural Development Authority, and (C) Granting Related Relief (the "MRDA Borrowing Motion") and

k. Motion for Entry of an Order (A) Authorizing, but Not Directing, the Debtor to Pay Prepetition Claims of Shippers, Freight Handlers, and Warehousemen and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the "Shippers Motion").

4. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is necessary if Irving is to operate in chapter 11 with a minimum of disruption and, ultimately, will be critical to its ability to achieve a successful reorganization or a sale of its business and assets on a going-concern basis. Factual information with respect to each First Day Motion is provided below and in each First Day Motion.

5. All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtors' organizations, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition, and present liquidity needs. If I were called to testify, I could and would testify competently to the facts set forth herein.

## I. The Debtors' Businesses and Historical Background

6. Irving is a worldwide leader in the manufacture and sale of leather primarily to manufacturers of footwear and consumer goods located in North America, Asia, and Europe. Irving maintains its principal place of business in Hartland, Maine.

7. In or around September 2005, Irving emerged from a prior chapter 11 case under a confirmed plan whereby Meriturn Fund LP ("Meriturn") acquired 100% of the stock in Irving through Meriturn's majority ownership of Irving Acquisition, Inc. ("Irving Acquisition"), a corporation organized under Delaware law.[1] Wells Fargo Bank, N.A. ("Wells Fargo") was the primary secured lender to Irving after its acquisition by Meriturn, providing a term loan and a revolving credit facility. The Maine Rural Development Authority ("MRDA") and the Finance Authority of Maine ("FAME") also provided term loans to Irving, loans that were secured by mortgages on Irving's real estate as well as subordinated security interests in substantially all of Irving's personal property, including inventory and accounts.

8. In or around August 2007, Meriturn structured a transaction whereby Irving, one of its largest competitors, Prime Tanning Co., Inc. ("Prime Maine"), and another tannery, Cudahy Tanning Company, Inc., ("Cudahy"), a corporation organized under Wisconsin law, came under common ownership. At that time, Prime Maine operated a tannery in Berwick, Maine and owned 100% of the outstanding shares of stock in Prime Tanning Corp. ("Prime

[1] *See generally* In re Irving Tanning Company, Case No. 05-10423-LHK.

Missouri"), a corporation organized under Missouri law. Prime Missouri operated an extensive "wet blue" operation, supplying Prime Maine with processed hides. This transaction created the largest stand-alone and vertically integrated leather tanning company in the United States. In connection with the transaction, Meriturn invested an additional $3.9 million in the form of subordinated debt.

9. As a result of that transaction, Acquisition became the owner of 60% of outstanding shares of capital stock of Prime Tanning Company, Inc. ("Prime Delaware"), a corporation organized under Delaware law.[2] Prime Delaware became the sole shareholder of Irving, Cudahy, and Prime Maine. In addition, certain subordinated indebtedness and contingent payments were owed to the former shareholders of Prime Maine and Cudahy under various instruments.[3] As a result of a series of subsequent transactions, Acquisition currently owns 100% of the stock of Prime Delaware.

10. In 2008, Prime Maine's operations in Berwick were consolidated with Irving's operations in Hartland. In or around May 2008, the Cudahy finishing facility was closed and its production was transitioned to Irving's facility in Hartland. Overcapacity in the domestic tanning industry had resulted in reduced capacity utilization, and facility consolidation in Hartland offered an opportunity to lower overhead costs and regain profitability across all operations. After consolidation, the combined companies would be the largest and lowest cost tanning operation in the United States.

11. Prime Maine currently owns improved commercial real estate and some residual machinery and equipment in Berwick and 100% of the outstanding shares of stock in Prime

---

[2] The former shareholders of Prime Maine collectively owned the other 40% of the stock in Prime Delaware.
[3] To the extent that those obligations remain unpaid, they are unsecured.

Missouri. Prime Maine also has certain liabilities arising out of its now-discontinued operations in Berwick and debts related to allegedly underfunded defined benefit pension plans.

12. Just as the companies were consolidating operations in Hartland in 2008, the companies were hit with unprecedented increases in energy and chemical costs. Given that the Debtors were then involved in a major operational restructuring, the timing of these increases was particularly inopportune. In addition, the consolidation of the Prime Maine and Cudahy operations was more costly, and took longer, than expected. Strained cash flows forced the Debtors to stretch payables beyond normal limits.

13. Accordingly, in late 2008 and 2009, the Debtors sought and subsequently entered into a composition with certain trade vendors (the "Composition"). In connection with that composition, Prime Maine executed certain vendor notes, and Irving and Prime Maine granted certain mortgages and security interests to Windsor Associates, LLC ("Windsor") as a collateral agent for the participating vendors. The current balance of the promissory notes issued to participating vendors is approximately $7.5 million. The aggregate amount of Irving's debts to Porter, Jupiter, FAME and Tasman (as those terms as defined in this Affidavit) is greater than the value of Irving's personal property.

