# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MAINE

In re:

| | | |
|---|---|---|
| IRVING TANNING COMPANY, | ] | Chapter 11 |
| | ] | |
| PRIME TANNING CO., INC., | ] | |
| | ] | Case No. 10-11757-LHK |
| PRIME TANNING CORP., | ] | Jointly Administered |
| | ] | |
| CUDAHY TANNING COMPANY, INC., | ] | |
| | ] | |
| WISMO CHEMICAL CORP., | ] | |
| | ] | |
| PRIME TANNING COMPANY, INC., | ] | |
| | ] | |
| Debtors. | ] | |

## MEMORANDUM OF OPINION

This memorandum contains my findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 on the contested joint plan of reorganization in these jointly administered chapter 11 cases and a related adversary proceeding. Jurisdiction of these cases and the adversary proceeding lies in the District Court of the District of Maine. See 28 U.S.C. § 1334(a) and (b). Venue is appropriate under 28 U.S.C. § 1408. These cases and related proceedings have been referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a) and (b) and D. Me. Loc. R. 83.6(a) of the District Court of the District of Maine. Jurisdiction and venue are not disputed; nor is final determination by a bankruptcy judge.[1] For the reasons given below, confirmation is denied without prejudice.

---

[1] The jurisdictional challenge raised by National Beef Leathers, LLC, relating to its contested claim is not implicated in this confirmation proceeding.

## THE PARTIES AND THE PLAN

Irving Tanning Company ("Irving"), Prime Tanning Co., Inc. ("Prime Maine"), Prime Tanning Corp. ("Prime Missouri"), Cudahy Tanning Company, Inc. ("Cudahy"), Wismo Chemical Corp. ("Wismo"), and Prime Tanning Company, Inc. ("Prime Delaware"), collectively the "Debtors," are debtors and debtors in possession in separate chapter 11 cases pending before this court.[2] On November 14, 2011, they jointly filed the "Debtors' Plan of Reorganization" which provides for limited substantive consolidation (the "Plan").

At issue are the portions of the Plan relating the use of assets (the "Self-Insurance Funds") sequestered by the Debtors under the self-insurance provisions of the laws regulating workers' compensation claims in Missouri and Maine.[3] These provisions allow the Debtors to (a) satisfy workers' claims under the Plan,[4] (b) use the Self-Insurance Funds for general distribution, and (c) protect those charged with satisfying workers' claims under state law with

---

[2] Prime Delaware is the parent company of subsidiaries Cudahy, Irving, and Prime Maine. Prime Delaware is a wholly owned subsidiary of Irving Acquisition, Inc., an entity not a party to this bankruptcy case. Prime Maine and Cudahy merged with Irving pre-bankruptcy. Prime Maine was the parent company to Prime Missouri prior to the pre-petition sale of Prime Missouri and its wholly owned subsidiary Wismo to National Beef Leathers, LLC. As of the bankruptcy filings, Irving was the only operating entity. The complex nature of parent-subsidiary relationships, their operating structures, the history of their pre-petition debt, operations, and financing are set out in the Disclosure Statement. Those factors are not recounted here because they are not relevant to the dispute over funding of the plan of reorganization.

[3] The Plan defines the Self-Insurance Funds to include: the Maine Self-Insurance Fund, defined in the Plan as the funds held by the Treasurer of the State of Maine to secure the obligations of Irving and/or Prime Maine with respect to the self-insurance programs for workers compensation; the Mo-Acstar Cash Collateral, defined as the cash collateral held by Acstar with respect to the issuance of the Missouri Surety Bond; the NH-Acstar Cash Collateral, defined as the cash collateral held by Acstar with respect to the NH Surety Bond; and the Vista Trust Funds, defined as the proceeds of the Vista Trust.

[4] Early in these cases an order was entered setting a bar date of September 19, 2011 for workers' compensation claims. Later, during the confirmation hearing, the Debtors agreed that workers' claims filed prior to the bar date would be adjudicated in state proceedings, subject to bankruptcy jurisdiction.

an injunction  ("the Self-Insurance Channeling Injunction").[5]

---

[5] Section 8.3 of the Plan provides:

