**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE FIRST CIRCUIT

_____

**BAP NO. EB 12-077**
_____

**Bankruptcy Case No. 10-11757-LHK**
**(Jointly Administered)**

_____

**IRVING TANNING COMPANY, et al.,[1]**
**Debtors.**

_____

**IRVING TANNING COMPANY, et al.,**
**Appellants,**

**v.**

**MAINE SUPERINTENDENT OF INSURANCE,**
**MAINE SELF-INSURANCE GUARANTEE ASSOCIATION,**
**ACSTAR INSURANCE COMPANY,**
**MISSOURI DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS, and**
**MISSOURI PRIVATE SECTOR INDIVIDUAL SELF-INSURERS**
**GUARANTY CORPORATION,**
**Appellees.**

_____

**Appeal from the United States Bankruptcy Court**
**for the District of Maine**
**(Hon. Louis H. Kornreich, U.S. Bankruptcy Judge)**

_____

**Before**
**Lamoutte, Bailey, and Cabán,**
**United States Bankruptcy Appellate Panel Judges.**

_____

[1] The Debtors and Appellants are Irving Tanning Company (Case No. 10-11757-LHK), Prime Tanning Co., Inc. (Case No. 10-11758-LHK), Prime Tanning Corp. (Case No. 10-11759-LHK), Cudahy Tanning Company, Inc. (Case No. 10-11948-LHK), Prime Tanning Company Inc. (Case No. 10-11949-LHK), and Wismo Chemical Corp. (Case No. 10-11952-LHK).

---

Robert J. Keach, Esq. and Máire B. Corcoran, Esq., on brief for Appellants.

Paula-Lee Chambers, Esq., on brief for Appellee, Acstar Insurance Company.

Thomas C. Sturtevant, Jr., Esq. and Elizabeth J. Wyman, Esq., on brief for Appellee,
Maine Superintendent of Insurance.

R. Scott Moore, Esq. on brief for Appellee,
Missouri Private Sector Individual Self-Insurers Guaranty Corporation.

Jeff Klusmeier, Esq., on brief for Appellee,
Missouri Department of Labor and Industrial Relations.

Daniel L. Cummings, Esq. on brief for Appellee,
Maine Self-Insurance Guarantee Association.

---

Brent A. Singer, Esq., on brief for Amici Curiae,
The International Association of Industrial Accident Boards and Commissions,
and The Southern Association of Workers' Compensation Administrators.

Peter G. Cary, Esq., and Robert E. Mittel, Esq., on brief for Amicus Curiae,
Self-Insurance Guaranty Funds of America, Inc.

Daniel W. Sklar, Esq., Daniel R. Sovocool, Esq., and Christopher M. Desiderio, Esq.,
on brief for Amici Curiae, National Council of Self-Insurers,
California Self-Insurers' Security Fund, Safety National Casualty Corporation,
and California Self-Insurers Association.

---

August 15, 2013

---

**Bailey, U.S. Bankruptcy Appellate Panel Judge.**

Six related debtors in jointly-administered cases (the "Debtors") appeal from the bankruptcy court's October 18, 2012 order denying confirmation of their joint liquidating plan (the "Plan").  At issue are Plan provisions through which the Debtors would: (i) reach and distribute certain funds (the "Self-Insurance Funds") held, variously, by state authorities, a private trustee, and a bonding company to secure the statutory obligations of three of the six Debtors under the self-insurance provisions of the laws regulating workers' compensation claims in Maine, New Hampshire, and Missouri; and (ii) through a channeling injunction terminate the liability of third party guarantors of these obligations and otherwise nullify and supplant the workers' compensation laws in these states as to the Debtors' employees.  The bankruptcy court determined that the Debtors held no property interest in the Self-Insurance Funds themselves, only a "chose in action" to recover any surplus that may remain after payment of workers' compensation claims, as and when state laws permit.  Implicitly, the court also rejected the Debtors' argument that § 1123(a)(5)[2] permits them to override the state law limitations on their ability to reach these funds.  The bankruptcy court concluded that, without immediate access to the Self-Insurance Funds, the Plan would be underfunded and thus fail to satisfy the feasibility requirement in § 1129(a)(11).  Agreeing with the bankruptcy court on the property interest and § 1123(a)(5) issues, we **AFFIRM.**

---

[2]   Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended.

## BACKGROUND

I.    **The Parties**

A.    **The Debtors**

The Plan that was denied confirmation was proposed jointly by all six Debtors, and accordingly, all six now appeal from that denial.  Prior to the petition date, five of the six Debtors were engaged in the tanning, manufacture, and sale of leather.  Among them, they had operations in Maine, New Hampshire, Wisconsin, and Missouri.  The sixth Debtor, Prime Tanning Company Inc. ("Prime Delaware"), is a holding company, the parent company of Debtors Irving Tanning Company ("Irving"), Cudahy Tanning Company, Inc. ("Cudahy"), and Prime Tanning Co., Inc. ("Prime Maine").  Debtor Prime Tanning Corp. ("Prime Missouri") is a wholly-owned subsidiary of Prime Maine.  And Debtor Wismo Chemical Corp. ("Wismo") is a wholly-owned subsidiary of Prime Missouri.

Irving, a manufacturer and seller of leather, operated its business in Hartland, Maine.  Cudahy and Prime Maine were involved in the leather tanning process.  Prime Maine's operations were in Berwick, Maine until, in 2008, they were consolidated with Irving's operations in Hartland.  Cudahy's finishing facility was in Cudahy, Wisconsin until its production was transitioned to Irving's facility in Hartland.  Until it ceased operations in 2009, Prime Missouri operated a "wet blue" operation in St. Joseph, Missouri, supplying Prime Maine with processed hides.  Wismo operated a chemical business related to the processing of hides for leather.

4

B.      The Appellees

The "Appellees" are the Missouri Private Sector Individual Self-Insurers Guaranty

Corporation (the "Missouri Guaranty"), the Missouri Department of Labor and Industrial

Relations ("MDLIR"), the Maine Superintendent of Insurance ("Maine Superintendent"), the

Maine Self-Insurance Guarantee Association ("MSIGA"), and Acstar Insurance Company

("Acstar").  MDLIR and the Maine Superintendent are state agencies charged with administering

the workers' compensation schemes in Missouri and Maine.  Missouri Guaranty and MSIGA are

quasi-governmental entities created under the laws of their respective states to administer self-

insurance funds for the benefit of injured workers and to guarantee payment of claims against

insolvent employers.  Acstar is a surety company that issued bonds to Prime Missouri and Prime

Maine to secure their obligations under their self-insurance programs.

II.    The Debtors' Self-Insurance Programs

In the course of operating their respective businesses, Irving, Prime Maine, and Prime

Missouri maintained self-insurance programs for workers' compensation claims in Maine, New

Hampshire, and Missouri.  In his Memorandum of Opinion, the bankruptcy judge made findings

of fact and rulings of law about the relevant state laws and the nature and status of the Debtors'

self-insurance programs.  The Debtors take no issue with these findings and rulings on appeal,[3]

and the relevant facts are not in dispute.

---

[3]   The Debtors argue that nothing in the bankruptcy court's findings and rulings precludes the
confirmation of the Plan, but they take no issue with the subsidiary findings and rulings concerning the
workings of the state programs and the status of the Debtors' own self-insurance programs thereunder.

5

A.      **Maine Workers' Compensation Self-Insurance Law**

Irving and Prime Maine maintained self-insurance programs pursuant to the Maine

workers' compensation statute.  See Me. Rev. Stat. tit. 39-A, § 403 (1991).  Under the Maine

statute, if an employer wishes to self-insure, it must secure its obligations to pay compensation in

one or more of the ways described in the statute.  Id.  ("An employer subject to this Act shall

secure compensation and other benefits to the employer's employees in one or more of the ways

described in this section.").  These include the posting of cash, a surety bond, or an irrevocable

standby letter of credit with the Maine Superintendent in an amount determined by the Maine

Superintendent.  Id. at § 403(3).  These also include the establishment of an actuarially

determined, fully-funded trust.  Id. at § 403(3)(C).  Any "security deposit must be held by the

Treasurer of State in trust for the benefit of the self-insurer's employees for the purposes of

making payments" under the state's self-insurance law.  Id. at § 403(3).  If the employer opts to

secure its obligations with a letter of credit, the letter must give the Maine Superintendent the

right to call the letter if the self-insurer fails to renew it.  Id.; 02-031-250 Me. Code R. § II(D)(7).