14. In addition to the consolidation of operations in Hartland, and the Composition, the shareholder arranged for additional investment in the companies, and aggressive action was taken to reduce costs, including downsizing the Prime Missouri operations, and converting those operations to a contract processing model. Price increases were put into effect where possible, and a turnaround consultant was hired for the combined operations.

15. As noted, Prime Missouri was previously engaged in the business of processing and selling bovine hides at a facility in St. Joseph, Missouri. In or around March 2009, in an

effort to deleverage and to stem losses, Prime Maine caused Prime Missouri to sell substantially all of its assets to National Beef Leathers, LLC ("National Beef"), an unaffiliated competitor, for approximately $10.4 million dollars. The majority of the proceeds from this transaction were used, in part, to satisfy the secured debts (term and working capital) owed to Wells Fargo. In connection with the Missouri transaction, Prime Missouri made certain representations and warranties to National Beef and $1.5 million of the sale price was paid into escrow (the "Missouri Escrow") to provide a source of recovery in the event of a breach of any such representations and warranties and the assertion of a claim by National Beef under the indemnity agreements executed in connection with the sale.

16. Following the sale, several plaintiffs commenced actions against, among others, Prime Missouri under state and federal environmental laws, and based on state law causes of action, for alleged personal and other injuries arising out of the use of processed industrial waste as fertilizer and alleged airborne and other migration of certain toxic substances. National Beef was also named in certain of the litigation, and made claims under the indemnity provisions described above. The Missouri Escrow currently contains just under $1.5 million, and National Beef has asserted claims—claims that are disputed by Prime Missouri—that are in excess of the amount of the escrow. If the amount in the escrow is not paid to National Beef, the funds revert to Prime Missouri (and are subject to a lien in favor of the current secured lender, as noted below).

17. Other than its residual interests in the Missouri Escrow, in certain insurance policies and proceeds, and in certain causes of action, Prime Missouri does not have any other assets. In addition to the claims asserted in the litigation noted above, Prime Missouri has

obligations arising from unsecured trade debt and debts related to allegedly underfunded defined benefit pension plans.

## II. The Debtors' Current Debt Structure; Secured Debt and Factoring

18. In January 2010, Irving entered into a factoring agreement with Porter Capital Corporation ("Porter") whereby Porter agreed to factor certain receivables generated by Irving. To secure its obligations to Porter, Irving granted security interests in certain assets to Porter, including a first priority security interest in Irving's accounts and a second priority security interest in all or substantially all of Irving's other personal property. As of November 12, 2010, Irving owed approximately $1,959,000 to Porter. Irving's obligations to Porter were guaranteed by Prime Delaware, Prime Maine, and Cudahy.

19. At or about the same time (*i.e.*, January 2010), Irving borrowed $2.5 million from The Fund of Jupiter, LLC ("Jupiter") and executed a promissory note (the "First Jupiter Note") in favor of Jupiter. The President and Chief Executive Officer of Jupiter, Mark Kehaya, is or was affiliated with Meriturn. Irving's obligations to Jupiter are secured by first priority security interests in all of Irving's personal property, other than Irving's accounts (which have been pledged to Porter pursuant to the factoring agreement described above), and a second security interest in accounts. Prime Maine and Prime Missouri each executed limited resource guarantees in connection with Jupiter's loans to Irving. Prime Maine granted a first mortgage on its real estate to secure its guarantee obligations, and Prime Missouri granted a first security interest in its rights in the Missouri Escrow to secure its guarantee obligations. The borrowing from Jupiter was used, among other things, to pay off the remaining debt to Wells Fargo.

20. In June 2010, Irving borrowed another $500,000 from Jupiter and executed and delivered a note (the "Second Jupiter Note") evidencing its obligation to Jupiter. Irving and

Jupiter have modified the Second Jupiter Note and the related loan and security documents several times, most recently in or around September 2010. In general, these modifications have increased the original principal balance of the Second Jupiter Note to $1.68 million. According to Irving's records, the amount owed to Jupiter on account of the First Jupiter Note and the Second Jupiter Note, as of November 4, 2010, was approximately $4,160,040.[4] Both notes are secured by the same collateral.

21. As noted above, MRDA and FAME also provided term loans to Irving. As of November 4, 2010, the amount owed to MRDA was approximately $401,933 and the amount owed to FAME was approximately $828,620. The amounts owed to MRDA and FAME are secured by mortgages on Irving's real estate in Hartland, with the MRDA mortgage having priority over the FAME mortgage. In addition, FAME has subordinated security interests in Irving's personal property.

22. Excluding intercompany transactions, as of September 25, 2010, Irving had accounts payable and accrued expenses of approximately $2.56 million. This does not include amounts owed to creditors in the Composition noted above in the approximate amount of $7.5 million, a portion of which is or may be owed by Irving.