8.3  <u>Self Insurance Claims Channeling Injunction</u>.  Except as otherwise expressly provided in the Plan, the documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all persons and entities who have held, currently hold or may hold Self-Insurance Claims against the Debtors that arose prior to the Effective Date (including, but not limited to, states and other governmental units, and any state official, employee, or other entity acting in an individual or official capacity on behalf of any state or other governmental units), or against any bond, fund, letter of credit or private or governmental association, agency or entity with respect to such Self-Insurance Claims, or any property thereof, are permanently enjoined from:  (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Debtor or against any bond, fund, letter of credit or private or governmental association, agency or entity with respect to such Self-Insurance Claims, or any property thereof or collateral therefor; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Debtor or against any bond, fund, letter of credit or private or governmental association, agency or entity with respect to such Self-Insurance Claims, or any property thereof or collateral therefor; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Debtor or against any bond, fund, letter of credit or private or governmental association, agency or entity with respect to such Self-Insurance Claims, or any property therefor; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due to any Debtor or against any bond, fund, letter of credit or private or governmental association, agency or entity with respect to such Self-Insurance Claims, or any property thereof or collateral therefor; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of the Plan.  In furtherance of the Plan and this injunction, Acstar, the Missouri Guaranty Association, the MSGA, the Treasurer of the State of Maine, the Missouri Department of Labor and any other person, entity or agency holding Self-Insurance Funds, shall within thirty (30) days after the Confirmation Date, turnover to the Debtors all Self-Insurance Funds, including without limitation, the funds in the Vista Trust, the NH-Acstar Cash Collateral, the MO-Acstar Cash Collateral, and amounts held by the Treasurer of the State of Maine.  From the turnover of the Self-Insurance Funds, the Debtor will fund the Self-Insurance Claims Escrow in an amount equal to the total Allowed/Estimated Self Insurance Claims as set by the Court, and any and all holders of Self-Insurance Claims shall look solely to the Self-Insurance Claims Escrow for the satisfaction of Self-Insurance Claims.  Any person, agency, fund, association or entity injured by any willful violation of the injunction set forth in this section 8.3 shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.  Nothing contained in the Plan shall prohibit the Holder of a Disputed or Estimated Claim from litigating its right to seek to have such Disputed or Estimated Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan or Trust and from the Self-Insurance Claims Escrow, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed or

The Self-Insurance Funds are to be placed in a special account (the "Self-Insurance Claims Escrow"). Workers' claims are to be paid from this account (the "Self-Insurance Claims").[6] The Debtors anticipate that a surplus will remain in the Self-Insurance Claims Escrow after the satisfaction of the Self-Insurance Claims under the Plan. This surplus is to be used for general distribution.

Several parties (the "Objecting Parties") object to the proposed use of the Self-Insurance Funds and oppose the Self-Insurance Channeling Injunction. These parties include the Missouri Department of Labor and Industrial Relations ("MDLIR"), the Missouri Private Sector

---

Estimated Claim of any of the obligations of the Debtor or the Trustee under the Plan or Trust. The Confirmation Order shall also constitute an injunction enjoining any person from collecting from any property of any person, agency, association or fund protected by this injunction set forth in this section 8.3 based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Self-Insurance Claim under the Plan.

[6] Section 5.3 of the Plan provides:

5.3 <u>Self-Insurance Claims</u>. With respect to any Self-Insurance Claims filed by the Self-Insurance Claims Bar Date, such claims shall either (a) become Allowed, to the extent the Debtors do not object to any such claim; or (b) be estimated pursuant to § 502(c) of the Code, to the extent the Debtors object to such claim. Once such claims are allowed and/or estimated (the "<u>Allowed/Estimated Self-Insurance Claims</u>"), the Confirmation order shall provide that the Self-Insurance Funds shall be turned over to the Debtors and the Self-Insurance Claims Escrow will be created equal to the Allowed/Estimated Self-Insurance Claims, and the balance of the Self-Insurance Funds shall be distributed in accordance with the Jupiter-Meriturn Compromise and the Plan, as will any excess from such Self-Insurance Escrow upon satisfaction of all Allowed Self-Insurance Claims. The Confirmation Order will also provide a permanent injunction barring assertion or prosecution of any Self-Insurance Claims other than via this Plan and against the Self-Insurance Claims Escrow, including barring claims against any relevant state or multi-employer self-insurance fund, guaranty association, back-up fund or program, and against any surety bond, or cash collateral transfer including the NH-Acstar Surety Bond and the MO-Acstar Surety Bond, and all such surety bonds will be terminated upon transfer of the Self-Insurance Funds to the Debtors under the Plan, to permit return of any cash collateral, including without limitation, the MO-Acstar Cash Collateral and the NH Acstar Cash Collateral to the Debtors and their creditors subject to Jupiter's lien and subject to the sharing agreement set forth in the Jupiter-Meriturn Compromise.