If the letter is called, its proceeds must be deposited with the Treasurer of State to be held in trust

for the benefit of the employees for the purposes of making payments under the workers'

compensation statute.  Me. Rev. Stat. tit. 39-A, § 403(3)(A).  The proceeds shall be so held in

trust "until either the superintendent authorizes the Treasurer of State to release those proceeds to

the employer upon provision by the employer of replacement security adequate to meet the

requirements for security set by the superintendent or the superintendent directs distribution of

the proceeds in accordance with this Title."  Id. at § 403(3)(A).  If the employer opts to secure its

obligations by depositing funds into a trust, "[t]he trust must be established and maintained

6

subject to the condition that trust assets may not be transferred or revert in any manner to the

employer except to the extent that the superintendent finds that the value of the trust assets

exceeds the present value of incurred claims and claims settlement costs with an actuarially

indicated margin for future loss development." Id. at § 403(3)(C)(4).

Virtually all self-insured employers in Maine are required to join MSIGA, which is the

payor of last resort if a self-insurer becomes unable to pay its workers' compensation obligations.

See Me. Rev. Stat. tit. 39-A § 404(4)(A)(4).  MSIGA is required to pay workers' compensation

benefits that a self-insurer fails to pay due to insolvency.  Id.  MSIGA pays such obligations from

a fund it administers, which in turn is funded through assessments on its members.  Id. at

§ 404(4)(A)(3).  If the assets in the fund are insufficient to pay workers' compensation liabilities,

MSIGA is required to make an additional assessment on its members.  Id. at § 404(4)(C)(1).

### B.    Irving

As security for its obligations under the Maine statute, Irving paid funds into a trust

known as the Vista Trust (the "Vista Trust"), established in 1993 and amended in March 2010.

In 2007, the Maine Superintendent permitted Irving to terminate its self-insurance program on

the condition that the Vista Trust "shall be maintained on a continuing basis until all claims are

paid and corresponding exposure concluded."  The agreement establishing the Vista Trust

restricted the transfer of Irving's interest in the Vista Trust as follows:

> Exclusive Purpose: the Trust Fund shall not be subject to seizure
> by creditors under any writ or proceeding at law or equity and the
> Fund shall not borrow from, sell, assign, encumber, hypothecate,
> pledge or in any other manner dispose of its interest in the Trust
> Fund except payments made pursuant to Section 3.1 and conditions
> of termination or amendment herein.

The Debtors state that as of November 30, 2010, the funds held in the Vista Trust totaled $330,000.00.

### C.      Prime Maine  as to Maine Employees

To secure its obligations under the Maine statute, Prime Maine obtained a letter of credit issued by Wells Fargo Bank in the amount of $718,000.00.  In 2008, Prime Maine terminated its self-insurance program with the consent of the Maine Superintendent on the condition that the security held under the letter of credit "shall be maintained until all claims are paid."  The Maine Superintendent eventually drew down the letter of credit, and the proceeds were paid to the Maine Treasurer of State to be held in trust for the benefit of workers' compensation claimants (the "Maine Fund").  Upon Prime Maine's bankruptcy filing, MSIGA assumed responsibility for paying Prime Maine's workers' compensation claims.  When and if it pays any such claims, MSIGA is entitled to be reimbursed for paying the claims by the Maine Treasurer of State from the proceeds of the letter of credit.

### D.      Prime Maine as to New Hampshire Employees

Prime Maine also maintained a self-insurance program in New Hampshire pursuant to N.H. Rev. Stat. Ann. 281-A:5-a.  To ensure the availability of funds to satisfy its workers' compensation obligations in New Hampshire, Prime Maine posted a $100,000.00 surety bond issued by Acstar for the benefit of the State of New Hampshire Department of Labor.  As a condition of issuing this bond, Prime Maine agreed to indemnify Acstar for amounts it might be required to pay under the bond, and Prime Maine secured that indemnity obligation by providing Acstar with an irrevocable stand by letter of credit issued by Wells Fargo Bank in the amount of $551,250.00.  In June 2010, Acstar drew upon the letter of credit and currently holds the

proceeds.  It is these proceeds that the Plan refers to as the New Hampshire Acstar Cash

Collateral and which, to avoid confusion,[4] we will refer to here as the New Hampshire Acstar

Funds.  The State of New Hampshire filed no objection to confirmation of the Plan.

### E.    Prime Missouri

Prime Missouri maintained a self-insurance program for workers' compensation under

Missouri workers' compensation laws from 1985 to 2009.  The Missouri self-insurance scheme

is similar to that in Maine: it requires employers to post "security" to ensure the availability of

funds to pay their workers' compensation obligations in Missouri; it establishes mechanisms to

guarantee payment of workers' compensation claims against insolvent self-insured employers;

and it allows for the return of excess "security" only when defined conditions have been met.

"Security" is defined as a "surety bond, an irrevocable letter of credit, or escrow deposit to assure

the fulfillment of payment or performance of any workers' compensation liability or obligation of

an employer."  Mo. Code Regs. Ann. tit. 8, § 50-3.010(1)(A)(10).  Upon a member's insolvency,

---

[4] Although the Plan refers to these proceeds (and proceeds of another letter of credit obtained
by Prime Missouri (see below)) as "cash collateral," it is by no means clear that they are cash collateral
in the sense that that term is usually employed in bankruptcy.  Cash collateral normally refers to cash
belonging to the debtor that is subject to a security interest in favor of a secured creditor.  In this
instance, the bankruptcy court did not find that the funds in question belong to the Debtors.  At most, the
court essentially concluded, Prime Maine and Prime Missouri have contingent and unmatured claims
against Acstar in the amount of those proceeds that eventually prove unnecessary under their respective
indemnification agreements.  Because the funds in question are proceeds of letters of credit, the Debtors
do not have a right to an immediate turnover of those proceeds, and, therefore, the funds do not constitute
property of the Debtors or their estate.  See EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re
Stonebridge Tech., Inc.), 430 F.3d 260, 269 (5th Cir. 2005) ("It is well-established . . . that letters of
credit and the proceeds therefrom are not property of the debtor's bankruptcy estate."); Int'l Fin. Corp. v.
Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.), 399 F.3d 558, 566 (3d Cir. 2005) (It is a "well-
established rule of bankruptcy law that a letter of credit and the proceeds therefrom are not property of
the debtor's estate.") (citations and internal quotations omitted); OHC Liquidation Trust v. Discover Re
(In re Oakwood Homes Corp.), 342 B.R. 59, 67 (Bankr. D. Del. 2006) ("[T]he proceeds of a letter of
credit are not property of the estate. . . .").

the MDLIR's Division of Workers' Compensation is obligated to call any bond that has been

posted by the insolvent member as security for its self-insured workers' compensation

obligations.  Id. at § 50-3.010(3)(B)(1)(A).  The proceeds of the bond amount are then deposited

with Missouri Guaranty.  Id.  These funds are to be distributed by Missouri Guaranty to

"compensate persons entitled to receive workers' compensation benefits" from the insolvent

member.  Mo. Rev. Stat. § 287.865.2 (2011).

In accordance with the self-insurance provisions of Missouri law, Prime Missouri posted

security with Missouri Guaranty in the form of a surety bond in the amount of $535,000.00,

issued by Acstar for the benefit of MDLIR.  As a condition of issuing the bond to Prime

Missouri, Prime Missouri agreed to indemnify Acstar for amounts it might be required to pay

under its bond, and Prime Missouri secured that indemnity obligation by providing Acstar with

an irrevocable stand by letter of credit issued by Wells Fargo Bank in the amount of $551,250.00.

On or about June 4, 2010, Acstar drew down upon the letter of credit and now holds proceeds

thereof in the amount of $480,750.10.  It is these proceeds that the Plan refers to as the Missouri

Acstar Cash Collateral and which, to avoid confusion, we will refer to here as the Missouri

Acstar Funds.  Upon Prime Missouri's insolvency, Missouri Guaranty became obligated to pay

the claims of Prime Missouri's employees.  Procedures exist for Prime Missouri to recover

excess security after all outstanding workers' claims have been satisfied.[5]

**F.     The Self-Insurance Funds**

Consistent with the definition in the Plan, the term "Self-Insurance Funds" refers to the

following:

---

[5]  See Mo. Code Regs. Ann. tit. 8, § 50-3.010(3)(F)(1) and (2).