## III. Current Business Operations

### *A. General*

23. Irving operates on a fiscal year that ends on the Saturday closest to December 31 and a tax year ending on the Saturday closest to June 30. For the tax year ending June 26, 2010, Irving's gross revenues were approximately $28.1 million. For the fiscal year ending on January

[4] On or about November 4, 2010, Jupiter accelerated the amounts owed by Irving as a result of Irving's defaults under the various notes issued to Jupiter. Jupiter contends that the amount owed as of November 3, 2010 was $4,358,577.83.

2, 2010, Irving's gross revenues were approximately $30.7 million. Substantially all of this revenue is derived from the sale of finished leather to customers.

***a. Employee and Related Matters***

24. As of November 13, 2010, Irving employed approximately 178 people at its facilities in Hartland. In the ordinary course of business, Irving pays wages, salary and benefits to employees on a weekly or a biweekly basis. In particular, hourly wage employees are paid each Friday in arrears. For example, on Friday, November 19, 2010, Irving would normally pay its hourly employees for services performed during the period from November 7, 2010 to November 13, 2010. Salaried employees would, in the ordinary course, be paid on November 26, 2010 for the two week period beginning on November 14, 2010 and ending on November 27, 2010. Irving uses a payroll service, Automatic Data Processing, Inc. ("ADP"), to meet its payroll and certain payroll-related obligations.

25. Irving maintains a 401(k) plan where certain contributions by employees are "matched" by Irving. Irving also provides group health, life, and disability insurance (both long-term and short-term) to certain employees. Finally, Irving maintains a deferred compensation program whereby hourly wage employees are paid $0.40 per hour worked in a 6-month period. These payments are made twice each year, usually in June and December.

***b. Tasman Industries***

26. In or around September 2008, Prime Delaware, Prime Maine, and Prime Missouri entered into a "Prime Wet Blue Bailment and Service Agreement" with Tasman Industries, Inc. and/or various of its affiliates (collectively, "Tasman"). Under the Bailment Agreement, the Prime parties provided certain processing services that are necessary to convert raw hides into

"wet blue" hides for Tasman.  Tasman retained ownership of the hides and paid a fee for the processing services.

27. In or around November 2009, following the consolidation of Prime Maine's operations with Irving's operations at its Hartland facility, the parties altered their relationship and Tasman began selling hides to Irving and Prime Maine. Such sales were made on credit pursuant to purchase contracts between Tasman and Irving, and were based on the volume and type of hides needed by Irving. Irving, Prime Maine, Prime Delaware, and Tasman entered into a security agreement (the "Security Agreement"), whereby Tasman obtained a purchase money security interest in hide inventory to secure Irving's obligations to Tasman. Specifically, Irving granted Tasman security interests in:

> [a]ll of Debtor's inventory of animal hides acquired from Secured Party with respect to which Debtor has not yet made payment, including but not limited to, cured animal hides, hides in process and wet-blue hides, now owned and hereafter acquired, all accessions, additions, replacements and substitutions thereto and therefrom, but not Debtor's accounts receivable[.]

28. To perfect its security interests, Tasman filed a UCC-1 financing statement with the Maine Secretary of State's office on November 19, 2009. In addition, Tasman provided a notice of its purchase money security interest in the foregoing inventory collateral to the other parties that had filed financing statements against Irving.

29. In addition, Tasman is currently holding cash collateral (the "Tasman Cash Collateral") in the amount of $400,000, which cash collateral was provided by The Fund of Jupiter, LLC ("Jupiter") and Meriturn Partners, LLC.  Jupiter one of Irving's secured creditors. In July 2010, Prime Delaware agreed to pay a monthly fee, equal to 1.0% of average outstanding amount of the Tasman Cash Collateral, to Jupiter.

30. From and after the execution of the Security Agreement, Tasman regularly sold hides to Irving, providing not less than ten (10) loads of hides to Irving on credit at any given point in time. Typically, payment was due from Irving within the earlier of (i) 15 days from delivery of the hides to Irving or (ii) shipment of finished goods created by processing of the hides.

31. A series of six (6) open purchase contracts between Tasman and Irving is attached to the Tasman Assumption Motion as **Exhibit E**. Other purchase contracts have been fully performed, and still others will be entered into on a going-forward basis if the Tasman Assumption Motion is granted by the Court.

32. As of November 5, 2010, Irving owed $713,260 (the "Cure Amount") to Tasman on account of the purchase of hides in the ordinary course. As of the date of this Affidavit, Tasman has been unwilling to sell additional hides to Irving on credit.

33. On or about November 10, 2010, Irving paid $206,320 to Tasman via wire transfer to purchase two loads of hides (collectively, the "Recent Tasman Shipment"). Irving took possession of the Recent Tasman Shipment on November 11, 2010.