Individual Self-Insurers Guaranty Corporation ("Mo. Guaranty"), the Maine Superintendent of Insurance ("Maine Superintendent"), and the Maine Self-Insurance Guaranty Association ("MSIGA"). MDLIR and the Maine Superintendent are state agencies charged with administering the workers' compensation schemes in Missouri and Maine. Mo. Guaranty and MSIGA are the entities created under state law to administer self-insurance funds for the benefit of injured workers. Another Objecting Party is Acstar, the surety company that issued bonds to Prime Missouri (the "MO-Acstar Surety Bond") and Prime Maine (the "NH-Acstar Surety Bond").[7] The Objecting Parties assert that the Debtors had no property interest in the Self-Insurance Funds upon the commencement of the cases beyond a chose in action to recover any surplus that may remain after all actual and potential workers' claims have been satisfied under state law.[8]

The Debtors readily met their burden of establishing all of the requirements for confirmation under §1129(a),[9] apart from the challenges of the Objecting Parties relating to the use of the Self-Insurance Funds. These challenges include assertions that: the Plan does not

---

[7] Prime Missouri commenced an adversary proceeding against MDLIR (case number 11-1031-LHK) to enjoin it from making demand on the MO-Acstar Surety Bond, in which Acstar and MSIGA intervened. Acstar filed a separate complaint in that proceeding also seeking injunctive relief and contesting the jurisdiction of this court. A preliminary injunction was entered on Prime Missouri's complaint enjoining MDLIR from calling or otherwise enforcing the MO-Acstar Surety Bond. Because the issues raised in the adversary proceeding overlap the confirmation issues, the parties have agreed that resolution of the adversary proceeding may occur within the context of confirmation.

[8] Of the Objecting Parties, only MSIGA and Acstar have filed proofs of claim in these proceedings; nonetheless it appears that each Objecting Party is a party in interest with a right to be heard because the Plan proposes to adversely affect their pecuniary interests in the Self-Insurance Funds. See 11 U.S.C. § 1109 (b). Thus the Objecting Parties have standing in this case.

[9] Unless otherwise indicated, all statutory references are to title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8 (the "Bankruptcy Code").

comply with the Bankruptcy Code; the Plan was not filed in good faith because the proposed use of the Self-Insurance Funds is forbidden by law; the holders of claims will not receive value which is not less than they would receive under chapter 7; the Plan was not accepted by all impaired classes; and the Plan is not feasible. See § 1129(a)(1), (3), (7), (8) and (11).

Because there was no contrary showing and because the Objecting Parties could have consented to confirmation without violating the Bankruptcy Code or state law, the objections under § 1129(a)(1) and (3) are overruled. The objection under (a)(7) is overruled because creditors are not likely to receive more in a chapter 7 than they are to receive under the Plan. The objection under (a)(8) -- that the Plan was not accepted by all impaired classes -- is overruled because it was never pressed.[10] The only objection that will be sustained is the challenge to feasibility under § 1129(a)(11) because, as more fully set forth below, the Self-Insurance Funds are beyond the immediate reach of the Debtors. Without those funds, the Plan will be short of cash.[11]

### DISCUSSION

The focus of this dispute is whether the Debtors had a property interest in excess Self-Insurance Funds upon the commencement of these cases. The Bankruptcy Code defines property of a bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). But applicable state law will determine the nature and extent of a debtor's interest in property upon bankruptcy. See

---

[10] For this reason, confirmation under § 1129(b) is not implicated.

[11] Counsel for the Debtors has stated that feasibility under § 1129(a)(11) is not implicated because the Self-Insurance Funds are not essential to the Plan. That may be so, but the Debtors are pressing for distribution under the Plan in its present form.

Butner v. United States, 440 U.S. 48, 55 (1979).

      Prior to bankruptcy, Prime Missouri was a self-insured employer in the leather tanning business in Missouri.[12] It posted "security" with Mo. Guaranty whose members, like Prime Missouri, chose to self-insure against workers' claims.[13] Upon Prime Missouri's insolvency, Mo. Guaranty became obligated to pay the claims of Prime Missouri's employees.[14] Procedures exist for Prime Missouri to recover excess "security" after all outstanding workers' claims have been satisfied.[15]

---

[12] See Mo. Rev. Stat. § 287.865 (2011) and Mo. Code Regs. Ann. Tit. 8, § 50-3.010 (2009) (Rules Governing Self-Insurance, setting forth requirements and standards for authority to self-insure an employer's liability under the Workers' Compensation Law).