(i) the funds held in the Vista Trust, established by Irving;

(ii) the Maine Fund:  the letter of credit proceeds being held in trust by the Maine Treasurer of State for the benefit of workers' compensation claimants;

(iii) the New Hampshire Acstar Fund:  the letter of credit proceeds held by Acstar to secure any obligation Prime Missouri may have to Acstar should Acstar's New Hampshire surety bond be called upon; and

(iv) the Missouri Acstar Fund:  the letter of credit proceeds held by Acstar to secure any obligation Prime Missouri may have to Acstar should Acstar's Missouri surety bond be called upon.

## III.    The Bankruptcy Proceedings

Irving, Prime Maine, and Prime Missouri filed petitions for relief under chapter 11 of the Bankruptcy Code on November 16, 2010; Prime Delaware, Wismo, and Cudahy did the same on December 30, 2010.  The six bankruptcy cases were jointly administered.  During the cases, the Debtors ceased their remaining operations and terminated their remaining employees.

On May 11, 2011, the Debtors filed a motion with the bankruptcy court to establish a bar date (the "Self-Insurance Claims Bar Date") by which each former employee of the Debtors, or any state agency or entity, issuer of surety bonds, multi-employer group or cooperative, or other party or entity, who holds or asserts a workers' compensation or related claim (a "Self-Insurance Claim"), arising from, and to the extent allowable, covered by any Debtor's pre-existing workers' compensation self-insurance program, must file a proof of claim with respect to the Self-Insurance Claim.  The court granted the motion and established September 19, 2011, as the Self-Insurance Claims Bar Date.  The bar date order further provided:  "Any person or entity that is

11

required to file a timely Self-Insurance Claim and who fails to do so on or before the Self-Insurance Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors (or filing a proof of claim or application for payment of administrative claim with respect thereto)."

On November 22, 2011, the Debtors filed the Plan, a joint liquidating plan.[6]  As set forth primarily in its sections 5.3 and 8.3, the Plan has the following relevant features.

First, it requires that the Self-Insurance Funds be turned over to the Debtors.[7]  Pursuant to section 5.3, the order confirming the plan would expressly order the holders of the Self-Insurance Funds to turnover the Self-Insurance Funds to the Debtors.

Second, the Plan would require the Debtors to place a portion of the Self-Insurance Funds in an escrow account, the Self-Insurance Claims Escrow.  The amount to be placed in escrow would be the total of: (i) the amounts of all Self-Insurance Claims to which the Debtors do not object; and (ii) the bankruptcy court-estimated amounts of all Self-Insurance Claims to which the Debtors do object.  These latter claims would be estimated by the bankruptcy court pursuant to § 502(c) for the limited purpose of determining the amount to be placed in escrow, not for purposes of adjudicating the claims.[8]

---

[6]  Notwithstanding its filing date and liquidating nature, the Plan is entitled "Debtors' Plan Of Reorganization Dated November 14, 2011."

[7]  The Plan is internally inconsistent about timing.  Paragraph 5.3 states that turnover would be required "[o]nce such claims are allowed and/or estimated."  Paragraph 8.3 states that turnover shall be made "within thirty (30) days after the Confirmation Date."

[8]  The Plan does not specify how disputed Self-Insurance Claims would be adjudicated.  In his Memorandum of Opinion, the bankruptcy judge indicated that at the confirmation hearing, "the Debtors agreed that workers' claims filed prior to the bar date would be adjudicated in state proceedings, subject to bankruptcy jurisdiction."  In their brief on appeal, the Debtors attempted to clarify: "such claims would be liquidated in accordance with state law processes and procedures, whereas the Bankruptcy

Third, the Plan provides that allowed Self-Insurance Claims shall be paid from the Self-Insurance Claims Escrow and that the Self-Insurance Claims Escrow shall constitute the sole source of payment of all Self-Insurance Claims.[9]  Because the Plan does not state otherwise and the Self-Insurance Claims Escrow may be insufficient to pay all Self-Insurance Claims in full (if for no other reason than that the total estimated amounts of disputed claims might be less than the total adjudicated amounts of those claims), the Plan must be construed as promising distribution of the entire Self-Insurance Claims Escrow among all allowed Self-Insurance Claims on a pro rata basis.[10]  For purposes of the Plan, the term "Self-Insurance Claims" includes, but is not limited to, employee claims for workers' compensation; it includes:

> any claims filed against any Debtor and arising out of or related to a self-insurance plan or program for workers compensation, including . . . without limitation, any claims of Acstar, another issuer of surety bonds, any state agency or entity or any multiemployee cooperative or plan, including, without limitation, the Maine Self Insurance Guarantee Association, the Missouri Private Sector Individual Self-Insurers Guaranty Corporation, and the Missouri Department of Labor.

---

Court would properly retain jurisdiction over distribution on, and final allowance of, such claims."

[9]  The Plan creates three classes of Self-Insurance Claims -- one for the Self-Insurance Claims against Irving, another for those against Prime Maine, and another for those against Prime Missouri – and with respect to each such class provides that the claims therein "will be satisfied in accordance with Section 5.3 of the Plan."  Section 5.3 does not expressly provide for the payment of any claim, but it does provide for the creation of the Self-Insurance Claims Escrow, and, in its definitional section, the Plan specifies that "Self-Insurance Claims Escrow" shall mean "the escrow account funded from Self-Insurance Funds to pay, or secure the payment of (if allowed), Allowed or estimated Self-Insurance Claims, as set forth in Article V of the Plan."  Section 8.3 states: "any and all holders of Self-Insurance Claims shall look solely to the Self-Insurance Claims Escrow for the satisfaction of Self-Insurance Claims."

[10]  By combining the Self-Insurance Funds of three different Debtors into a common escrow account from which all claims are paid without regard to the Debtor against whom they are asserted, this effects a limited substantive consolidation of the estates of the three Debtors.

Therefore, the Plan effectively reduces to equal priority employee claims for workers'

compensation and other claims of a different nature, including claims of entities whose duty it

was to guarantee or fund payment of the employee claims.

Fourth, the Plan states that the excess Self-Insurance Funds – that is: (i) the Self-

Insurance Funds that are not placed in the Self-Insurance Claims Escrow; and (ii) any excess

from the Self-Insurance Claims Escrow upon satisfaction of all Allowed Self-Insurance Claims –

"shall be distributed in accordance with the Jupiter-Meriturn Compromise and the Plan." The

formulation "in accordance with the Jupiter-Meriturn Compromise and the Plan" is ambiguous;

the Plan does not specify how the excess Self-Insurance Funds would be distributed. If the

excess Self-Insurance Proceeds are "Residual Assets" as that term is used in the Plan, they will

be transferred to a liquidating trust for the benefit of the Debtors' general unsecured creditors.

According to the Debtors' disclosure statement for the Plan, the Jupiter-Meriturn Compromise is

an approved settlement agreement between the Debtors and two secured creditors under which:

(i) the Debtors agreed "that Jupiter would receive 85%, and the Debtors would receive 15%, of

net liquidation proceeds from the liquidation of the Debtors' remaining assets"; and (ii) the

Debtors further agreed to seek to facilitate the turnover of the Self-Insurance Funds.

Fifth, in what the Debtors label the "Self Insurance Claims Channeling Injunction," the

Plan would permanently enjoin all holders of Self-Insurance Claims from seeking satisfaction of

their Self-Insurance Claims from any entity or property other than through the Plan from the Self-

Insurance Claims Escrow. To that end, the channeling injunction would permanently enjoin the

commencement or continuation of any action or other proceeding against any Debtor and, more

to the point, against any bond, fund, letter of credit or private or governmental association,

14

agency, or entity with respect to the Self-Insurance Claims, or any property thereof or collateral

therefor.  This injunction would permanently abate and enjoin the prosecution of all claims

against entities that would be liable with the Debtors for the claims in question.  It would

expressly and permanently bar "claims against any relevant state or multiemployer self-insurance

fund, guaranty association, back-up fund or program, and against any surety bond, or cash

collateral transfer including the New Hampshire Acstar Surety Bond and the Missouri Acstar

Surety Bond."  Moreover, it would expressly terminate all such surety bonds upon transfer of the

Self-Insurance Funds to the Debtors under the Plan.