34. As noted above, Tasman is Irving's principal supplier of hides. If Irving is unable to obtain hides from Tasman, Irving would be forced to either to locate another supplier or to negotiate a new contract with Tasman. Moreover, such negotiations would take time to complete and Irving is in desperate need of raw material (*i.e.*, hides) to fulfill its obligations to customers. If those obligations are not met in a timely manner, customers may be expected to look for alternative suppliers, a disastrous result for Irving that could lead to a reduction in operation of even a permanent closure.

### *c. Insurance*

35. Irving maintains property and liability insurance, including executive liability insurance. Pursuant to a premium financing agreement (the "IPFS") entered into by Irving with IPFS Corporation d/b/a Premium Financing Specialists Corp. ("IPFS"), Irving is required to make nine (9) monthly payments of $16,508.25 to IPFS on account of insurance premiums paid on behalf of Irving by Premium Financing. Pursuant to the Premium Financing Agreement, Irving is required to make its first monthly payment on or before December 1, 2010.

36. Also, as mentioned above, Irving provides group health, life, and disability insurance to certain of its employees. Irving self-insures with respect to employee medical claims, which self-insurance is administered by CIGNA. Included in Irving's self-insurance package is a stop loss policy which provides Irving with catastrophic coverage. Additionally, Irving's life insurance policy provides hourly employees with coverage up to $25,000 and salaried employees with coverage amounting to twice the employee's compensation, up to $80,000. Hourly employees pay 100% of the cost of short-term disability insurance through a payroll deduction.

37. Finally, Irving also maintains worker's compensation insurance, which is provided through Maine Employers' Mutual Insurance. Irving currently owes a down payment of $34,221.60, which was due on or before November 1, 2010.

## IV. The Chapter 11 Filings

38. Notwithstanding the Debtors' efforts, the refinancing of senior secured debt and the cooperation of its secured lenders, the Debtors' operations and finances continue to be hampered by the legacy of, and the need to finance retirement of, the historical liabilities accrued prior to and during the facilities consolidation as a consequence of the fuel and chemical cost

spikes and the unprofitable operations at the now-discontinued Berwick operation and the now-sold Prime Missouri. In addition, the defense of the Missouri litigation is expensive and time-consuming. The combination of the legacy liabilities and the ongoing litigation has made it exceedingly difficult for Irving to obtain further financing for its operations at reasonable costs, if at all. The persistent global credit crunch and the lengthy recession in the United States have only added to the Debtors' difficulties by reducing sales volume and margins at a critical time.

## V. First Day Motions

### *A. Joint Administration Motion*

39. Most of Irving's lenders have claims against all three of the Debtors, whether based on direct loans or extensions or credit, or based on guarantees. In addition, as set forth on **Exhibit A** attached hereto, the Debtors and other affiliated entities have substantial inter-company claims. Given the interrelationship between the Debtors, creditors will likely want to be informed of developments in all three cases. Joint administration will ensure that all creditors will simultaneously be apprised of all pleadings in each case.

40. In addition to maximizing creditors' access to information in these cases, joint administration will better preserve the Debtors' estate by avoiding otherwise unnecessary and expensive duplication associated with preparing and serving the creditors with multiple sets of differently captioned, but otherwise identical, pleadings.

41. Finally, some creditors may be uncertain as to which debtor-entity is their obligor. By jointly administering the estates, creditors will receive notice of all matters involving all of the Debtors, thereby ensuring that they are fully informed of matters potentially affecting their claims.

### *B. Application to Employ*

42. These chapter 11 cases are likely to be complex and the Debtors require lead counsel with substantial experience in bankruptcy and insolvency matters.

43. The Debtors have selected Bernstein, Shur, Sawyer & Nelson, P.A. ("BSSN") to serve as their general bankruptcy counsel because of BSSN's recognized expertise in the field of business reorganizations under chapter 11 of the Bankruptcy Code, as well as all areas of the law that typically arise in the context of a case under chapter 11. In particular, BSSN has substantial experience in complex cases involving the representation of debtors and debtors in possession under the Bankruptcy Code. In addition, BSSN has previously represented Irving in connection with several matters, including its prior chapter 11 filings. Accordingly, BSSN (i) has the necessary background to deal effectively with many of the legal issues and problems that may arise in the context of the Debtors' chapter 11 cases and (ii) is well qualified to represent the Debtors in their chapter 11 cases in an efficient and timely manner.

44. The professional services of BSSN are necessary to enable the Debtors to execute faithfully and competently their duties as debtors in possession. Subject to the control and further order of the Bankruptcy Court, the Debtors propose to retain BSSN to perform the services detailed in the Application to Employ.

### *C. Payroll Motion*

45. Irving has accrued payroll expenses as a result of regular business activity prior to the Petition Date and therefore seeks authorization from this Court to pay certain accrued wages and salaries as well as specified payroll-related expenses.