Under the Missouri self-insurance statute, an employer seeking the privilege to self-insure must:

1. Provide security in the minimum amount of two hundred thousand dollars ($200,000) and the division may, if it deems advisable in any particular case, require a larger amount. Security will be furnished in one (1) of three (3) ways: by filing with the Division of Workers' Compensation an approved surety bond; by an irrevocable letter of credit; or by depositing in escrow approved securities as defined in this section. In exceptional instances the division may require additional security deposits equal to actuarially determined incurred losses.

Mo. Code Regs. Ann. tit. 8, § 50-3.010(3)(B)(1) (2009).

[13] "Security" is defined as a "surety bond, an irrevocable letter of credit, or escrow deposit to assure the fulfillment of payment or performance of any workers' compensation liability or obligation of an employer." Mo. Code Regs. Ann. tit. 8, § 50-3.010(1)(A)(10). The Missouri self-insurance scheme further provides that upon insolvency, "the proceeds of the surety bond shall be transferred to Missouri Private Sector Individual Self-Insurers Guaranty Corporation, if applicable, in anticipation of payment for compensation obligations which the employer has not paid . . . ."
Mo. Code Regs. Ann. tit. 8, § 50-3.010(3)(B)(1)(A) (2009).

[14] Also upon a member's insolvency, the Division of Workers' Compensation is obligated to call any bond that had been posted by the insolvent member as security for its self-insured workers' compensation obligations. The proceeds of the bond amount are then deposited with Mo. Guaranty. These funds are to be distributed by Mo. Guaranty to "compensate persons entitled to receive workers' compensation benefits" from the insolvent member. Mo. Rev. Stat. § 287.865.2 (2011).

[15] Under Missouri law, an employer may be entitled to any excess funds after claims have been paid. The statute allows as follows:

(F) When an employer ceases to be self-insured under Chapter 287, RSMo the employer may

7

Prime Missouri provided a surety bond from Acstar as "security" under the statute.[16]

---

apply to the Division of Workers' Compensation for the release of the securities held in escrow or trust.

1. Such employer shall file a sworn statement of–

    A. All of its outstanding liabilities of compensation;

    B. All pending claims for compensation; and

    C. All accidents occurring in its establishment for a period of three (3) years prior to the date of such application.

2. The division shall have the right to require that all of the securities held in escrow or trust be retained for a period of three (3) years from the date of closure of all cases of workers' compensation liability, and after three (3) years, the division shall have the right to require that all or any part of the securities held in escrow be retained, as deemed advisable by the division and the securities shall be released only on written order of the division.

Mo. Code Regs. Ann. tit. 8, § 50-3.010(3)(F)(1) and (2) (2009).

[16] The language of the Mo-Acstar Surety Bond provides in part:

Whereas the above bounden principal [Prime Missouri] has heretofore filed with the Division of Workers' Compensation of the State of Missouri . . . its application for the privilege, under Chapter 287 of the Revised Statutes of Missouri, entitled "The Workers' Compensation Law," of self-insuring . . . its workers' compensation liability under said Law; and

Whereas, the Missouri Division of Workers' Compensation has heretofore granted this privilege upon condition, among other things, that the said principal enter into bond in the penal sum of $535,000.00.

Paragraph 5 of the Mo-Acstar Surety Bond states:

Moneys collected by or on behalf of the Division of Workers' Compensation . . . and dispersed to the Missouri Private Sector Individual Self-Insurers Guaranty Corporation shall be vested in the Missouri Private Sector Individual Self-Insurers Guaranty Corporation and shall not be deemed state property and shall not be subject to appropriation by the legislature, the treasurer or any other state agency.