Sixth, the Plan provides that its confirmation would discharge the Debtors from all

Claims arising before the Confirmation Date, except as the Plan expressly provides otherwise.

Each of the Appellees objected to confirmation of the Plan, opposing principally both the

Plan's proposed use of the Self-Insurance Funds and its channeling injunction.  The Appellees

argued that the Self-Insurance Provisions contradicted, and would impermissibly supersede or

preempt, applicable state law governing payment of workers' compensation claims, the guaranty

by quasi-governmental entities of the payment of those claims, and the recovery by self-insuring

employers of excess security for the self-insurance obligations.  The Appellees also asserted that

the Debtors' interest in the Self-Insurance Funds was limited to a "chose in action" to recover

any surplus that may remain after all actual and potential workers' claims have been satisfied

under state law, and that the Self-Insurance Funds themselves are not property of the Debtors'

bankruptcy estates under § 541(a) and therefore may not be appropriated for use in the Plan.  The

Maine Superintendent of Insurance also opposed confirmation on the further basis that under

§ 1141(d)(3), the Debtors are not entitled to a discharge because this is a liquidating plan.

At a confirmation hearing on February 2, 2012, the bankruptcy court concluded that the

Debtors had met their burden of establishing all the requirements for confirmation under

§ 1129(a) that were not implicated by the Appellees' challenges relating to the use of the Self-

Insurance Funds.  With respect to the Appellees' objections, the bankruptcy court held a

continued confirmation hearing on February 28, 2012, during which the Appellees and the

Debtors proffered actuarial and other evidence on the scope, extent, and value of the universe of

actual and potential Self-Insurance Claims.  The Debtors presented evidence showing that the

sum of all Self-Insurance Claims to be paid would leave a surplus of Self-Insurance Funds that

could be used for general distribution under the Plan.  Their showing was based upon the sum of

all Self-Insurance Claims filed prior to the Self-Insurance Claims Bar Date and did not take state

law into account.  The Appellees countered with evidence showing that there would be no

surplus.  Their demonstration was premised upon applicable state law without consideration of

the Self-Insurance Claims Bar Date.

On August 28, 2012, the bankruptcy court entered an order (the "August 28 Order")

denying confirmation of the Plan "without prejudice" and permitting the Debtors to file an

amended plan within 28 days.[11]  In its accompanying decision, the bankruptcy court stated:

> At issue are the portions of the Plan relating the use of assets (the
> "Self-Insurance Funds") sequestered by the Debtors under the
> self-insurance provisions of the laws regulating workers' compensation

---

[11]  The August 28 Order provided, in relevant part:

> For the reasons set forth in the Memorandum of Opinion dated August 28, 2012,
> confirmation is DENIED without prejudice.  Debtors may file an amended plan
> of reorganization within 28 days of this order.  If Debtors fail to file an amended
> plan of reorganization within 28 days, or as otherwise ordered by the court, this
> order shall become final.

claims in Missouri and Maine.  These provisions allow the Debtors to (a) satisfy workers' claims under the Plan, (b) use the Self-Insurance Funds for general distribution, and (c) protect those charged with satisfying workers' claims under state law with an injunction (the "Self-Insurance Channeling Injunction").

In evaluating those portions of the Plan, the bankruptcy court determined that the primary question was "whether the Debtors had a property interest in excess Self-Insurance Funds upon the commencement of these cases."  Applying state law, the bankruptcy court found that the Debtors did not have a right to immediate turnover of the Self-Insurance Funds but rather had merely a "chose in action" to recover excess Self-Insurance Funds in accordance with state law.  The bankruptcy court reasoned that because the Self-Insurance Funds were beyond the immediate reach of the Debtors, the Plan would be short of cash.  Therefore, the bankruptcy court concluded that the plan did not satisfy the "feasibility requirement" in § 1129(a)(11) and denied confirmation.  The Debtors timely filed a notice of appeal with respect to the August 28 Order and elected to proceed to the district court.

On September 25, 2012, the Debtors filed their First Amended Plan of Reorganization Dated September 25, 2012 (the "Amended Plan").  The Amended Plan differs from the Plan by eliminating from it the self-insurance provisions; under the Amended Plan, the Debtors would gain access to the Self-Insurance Funds only in accordance with applicable state law.  However, the Amended Plan also provides that if the Debtors prevail on their appeal from the order denying confirmation of the Plan and the Plan is deemed confirmable, then the terms of the Amended Plan will be identical to those of the original Plan.  The Amended Plan also provides

that, during the pendency of the appeal, the Self-Insurance Funds would be handled, and all Self-

Insurance Claims would be administered and paid, in accordance with applicable state law and

procedures.

On September 28, 2012, prior to any hearing on the Amended Plan, the bankruptcy court

entered an order stating that it would take no action on the Amended Plan while the appeal was

pending. Then, at a hearing on October 12, 2012, the bankruptcy court stated that the August 28

Order was interlocutory and that, following the Debtors' withdrawal of the appeal, it would enter

a final order denying confirmation of the Plan that could then be appealed by the Debtors, and the

bankruptcy court would consider confirmation of the Amended Plan. Thereafter, the Debtors

filed a motion to withdraw the appeal without prejudice, which the court granted.

The bankruptcy court held another confirmation hearing on October 18, 2012. At the

conclusion of the hearing, the bankruptcy court entered a final order denying confirmation of the

Plan (the "Order Denying Confirmation")[12] and another order confirming the Amended Plan.

The Debtors then filed a notice of appeal of the Order Denying Confirmation.

## <u>JURISDICTION</u>

Before addressing the merits of an appeal, the Panel must determine that it has

jurisdiction, even if the issue is not raised by the litigants. See Boylan v. George E. Bumpus, Jr.

Constr. Co. (In re George E. Bumpus, Jr. Constr. Co.), 226 B.R. 724 (B.A.P. 1st Cir. 1998). The

---

[12] The Order Denying Confirmation provided:

> For the reasons set forth in the Memorandum of Opinion dated August 28, 2012
> [Docket No. 597], confirmation of the Debtors' Plan of Reorganization Dated
> November 14, 2011 [Docket No. 447] is denied. In accordance with this Court's
> statements on the record of the October 12, 2012 hearing, this order shall be
> deemed a final order for purposes of 28 U.S.C. § 158(a)(1).

Panel has jurisdiction to hear appeals from: (1) final judgments, orders and decrees; or (2) with

leave of court, from certain interlocutory orders.  28 U.S.C. § 158(a); Fleet Data Processing

Corp. v. Branch (In re Bank of New England Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998).

A decision is considered final if it "ends the litigation on the merits and leaves nothing for the

court to do but execute the judgment," id. at 646 (citations omitted); a decision is interlocutory if

it "only decides some intervening matter pertaining to the cause, and . . . requires further steps to

be taken in order to enable the court to adjudicate the cause on the merits."  Id. (quoting In re

American Colonial Broad. Corp., 758 F.2d 794, 801 (1st Cir. 1985)).

      Generally, an order denying confirmation of a proposed plan is not a final order because

debtors are usually free to propose an alternate plan.  See Coffin v. eCast Settlement Corp. (In re

Coffin), 435 B.R. 780, 784 (B.A.P. 1st Cir. 2010); Hamilton v. Wells Fargo Bank, N.A. (In re

Hamilton), 401 B.R. 539 (B.A.P. 1st Cir. 2009); Watson v. Boyajian (In re Watson), 309 B.R.

652, 659 (B.A.P. 1st Cir. 2004), aff'd, 403 F.3d 1 (1st Cir. 2005).  Where an alternative plan has

been confirmed, however, an order denying confirmation of a prior plan may be considered on

appeal.  See Zahn v. Fink (In re Zahn), 526 F.3d 1140, 1142-1143 (8th Cir. 2008) (stating that

bankruptcy court's rejection of debtor's proposed plan may be considered on appeal after final

judgment either confirming an alternative plan or dismissing the underlying proceeding); see also

Broken Bow Ranch, Inc. v. Farmers Home Admin. (In re Broken Bow Ranch, Inc.), 33 F.3d

1005, 1008 (8th Cir. 1994) (concluding that order denying confirmation is interlocutory until

either a modified plan is confirmed, or the bankruptcy case is dismissed) (citation omitted).  As

the bankruptcy court has confirmed the Amended Plan, the Panel has jurisdiction to hear this

appeal of the Order Denying Confirmation.