46. Specifically, Irving seeks authorization to make payments for or relating to prepetition compensation (collectively, the "Prepetition Compensation") that will come due and normally be paid out to the employees, taxing authorities, and others on Friday, November 19, 2010 and Friday, November 26, 2010. Due to the timing of Irving's filing, Irving has not yet assembled precise information regarding the amounts to be paid out in connection with the upcoming payroll periods. Accordingly, Irving has estimated the amounts owed to hourly and salaried employees based on payroll amounts for the prior payroll period, from October 31, 2010 through November 6, 2010 for hourly employees and October 31, 2010 through November 13, 2010 for salaried employees. For salaried employees, the compensation due and payments to be made on November 26, 2010 will be attributable to work performed during the period from November 14, 2010 through November 27, 2010, a portion of which is prior to the Petition Date. As shown on **Exhibit A** to this Motion, the gross payroll for salaried employees for such period, based on the prior period's payroll, is estimated to be approximately $88,400.00. No single salaried employee will be paid more than $10,950.00 on account of services provided to the Debtor prior to the Petition Date.

47. For hourly wage employees, the compensation due and payments to be made on November 19 will be attributable to work performed during the period from November 7, 2010 through November 13, 2010. As shown on **Exhibit B** to this Motion, the total gross hourly payroll for the period is estimated to be, based on the amounts for the prior payroll period, $25,900.00, which includes payroll taxes and unemployment contributions. No single hourly employee would be paid more than $10,950.00 on account of services provided to Irving prior to the Petition Date.

48. By the Payroll Motion, Irving seeks authorization: (i) to pay the Prepetition Compensation attributable to the period from November 7, 2010 through the Petition Date for hourly employees and the Prepetition Compensation attributable to the period from November 14, 2010 through the Petition Date for salaried employees; (ii) to pay the service fee payable to ADP for both pay periods, in the aggregate approximate amount of $826; and (iii) for its bank to honor wire transfers issued for such Prepetition Compensation. Irving seeks this relief because any further delay in paying Prepetition Compensation and related payroll expenses will damage Irving's relations with its employees and will irreparably harm morale. To maintain and preserve the morale of any continuing labor force, it is essential that Irving be permitted to pay its employees the compensation and deductions accrued prior to the filing. Absent the relief requested by the Payroll Motion, Irving's employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations. Many employees would undoubtedly seek other employment if not paid, and Irving could lose critical employees. Irving has contracted with a payroll service, ADP, in order to facilitate the processing of payroll. ADP writes checks, issues direct deposits, and makes all of Irving's fiduciary returns and tax deposits. Typically, Irving will initiate two transfers to ADP, one for payroll taxes for the hourly and salaried employees and a second to cover direct deposit, manual checks, and wage garnishments. These wires are typically made to ADP on Wednesday and related payments are made to employees and others on Friday of the same week.

49. In addition to payroll, Irving also seeks authority to pay insurance premiums identified on **Exhibit C** to the Payroll Motion, including worker's compensation insurance, stop loss insurance (which was obtained in connection with Irving's self-insured health plan), life

and disability insurance, and amounts owed to a premium financing company for Irving's property and casualty policies. Failure to pay the insurance premiums will expose Irving to significant liability and could be extremely detrimental to its bankruptcy estate. In addition, Irving seeks authorization to pay other employee-related obligations incurred in the ordinary course of business.

50. Finally, Irving further requests that all applicable banks or financial institutions be authorized and directed to receive, process, honor and pay any and all checks drawn on Irving's operating payroll and payroll related tax accounts and which have been authorized by order of this Court. Without this relief, it will be impossible for Irving to carry on in the ordinary course of its business and any attempt at reorganization may fail.

51. Because Prime Tanning Corp. and Prime Tanning Co., Inc. do not have current operations, they are not seeking typical first-day relief relating to payment of amounts owed to employees.

### *D. Cash Management System Motion*

52. Irving seeks authority to continue its prepetition cash management system (the "Cash Management System") and to use prepetition bank accounts and business forms.

53. The Cash Management System consists of two accounts (collectively, the "Accounts") that facilitate Irving's timely and efficient collection, concentration, management, and disbursement of funds. Irving's domestic customers typically deposit funds directly into an account owned and controlled by Porter pursuant to the factoring agreement between Porter and Irving. Funds advanced by Porter to Irving on Irving's revolving line of credit are then deposited, via wire transfer, into Irving's primary bank account at TD Bank (the "Operating Account"). In addition, certain receipts, usually from isolated, non-factored receivables or cash

transactions, are deposited directly by Irving into the Operating Account. Irving's international customers wire payments directly into an account held by Irving at Bank of America, N.A. (the "BOA Account"). The BOA Account is swept daily and the funds are transferred into the Operating Account.