Paragraph 2 of the Mo-Acstar Surety Bond provides:

[I]n the event said principal [Prime Missouri] . . . shall fail to pay any award(s), approved settlements(s) or any other existing, future and potential liabilities or obligations of the principal . . . under the Workers' Compensation Law . . . rendered against said principal . . . the said surety [Acstar] . . . shall within ten (10) days pay to the Division of Workers' Compensation, . . . the full penal sum of this bond as specified by said Division to satisfy said approved award(s) or settlement(s) or other such existing,

Acstar in turn obtained a letter of credit from Wells Fargo to secure its obligations under the Mo-Acstar Surety Bond. Acstar also obtained an indemnity agreement from Prime Maine, Prime Missouri, and Prime Export Corp. requiring them to indemnify Acstar up to the full amount of the penal sums of the Mo-Acstar Surety Bond and the NH-Acstar Surety Bond.[17]

The Maine self-insurance scheme is similar.[18] It governs Prime Maine and Irving and provides for the payment of workers' claims against an insolvent self-insured employer.[19] Like Missouri, the Maine law allows for the return of excess funds when defined conditions have been

---

future, and potential liabilities of the principal . . . under the Workers' Compensation Law upon the order or demand of the Division of Workers' Compensation to said surety . . . .

Paragraph 3 of the Mo-Acstar Surety Bond addresses the bankruptcy of the principal (Prime Missouri):

3. Surety herein . . . by and in the execution of this bond, expressly agrees that, upon the default of the payment of compensation as defined in paragraph two above . . . or upon the principal . . . having become insolvent and/or bankrupt within the meaning of the bankruptcy Act, 11 U.S.C. s 101 et. Seq., the Division of Workers' Compensation . . . may enforce this bond in the name of the people of the State of Missouri for the benefit of any and all persons who may be entitled to such sums for compensation . . . .

[17] Prime Maine also operated under New Hampshire law with respect to its New Hampshire employees. Its self-insurance obligations in that jurisdiction were secured by the NH-Acstar Surety Bond in the amount of $100,000.

[18] Pursuant to the Maine Workers' Compensation Act of 1992, private employers in the State of Maine are required to insure their employees against injuries and death arising out of and in the course of their employment. Me. Rev. Stat. tit. 39-A, §§ 101–409 (1991).

[19] Self-insurers in Maine are given the option to provide several types of "security," including a surety bond, an irrevocable standby letter of credit, or an actuarially determined, fully-funded trust. See Me. Rev. Stat. tit. 39-A, § 403(3) (1991). This allows that any "security deposit must be held by the Treasurer of State in trust for the benefit of the self-insurer's employees for the purposes of making payments" under the self-insurance act. Id.

met.[20]

Irving deposited funds into a trust fund, the Vista Trust, to secure its self-insurance obligations for the benefit of its Maine employees. In 2007, the Maine Superintendent permitted Irving to terminate its self-insurance program on the condition that the Vista Trust "shall be maintained on a continuing basis until all claims are paid and corresponding exposure concluded."

To secure its self-insurance obligations, Prime Maine obtained a letter of credit issued by Wells Fargo. Prime Maine terminated its self-insurance program with the consent of the Maine Superintendent on the condition that the security held under the Prime Maine/Wells Fargo letter of credit "shall be maintained until all claims are paid." In 2010, the Maine Superintendent drew down the Prime Maine/Wells Fargo letter of credit after Prime Maine failed to renew its letter of credit and did not post any substitute security for its self-insurance obligations. The proceeds of the letter of credit were paid to the Maine State Treasurer. Upon Debtors' bankruptcy filing, MSIGA assumed responsibility for paying Prime Maine's former employees' workers' compensation claims. MSIGA is to be reimbursed for paying these claims by the Maine State Treasurer from the proceeds of the letter of credit.

Wells Fargo also issued an Irrevocable Standby Letter of Credit to Acstar, at the request of Prime Maine, authorizing Acstar to draw on Wells Fargo "in the event you [Acstar] deem it

---

[20] Upon termination of a self-insurance program, the departing employer or the Superintendent submits a written termination plan which prescribes the terms and conditions of the termination and which must include "an agreement that the security must be maintained until all claims are paid and that the amount is subject to adjustment by the Superintendent, not less frequently than annually, based upon actuarial review." Code Me. R. 02-031 Ch. 250, § II(N)(6)(a) (1997). For other specific requirements, see generally Code Me. R. 02-031 Ch. 250, § II(N)(1) and (6)(a)-(e) (1997) (for individual self-insurers) and § III(N)(1) and (4)(a)-(e) (1997) (for group self-insurers).

necessary by reason of your having executed bond(s) on behalf of Prime Tanning Co., Inc. [Prime Maine] . . . ." Acstar drew down the Wells Fargo/Acstar letter of credit in June 2010, prior to the Debtors' bankruptcy. Acstar presently holds the proceeds.