## STANDARD OF REVIEW

Appellate courts apply the clearly erroneous standard to findings of fact and *de novo*

review to conclusions of law. See Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 592 F.3d

267, 269 (1st Cir. 2010). Here, the Debtors appeal the bankruptcy court's determination that the

Plan was not feasible. "'Feasibility is a factual determination and the bankruptcy court's

decision will not be disturbed absent a firm conviction that clear error has been committed.'"

Kristan v. Nesbit (In re Nesbit), BAP No. EP 07-068, 2008 Bankr. LEXIS 3957, *9 (B.A.P. 1st

Cir. Jun. 17, 2008) (quoting First Nat'l Bank of Boston v. Fantasia (In re Fantasia), 211 B.R. 420,

422-23 (B.A.P. 1st Cir. 1997)); see also Federal Nat'l Mortgage Ass'n v. Ferreira (In re Ferreira),

223 B.R. 258, 262 (D.R.I. 1998) (citing Peerless Ins. Co. v. Rivera, 208 B.R. 313, 315 (D.R.I.

1997)). The bankruptcy court's consideration of the Plan's feasability turned on the issue of

whether the Self-Insurance Funds constituted property of the Debtors' bankruptcy estate.

Generally, the question of whether property is included in the bankruptcy estate is one of law

subject to *de novo* review. See City of Springfield v. Ostrander (In re LAN Tamers, Inc.), 329

F.3d 204, 209 (1st Cir. 2003) (citations omitted); Ostrander v. Lalchandani (In re Lalchandani),

279 B.R. 880, 883 (B.A.P. 1st Cir. 2002). We may affirm the decision of the bankruptcy court

on "any independently sufficient grounds made manifest by the record" as it existed before the

bankruptcy court. Rockwood v. SKF USA, Inc., 687 F.3d 1, 9 (1st Cir. 2012); Torres-Rosado v.

Rotger-Sabat, 335 F.3d 1, 13 (1st Cir. 2003) (holding that appellate court may affirm the decision

of the bankruptcy court order "on any basis that is manifest in the record."); Hann v. Educ. Credit

Mgmt. Corp. (In re Hann), 476 B.R. 344, 360 n.16 (B.A.P. 1st Cir. 2012) (quoting

20

Baybank-Middlesex v. Ralar Distribs., Inc., 69 F.3d 1200, 1202 (1st Cir. 1995) (citation

omitted)).

## DISCUSSION

### I.      Arguments of the Parties

On appeal, the Debtors argue that the bankruptcy court erred in denying confirmation of

the Plan because: (i) the Plan satisfies § 1129(a)(11) as a matter of law; (ii) § 1123(a)(5)

preempts otherwise applicable nonbankruptcy law and therefore permits the Debtors to include in

their Plan provisions for disposition of the Self-Insurance Funds *notwithstanding that those*

*provisions violate state law*; (iii) the nature of the Debtors' interests in excess Self-Insurance

Funds is irrelevant to the preemptive effect of the Self-Insurance Provisions under § 1123(a)(5);

(iv) insofar as the Debtors may need an interest in the Self-Insurance Funds in order to justify

their recourse to the preemptive authority afforded by § 1123(a)(5), the Debtors have contingent

interests in their respective Self-Insurance Funds, and those interests are property of their

bankruptcy estates; and (v) even if the Debtors' interests are mere "choses in action," as the

bankruptcy court held, such limited interests are property of the Debtors' estates and enable the

Debtors under § 1123(a)(5) to employ the challenged features of the Plan.  Though the Debtors

dispute the bankruptcy judge's conclusion that their interests in the Self-Insurance Funds are

mere "choses in action" and not property interests, they concede that such interests as they do

have are unmatured and contingent, and that they therefore have no present right to dispose of the

funds in question.  They concede that unless § 1123(a)(5) preempts the state law rights of the

Appellees in the Self-Insurance Funds, they may not presently reach and distribute the funds, and

the Plan may not be confirmed.

21

The Appellees collectively respond with the following defenses of the order denying

confirmation: (i) the Bankruptcy Court correctly held that the Plan did not satisfy the feasibility

requirement in § 1129(a)(11); (ii) if confirmation is not barred by § 1129(a)(11), the Plan fails

because, where the Plan proposes to appropriate property rights that are not the Debtors', it

violates both § 1129(a)(1) (requiring that a plan comply with the applicable provisions of the

Bankruptcy Code) and § 1129(a)(3) (requiring that the plan have been proposed not by any

means forbidden by law); (iii) the Debtors cannot alter the scope of their interests in the Self-

Insurance Funds per force of § 1123(a)(5); (iv) the Self-Insurance Funds are not property of the

Debtors or of their bankruptcy estates and not subject to the jurisdiction of the bankruptcy court;

(v) whatever interests the Debtors may have in the funds in the Vista Trust and in the Maine

Fund are subject to state law restrictions on transfer that § 541(c)(2) expressly makes enforceable

in a bankruptcy case, effectively prohibiting the Plan's proposed appropriation of these funds;

and (vi) the channeling injunction, a discharge of third-party liability, is impermissible and would

violate constitutional due process as applied to latent claims for injuries that have not yet

manifested themselves.

## II.    Overview of the Panel's Decision

As set forth below, we agree with the bankruptcy court that the Debtors' interest in each

of the Self-Insurance Funds was limited to a contingent and unmatured future interest or a right

to recover any surplus after the payment of all worker's compensation claims, when and as

permitted by state law; indeed, we do not understand the Debtors to contend otherwise.  As the

Debtors argue, however, this Plan does not violate § 1129(a)(11) because the cited infeasibility is

one that the Plan itself, if confirmed, would overcome – by simply compelling what state laws

would otherwise prohibit.  Rather, the Plan cannot be confirmed because it would violate state

self-insurance and property laws that, in rejection of the Debtors' position, we conclude

§ 1123(a)(5) does not permit the Debtors to overwrite.

## III.    Requirements of Plan Confirmation

Requirements for confirmation of a chapter 11 plan are enumerated principally in

§ 1129(a) and also, through subsection (a)(1) (requiring that a plan comply with applicable

provisions of the Bankruptcy Code) in, among other sections of the Bankruptcy Code, § 1123(a)

(specifying what a plan "shall" do).  A plan proponent has the burden of proving by a

preponderance of the evidence that the plan satisfies the applicable requirements.  See In re

Salem Suede, Inc., 219 B.R. 922, 932 (Bankr. D. Mass. 1998).

### A.    Subsection 1129(a)(11)

The bankruptcy court found that the Plan met each requirement for confirmation except

that in § 1129(a)(11), known as the "feasibility" requirement.  It requires as a condition of

confirmation that the plan "is not likely to be followed by liquidation, or the need for further

financial reorganization . . . unless such liquidation or reorganization is proposed in the plan."

11 U.S.C. § 1129(a)(11).  The bankruptcy court reasoned that, where the Debtors' bankruptcy

estates had no property interest in the Self-Insurance Funds, only "choses in action" to recover

any surplus that may remain after workers' claims have been satisfied to the extent required by

state law, the Appellees could not be compelled to turnover their respective Self-Insurance

Funds, and therefore the Plan would be underfunded and not feasible.

The Debtors argue that the court erred in finding in § 1129(a)(11) a barrier to

confirmation.  Among the arguments they advance for this conclusion, the simplest is that the

cited infeasibility is one that the Plan itself, if confirmed, would overcome by simply compelling

what state laws would otherwise prohibit.  In response, the Appellees contend that the

determination of infeasibility was correct but offer no justification for that position or answer to

this particular argument.  We agree with the Debtors, and indeed it is undisputed, that the Plan, if

confirmed, would require and compel turnover of the funds.[13]  The Plan itself would thereby

overcome the difficulty on which the determination of infeasibility was predicated.  Monarch

Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 983-84 (1st Cir. 1995) (confirmation order that

enjoined actions against third parties has preclusive effect notwithstanding that bankruptcy court

jurisdiction to enter third-party injunctions is unclear); 11 U.S.C. § 1142(a).  Therefore, and

without need to address the Debtors' other arguments as to subsection (a)(11), we conclude that

this subsection does not bar confirmation of the Plan.

### B.      Means Forbidden by Applicable Nonbankruptcy Law

In the alternative, the Appellees argue, as they did below, that confirmation is nonetheless

barred by § 1129(a)(3).[14]  In relevant part, § 1129(a)(3) requires as a further condition of

confirmation that "[t]he plan [have] been proposed . . . not by any means forbidden by law."