54. By the Cash Management System Motion, Irving seeks authority to continue the use of the Cash Management System from and after the Petition Date. Changing the Cash Management System would result in needless disruption of Irving's business and impede Irving's ability to seamlessly transition into Chapter 11. Any new remittance procedure may lead to confusion and delay in receiving payments, a result that would be particularly disastrous while Irving relies on cash collateral to operate its business. Additionally, transitioning to a new cash management system would cause Irving to incur additional costs and deplete assets of the estate without providing any benefit to Irving's creditors.

55. Irving also requests that it be authorized to continue to use all correspondence, business forms and checks existing immediately before the Petition Date without reference to Irving's status as a debtor-in-possession. Irving believes that it would be extremely costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, business forms, and checks. Moreover, parties doing business with Irving will undoubtedly be aware of Irving's status as a debtor-in-possession as a result of press coverage and noticing of matters in the chapter 11 case.

### *E. Critical Vendors Motion*

56. Irving seeks authority to pay the prepetition claims (the "Critical Vendor Payments") of certain critical vendors (the "Critical Vendors") identified on **Exhibit A** to the Critical Vendors Motion.

57. While Irving anticipates being able to make the arrangements necessary for most of its vendors to continue supplying goods and services essential to its postpetition operations, Irving also anticipates that it will be necessary to make the Critical Vendor Payments in order to induce the Critical Vendors to continue supplying essential services.

58. The Critical Vendors provide goods which are critical to Irving's ongoing operations. Irving is not able to compel the Critical Vendors to perform on a timely basis pursuant to contracts or otherwise. Furthermore, Irving believes that, unlike other vendors who may be replaced without disruption to the business, the Critical Vendors would be replaceable only with extraordinary expense, significant delay, quality issues, and other detrimental effects – all of which would damage the value of Irving's going concern value.

59. Additionally, Irving seeks an order directing and authorizing financial institutions to receive, process, honor and pay the checks listed on **Exhibit C** to the Critical Vendor Motion (the "Outstanding Checks"), which were delivered prior to the Petition Date but were still outstanding as of the Petition Date. Failure to honor and pay the Outstanding Checks will unnecessarily disrupt and harm Irving's operations, its relations with certain key vendors, and its ability to reorganize.

***F. Shippers Motion***

60. Irving relies on various freight handlers and shippers (collectively, the "Shippers") in the ordinary course of its business, for both international and domestic inbound and outbound shipping. Irving also owns inventory that is located on the premises of certain third-party entities ("Warehousemen"). As a result, Shippers and Warehousemen regularly have possession of materials and supplies as well as finished goods produced by Irving and intended for delivery to its international and domestic customers. Irving expects that, as of the Petition

Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that were delivered to Irving's customers prior to the Petition Date (the "Shipping and Warehousing Claims").

61. Irving believes that the value of the goods and materials in the possession of the Shippers and Warehousemen, and the potential injury to Irving if they are not timely released, is likely to greatly exceed the amount of the Shipping and Warehousing Claims. Even if the Shippers and Warehousemen did not have valid liens under applicable state law, their possession (and retention) of Irving's finished products or raw materials and equipment could severely disrupt Irving's operations at a time when such disruption would be extremely deleterious.

62. For these reasons, Irving believes that it is necessary and essential to its reorganization efforts and the value of its estate for it to be permitted to make payments on account of certain Shipping and Warehousing Claims.

### *G. Tasman Assumption Motion*

63. Tasman is unwilling to continue supplying hides to Irving without reasonable assurance that it will be paid for such hides.

64. At this point, Irving does not have an alternative supplier of hides that could made hides available to Irving on better terms than those offered by Tasman. In addition, locating an alternative supplier and negotiating the terms of sale would take time and, accordingly, would further delay the resumption of hide deliveries that are badly needed by Irving.

### *H. Porter Borrowing Motion*

65. As described above, or about January 14, 2010, Irving and Porter entered into a Commercial Financing Agreement (the "Financing Agreement"), a copy of which is attached to the Porter Borrowing Motion as **Exhibit A**. In general, the Financing Agreement created a

lending relationship between Irving and Porter whereby Irving sells, assigns, and transfers its receivables to Porter and, in exchange, Porter extends a working capital line of credit to Irving. The maximum amount outstanding under the Financing Agreement is limited to the lesser of (a) $5,000,000 and (b) the "Available Advance Amount," which is 85% of the factored receivables (which is limited to domestic receivables) that are not subject to a customer dispute. The interest rate on the credit facility provided by Porter is the "Prime Rate" plus 3%, and Irving pays certain other charges including an Invoice Service Fee equal to 0.95% charged monthly on the daily outstanding principal balance of the obligations. The "Prime Rate" is based on a published rate that fluctuates, but is subject to a "floor" of 5%

66. In connection with the Financing Agreement, Irving and Porter entered into a Security Agreement, a true and correct copy of which is attached to the Porter Borrowing Motion as **<u>Exhibit B</u>**. Under that security agreement, Irving granted Porter a security interest in certain collateral, including Irving accounts, inventory, general intangibles, and equipment (among other assets).