The Debtors presented evidence showing that the sum of all workers' claims to be paid in each jurisdiction will leave excess Self-Insurance Funds for general distribution under the Plan. Their showing was based upon the sum of all workers' claims filed prior to the bar date and did not take state law into account. The Objecting Parties countered with evidence showing no surplus. Their demonstration was premised upon applicable state law without consideration of the bar date. The difference between the two presentations is legal rather than factual. If, as the Debtors contend, they had a property interest in the excess Self-Insurance Funds upon the commencement of the case, they would prevail. On the other hand, if, as the Objecting Parties contend, the Debtors held nothing more than a chose in action to recover excess funds as of the commencement of the cases, the Objecting Parties would prevail.

To support their approach, the Debtors say that the excess Self-Insurance Funds should be treated as the equivalent of a tax refund, which is deemed to be property of the estate upon bankruptcy. See Kokoszka v. Belford, 417 U.S. 642, 647-648 (1974). This analogy falls short because the value of a tax refund is established generally under applicable tax law,[21] not, as the

---

[21] None of the authorities offered by the Debtors shows otherwise. See Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.), 270 F.3d 280, 286, 291-292 (6th Cir. 2001)(tax refund property of the estate, set-off dispute); BankUnited Financial Corporation v. Federal Deposit Insurance Corp. (In re BankUnited Financial Corp.), 462 B.R. 885, 901 (Bankr. S.D. Fla. 2011)(tax refund property of the estate); Zucker v. Federal Deposit Insurance Corporation (In re Netbank, Inc.), 459 B.R. 801, 822 (Bankr. M.D. Fla. 2010) (refund property of estate); In re Donnell, 357 B.R. 386, 389 (Bankr. W.D. Tex. 2006) (when refund is property of the estate, not who determines); and Levine v. Telco Systems, Inc. (In re World Access, Inc.), 324 B.R. 662, 683, 686-687 (Bankr. N.D. Ill. 2005)(tax refunds property of estate and issues of when set-off or recoupment apply to refund). Only one case cited by the Debtors presents the issue of refund determination and that case was determined in favor of the taxing authority. See In re

Debtors suggest, as an adjunct of the claims allowance process.[22]

The Debtors also say that if state law is to govern the outcome, they are not likely to realize the excess Self-Insurance Funds until years after their Plan is confirmed, if at all. To avoid this outcome, they point to several Bankruptcy Code provisions which preempt any non-bankruptcy law that limits the use of estate property due to a debtor's insolvency or financial condition. See, e.g., § 363(l)(which allows a trustee to use estate property "notwithstanding any provision in . . . applicable law that is conditioned on the insolvency or financial condition of the debtor [or] on the commencement of a case under this title concerning the debtor . . . , and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property"). See also §§ 365(e) and 541(c). This argument misses the mark because these Code provisions relate to non-bankruptcy laws that *impede* a trustee's use of estate property. Here the Missouri and Maine statutes are the laws that *defined* the Debtors' interest in the excess Self-Insurance Funds upon the commencement of these cases.

At that moment, the Debtors held nothing more than a chose in action to recover excess funds under state law. See In re McLean Trucking, 74 B.R. 820, 827 (Bankr. W.D.N.C. 1987) (where an explicit provision of the applicable California statute divested the debtor from all right, title and interest in the surety bond or its proceeds). While there is no express alienation provision in the Missouri or Maine self-insurance schemes, such alienation is implicit in both. As described above, each jurisdiction has a procedure for the recovery of excess funds after all

---

Northeast Enterprises, Inc., 318 B.R. 625, 630-631 (Bankr. E.D. Pa. 2005)(bankruptcy court lacked jurisdiction to determine refund of reserve account for payment of future unemployment compensation claims).

[22]Moreover, the Debtors have ignored the implications of § 505(a)(2)(B), which specifies when a bankruptcy court may determine a tax refund.

workers' claims have been satisfied under state law.

## CONCLUSION

The objections under §§ 1129(a)(1), (3), (7), and (8) are overruled.  The objection under § 1129(a)(11) is sustained.  Confirmation of the plan will be denied without prejudice. A separate order will issue.  The adversary proceeding shall remain stayed pending a further pre-trial conference to be scheduled by the parties after 28 days from this order.

Date: August 28, 2012

_____
LOUIS H. KORNREICH
UNITED STATES BANKRUPTCY JUDGE