11 U.S.C. § 1129(a)(3).  The Appellees contend that the Plan is proposed by means forbidden by

---

[13]   At § 8.3, the Plan would require turnover: "In furtherance of the Plan and this injunction,
Acstar, the Missouri Guaranty Association, the MS[I]GA, the Treasurer of the State of Maine, the
Missouri Department of Labor and any other person, entity or agency holding Self-Insurance Funds, shall
within thirty (30) days after the Confirmation Date, turnover to the Debtors all Self-Insurance Funds."  At
§ 5.3, the Plan further specifies that "the Confirmation Order shall provide that the Self-Insurance Funds
shall be turned over to the Debtors . . ."  Plan, at § 5.3.

[14]   The Appellees also argue that the Plan fails under § 1129(a)(1), but the parties' arguments
under § 1129(a)(3) are the more developed on appeal and, unlike those under subsection (a)(1), were
addressed to a large extent by the bankruptcy court.  Finding the arguments under (a)(3) dispositive, we
need not reach those under (a)(1).

applicable nonbankruptcy law in at least two respects: first, in violation of state property and self-insurance laws, the Plan would appropriate for distribution to creditors certain interests in property that are not the Debtors', especially the interests of Acstar, the Vista Trust, and the Maine authorities in their respective Self-Insurance Funds; and second, by the Self-Insurance Claims Channeling Injunction, the Plan would, in violation of state self-insurance laws, (i) discharge the liability of third parties and their property for debts of the Debtors, and (ii) accelerate the deadline for the filing of workers' compensation claims against those third parties. Conceding that these are means forbidden by state laws, the Debtors contend that this fact is not a barrier to confirmation because § 1123(a)(5) requires a debtor to provide adequate means for the plan's implementation and dictates that the chosen means shall preempt any otherwise applicable nonbankruptcy law; the means employed in the Plan do not contravene state law because, by operation of § 1123(a)(5), they automatically supersede and effectively neutralize otherwise applicable law.

For reasons set forth below, we agree with the Appellees that a plan must comply with those applicable nonbankruptcy laws that are not preempted by the Bankruptcy Code, but we do not construe § 1129(a)(3) as the source of that mandate. Section 1129(a)(3) focuses not on the terms of the plan and its means of implementation but on the manner in which the plan "has been proposed." 11 U.S.C. § 1129(a)(3) (emphasis added); In re Buttonwood Partners, Ltd., 111 B.R. 57, 59 (Bankr. S.D.N.Y. 1990) ("it must be construed that the term 'means forbidden by law' subsumes some conduct in connection with obtaining confirmation of such proposal"); In re Sovereign Group, 1984-21 LTD, 88 B.R. 325 (Bankr D. Colo. 1988) (purpose of § 1129(a)(3) is to insure that proposal of plan be done not in a way forbidden by law; its focus is on the conduct

25

manifested in obtaining the votes for confirmation); 7 <u>Collier on Bankruptcy</u>, ¶ 1129.02[3][b],

1129-28 (16th ed. 2013) ("the statute requires denial of confirmation if the plan is 'proposed' by

'forbidden' means").  Courts from time to time, without discussion, construe subsection (a)(3) to

require conformity of the *terms* of the plan to applicable nonbankruptcy law, but we are aware of

none that have expressly squared that understanding with subsection (a)(3)'s express focus on the

manner of the plan's *proposal*.  The Appellees, whose gripe is with the substance of the Plan,

have alleged no fault in the manner in which the Debtors have proposed it or attempted to obtain

its confirmation.  Subsection (a)(3) is therefore not implicated.

Nonetheless, a plan must comply with those applicable nonbankruptcy laws that are not

preempted by the Bankruptcy Code.  To be sure, the Bankruptcy Code preempts otherwise

applicable laws in many ways, especially concerning the adjustment of the debtor-creditor

relationship, but as the discussion of § 1123(a)(5) below concludes, that preemption is not

thoroughgoing but limited, even in § 1123(a)(5).  The preemptive "notwithstanding" clause in

§ 1123(a) that is at the center of this controversy speaks of "otherwise applicable nonbankruptcy

law."  11 U.S.C. § 1123(a) ("Notwithstanding any otherwise applicable nonbankruptcy law, a

plan shall . . . .").  Implicit in this phrase is a recognition that unless preempted by the

Bankruptcy Code, otherwise applicable nonbankruptcy law remains "applicable."  That is, it

remains binding, even in the crafting of a plan.  Indeed, the preemptive language on which the

Debtors rely would be unnecessary were this not the case.  The real question here is the scope of

preemption in § 1123(a)(5), to which we now turn.

26

### 1.      Preemption in § 1123(a)(5)[15]

Section 1123(a) of the Bankruptcy Code is mandatory in nature, specifying what a plan

"shall" do.  11 U.S.C. § 1123(a).  Among other things, it requires that a plan designate classes of

claims, specify which are impaired, and specify the treatment of any that are not impaired.  11

U.S.C. § 1123(a)(1)-(3).  Of most immediate concern, in subsection (a)(5), it also mandates that

the plan "provide adequate means for the plan's implementation," § 1123(a)(5), and supplies a

nonexhaustive list of such means of implementation, § 1123(a)(5)(A)-(J).  And it specifies that

the plan shall do all of these things "[n]otwithstanding any otherwise applicable nonbankruptcy

law."  11 U.S.C. § 1123(a) ("Notwithstanding any otherwise applicable nonbankruptcy law, a

plan shall . . . .").

The Plan's means of implementation violate "otherwise applicable nonbankruptcy law" in

at least three ways.  First, in violation of state property and self-insurance laws, the Plan would

appropriate for distribution to creditors certain interests in property that are not the Debtors': the

interests of Acstar, the Vista Trust, and the Maine authorities in their respective Self-Insurance

Funds.  As to these, the Debtors' "interests"—"choses in action," property interests, or statutory

or contractual rights to repayment, whatever they are and however they may be

characterized—are at present only contingent and unmatured.  This is essentially what the

bankruptcy judge decided, and the Debtors do not dispute it.  Yet the Plan would treat these

claims as if they were matured and absolute, treat future rights as if they were present rights, in

violation of the state law rights of Acstar, the Vista Trust, and the Maine authorities, all holders

---

[15]   In relevant part, § 1123(a)(5) states:  "[n]otwithstanding any otherwise applicable
nonbankruptcy law, a plan shall—(5) provide adequate means for the plan's implementation."  11 U.S.C.
§ 1123(a)(5).

of the present property interests in their respective Self-Insurance Funds. Second, by the Self-Insurance Claims Channeling Injunction, the Plan would, in violation of state self-insurance laws, discharge the liability of third parties and their property for debts of the Debtors. And third, also by the Self-Insurance Claims Channeling Injunction, the Plan would, in violation of state self-insurance laws, accelerate the deadline for the filing of workers' compensation claims against those third parties. The Debtors argue that the Self-Insurance Claims Bar Date Order already accomplished this third, but the Bar Date Order accelerated only claims against the Debtors, and we see no reason to read it more broadly.[16]

Conceding that the Plan employs means forbidden by state laws, the Debtors contend that the Plan may nonetheless be confirmed because, by its "notwithstanding" clause, § 1123(a) dictates that the chosen means shall preempt any otherwise applicable nonbankruptcy law. The means employed in the Plan do not contravene state law, they contend, because, by operation of § 1123(a)(5), the specified means automatically supersede and effectively neutralize any otherwise applicable law.

By this reading, § 1123(a) would expressly preempt any nonbankruptcy law that, but for the preemption, would either prevent a plan proponent from doing the various things that § 1123(a) mandates or, more specifically, prevent a proponent from employing such adequate means of implementation as, pursuant to subsection (a)(5), the proponent incorporates into its

---

[16] Whether state law would treat this abatement as effectively also abating claims against third-parties is another matter (one we need not resolve); but if and to the extent that state law does so abate claims against third parties, it would be unnecessary for the Plan also to do so. We note moreover that a discharge in bankruptcy makes debts unenforceable but does not purport to nullify them. 11 U.S.C. § 524(a). Nor, with limited exception, does it affect the liability of any non-debtor party for discharged debts. 11 U.S.C. § 524(e).