67. On or about January 15, 2010, Porter filed a UCC-1 financing statement with the Maine Secretary of State, a true and correct copy of which is attached to the Porter Borrowing Motion as **<u>Exhibit C</u>**.

68. In connection with the Financing Agreement, certain of Irving other secured creditors released and/or subordinated their security interests in the accounts to be factored to Porter pursuant to various subordination agreements. Specifically, Jupiter, FAME, Windsor Associates, LLC in its capacity as collateral agent for certain trade creditors, and Benjamin E. Marcus and Norman C. Spector in their capacities as collateral agents for another creditor all subordinated their security interests in accounts factored to Porter. Accordingly, Irving believes

that Porter holds a first priority security interest on the factored accounts and the proceeds thereof.

69. Prime Delaware, Prime Maine, and a related entity, Cudahy Tanning Company, Inc. each guaranteed the payment and performance of Irving's obligations to Porter

70. The relief requested in the Porter Borrowing Motion is essential to Irving's continued operations. Currently, Irving does not have an alternative source of working capital with which to continue its operations and to pay ordinary course obligations. Accordingly, the relief requested in the Porter Borrowing Motion is necessary for Irving to continue operating, satisfy its obligations as a debtor in possession, and execute on its chapter 11 strategy.

### *I. MRDA Borrowing Motion*

71. In the week preceding the Petition Date, facing a liquidity crisis that threatened to curtail its operations, Irving obtained a financing commitment from MRDA (the "Commitment"). Under the Commitment, the MRDA will re-advance $100,000 under the 2005 Note (the "$100K Loan"). The $100K Loan would be made on the same terms and conditions as the 2005 Note, and would be secured by the MRDA Mortgage, as evidenced in the Note Modification Agreement attached to the MRDA Borrowing Motion as **Exhibit D**. As set forth in the Note Modification Agreement, the $100K Loan would mature on November 3, 2013.

72. Additionally, MRDA agreed to lend Irving an additional $450,000 (the "$450K Loan") (and collectively with the $150K Loan, the "New Loans"), as evidenced in that certain Commercial Promissory Note attached to the MRDA Borrowing Motion as **Exhibit E** (the "2010 Note"). Pursuant to the 2010 Note, Irving would make monthly minimum principal payments in the amount of $37,500.00, plus interest accrued at a fixed rate of six percent (6%) per annum, commencing December 1, 2010. The 2010 Note has a term of one (1) year.

73. As security for the 2010 Note, Irving proposes to grant MRDA a first priority security interest in the Collateral, being certain specified inventory listed on Schedule I of that certain Security Agreement (the "Security Agreement"), a true and correct copy of which is attached to the MRDA Borrowing Motion as **Exhibit F**. As described above, Porter currently holds a second priority interest in all or substantially all of Irving's other personal property, including inventory. Additionally, Jupiter holds a first priority security interest in all of the Irving's personal property, including inventory. Tasman holds a purchase money security interest in the Collateral. Both FAME and Windsor hold subordinated interests in Irving's personal property, including inventory. By consent of Jupiter, Tasman, and FAME, the proposed grant of a security interest to MRDA in the Collateral would prime the security interests held by Jupiter, Tasman, and FAME (collectively, the "Consenting Lenders"). In addition, Porter has either consented to the grant of a senior lien on the Collateral to MRDA or, in the alternative, Porter's interests are adequately protected as a result of the value of accounts in which it has a first priority lien.

74. As evidenced by the Commitment, MRDA proposes to provide Irving with short-term financing in the form of the $100K Loan and the $450K Loan so that Irving may purchase hides from Tasman, its prepetition and sole hide supplier. Tasman is unwilling to continue supplying Irving with hides unless and until Irving secures financing, assumes the Tasman supply agreement, and provides for a prompt cure of the defaults under that agreement. However, under those circumstances, Tasman has agreed to supply hides to Irving on credit terms, with not less than ten loads outstanding at any one time (a value of about $800,000 to $1,000,000). Obtaining this credit from Tasman, and ensuring the supply of hides to Irving's operations, is essential to Irving's reorganization efforts. Both the $450K Loan and the $100K

Loan would permit Irving to continue its prepetition relationship with Tasman and ensure that Irving can obtain the hides desperately needed to fulfill customer orders, both existing and expected.

75. The lending agreement between Irving and MRDA is conditioned upon, *inter alia*, the closing of the New Loans on or before 5:00 p.m. on November 30, 2010, but in reality the closing must occur immediately to insure continued operations of Irving. Irving's agreement with Tasman for the purchase of hides is conditioned upon Irving obtaining the financing proposed in the Commitment Letter. Accordingly, Irving must immediately obtain the authority to execute the New Loans and the related documents.