28

plan. Subject to reservations about the scope of the preemption thus effected, the U.S. Court of Appeals for the Third Circuit has persuasively construed the "Notwithstanding" clause in § 1123(a) in this manner. In re Federal-Mogul Global, Inc., 684 F.3d 355, 374 (3d Cir. 2012) ("Federal Mogul"). "The plain language of § 1123(a) evinces clear congressional intent for a preemptive scope that includes the transactions listed under § 1123(a)(5) as 'adequate means' for the plan's implementation." Id.

In Federal Mogul, the debtor had sought relief under chapter 11 to address overwhelming asbestos liabilities, and its reorganization plan included an asbestos personal injury trust and a § 524(g) injunction. In particular, the debtor sought to assign the proceeds of several of its insurance policies to the trust, but the insurers objected on the grounds that anti-assignment provisions in their policies prevented the assignment. Id. After a careful and thorough review of the relevant statutory text, case law, and legislative history, the Third Circuit held that the Bankruptcy Code expressly preempted state law in that context, stating that: "[t]he plain language of § 1123(a) evinces Congress's clear intent to preempt state law." Id. at 369. The court focused on the statutory phrase "[n]otwithstanding any otherwise applicable nonbankruptcy law," which it believed "'clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions . . . .'" Id. (quoting Cisneros v. Alpine Ridge Group, 508 U.S. 10, 16 (1993)) (further citation omitted).

Other cases that have addressed the issue largely agree that § 1123(a) evinces clear congressional intent for a preemptive scope that includes the transactions listed under § 1123(a)(5) as "adequate means" for the plan's implementation. See Universal Coop., Inc. v. FCX, Inc. (In re FCX), 853 F.2d 1149 (4th Cir. 1988) ("§ 1123(a)(5)(D) overrides nonbankruptcy

law restrictions on the distribution of collateral to satisfy a claim secured by the same [and]

accordingly . . . supersedes the discretionary power over surrender of the patronage certificates

bestowed on [the secured creditor's] board by its by-laws"); In re LandAmerica Fin. Group, Inc.,

470 B.R. 759, 780 (Bankr. E.D. Va. 2012) (§ 1123(a)(5) is an empowering statute that enlarges

the scope of debtor's prebankruptcy rights, such that trustee of liquidation trust created under

confirmed plan had standing to bring claims against corporate debtors' prepetition officers and

directors on behalf of trust, notwithstanding state law that would otherwise restrict assignability

of those claims to trust); Montgomery County, MD  v. Barwood, Inc., 422 B.R. 40, 44 (D. Md.

2009) (§ 1123(a)(5) preempts otherwise applicable nonbankruptcy laws, albeit not those

concerning public health, safety, or welfare); In re Carolina Tobacco Co., 360 B.R. 702, 712 (D.

Or. 2007) (per § 1123(a)(5), noncompliance of plan's escrow payment provisions with state law

did not prevent its confirmation); In re Renegade Holdings, Inc., 429 B.R. 502, 517 (Bankr.

M.D.N.C. 2010) (under § 1123(a)(5), plan provisions that are necessary to implement a plan

preempt and override conflicting state law).  Even the U.S. Court of Appeals for the Ninth

Circuit, which in Pac. Gas & Elec. Co. v. Cal. ex. rel. Cal. Dep't of Toxic Substances Control,

350 F.3d 932 (9th Cir. 2003) ("Pacific Gas"), held that the scope of § 1123(a)'s preemptive effect

extends only to laws relating to financial condition, recognized the "notwithstanding" clause as

preemptive.  Id. at 948.  Courts in the First Circuit have not addressed the issue.  Following

Federal Mogul, we agree that § 1123(a) preempts any nonbankruptcy law that, but for the

preemption, would prevent a proponent from employing such adequate means of implementation

as the proponent incorporates into its plan.

30

This type of preemption is broad and unusual.  It gives preemptive effect not to a

specified provision of federal law but instead to whatever means of implementation a plan

proponent builds into its plan.  This preemption is necessary: routine and unobjectionable

features of chapter 11 plans—among others, the curing of defaults, extension of payment periods,

and payment of claims less than in full—all would be impossible without preemption of state

laws.  Likewise, given the myriad circumstances that chapter 11 is meant to address, the range of

options a plan proponent might legitimately call upon to address them, and the vast panoply of

nonbankruptcy laws a proponent might face in fashioning a plan, the preemption must also be

one of considerable breadth and flexibility.  The language of preemption in § 1123(a)(5) is

accordingly broad: it applies to "any otherwise applicable nonbankruptcy law" and to any means

a proponent might specify, provided only the means are "adequate."

However, for this very reason, § 1123(a)(5) also reads like a debtor's license to rewrite

the law to its liking—in ways far outside the comfort zone inhabited by the unobjectionable

staples of chapter 11 plans and, more to the point, beyond what Congress can plausibly have

intended.  Federal Mogul, 684 F.3d at 364 ("in every preemption case, [t]he purpose of Congress

is the ultimate touchstone").  Freedom from regulation, from taxation, from the laws of property

and contract: these and many other horrible imaginings, preemptive effects that Congress cannot

plausibly have intended, might be justified as conferring an advantage needed to implement a

plan.  Therefore, when they have acknowledged the preemptive effect of § 1123(a)(5), courts

have routinely hastened to add, as do we, that it is not unbounded.  In Federal Mogul, the Third

Circuit stated that "the scope of preemption under § 1123(a) is not unlimited," 684 F.3d at 381,

and "we would find problematic attempts under § 1123(a) to disregard large swaths of state and

federal regulatory schemes." Id.

The challenge in each case is to determine preemption's scope and limits. Even where, as

here, there is a finding of express preemption, the court "must . . . identify the domain expressly

pre-empted by the statutory language." Federal Mogul, 684 F.3d at 369 (internal quotations

omitted) (citing Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996)). To this inquiry we bring the

following principles:

> First, in every preemption case, [t]he purpose of Congress is the
> ultimate touchstone, which primarily is discerned from the
> language of the preemption statute and the statutory framework
> surrounding it, as well as from the structure and purpose of the
> statute as a whole. Second, we begin with a "presumption against
> preemption" rooted in the respect for states as independent
> sovereigns in our federal system. This presumption operates most
> forcefully when Congress legislates in a field which the States have
> traditionally occupied, particularly regulation of matters of health
> and safety. This strong presumption against inferring
> Congressional preemption also applies in the bankruptcy context.
> The presumption may be overcome, however, where a
> Congressional purpose to preempt . . . is clear and manifest.

Federal Mogul, 684 F.3d at 365 (internal quotations and citations omitted). "Even in instances of

express preemption, the presumption in favor of state law applies, requiring us to accept 'a

plausible alternative reading . . . that disfavors preemption.'" Id. at 369 (citing Bates v. Dow

Agrosciences LLC, 544 U.S. 431, 449 (2005)).

## 2.     Limits to § 1123(a)(5) Preemption

Courts that have held § 1123(a)(5) to be preemptive have done so primarily as to anti-

assignment provisions, which are expressly invalidated elsewhere in the Code. See, e.g., Federal

Mogul, 684 F.3d at 371; In re Combustion Eng'g, Inc., 391 F.3d 190, 219 (3d Cir. 2005); In re

32

W.R. Grace & Co., 468 B.R. 81, 158 (D. Del. 2012).  No anti-assignment provisions are at issue here.

     We discern at least three limits to the preemptive reach of § 1123(a)(5) that are relevant to the Plan.  The first is in the language of § 1123(a)(5) itself: otherwise applicable nonbankruptcy law is preempted only as to those specified means that are "adequate . . . for the plan's implementation."  11 U.S.C. § 1123(a)(5).  "Adequate" is not defined in the Bankruptcy Code.  It means "sufficient," "commensurate," or "equal to what is required."  Black's Law Dictionary, p. 39 (6th ed. 1990).  Also, "barely satisfactory or sufficient."  The American Heritage Dictionary, p. 79 (second college ed. 1992).  Therefore, only those means may preempt state law that are sufficient for the implementation of the plan: they must be sufficient to implement the plan, equal to what is required, but also not more than is required.  The requirement of adequacy denies preemptive effect not only to those means that are insufficient but also to those that are superfluous or unnecessary.  The Debtors agree that preemption extends only to means that are necessary.