### *J. Cash Collateral Motion*

76. By the Cash Collateral Motion, Irving seeks interim approval of Irving's stipulation with Jupiter, FAME, and MRDA regarding Irving's use of the collateral in which these creditors have, or assert, security interests. The ability to use cash and the proceeds of the sale of inventory in the ordinary course of business, to meet its obligations as a debtor in possession and to continue operations, is essential to Irving's ability to achieve a successful chapter 11 result.

### *K. Motion for Emergency Hearing*

77. Due to the nature of the relief sought by certain of the First Day Motions, the Debtors seek an emergency hearing on such First Day Motions as soon as possible after the Petition Date.

78. First, Irving's ability to continue its operations depends, to a significant extent, on its ability to retain its employees. If the Payroll Motion is not heard on an emergency basis, Irving will not be able to pay its employees the Prepetition Compensation in a timely manner.

That inability could lead to loss of employees at the very time when Irving most needs a dedicated, motivated work force. Second, Irving seeks immediate relief with respect to the Tasman Borrowing Motion, the Cash Collateral Motion, the Porter Borrowing Motion, and the MRDA Borrowing Motion. As set forth in the Tasman Borrowing Motion, without immediate authority to continue its borrowing relationship with Tasman, Irving will be unable to operate its business going forward. The ability to obtain the necessary raw materials—hides—for its operations is essential to Irving's ability to reorganize. Additionally, Irving seeks immediate relief with respect to the Cash Collateral Motion so that it can operate pursuant to its stipulation with Jupiter, FAME, and MRDA and use cash and proceeds from the sale of inventory in the ordinary course as soon as possible. Without the ability to fund its obligations as a debtor in possession, purchase the materials and equipment necessary to its operations, and pay other postpetition amounts owed in the ordinary course, Irving will simply be unable to operate. Irving also seeks immediate relief with respect to the Porter Borrowing Motion because it does not currently have an alternative source of working capital. Without the relief requested in the Porter Borrowing Motion, provided on an immediate basis, Irving will be unable to continue operations, meet its postpetition obligations, and eventually reorganize. Finally, Irving requires immediate relief with respect to the MRDA Borrowing Motion. Without the relief requested in the MRDA Borrowing Motion, provided on an immediate basis, Irving will be unable to purchase hides from Tasman and fulfill other obligations as a debtor in possession. The funds that MRDA is willing to loan to Irving are needed on an immediate basis to ensure that Irving can continue to operate. Irving also seeks immediate authority to pay the prepetition claims of the Critical Vendors and Shippers and Warehousemen and to honor the outstanding checks. The continuity of Irving's business operations and its ability to continue as a going-concern depend

on Irving's ability to maintain an uninterrupted flow of goods, materials and services necessary to create finished goods and sell them to customers for a profit. Additionally, in order to maintain its customer base Irving must have dependable shipping practices so that customers can depend on receiving their goods in a timely manner. If Irving is not able to fulfill orders in a timely manner, customers will undoubtedly look for alternative sources of leather. Irving also seeks immediate authorization to maintain its existing Cash Management System, bank accounts and business forms to make a seamless transition into chapter 11 and, in turn, to best preserve its estate for the benefit of its creditors.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*[SIGNATURE PAGE FOLLOWS]*

*[SIGNATURE PAGE FOR AFFIDAVIT OF PAUL LAROCHELLE IN SUPPORT OF VARIOUS FIRST DAY MOTIONS]*

Dated: November 16, 2010

Paul Larochelle

STATE OF MAINE

November 16, 2010

______________________, SS.

Personally appeared the above-named Paul Larochelle and acknowledged the foregoing to be true to the best of his personal knowledge, information and belief.

Before me,

Notary Public

My commission expires: 2/22/17

EXHIBIT

A

| | Corporate | Hartland | Vietnam | Cudahy | Berwick | St. Joesph | |
|---|---|---|---|---|---|---|---|
| Corporate | 0.00 | 8,662,216.51 | 0.00 | (354,090.63) | (1,741,778.60) | (4,398,838.36) | |
| Hartland | (8,662,216.51) | 0.00 | 53,087.80 | (850.00) | 326,837.85 | 184,052.15 | |
| Vietnam | 0.00 | (53,087.80) | 0.00 | 0.00 | (35,000.00) | 61,441.22 | |
| Cudahy | 354,090.63 | 850.00 | | | | | |
| Berwick | 1,741,778.60 | (326,837.85) | 35,000.00 | 0.00 | 0.00 | 0.00 | |
| St. Joseph | 4,398,838.36 | (184,052.15) | (61,441.22) | 0.00 | 0.00 | 0.00 | |
| | (2,167,508.92) | 8,099,088.71 | 26,646.58 | (354,940.63) | (1,449,940.75) | (4,153,344.99) | 0.00 |