     Second, as the Debtors further concede, § 1123(a) does not preempt otherwise applicable nonbankruptcy laws that are concerned with protecting public health, safety, and welfare. Federal Mogul, 684 F.3d at 381 (the preemptive scope of § 1123(a) is restricted by long-standing presumption against preemption of state police power laws and regulations rooted in federalism concerns and the historic primacy of state regulation of matters of health and safety, but holding that contractual restriction on assignment of debtor-insured's insurance rights did not implicate public health, safety, and welfare); Montgomery County, 422 B.R. at 47 (§ 1123(a) does not

preempt laws relating to public health and welfare, including county regulations on ownership

and transfer of taxi licenses) and cases cited.

Third, for both statutory and constitutional reasons, the preemptive effect of § 1123(a)

cannot extend to laws defining and protecting the property rights of third parties.  The statutory

reason is found in the list of means that is set forth in § 1123(a)(5), three of which specify that

the plan may incorporate means involving "property of the estate": "retention by the debtor of all

or any part of the property of the estate," § 1123(a)(5)(A); "transfer of all or any part of the

property of the estate to one or more entities," § 1123(a)(5)(B); and "sale of all or any part of the

property of the estate, either subject to or free of any lien, or the distribution of all or any part of

the property of the estate among those having an interest in such property of the estate,"

§ 1123(a)(5)(D).  Though this list is non-exhaustive, its repeated use of "property of the estate"

suggests that insofar as the proposed means might involve disposition of property, the property in

question is limited to property of the estate and does not extend to property of another.  This is

consistent with the long and unremarkable understanding of the courts.  See, e.g., In re Union

Meeting Partners, 160 B.R. 757, 764-67 (Bankr. E.D. Pa. 1993) (denying confirmation of plan on

basis that it proposed to make use of rents as to which creditor had not merely a security interest

but an absolute ownership interest, albeit of limited duration).  Indeed, what the Debtors urge us

to find—a grant of power to appropriate the property of third parties—is so bold and remarkable

a grant that one cannot imagine Congress having inserted it without a clear and specific

indication of such intent.  To find that intent here is to ask too much of the blanket language in

§ 1123(a)'s notwithstanding clause.

34

Constitutional concerns also inform this interpretation. Any interpretation of the preemptive scope of § 1123(a)(5) that permitted plan proponents to appropriate or overwrite the property rights of third parties under applicable nonbankruptcy law would run headlong into constraints and quite possibly outright impediments in the takings clause of the Fifth Amendment. U.S. CONST. amend V ("nor shall private property be taken for public use, without just compensation"); Stop the Beach Renourishment, Inc. v. Florida Dept. of Envtl. Prot., 130 S. Ct. 2592, 2601 (2010) ("though the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing"). Would a plan proponent's appropriation of property rights to facilitate a chapter 11 plan serve a "public use," as the takings clause requires? And does that clause permit the government to permit non-governmental entities to make the taking decision? These significant questions appear to have received no attention in the legislative process by which preemptive language was added to § 1123(a). See Pacific Gas, 350 F.3d at 938-41 (legislative history of notwithstanding clause in § 1123(a)). Even if the takings clause were deemed to permit a private plan proponent to appropriate the property of another for plan purposes, "just compensation" would be a necessary condition of that appropriation, and we would expect some such provision were that subsection intended to be used for preemptively redefining property rights. But § 1123(a)(5) includes no mechanism for just compensation. By way of contrast, § 1129(b)(2)(A) specifies carefully what a plan proponent must do to afford the holder of a security interest its due when a plan proposes to use its collateral without consent. 11 U.S.C. § 1129(b)(2)(A). In short, § 1123(a)(5) and the history of its preemption clause do not begin to address the takings clause concerns that the preemptive language would raise were it construed as

broadly as the Debtors urge, a fact we read as evidence that Congress cannot have intended the preemption of property rights of third parties as defined by applicable nonbankruptcy law.

Each of these limits on preemption applies here.  First, the disputed means of implementation are unnecessary.  A liquidating plan need only liquidate and distribute the assets of the Debtors' estates, whatever they are, and subject to their state law limitations.  Creditors can have no legitimate expectation of anything more.  A plan need not enhance those assets by augmenting the Debtors' property rights at the expense of third parties.  In defending the feasibility of their Plan on appeal, the Debtors themselves argued that the disputed provisions are not essential to the Plan.  Confirmation of the Amended Plan—which is, in essence, the Plan minus the disputed self-insurance provisions—proves the point.

Second, the workers' compensation self-insurance laws of Maine and Missouri are health and safety laws.  They are part of comprehensive regulatory schemes whose purpose is to improve work-place safety and health and to compensate employees for those injuries and illnesses that originate on the job, in part by ensuring the availability of funds for this purpose over a period of each state's determination.  The Plan provisions would, among other things, prematurely terminate the state-law rights of the Debtors' employees to seek compensation from third-party obligors, including for injuries that may yet arise and others whose full effects are not yet manifested.  The affected state laws are not mere "economic" regulations, as the Debtors contend.  To be sure, they affect funds, but, in the case of the Maine Appellees, funds that are held in trust for health purposes, and in the case of the Acstar, funds that are held in conjunction with the self-insurance funding obligations that Acstar might yet incur on the Debtors' behalf.  The "economics" in question are inextricably enmeshed in effectuation of the health and safety

objectives of each state's laws. The Debtors' further argue that the disputed provisions are just as good as the displaced state provisions at serving the states' objectives. This argument is quite beside the point. Where the law in question arises under the police power and concerns health and safety, it simply is not preempted at all. It is not the role of plan proponents and bankruptcy courts to determine the adequacy for state purposes of plan provisions that conflict with state law.

Third, by appropriation of the Self-Insurance Funds, the Plan undisputedly would transgress the state-law property rights of Acstar and the Maine authorities. Whatever the Debtors' rights as to the various Self-Insurance Funds, they undisputedly do not include a present right to dispose of those funds.

For these reasons, we conclude that the preemptive scope of § 1123(a)(5) does not extend to the state laws in question, and therefore that the Plan violates applicable nonbankruptcy law and may not be confirmed.

### C.    Subsection 1129(a)(16)

Section 1129(a)(16) requires, as a condition of confirmation, that "[a]ll transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust." 11 U.S.C. §1129(a)(16). Before the bankruptcy court, the Debtors argued that this subsection did not apply to them because they are for-profit corporations. The bankruptcy judge apparently did not find in this subsection cause to deny confirmation, and no argument has been advanced under this subsection on appeal. Accordingly, we will not decide its application to the facts before us.

Nonetheless, it appears to be directly implicated by the subject matter of the appeal: specifically, by the Plan's requirement that two of the four Self-Insurance Funds, the Maine Fund and the Vista Trust, both being held in trust by Maine authorities, be transferred to the Debtors. Accordingly, to dispel any implication that we have decided otherwise, we note the following. First, subsection (a)(16) contains no obvious limitation to transfers by debtors; on its face, it applies to " all transfers of property under the plan."  Second, the Maine Fund and the Vista Trust would appear on the facts before us to be trusts that are not moneyed, business, or commercial trusts:  they exist solely to serve the non-profit purposes of Maine's workers' compensation laws. Third, subsection (a)(16) would require that the proposed transfers occur, if at all, only as and to the extent permitted by "any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust."  In short, it would expressly preserve the applicability of applicable nonbankruptcy law to these transfers (which further supports our conclusion as to the scope of preemption in § 1123(a)(5)), the applicable laws of Maine would bar the transfers, and subsection (a)(16) would therefore bar confirmation of the Plan.

### D.    Subsection 1129(a)(1)

In the alternative, the Appellees contend that the Plan violates § 1129(a)(1), which requires that "[t]he plan compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).  They contend that the Plan does not comply with the Bankruptcy Code in two ways:  by the Self-Insurance Claims Channeling Injunction, the Plan would, in violation of provisions of § 524 that define and limit the scope of a bankruptcy discharge, discharge the liability of third parties and their property for debts of the Debtors; and in violation of

§ 541(c)(2), the Plan would permit the Debtors to appropriate Self-Insurance Funds in a manner contrary to enforceable state-law restrictions on transfer of those funds.  Neither of these arguments is as developed as that on preemption, and, in view of the ruling above, neither is necessary for disposition of this appeal.  Accordingly, we need not and do not address them.

## CONCLUSION

For the reasons set forth above, we conclude that the Plan would violate applicable nonbankruptcy law and therefore may not be confirmed; accordingly, we **AFFIRM.**